# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PDL BIOPHARMA, INC.<br><br>Plaintiff,<br><br>v.<br><br>ALEXION PHARMACEUTICALS, INC.<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)    Case No.: 07-CV-156-***<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF CHRISTINE WILLGOOS
## IN SUPPORT OF ALEXION'S MOTION TO BIFURCATE AND STAY
## DISCOVERY AND TRIAL OF DAMAGES AND WILLFULNESS ISSUES

I am an associate at Kirkland & Ellis LLP, counsel for Alexion Pharmaceuticals, Inc. ("Alexion"). I submit this declaration in support of Alexion's Motion To Bifurcate And Stay Discovery And Trial Of Damages Issues.

1.    Attached as Exhibit 1 is a true and correct copy of a March 16, 2007 press release by Alexion, titled "FDA Approves Alexion's Soliris™ for All Patients With PNH—First Therapy Approved for This Rare and Life-Threatening Blood Disease".

2.    Attached as Exhibit 2 is a true and correct copy of Defendant Alexion Pharmaceuticals, Inc.'s First Set of Requests for Production of Documents and Things, served July 23, 2007.

3.    Attached as Exhibit 3 is a true and correct copy of PDL Biopharma, Inc.'s First Requests for Production of Documents (Nos. 1-115) To Alexion Pharmaceuticals, Inc., served July 23, 2007.

4.    Attached as Exhibit 4 is a true and correct copy of Defendant Alexion Pharmaceuticals, Inc.'s Rule 26 Initial Disclosures, served on August 6, 2007.

5.    Attached as Exhibit 5 is a true and correct copy of Alexion Pharmaceuticals, Inc.'s Objections and Responses to PDL Biopharma, Inc.'s First Set of Interrogatories, served August 22, 2007.

6.    Attached as Exhibit 6 is a true and correct copy of Defendant Alexion Pharmaceuticals, Inc.'s First Set of Interrogatories, served July 23, 2007.

7.    Attached as Exhibit 7 is a true and correct copy of pages 1, 12, 22, 165, and 189 of Progenics Pharmaceuticals, Inc.'s Form 10-K for the fiscal year ended December 31, 2005.

8.    Attached as Exhibit 8 is a true and correct copy of pages 1, and 54 of Tanox, Inc.'s Form 10-K for the fiscal year ended December 31, 2004.

9.    Attached as Exhibit 9 is a true and correct copy of pages 1, 14, and 76 of BioTransplant, Inc.'s Form 10-K for the fiscal year ended December 31, 2001.

10.    Attached as Exhibit 10 is a true and correct copy of the article, titled "Seattle Genetics Adds Industry Veterans John P. McLaughlin and Daniel G. Welch to its Board of Directors and Promotes Eric Dobmeier to Chief Business Officer", published on July 1, 2007 in Lab Business Week.

11.     Attached as Exhibit 11 is a true and correct copy of the article, titled "Human Genome Sciences reports $62.1M Q1 net loss, provides clinical trials update", published on June 11, 2006 in Aging & Elder Health Week.

I declare under penalty of perjury that the foregoing is true and correct.

Christine Willgoos

September 6, 2007
New York, New York.

3

## CERTIFICATE OF SERVICE

I, Andrew A. Lundgren, hereby certify that on September 6, 2007, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Jack B. Blumenfeld, Esquire
> Karen Jacobs Louden, Esquire
> Morris Nichols Arsht & Tunnell LLP
> 1201 North Market Street
> P.O. Box 1347
> Wilmington, DE 19899-1347

I further certify that on September 6, 2007, I caused a copy of the foregoing document to be served by hand delivery on the above-listed counsel of record and on the following in the manner indicated:

**BY E-MAIL**

> Matthew D. Powers, Esquire
> Vernon M. Winters, Esquire
> John D. Beynon, Esquire
> Weil, Gotshal & Manges LLP
> 201 Redwood Shores Parkway
> Redwood Shores, CA 94065

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Josy W. Ingersoll  (No. 1088)
Andrew A. Lundgren (No. 4429)
1000 West Street, 17th Floor
Wilmington, Delaware  19801
(302) 571-6600
alundgren@ycst.com

*Attorneys for Defendant.*

# Exhibit 1





About Us | Careers | Contact Us

About Us

Management & Board

Careers

Technology Platforms

Product Profiles

Corporate Governance

Investor Relations

**News**

Search

## News

**Contacts:**

| **Alexion Pharmaceuticals, inc.** | **Media** | **Investors** |
|---|---|---|
| Leonard Bell, M.D. | David Patti | Rhonda Chiger |
| Chief Executive Officer | makovsky+Company | Rx Communications group, LLC |
| 203-272-2596 Tel | 212-508-9623 Tel | 917-322-2596 Tel |
| | dpatti@makovsky.com | rchiger@rxir.com |

### FDA Approves Alexion's Soliris(TM) for All Patients With PNH

### - First Therapy Approved for This Rare and Life-Threatening Blood Disease -

CHESHIRE, Conn., March 16 /PRNewswire-FirstCall/ -- Alexion Pharmaceuticals, Inc., (Nasdaq: ALXN) announced today that it has received marketing approval from the U.S. Food and Drug Administration (FDA) for Soliris(TM) (eculizumab). Soliris is the first therapy approved for paroxysmal nocturnal hemoglobinuria (PNH), a rare, disabling and life-threatening blood disorder defined by chronic red blood cell destruction, or hemolysis. Soliris is indicated for the treatment of patients with PNH to reduce hemolysis.

Hemolysis can cause one or more of the following symptoms in patients with PNH: severe anemia, disabling fatigue, recurrent pain, shortness of breath, pulmonary hypertension, intermittent episodes of dark colored urine (hemoglobinuria), kidney disease, impaired quality of life and blood clots (thromboses).(1,2) PNH often strikes people in the prime of their lives, with an average age of onset in the early 30's.(3) The estimated median survival for PNH patients is between 10 and 15 years from the time of diagnosis.(3,4)

Patients with PNH are missing a specific protein that normally protects red blood cells from destruction by a component of the immune system called terminal complement. Soliris, the first complement inhibitor approved in the United States for the treatment of any disease, prevents hemolysis by selectively blocking terminal complement.

"Soliris brings real hope to people who live daily with the devastating effects of PNH. With the approval of Soliris, we now have a therapy that dramatically improves the lives of patients suffering from this disease. Importantly, all patients with this life-threatening disease will be eligible for treatment," said Leonard Bell, MD, chief executive officer of Alexion Pharmaceuticals.

"Soliris directly targets the underlying disease process responsible for debilitating symptoms that may contribute to shortened life spans of PNH patients," said Wendell F. Rosse, MD, Florence McAlister Professor of Medicine Emeritus, Duke University. "Having cared for more than 300 patients with PNH over my career, I believe this is the most important advance that has been

made in the treatment of this disease. Treatment with Soliris markedly decreases the hemolysis responsible for anemia, fatigue, poor patient functioning and blood clots in PNH patients."

Clinical Data

Soliris has proven to be a safe and effective therapy for PNH in three multi-national clinical studies: TRIUMPH, a placebo-controlled 26 week Phase 3 study involving 87 PNH patients,(5) SHEPHERD, an open-label 52 week Phase 3 trial involving 97 PNH patients,(6) and E05-001, a long term extension study.(7)

These studies showed that Soliris reduced hemolysis in every treated patient. Hemolysis was dramatically reduced from a baseline LDH of 2,032 U/L to 239 U/L at week 26 (p<0.001). The reductions in hemolysis occurred within one week of initiating treatment and were sustained for periods of up to 54 months with continued dosing of Soliris. The reduction in hemolysis expands the number of circulating PNH cells and, thereby, increases the hemoglobin level. Hemoglobin stabilization and the number of transfused packed red blood cell units, the pivotal study's co-primary endpoints, were both achieved; half of the Soliris-treated patients achieved hemoglobin stabilization compared with none of the patients in the placebo group, the median number of transfusions was reduced from 10 units/patient to 0 units/patient, respectively (p < 0.001 in both cases). Soliris patients reported less fatigue and improved health-related quality of life. There were fewer thrombotic events with Soliris treatment than during the same period of time prior to treatment.

"The Aplastic Anemia & MDS International Foundation (AA&MDSIF) is extremely pleased that PNH patients now have a treatment specifically for their disease. This is a tremendous step forward for all who suffer from PNH -- and for anyone with bone marrow failure," said Sherrie VanVliet, vice-chairperson, AA&MDSIF, and the mother of a child with aplastic anemia. "We also appreciate that Alexion, in cooperation with the National Organization of Rare Diseases, has established a program to ensure that all patients who need eculizumab have access to it."

"Patients with rare diseases face huge challenges -- first getting a proper diagnosis, then finding effective treatments and access to them," said Abbey Meyers, president, National Organization for Rare Disorders (NORD). "Now that Soliris has been approved, people with PNH will have an effective treatment, and through NORD's PNH Foundation, the uninsured and underinsured will receive help to assure they will have access. This is a sign of hope for others with orphan illnesses, that their needs will one day be met," she added.

Introducing Soliris OneSource(TM)

Alexion also today introduced Soliris OneSource(TM), a treatment support service for all PNH patients and their healthcare providers. Each patient enrolled in the program receives support from an Alexion Case Manager at OneSource. Alexion Case Managers are Registered Nurses and provide education about PNH and Soliris and facilitate solutions to help patients obtain Soliris. Alexion's goal is that all PNH patients who can benefit from Soliris will have access to it. Patients and their health care providers can learn more about OneSource by calling 1-888-SOLIRIS (1-888-765-4747) or visiting www.soliris.net.

Important Safety Information

Soliris is generally well tolerated. The most frequent adverse events observed in clinical studies were headache, nasopharyngitis (a runny nose), back pain and nausea.(8) Treatment with Soliris should not alter anticoagulant management because the effect of withdrawal of anticoagulant therapy during Soliris treatment has not been established.

The product label for Soliris also includes a boxed warning: "Soliris increases the risk of

meningococcal infections. Vaccinate patients with a meningococcal vaccine at least 2 weeks prior to receiving the first dose of Soliris; revaccinate according to current medical guidelines for vaccine use. Monitor patients for early signs of meningococcal infections, evaluate immediately if infection is suspected, and treat with antibiotics if necessary. "Two out of 196 vaccinated PNH patients treated with Soliris experienced a serious meningococcal infection.

Prior to beginning Soliris therapy, all patients and their prescribing physicians will be enrolled in the Soliris Safety Registry which is part of a special risk management program that involves initial and continuing education and long-term monitoring for detection of new safety findings.

Please see full prescribing information at www.soliris.net.

Conference Call Information

Alexion will host a conference call/webcast to discuss FDA approval of Soliris. The call is scheduled for Monday, March 19th at 9:00 a.m., Eastern Time. To participate in this call, dial 913-981-4900, confirmation code 4700435, shortly before 9:00 a.m., Eastern Time. A replay of the call will be available for a limited period following the call, beginning at 12:00 p.m., Eastern Time. The replay number is 719-457-0820, confirmation code 4700435. The audio webcast can be accessed at: www.alexionpharm.com.

About PNH

PNH is an acquired genetic blood disorder defined by hemolysis, in which patients' red blood cells are destroyed by complement, a component of the body's immune system. PNH is a rare disease that affects an estimated 8,000 to 10,000 people in North America and Europe. Ten percent of all patients first develop symptoms at 21 years of age or younger.(2) PNH develops without warning and can occur in men and women of all races, backgrounds and ages. PNH often goes unrecognized, with delays in diagnosis often ranging from one to more than 10 years. PNH has been identified more commonly among patients with diseases of the bone marrow, including aplastic anemia (AA) and myelodysplastic syndrome (MDS). In patients with thrombosis of unknown origin, PNH may be an underlying cause.

Prior to approval of Soliris, there were no therapies specifically available for the treatment of PNH. PNH treatment was limited to symptom management through periodic blood transfusions, non-specific immunosuppressive therapy and, infrequently, bone marrow transplantations -- a high-risk and painful procedure used as a last resort.(2)

About Alexion

Alexion Pharmaceuticals is a biotechnology company working to develop and deliver life-changing drug therapies for patients with serious and life- threatening medical conditions. Alexion's lead product, Soliris(TM) (eculizumab), is indicated for the treatment of paroxysmal nocturnal hemoglobinuria (PNH). Alexion is engaged in the discovery and development of therapeutic products aimed at treating patients with severe disease states, including hematologic diseases, cancer and autoimmune disorders. In September 2006, Alexion applied for marketing authorization with the European Medicines Evaluation Agency for the use of Soliris(TM) (eculizumab) in PNH patients. This press release and further information about Alexion Pharmaceuticals, Inc. can be found at: http://www.alexionpharm.com.

This news release contains forward-looking statements, including statements related to medical benefits and commercial potential of Soliris(TM)(eculizumab), initiation and conduct of the PNH OneSource(TM) treatment support service, and estimates of the number of people living with PNH. Forward-looking statements are subject to factors that may cause Alexion's results and plans to differ from those expected, including requests by regulatory authorities for additional

information following marketing approval, delays in arranging satisfactory manufacturing capability, inability to acquire funding on timely and satisfactory terms, delays in or failure to establish internal sales and marketing capabilities, delays in developing or adverse changes in commercial relationships, the possibility that results of clinical trials are not predictive of the safety and efficacy of Soliris(TM)(eculizumab) when made available to larger number of people, the risk that third parties won't agree to license any necessary intellectual property to us on reasonable terms, the risk that third party payors will not reimburse for the use of Soliris(TM) at acceptable rates or at all, the risk that estimates regarding the number of people living with PNH are inaccurate, and a variety of other risks set forth from time to time in Alexion's filings with the Securities and Exchange Commission, including but not limited to Alexion's Annual Report on Form 10-K. Alexion does not intend to update any of these forward-looking statements to reflect events or circumstances after the date hereof, except when a duty arises under law.

(1) Rother R, Bell L, Hillmen P, Gladwin M. The clinical sequelae of intravascular hemolysis and extracellular plasma hemoglobin. JAMA 2005; 293:1653-1662.

(2) Parker C, Omine M, Richards S, et al. Diagnosis and management of paroxysmal nocturnal hemoglobinuria. Blood 2005; 106:3699-3709.

(3) Socie G, Mary J Yves, de Gramont A, et al. Paroxysmal nocturnal haemoglobinuria: long-term follow-up and prognostic factors. Lancet 1996; 348:573-577.

(4) Hillmen P. Lewis SM, Bessler M, Luzzatto L, Dacie JV. Natural history of paroxysmal nocturnal hemoglobinuria. N Engl J Med 1995; 333:1253- 1258.

(5) Hillmen P, Young N, et al. The Complement Inhibitor Eculizumab in Paroxsysmal Nocturnal Hemoglobinuria. N Engl J Med 2006; 355:1233- 1243.

(6) Young N, Antonioli E, Rotoli B, et al. Safety and efficacy of the terminal complement inhibitor eculizumab in patients with paroxysmal nocturnal hemoglobinuria: SHEPHERD phase III clinical study results. Blood 2006; 108:971.

(7) Hillmen P, Muus P, Duhrsen U, et al. The terminal complement inhibitor eculizumab reduces thrombosis in patients with paroxysmal nocturnal hemoglobinuria. Blood 2006; 108:123.

(8) Soliris(TM) (eculizumab) prescribing information. Alexion Pharmaceuticals, Inc., 2006.

© Copyright and Terms of Use 1999 - 2006 Alexion Pharmaceuticals. All rights reserved. | Update Policy | California Compliance

# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| PDL BIOPHARMA, INC. | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 07-153 *** |
| | ) |
| ALEXION PHARMACEUTICALS, INC. | ) |
| | ) |
| Defendant. | ) |
| | ) |

<u>**DEFENDANT ALEXION PHARMACEUTICALS, INC.'S FIRST SET OF REQUESTS**
**FOR THE PRODUCTION OF DOCUMENTS AND THINGS**</u>

Pursuant to Federal Rule Of Civil Procedure 34, Defendant Alexion

Pharmaceuticals Inc. ("Alexion"), hereby requests that Plaintiff PDL Biopharma, Inc., ("PDL")

produce the documents and things requested below for inspection, copying and/or testing.  The

requested documents and things must be produced within thirty (30) days of the service of these

requests, at the offices of Kirkland & Ellis LLP, Citigroup Center, 153 East 53rd Street, New

York, New York 10022, or at such other time and place as may be mutually agreed upon in

writing by counsel for the parties.

**<u>DEFINITIONS</u>**

1.      As used herein, "PDL" shall mean Plaintiff PDL Biopharma, Inc. and all of its

corporate parents, corporate predecessors and past or present subsidiaries, affiliates, divisions,

departments, officers, directors, agents and employees.

2.      As used herein, "patents-in-suit" shall mean United States Patent Nos. 5,693,761 ("the '761 patent");  5,693,762 ("the '762 patent");  and 6,180,370 B1 ("the '370 patent"); including any corrections.

3.      As used herein, "the European Oppositions" shall mean all proceedings--including those before revocation, during appeal of revocation, and subsequent to appeal of revocation-- before the European Patent Office relating to the European Patent Nos. 0682040 B1 and 0451216 B1.

4.      As used herein, "document" shall have the full meaning ascribed to it by the Federal Rules Of Civil Procedure and shall include any means for retaining or reflecting information.

5.      As used herein, "all documents" shall mean every document within PDL's custody, possession or control, and the custody, possession or control of PDL's attorneys, insurance carriers, representatives, employees, and/or agents, whether an original or copy, as above defined, known to PDL and every such document or writing which PDL can locate or discover by reasonably diligent efforts.

6.      As used herein, "concerning" shall mean relating to, referring to, regarding, describing, evidencing, reflecting, comprising or constituting.

7.      As used herein, "person" means any natural person, corporation, partnership, business, governmental body or entity of any kind.

8.      As used herein, "and" and "or" shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive; use of a singular noun shall be construed to include the plural noun and use of a plural noun shall be construed to include the singular noun; and the use of a verb in any tense shall be construed as the use of that verb in all

other tenses whenever necessary to bring within the scope of the request that which might

otherwise be construed to be outside its scope.

9.     As used herein, the terms "all," "any," "each," and "every" shall each be construed

as both "each" and "every" to bring within the scope of the request all responses which might

otherwise be construed to be outside its scope.

## <u>INSTRUCTIONS</u>

1.     PDL shall construe each request herein independently and not with reference to

any other request for the purposes of limitation.

2.     In addition to original and final versions of documents, PDL shall produce all

drafts, alterations, modifications, changes, and amendments of documents, as well as all copies

not identical to the original in any respect, including any copy bearing non-identical markings or

notations of any kind.

3.     PDL shall produce all documents within its possession, custody or control. This

includes all documents in the possession, custody or control of PDL or any of its personnel,

inasmuch as those documents are available to PDL and can be obtained by PDL for production in

this matter.

4.     If any document requested herein is withheld or redacted on the basis of any claim

of attorney-client privilege, the work product doctrine, or any other applicable privilege or

immunity, PDL shall provide a written statement: (a) describing the nature of the document (e.g.,

letter, memorandum, minutes, telegram, notes, etc.); (b) specifying the date on which the

document was prepared; (c) identifying the person(s) who prepared or authored the document;

(d) identifying the person(s) to whom the document was sent, copied, or shown; (e) setting forth

the subject matter of the document; and (f) stating the privilege or other doctrine pursuant to

which the document is being withheld from production and setting forth the basis for such claim of privilege or immunity from production.

5.     If any document or part thereof called for by this demand has been destroyed, discarded, or otherwise disposed of, PDL shall furnish a list setting forth, as to each document or part thereof: (a) the nature of the document (e.g., letter, memorandum, telegram, etc.); (b) the name, address, occupation, title and business affiliation of each person who prepared, received, viewed and has or has had possession, custody or control of the document; (c) the date of the document; (d) a description of the subject matter of the document; (e) the date of destruction or other disposition; (f) a statement of the reasons for destruction or other disposition; (g) the name, address, occupation, title and business affiliation of each person who authorized destruction or other disposition; (h) the name, address, occupation, title and business affiliation of each person who destroyed or disposed of the document; and (i) the paragraph(s) of this request which call for the production of the document.

## **REQUESTS FOR PRODUCTION**

### **REQUEST FOR PRODUCTION NO. 1:**

All documents and things concerning the patents-in-suit.

### **REQUEST FOR PRODUCTION NO. 2:**

All documents and things disclosed by, claimed by, or relating to any decision, discussion, plan, or consideration to seek patent protection for the subject matter of the patents-in-suit, including but not limited to prior art searches and search results, patentability investigations, and meeting minutes.

**REQUEST FOR PRODUCTION NO. 3:**

All documents and things relating to the preparation, filing, or prosecution of the applications leading to the patents-in-suit, including, without limitation any invention disclosures, drafts of patent applications, notes of examiner interviews, prior art considered but not cited, and all non-identical copies of the file histories of the patents-in-suit.

**REQUEST FOR PRODUCTION NO. 4:**

All documents and things relating to the preparation, filing, or prosecution of any foreign patent or patent application related to any of patents-in-suit, including, without limitation any invention disclosures, drafts of patent applications, notes of examiner interviews, prior art considered but not cited, and all non-identical copies of the file histories.

**REQUEST FOR PRODUCTION NO. 5:**

All documents concerning any communication between PDL and prosecution counsel concerning any part of the patents-in-suit.

**REQUEST FOR PRODUCTION NO. 6:**

All documents concerning any analysis or evaluation of the validity, infringement and/or enforceability of any claim of the patents-in-suit, specifically including all opinions of counsel.

**REQUEST FOR PRODUCTION NO. 7:**

All documents and things relating to testing of any example or disclosure of the patents-in-suit.

**REQUEST FOR PRODUCTION NO. 8:**

All documents and things relating to the conception, reduction to practice, diligence in reducing to practice, research, development, design, testing, modification, and experimental use of the subject matter disclosed or claimed in the patents-in-suit.

**REQUEST FOR PRODUCTION NO. 9:**

All laboratory notebooks, inventor notebooks, research data, analytical data, reports, meeting minutes generated or maintained by or for any of the persons named as inventors at any time during the prosecution of the patents-in-suit that contain any information relating to the subject matter disclosed or claimed in the patents-in-suit or any alleged embodiments of the patents-in-suit.

**REQUEST FOR PRODUCTION NO. 10:**

All documents and things concerning the patentability, scope, or interpretation of the subject matter disclosed or claimed in the patents-in-suit.

**REQUEST FOR PRODUCTION NO. 11:**

All documents and things relating to the first disclosure, first public disclosure, first use, first public use, first offer for sale, first sale, first shipment, first importation, first demonstration, and first test of each embodiment of the subject matter disclosed or claimed in the patents-in-suit, or any product that embodies, implements, falls within the scope of, or is made or used in accordance with an asserted claim of the patents-in-suit.

**REQUEST FOR PRODUCTION NO. 12:**

All documents that discuss, refer to, or evidence any communications regarding the interpretation and/or construction of any terms, elements, or limitations of the claims of the patents-in-suit.

**REQUEST FOR PRODUCTION NO. 13:**

All court decisions relating to the interpretation and/or construction of any terms, elements, or limitations of the claims of the patents-in-suit.

**REQUEST FOR PRODUCTION NO. 14:**

All documents relating to deposition and/or trial testimony relating to the interpretation and/or construction of any terms, elements, or limitations of the claims of the patents-in-suit, including without limitation expert reports and testimony transcripts.

**REQUEST FOR PRODUCTION NO. 15:**

All documents concerning the relevant art or the level of ordinary skill in the art to which PDL contemplates the subject matter of the patents-in-suit pertains as of each of their priority dates.

**REQUEST FOR PRODUCTION NO. 16:**

All minutes, memos, presentations or other records describing or recording meetings at which any of the patents-in-suit is discussed or mentioned.

**REQUEST FOR PRODUCTION NO. 17:**

All documents related to the persons listed as inventors at any time during the

prosecution of the patents-in-suit including but not limited to plans, suggestions, contemplated

actions, or decisions to seek patent protection relating to the subject matter claimed or disclosed

in the patents-in-suit.

**REQUEST FOR PRODUCTION NO. 18:**

All documents relating to declarations in support of PDL during prosecution of the

patents-in-suit, including without limitation, communications between or among PDL, declarant,

and/or prosecution counsel, prior art or other literature searches conducted, and all documents

considered, reviewed or relied upon in preparation of any such declaration.

**REQUEST FOR PRODUCTION NO. 19:**

All documents concerning Dr. Cary Queen, including without limitation, correspondence

between PDL and Dr. Queen, and any notes, memoranda, or meeting minutes.

**REQUEST FOR PRODUCTION NO. 20:**

All documents concerning Dr. Harold Selick, including without limitation,

correspondence between PDL and Dr. Selick, and any notes, memoranda, or meeting minutes.

**REQUEST FOR PRODUCTION NO. 21:**

All documents concerning Dr. Maximilliano Vasquez, including without limitation,

correspondence between PDL and Dr. Vasquez, and any notes, memoranda, or meeting minutes.

**REQUEST FOR PRODUCTION NO. 22:**

All documents concerning Dr. Michael Levitt, including without limitation,

correspondence between PDL and Dr. Levitt, and any notes, memoranda, or meeting minutes.

**REQUEST FOR PRODUCTION NO. 23:**

All documents concerning Mr. Cedric Weisner, including without limitation,

correspondence between PDL and Mr. Weisner, and any notes, memoranda, or meeting minutes

between PDL and Dr. Weisner.

**REQUEST FOR PRODUCTION NO. 24:**

All documents concerning Dr. Chun Nan Chang, including without limitation,

correspondence between PDL and Dr. Chang, and any notes, memoranda, or meeting minutes.

**REQUEST FOR PRODUCTION NO. 25:**

All documents concerning each of the persons named as inventors at any time during the

prosecution of the patents-in-suit including without limitation, correspondence between PDL and

each of the named inventors of the patents-in-suit, and any notes, memoranda, or meeting

minutes.

**REQUEST FOR PRODUCTION NO. 26:**

All documents concerning any testing of any of the inventions described in the patents-

in-suit.

**REQUEST FOR PRODUCTION NO. 27:**

All documents concerning or comprising the prosecution histories of the applications that issued as EP 682040 and EP B1-0 451 216.

**REQUEST FOR PRODUCTION NO. 28:**

All documents concerning or comprising the European Oppositions, whether generated on behalf of PDL or any other party.

**REQUEST FOR PRODUCTION NO. 29:**

All submissions, transcripts, exhibits, demonstrative exhibits, expert declarations, draft expert declarations that were submitted, presented or otherwise generated by or on behalf of PDL during the European Oppositions, including without limitation, documents considered, reviewed or relied on but not cited.

**REQUEST FOR PRODUCTION NO. 30:**

All documents relating to declarations in support of PDL in the European Oppositions, including but not limited to all prior art searches conducted; results and partial results from such prior art searches; and references, literature or authorities consulted.

**REQUEST FOR PRODUCTION NO. 31:**

All documents comprising or concerning the decisions regarding the European Oppositions.

**REQUEST FOR PRODUCTION NO. 32:**

All documents that discuss, describe or refer to any accused Alexion product, including but not limited to any memoranda, emails, letters, notes, recordings in electronic media or other documentation.

**REQUEST FOR PRODUCTION NO. 33:**

All documents concerning any investigation, analysis, study, review, test, research or other mechanism undertaken by or for PDL to determine whether or not Alexion has infringed, is infringing or will infringe any of the patents-in-suit or related patents.

**REQUEST FOR PRODUCTION NO. 34:**

All documents and things relating to any test, comparison or evaluation of any Alexion product accused of infringement, conducted by or at the request of PDL, specifically including opinions of counsel.

**REQUEST FOR PRODUCTION NO. 35:**

All documents concerning the following averment contained in paragraph 3 of PDL's Complaint: "Soliris is projected to be a blockbuster product, with some projecting annual sales of $800 million per year upon launch."

**REQUEST FOR PRODUCTION NO. 36:**

All documents and things identifying products that PDL has sold or offered for sale that relate to the subject matter of the patents-in-suit.

**REQUEST FOR PRODUCTION NO. 37:**

All documents concerning the process, technique, method or approach used to manufacture each element or feature of all PDL products sold or offered for sale that relate to the subject matter of the patents-in-suit.

**REQUEST FOR PRODUCTION NO. 38:**

All documents consulted, referenced in, reviewed, considered, or that otherwise inform the basis for PDL's Complaint in this action.

**REQUEST FOR PRODUCTION NO. 39:**

All documents that PDL contends support, either solely or in combination, its allegations that the patents-in-suit are valid and infringed by Soliris®.

**REQUEST FOR PRODUCTION NO. 40:**

All documents that PDL contends support, either solely or in combination, its allegations that Alexion's infringement of the patents-in-suit is willful.

**REQUEST FOR PRODUCTION NO. 41:**

All documents concerning the following averment contained in paragraph 4 of PDL's Complaint:  "Because this is an exceptional case, PDL is entitled to its attorneys' fees."  *See* Complaint ¶ 4.

**REQUEST FOR PRODUCTION NO. 42:**

All documents supporting, refuting or otherwise concerning PDL's contention that "the relief sought by Alexion is barred in whole or in part by the doctrine of laches." *See* PDL's Answer ¶ 31.

**REQUEST FOR PRODUCTION NO. 43:**

All documents supporting, refuting or otherwise concerning PDL's contention that "the relief sought by Alexion is barred in whole or in part by the doctrine of unclean hands." *See* PDL's Answer ¶ 32.

**REQUEST FOR PRODUCTION NO. 44:**

All documents concerning PDL's allegations that Alexion had actual and constructive knowledge of the patents-in-suit.

**REQUEST FOR PRODUCTION NO. 45:**

All documents concerning PDL's electronic records management policies from the year 1985 to the present.

**REQUEST FOR PRODUCTION NO. 46:**

All documents concerning PDL's policy regarding the retention or destruction of documents from the year 1985 to the present.

**REQUEST FOR PRODUCTION NO. 47:**

All documents comprising any patent policy in effect at PDL at any time since January 1, 1985.

**REQUEST FOR PRODUCTION NO. 48:**

All documents and things concerning any communications or information exchanged between PDL and non-parties to this action that relate to any of the patents-in-suit.

**REQUEST FOR PRODUCTION NO. 49:**

All documents concerning any communication between PDL and any other party concerning Alexion.

**REQUEST FOR PRODUCTION NO. 50:**

All documents comprising any communication between PDL and any other party concerning this action.

**REQUEST FOR PRODUCTION NO. 51:**

All documents that PDL has obtained or obtains from any non-party discovery in connection with this action.

**REQUEST FOR PRODUCTION NO. 52:**

All documents concerning licensing or licensing negotiations or offers relating to any of the patents-in-suit.

**REQUEST FOR PRODUCTION NO. 53:**

All licenses and documents related to licensing offers for patents-in-suit or related technologies, including but not limited to PDL's alleged licenses to Genentech, Roche, MedImmune Inc., Wyeth/American Home Products, Biogen Idec/Elan, Abbot Laboratories, Eli Lilly & Co., and GlaxoSmithKline.

**REQUEST FOR PRODUCTION NO. 54:**

All documents concerning any analyses, reports, memoranda, or investigation regarding infringement, scope of claims, or validity generated by or on behalf of PDL or any potential licensee in connection with negotiations for a license or agreement concerning the patents-in-suit.

**REQUEST FOR PRODUCTION NO. 55:**

All documents concerning the following averment contained in paragraph 6 of PDL's Complaint: "Additionally, a substantial number of other companies and research organizations have licensed PDL's portfolio of patents covering antibody humanization technology."

**REQUEST FOR PRODUCTION NO. 56:**

All documents concerning the following averment contained in paragraph 1 of PDL's Complaint: "All of the other nine humanized antibody products currently approved by the FDA for marketing in the United States are covered by patent license agreements with PDL."

**REQUEST FOR PRODUCTION NO. 57:**

All documents concerning the following averment contained in paragraph 1 of PDL's Complaint: "In addition, numerous other biotechnology companies that are in the process of developing humanized antibodies have obtained licenses or the right to license PDL's antibody humanization patents."

**REQUEST FOR PRODUCTION NO. 58:**

All documents identifying and/or discussing PDL's licensing policies or practices.

**REQUEST FOR PRODUCTION NO. 59:**

All documents concerning royalties paid or to be paid pursuant to licenses of the patents-in-suit.

**REQUEST FOR PRODUCTION NO. 60:**

All documents identifying and/or discussing existing license agreements relating to the patents-in-suit and related technologies, including actual payments made under such licenses.

**REQUEST FOR PRODUCTION NO. 61:**

All documents providing evidence of industry licensing practices.

**REQUEST FOR PRODUCTION NO. 62:**

All documents concerning any work performed by PDL independently or with, for, or on behalf of any non-party relating to the patents-in-suit, including but not limited to any development or *in vitro*, *in vivo*, or *ex vivo* testing of humanized antibodies.

**REQUEST FOR PRODUCTION NO. 63:**

Documents sufficient to identify every PDL officer, manager, director, employee or agent whose responsibilities relate to or related to the research, design, development, testing, licensing, manufacture or sale of any PDL product sold or offered for sale that concern the subject matter of the patents-in-suit.

**REQUEST FOR PRODUCTION NO. 64:**

All organizational charts and personnel lists of PDL from the year 1985 to the present.

**REQUEST FOR PRODUCTION NO. 65:**

All documents and things that have been disclosed or provided to any individual or entity (including experts) from whom PDL expects to offer any declaration, affidavit or testimony in any trial, hearing, submission to the court or deposition in this action.

**REQUEST FOR PRODUCTION NO. 66:**

All documents identified or referred to in, or relied upon to prepare PDL's responses to Alexion's First Set Of Interrogatories.

**REQUEST FOR PRODUCTION NO. 67**

All documents PDL intends to present at any hearing or trial concerning this action.

**REQUEST FOR PRODUCTION NO. 68**

All documents concerning any testing of any examples or disclosure of the patents-in-suit.

YOUNG CONWAY STARGATT & TAYLOR LLP


/s/ Andrew Lundgren
Josy W. Ingersoll (I.D. #1088)
Andrew Lundgren (I.D. #4429)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware  19801
Telephone:  (302) 571-6600
alundgren@ycst.com

Attorneys for Defendant

Of Counsel:

John M. Desmarais
Gerald J. Flattmann, Jr.
Christine Willgoos
KIRKLAND & ELLIS
153 East 53rd Street
New York, NY  1002
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

# Exhibit 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PDL BIOPHARMA, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C. A. No. 07-156 (***) |
| | ) | |
| ALEXION PHARMACEUTICALS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

### PDL BIOPHARMA, INC.'S FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS (NOS. 1-115) TO ALEXION PHARMACEUTICALS, INC.

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Plaintiff PDL Biopharma, Inc. requests that Defendant Alexion Pharmaceuticals, Inc. serve PDL with its written responses to these requests for production and produce copies of the documents and things requested below at the law offices of Weil, Gotshal & Manges LLP, 201 Redwood Shores Parkway, Redwood Shores CA 94065 within 30 days after service hereof. Pursuant to Rule 26(e) of the Federal Rules of Civil Procedure, these requests for documents and things are continuing in nature. If, after producing the requested documents and things, Alexion obtains or becomes aware of any further responsive documents or things, Alexion must produce to PDL Biopharma such additional documents and things.

### DEFINITIONS

1.      "Alexion" means defendant Alexion Pharmaceuticals, Inc., its predecessors and successors, past and present parents, divisions, subsidiaries, affiliates, and related companies, and all past and present directors, officers, employees, agents, consultants, attorneys and others purporting to act on their behalf.

2.      "Communication" means any form of oral or written interchange or attempted interchange, whether in person, by telephone, by facsimile, by telex, by electronic mail, or by any other medium.

3.    "Document" means any physical or electronic media in which information is stored.

4.    "FDA" means the U.S. Food and Drug Administration.

5.    "Humanized Antibody Products And Methods" means any antibody containing amino acid sequences from both human and non-human sources or methods for making same, including, without limitation, Soliris.

6.    "Patents-In-Suit" means U.S. Patent Nos. 5,693,761, 5,693,762, and 6,180,370, both individually and collectively.

7.    "PDL" means plaintiff PDL BioPharma, Inc., Protein Design Labs, Inc., and any person or entity purporting to act on their behalf or that Alexion believed or understood to be acting on their behalf.

8.    "Related Patents" means all U.S. and foreign patents and patent applications claiming priority, in whole or part, to U.S. Patent Application 07/290,975, both individually and collectively.

9.    "Soliris" means (1) any product sold under the trade name Soliris, (2) any product sold under the generic name eculizumab, (3) any composition containing the amino acid sequences found in (1) or (2), and (4) any composition containing an amino acid sequence derived from the amino acid sequences found in (1) or (2).

## INSTRUCTIONS

1.    As used in these Requests for Production, the singular shall include the plural, and the past tense shall include the present tense, and vice versa; the words "and" and "or" shall be both conjunctive and disjunctive; the word "all" shall mean "any and all;" the word "including" shall mean "including without limitation," so as to be most inclusive.

2.    Documents produced in response to these requests should be produced as they are kept in the usual course of business or should be organized and labeled to correspond with the categories in the request.

2

3.      If Alexion contends that a portion of a document is subject to being withheld under a claim of privilege or immunity from production or that a portion of a document is non-responsive to the requests below, produce the entire document with any necessary redactions.

4.      If any document is withheld under a claim of privilege or immunity from production, identify that document as required by Federal Rule of Civil Procedure 26(b)(5).

5.      These requests are continuing, so that if after responding and producing documents for inspection and copying, Alexion acquires or locates any additional documents falling within the scope of any of the requests herein, Alexion is to produce such additional documents promptly for inspection and copying.

## REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 1:**

All Documents that describe Alexion's email and document deletion, backup, destruction and retention policies from 1987 to the present.

**REQUEST FOR PRODUCTION NO. 2:**

All board minutes, board presentations, and other documents from Alexion's board of directors meetings concerning Alexion's Humanized Antibody Products And Methods.

**REQUEST FOR PRODUCTION NO. 3:**

All Documents and things concerning PDL including, without limitation, all letters, faxes, emails, presentations, marketing materials, Documents that constitute, refer to, or reflect actual or prospective business relationships, and discussions pertaining to the same.

**REQUEST FOR PRODUCTION NO. 4:**

All Documents that describe Alexion's corporate and personnel structure including, without limitation, organizational charts, from 1987 to the present.

**REQUEST FOR PRODUCTION NO. 5:**

All Documents that identify Alexion's affiliates including, without limitation, parent companies, subsidiaries, partnerships, joint ventures, and divisions.

**REQUEST FOR PRODUCTION NO. 6:**

All Documents that constitute, refer to, or reflect communications between Alexion and the FDA regarding the FDA's approval of Alexion's Humanized Antibody Products And Methods for any use.

**REQUEST FOR PRODUCTION NO. 7:**

All Documents that constitute, refer to, or reflect actions taken or activities initiated by Alexion to seek FDA approval of Alexion's Humanized Antibody Products And Methods for any use.

**REQUEST FOR PRODUCTION NO. 8:**

All Documents that constitute, refer to, or reflect a relationship between any manufacture, use, sale, offer for sale, or importation of Alexion's Humanized Antibody Products And Methods and the development and submission of information to the FDA.

**REQUEST FOR PRODUCTION NO. 9:**

All Documents that constitute, refer to, or reflect distribution of Alexion's Humanized Antibody Products And Methods for any purpose.

**REQUEST FOR PRODUCTION NO. 10:**

All Documents that constitute, refer to, or reflect Alexion's early access program for Alexion's Humanized Antibody Products And Methods, or any other distribution program for Alexion's Humanized Antibody Products And Methods.

**REQUEST FOR PRODUCTION NO. 11:**

All Documents that constitute, refer to, or reflect the composition, sequence, or characterization of Alexion's Humanized Antibody Products And Methods.

**REQUEST FOR PRODUCTION NO. 12:**

All Documents that constitute, refer to, or reflect the *in vivo* or *in vitro* studies of Alexion's Humanized Antibody Products And Methods.

**REQUEST FOR PRODUCTION NO. 13:**

All Documents that constitute, refer to, or reflect the characterization of Alexion's Humanized Antibody Products And Methods, including any studies of the binding strength, binding efficiency, binding selectivity, binding constant, or dissociation constant.

**REQUEST FOR PRODUCTION NO. 14:**

All Documents that constitute, refer to, or reflect agreements to manufacture Alexion's Humanized Antibody Products And Methods.

**REQUEST FOR PRODUCTION NO. 15:**

All Documents that constitute, refer to, or reflect the entities manufacturing Alexion's Humanized Antibody Products And Methods.

**REQUEST FOR PRODUCTION NO. 16:**

All Documents that refer to or reflect the time periods and the locations where Alexion's Humanized Antibody Products And Methods have been manufactured.

**REQUEST FOR PRODUCTION NO. 17:**

All Documents that constitute, refer to, or reflect any agreement by which Alexion agreed to indemnify any other entity for manufacturing, using, importing, offering to sell, or selling Alexion's Humanized Antibody Products And Methods.

**REQUEST FOR PRODUCTION NO. 18:**

All Documents that constitute, refer to, or reflect any investigation, testing, analysis, or study of Alexion's Humanized Antibody Products And Methods conducted by or on the behalf of Alexion.

**REQUEST FOR PRODUCTION NO. 19:**

One copy of each version (including each paper, magnetic, and electronic version) of all manuals, user guides, white papers, training guide, brochures, instructions for use, specifications and licenses (both express and implied) for each of Alexion's Humanized Antibody Products And Methods, including prototypes thereof.

**REQUEST FOR PRODUCTION NO. 20:**

Two representative samples of each Alexion Humanized Antibody Product And Method.

**REQUEST FOR PRODUCTION NO. 21:**

All Documents that constitute, refer to, or reflect Alexion's investigation, assessment, or study of the claims of the Patents-In-Suit or Related Patents.

**REQUEST FOR PRODUCTION NO. 22:**

All Documents that refer to or reflect the scope of equivalents that Alexion contends should be applied to any claim element of the Patents-In-Suit.

**REQUEST FOR PRODUCTION NO. 23:**

All Documents that refer to or reflect what Alexion contends are any noninfringing alternatives to the inventions claimed in any of the Patents-In-Suit.

**REQUEST FOR PRODUCTION NO. 24:**

All Documents, things and Communications that constitute, refer to, or reflect potential or actual enforcement of the Patents-In-Suit and Related Patents, including allegations of infringement and notifications of the existence of the aforementioned patents.

**REQUEST FOR PRODUCTION NO. 25:**

All Documents and things that constitute, refer to, or reflect the circumstances under which Alexion contends that it received notice of the Patents-In-Suit.

**REQUEST FOR PRODUCTION NO. 26:**

All Documents that constitute, refer to, or reflect Communications, meetings, discussions, negotiations, or agreements between Alexion and PDL regarding any of the Patents-In-Suit.

**REQUEST FOR PRODUCTION NO. 27:**

All Documents that refer to or reflect analysis by or on behalf of Alexion about the need to establish accounting reserves in light of the Patents-In-Suit or this litigation.

**REQUEST FOR PRODUCTION NO. 28:**

All Documents that refer to or reflect the amount of accounting reserves that Alexion has established, or considered establishing, in light of the Patents-In-Suit or this litigation.

**REQUEST FOR PRODUCTION NO. 29:**

All Documents that constitute, refer to, or reflect communications by or on behalf of Alexion to financial or securities analysts about the Patents-In-Suit or this litigation.

**REQUEST FOR PRODUCTION NO. 30:**

All Documents that constitute, refer to, or reflect communications by or on behalf of Alexion to reporters about the Patents-In-Suit or this litigation.

**REQUEST FOR PRODUCTION NO. 31:**

All Documents that constitute, refer to, or reflect communications by or on behalf of Alexion to any other third person or entity about the Patents-In-Suit or this litigation.

**REQUEST FOR PRODUCTION NO. 32:**

All Documents that refer to or reflect what Alexion contends are alternatives to Alexion's Humanized Antibody Products And Methods.

**REQUEST FOR PRODUCTION NO. 33:**

All Documents that refer to or reflect what any third party has asserted are alternatives to Alexion's Humanized Antibody Products And Methods.

**REQUEST FOR PRODUCTION NO. 34:**

All Documents that constitute, refer to, or reflect any attempt to redesign or reformulate Alexion's Humanized Antibody Products And Methods.

**REQUEST FOR PRODUCTION NO. 35:**

All Documents that constitute, refer to, or reflect knowledge at Alexion of the Patents-In-Suit.

**REQUEST FOR PRODUCTION NO. 36:**

All Documents that constitute, refer to, or reflect the possibility of redesigning or seeking an alternative to Alexion's Humanized Antibody Products And Methods.

**REQUEST FOR PRODUCTION NO. 37:**

All Documents that constitute, refer to, or reflect the first commercial sale of Alexion's Humanized Antibody Products And Methods.

**REQUEST FOR PRODUCTION NO. 38:**

All Documents that constitute, refer to, or reflect knowledge at Alexion of European Patent Office proceedings regarding the Patents-In-Suit.

**REQUEST FOR PRODUCTION NO. 39:**

All Documents that constitute, refer to, or reflect any Communications regarding European Patent Office proceedings regarding the Patents-In-Suit.

**REQUEST FOR PRODUCTION NO. 40:**

All Documents that constitute, refer to, or reflect involvement by Alexion in European Patent Office proceedings regarding the Patents-In-Suit.

**REQUEST FOR PRODUCTION NO. 41:**

All Documents that constitute, refer to, or reflect Alexion's first, and any subsequent awareness of the Patents-In-Suit (having admitted in ¶¶ 14, 20, and 26 "that it was aware of the ['761, '762, and '370] patent[s] prior to the filing of PDL's Complaint.").

**REQUEST FOR PRODUCTION NO. 42:**

All Documents that constitute, refer to, or reflect the patents to which Alexion was referring in its Securities and Exchange Commission Form 10-K filings that it was aware of "broad patents owned by third parties relating to the manufacture, use, and sale of recombinant humanized antibodies, recombinant humanized single-chain antibodies, recombinant human antibodies and recombinant human single-chain antibodies."

**REQUEST FOR PRODUCTION NO. 43:**

All Documents that constitute, refer to, or reflect the patents to which Alexion was referring in its Securities and Exchange Commission Form 10-K filings that it was aware of "broad patents owned by third parties relating to the manufacture, use, and sale of recombinant humanized antibodies, recombinant humanized single-chain antibodies, recombinant human antibodies, recombinant human single-chain antibodies, and genetically engineered animals."

**REQUEST FOR PRODUCTION NO. 44:**

All Documents that constitute, refer to, or reflect the patents to which Alexion was referring in its Securities and Exchange Commission Form 10-K filings that it was aware of "broad patents owned by third parties relating to the manufacture, use, and sale of recombinant humanized antibodies, recombinant humanized single-chain antibodies and genetically engineered animals."

**REQUEST FOR PRODUCTION NO. 45:**

All Documents that constitute, refer to, or reflect the Patents-In-Suit.

**REQUEST FOR PRODUCTION NO. 46:**

All Documents and things that constitute, refer to, or reflect any test, evaluation, comparison, analysis, consideration, study, or reverse engineering conducted by Alexion, or on behalf of Alexion, of any PDL humanized antibody.

**REQUEST FOR PRODUCTION NO. 47:**

All Documents and things that Alexion contends support its contention that the Patents-In-Suit are invalid.

**REQUEST FOR PRODUCTION NO. 48:**

All Documents and things that refer to or reflect any nexus, or lack thereof, between any secondary indicia of nonobviousness – including commercial success of each invention disclosed or claimed in the Patents-In-Suit and Related Patents – and the advantages of the invention.

**REQUEST FOR PRODUCTION NO. 49:**

All Documents that refer to or reflect the commercial success, or lack thereof, of any of the subject matters claimed in any of the Patents-In-Suit.

**REQUEST FOR PRODUCTION NO. 50:**

All Documents that refer to or reflect any long felt need, or lack thereof, for any of the subject matter claimed in any of the Patents-In-Suit including, without limitation, all Documents Concerning the attempts of others to meet any such need.

**REQUEST FOR PRODUCTION NO. 51:**

All Documents that refer to or reflect any unexpected results, or lack thereof, achieved by practicing any of the subject matter claimed in the Patents-In-Suit.

**REQUEST FOR PRODUCTION NO. 52:**

All Documents that constitute, refer to, or reflect any copying, or lack thereof, by anyone of any of the subject matter claimed in the Patents-In-Suit.

**REQUEST FOR PRODUCTION NO. 53:**

All Documents that constitute, refer to, or reflect any skepticism or disbelief, or lack thereof, expressed by anyone regarding any of the subject matter claimed in the Patents-In-Suit.

**REQUEST FOR PRODUCTION NO. 54:**

All Documents that constitute, refer to, or reflect any criticism by anyone of any inventions disclosed in the Patents-In-Suit or of the patentability of any inventions disclosed in the Patents-In-Suit.

**REQUEST FOR PRODUCTION NO. 55:**

All documents that constitute, refer to, or reflect prior art Alexion intends to rely on.

**REQUEST FOR PRODUCTION NO. 56:**

All Documents, things and Communications that constitute, refer to, or reflect actual or potential prior art to the Patents-In-Suit and Related Patents obtained by or received

from any person at any time.

**REQUEST FOR PRODUCTION NO. 57:**

All Documents and things that refer to or reflect the state of the art relevant to each of the Patents-In-Suit and Related Patents as of the effective filing date.

**REQUEST FOR PRODUCTION NO. 58:**

All Documents and things that constitute, refer to, or reflect actual or potential prior art, or asserted as comprising actual or potential prior art, to the Patents-In-Suit and Related Patents, including all prior art and alleged prior art identified by Alexion or asserted by any person not a party to this lawsuit.

**REQUEST FOR PRODUCTION NO. 59:**

All Documents and things that constitute, refer to, or reflect any search for, investigation of, or evaluation of, any actual or potential prior art to the Patents-In-Suit and Related Patents, including all results obtained from such searches or investigations.

**REQUEST FOR PRODUCTION NO. 60:**

All Documents and things that constitute, refer to, or reflect Alexion Humanized Antibody Products and Methods including, without limitation, Documents that constitute, refer to, or reflect Humanized Antibody Products and Methods made, used, sold, offered for sale, or imported into the United States by PDL, Genentech, Glaxosmithkline, Medimmune, Eli Lilly and Co., and Abbott Laboratories.

**REQUEST FOR PRODUCTION NO. 61:**

All Documents or things that refer to or reflect the scope, validity, or enforceability of any Patent-In-Suit.

**REQUEST FOR PRODUCTION NO. 62:**

All publications or other public Documents that refer to or reflect any of the subject matter disclosed in the Patents-In-Suit or Related Applications including, without limitation, articles, speeches, presentations, and other like documents.

**REQUEST FOR PRODUCTION NO. 63:**

All Documents that refer to or reflect any conference, symposium, seminar, trade show, convention, exhibition or panel discussion Concerning, in whole or in part, any subject matter disclosed in the Patents-In-Suit or Related Applications.

**REQUEST FOR PRODUCTION NO. 64:**

All Documents that constitute, refer to, or reflect prior art to the Patents-In-Suit and Related Applications.

**REQUEST FOR PRODUCTION NO. 65:**

Copies of all of Alexion's financial statements including annual reports, required financial filings, statements of operations, balance sheets, statements of changes in retained earnings and notes thereto, whether prepared for internal or external purposes.

**REQUEST FOR PRODUCTION NO. 66:**

All Documents and things that constitute, refer to, or reflect actual or potential market research or consumer perception studies that refer to Alexion Humanized Antibody Products And Methods, including prototypes and samples of the aforementioned products and methods, and competing methods or products.

**REQUEST FOR PRODUCTION NO. 67:**

All Documents and things that constitute, refer to, or reflect the actual and projected profitability of each Alexion Humanized Antibody Product And Method, including sales forecasts, projected profit, profit calculations, unit sales, revenues, cost of sales, order contribution, product margin, product contribution margin, gross margins, and operating margins, and a list of the top twenty customers for each of the aforementioned products and methods by unit sales and revenue for each year from March 16, 2007 to the present.

**REQUEST FOR PRODUCTION NO. 68:**

All Documents and things that constitute, refer to, or reflect the actual and forecasted market share of each Alexion Humanized Antibody Product And Method.

**REQUEST FOR PRODUCTION NO. 69:**

      All Documents that refer to or reflect Alexion's competition in the market for Alexion Humanized Antibody Products And Methods.

**REQUEST FOR PRODUCTION NO. 70:**

      All Documents that constitute, refer to, or reflect Alexion's attempts to purchase, license or otherwise obtain a right, title or interest in the Patents-In-Suit.

**REQUEST FOR PRODUCTION NO. 71:**

      All Documents that reflect Alexion's net profits or losses selling Alexion's Humanized Antibody Products And Methods, including Documents that reflect gross sales, all costs of sales, manufacturing costs, research and development costs, marketing costs, support costs, and profit margins.

**REQUEST FOR PRODUCTION NO. 72:**

      All Documents that refer to or reflect the projected profit or profit calculations for any Alexion Humanized Antibody Products And Methods, whether or not such products were completed and/or commercialized including, without limitation, unit sales and revenues.

**REQUEST FOR PRODUCTION NO. 73:**

      All Documents that constitute, refer to, or reflect market studies, reports, or analyses that refer to or reflect product design, competition, consumer surveys, outside consultant surveys, advertising campaigns, promotional and sales training materials, market segments, market share, or market revenue (whether actual or projected) that refer to or reflect Alexion's Humanized Antibody Products And Methods.

**REQUEST FOR PRODUCTION NO. 74:**

      All Documents and things sufficient to identify on a customer-by-customer basis the unit sales and revenue for each Alexion Humanized Antibody Product And Method, including prototypes thereof.

**REQUEST FOR PRODUCTION NO. 75:**

Documents that constitute, refer to, or reflect royalties paid by Alexion to every licensor of any patent in the fields of recombinant DNA, antibodies, or humanized antibodies to which Alexion has obtained a license.

**REQUEST FOR PRODUCTION NO. 76:**

All Documents that constitute, refer to, or reflect discussions between Alexion and any other entity for a license to a patent or patents in the fields of recombinant DNA, antibodies, or humanized antibodies.

**REQUEST FOR PRODUCTION NO. 77:**

All Documents that constitute, refer to, or reflect Communications between Alexion and any third parties that refer to the Patents-In-Suit and any Related Applications.

**REQUEST FOR PRODUCTION NO. 78:**

Pleadings, discovery, discovery responses, briefs, submissions to the court, transcripts, and correspondence between the parties in *Oklahoma Medical Research Foundation v. Alexion Pharmaceuticals, Inc.*, Case No. 4:07-CV-00163-GKF-SAJ.

**REQUEST FOR PRODUCTION NO. 79:**

All Documents that constitute, refer to, or reflect Communications between Oklahoma Medical Research Foundation and Alexion that refer to *Oklahoma Medical Research Foundation v. Alexion Pharmaceuticals, Inc.*, Case No. 4:07-CV-00163-GKF-SAJ, Humanized Antibody Products And Methods, PDL, or the Patents-In-Suit.

**REQUEST FOR PRODUCTION NO. 80:**

All Documents, things, and Communications that constitute, refer to, or reflect any contract, assignment, license, effort to license, agreement, covenant not to sue, or settlement agreement that refer to the Patents-In-Suit and Related Patents.

**REQUEST FOR PRODUCTION NO. 81:**

All Documents that refer to or reflect any litigation, dispute, contested proceeding, interference, request for reexamination, reexamination, opposition, reissue or charge

of infringement that involved or involves any of the Patents-In-Suit or Related Applications including, without limitation, oppositions to EP 0682040 and EP 0451216.

**REQUEST FOR PRODUCTION NO. 82:**

All Documents and things subpoenaed by Alexion, or at the direction of Alexion, from third parties to any action that refer to or reflect the Patents-In-Suit or Related Patents.

**REQUEST FOR PRODUCTION NO. 83:**

All Documents produced to Alexion in response to any subpoena served in this action to any third parties.

**REQUEST FOR PRODUCTION NO. 84:**

All Documents and things identified or described (individually or by category) by Alexion in its Federal Rule of Civil Procedure 26(a) Initial Disclosures.

**REQUEST FOR PRODUCTION NO. 85:**

All Documents and things that Alexion was requested to identify or that Alexion identified in its responses to any PDL interrogatory to Alexion.

**REQUEST FOR PRODUCTION NO. 86:**

All Documents and things that PDL reviewed, considered, or relied upon in answering any PDL interrogatory to Alexion.

**REQUEST FOR PRODUCTION NO. 87:**

All Documents that Alexion contends support its assertion in paragraph 12 of its *Answer And Counterclaims* that "Alexion denies that the '761 patent was duly and legally issued."

**REQUEST FOR PRODUCTION NO. 88:**

All Documents that Alexion contends support its assertion in paragraph 18 of its *Answer And Counterclaims* that "Alexion denies that the '762 patent was duly and legally issued."

15

**REQUEST FOR PRODUCTION NO. 89:**

All Documents that Alexion contends support its assertion in paragraph 24 of its *Answer And Counterclaims* that "Alexion denies that the '370 patent was duly and legally issued."

**REQUEST FOR PRODUCTION NO. 90:**

All Documents and things that Alexion contends support its allegation in its *Answer And Counterclaims* that (1) it does not infringe any asserted claim of the Patents-In-Suit, and (2) it does not contribute to the infringement of any asserted claim of the Patents-In-Suit.

**REQUEST FOR PRODUCTION NO. 91:**

All Documents and things that Alexion contends support its allegation in its *Answer And Counterclaims* that this case is in any way exceptional pursuant to 35 U.S.C. § 285.

**REQUEST FOR PRODUCTION NO. 92:**

All Documents and things that Alexion contends support its allegation in its *Answer And Counterclaims* that any infringement of the Patents-In-Suit is or was not willful.

**REQUEST FOR PRODUCTION NO. 93:**

All Documents and things that Alexion contends support its allegation in its *Answer And Counterclaims* that PDL is not entitled to relief.

**REQUEST FOR PRODUCTION NO. 94:**

All Documents and things that Alexion contends support its allegations in its *Answer And Counterclaims* that the Patents-In-Suit are invalid for failure to comply with the requirements of U.S.C. § 101 *et seq.* including, without limitation, §§ 102, 103 and 112.

**REQUEST FOR PRODUCTION NO. 95:**

All Documents that constitute, refer to, or reflect Dr. Max Link's knowledge of Alexion's Humanized Antibody Products And Methods.

**REQUEST FOR PRODUCTION NO. 96:**

All Documents that constitute, refer to, or reflect Dr. Max Link's knowledge of the Patents-In-Suit.

**REQUEST FOR PRODUCTION NO. 97:**

All Documents that constitute, refer to, or reflect any discussion or attempt to limit the information Dr. Max Link received regarding Alexion's Humanized Antibody Products And Methods.

**REQUEST FOR PRODUCTION NO. 98:**

All Documents that constitute, refer to, or reflect Dr. Max Link's work on the Alexion Compliance and Quality Committee relating to Alexion's Humanized Antibody Products And Methods.

**REQUEST FOR PRODUCTION NO. 99:**

All Documents that constitute the meeting minutes or other official records of the Alexion Compliance and Quality Committee on which Dr. Max Link served.

**REQUEST FOR PRODUCTION NO. 100:**

All Documents provided to, received by, or created by the Alexion Compliance and Quality Committee that refer to the Patents-In-Suit.

**REQUEST FOR PRODUCTION NO. 101:**

All Documents provided to, received by, or created by the Alexion Compliance and Quality Committee that refer to PDL.

**REQUEST FOR PRODUCTION NO. 102:**

All Documents that constitute, refer to, or reflect email sent or received by Dr. Max Link at Alexion that refer to or reflect the Patents-In-Suit including, without limitation whether the Patents-In-Suit are infringed, valid, or should be licensed.

**REQUEST FOR PRODUCTION NO. 103:**

All Documents and things that constitute, refer to, or reflect the level of skill, knowledge, education, experience or expertise of a person having ordinary skill in the art that refer to or reflect any invention disclosed or claimed in the Patents-In-Suit and Related Patents as of the filing date of the foregoing.

**REQUEST FOR PRODUCTION NO. 104:**

Any research conducted by, or on behalf of, any individual in his or her capacity as an expert witness or consultant hired by Alexion in connection with this action including any study, analysis, evaluation, research, or discussion that refer to or reflect the Patents-In-Suit.

**REQUEST FOR PRODUCTION NO. 105:**

All Documents that constitute, refer to, or reflect any study, analysis, evaluation, research, or discussion regarding whether any of Alexion's Humanized Antibody Products And Methods infringes one or more claims of the Patents-In-Suit.

**REQUEST FOR PRODUCTION NO. 106:**

All Documents that constitute, refer to, or reflect each consulting relationship that exists between any expert witness or consultants and Alexion in this action including, without limitation, consulting agreements, invoices, and Documents that refer to or reflect the total hours worked and the amount of fees paid by, or on behalf of, Alexion.

**REQUEST FOR PRODUCTION NO. 107:**

All Documents that constitute, refer to, or reflect each consulting relationship that has existed between any expert witnesses or consultants and any attorneys for Alexion including, without limitation, consulting agreements, invoices, and Documents that refer to or reflect the total hours worked and the amount of fees paid by Alexion's attorneys.

**REQUEST FOR PRODUCTION NO. 108:**

All Documents that constitute, refer to, or reflect any past or present negotiations between Alexion or Alexion's attorneys and any expert witnesses or consultants that refer to or reflect consulting, experiments, research, or other analyses to be conducted.

**REQUEST FOR PRODUCTION NO. 109:**

All Documents and things that constitute, refer to, or reflect any Communication, interview, meeting or contact with the U.S. Patent Office or any foreign patent office that refer to or reflect the Patents-In-Suit or Related Patents.

**REQUEST FOR PRODUCTION NO. 110:**

All Documents and things that constitute, refer to, or reflect Communications with third parties that refer to or reflect Alexion's Humanized Antibody Products And Methods.

**REQUEST FOR PRODUCTION NO. 111:**

All Documents and things that constitute, refer to, or reflect the marketing, advertising, promotion, or training of each version, revision or prototype of any of Alexion's Humanized Antibody Products And Methods.

**REQUEST FOR PRODUCTION NO. 112:**

All Documents and things that constitute, refer to, or reflect sales, promotion or customer training programs and materials for any of Alexion's Humanized Antibody Products And Methods, including prototypes thereof.

**REQUEST FOR PRODUCTION NO. 113:**

All Documents that constitute, refer to, or reflect the training of customers, sales representatives, or other individuals in the operation, design, and/or functionality of any Alexion's Humanized Antibody Products And Methods, prototypes, or technologies.

**REQUEST FOR PRODUCTION NO. 114:**

All Documents that constitute, refer to, or reflect Communications to any third party – including, without limitation, customers or prospective customers – regarding this lawsuit.

**REQUEST FOR PRODUCTION NO. 115:**

All Documents that constitute, refer to, or reflect proposed, contemplated, or actual statements or explanations to any third party – including, without limitation, customers or prospective customers – regarding this litigation.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Jack B. Blumenfeld (#1014)
Karen Jacobs Louden (#2881)
James W. Parrett, Jr. (#4292)
1201 N. Market Street
P.O. Box 1347
Wilmington, Delaware 19899
302-658-9200
*Attorneys for Plaintiff and Counter-*
*Defendant PDL BIOPHARMA, INC.*

OF COUNSEL:

Matthew D. Powers
Vernon M. Winters
Eric P. Xanthopoulos
John D. Beynon
Weil, Gotshal & Manges LLP
Silicon Valley Office
201 Redwood Shores Parkway
Redwood Shores, CA 94065
650-802-3000

July 23, 2007
978969

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on July 23, 2007, copies of the foregoing were caused to be served on upon the following in the manner indicated:

### BY HAND

Josy W. Ingersoll
Andrew A. Lundgren
Young, Conaway, Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801

### BY EMAIL

Gerald J. Flattmann, Jr.
Christine Willgoos
Gregory A. Morris
Kirkland & Ellis
153 East 53rd Street
New York, NY 10022-4611

_____
James W. Parrett, Jr. (#4292)

# Exhibit 4

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| PDL BIOPHARMA, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 07-CV-153-*** |
| | ) | |
| ALEXION PHARMACEUTICALS, INC. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>DEFENDANT ALEXION PHARMACEUTICALS, INC.'S
RULE 26 INITIAL DISCLOSURES</u>

Pursuant to Federal Rule Of Civil Procedure 26(a)(1), Defendant Alexion

Pharmaceuticals, Inc. ("Alexion"), based upon information reasonably available to it, hereby

provides its initial disclosures to Plaintiff PDL Biopharma, Inc. ("PDL").

Alexion reserves the right to amend and/or supplement these disclosures as its

investigation and discovery proceeds in this action.

## <u>Initial Disclosures</u>

A.      The name and, if known, the address and telephone number of each
individual likely to have discoverable information that the disclosing party may use to support its
claims or defenses, unless solely for impeachment, identifying the subjects of the information.

**Response:**  Alexion identifies the following individuals.  Alexion reserves the

right to supplement and/or amend this list as its investigation and discovery proceeds in this

action.

1.    Stephen Squinto
      Executive Vice President and Head of Research
      Alexion Pharmaceuticals, Inc.
      352 Knotter Dr.
      Cheshire, CT 06410
      Telephone: (203) 272-2596
      Subject matter:  Certain scientific and clinical data concerning Soliris™.

2.    Russell Rother
      Senior Vice President, Research
      Alexion Pharmaceuticals, Inc.
      352 Knotter Dr.
      Cheshire, CT 06410
      Telephone: (203) 272-2596
      Subject matter:  Certain scientific and clinical data concerning Soliris™.

3.    Scott Rollins
      Senior Vice President, Drug Development and Project Management
      Alexion Pharmaceuticals, Inc.
      352 Knotter Dr.
      Cheshire, CT 06410
      Telephone: (203) 272-2596
      Subject matter:  Certain scientific and clinical data concerning Soliris™.

4.    Sir Gregory Winter
      MRC Laboratory of Molecular Biology
      Hills Road, Cambridge CB2 0QH UK
      Subject matter: Certain scientific aspects of prior art.

5.    Lutz Riechmann
      MRC Laboratory of Molecular Biology
      Hills Road, Cambridge CB2 0QH UK
      Subject matter: Certain scientific aspects of prior art.

6.    Cary L. Queen
      22830 San Juan Road
      Cupertino, CA 95014
      Phone: (408) 446-2691
      Subject matter: Conception, development, and testing of the alleged
      inventions of the patents-in-suit and related patents and patent
      applications.

7.    Harold E. Selick
      11 Somerset Ct.
      Belmont, CA 94002
      Phone: (650) 592-8307
      Subject matter: Conception, development, and testing of the alleged

inventions of the patents-in-suit and related patents and patent applications.

8.    Man Sung Co
      10952 Wilkinson Ave. #3
      Cupertino, CA 95014
      Phone: (408) 252-3681
      Subject matter: Conception, development, and testing of the alleged inventions of the patents-in-suit and related patents and patent applications.

9.    William P. Schneider
      200 Osage Avenue #1
      Los Altos, CA 94022
      Phone: (650) 948-8116
      Subject matter: Conception, development, and testing of the alleged inventions of the patents-in-suit and related patents and patent applications.

10.   Nicholas F. Landolfi
      240 Gloria Cir.
      Menlo Park, CA 94025
      Phone: (650) 462-1737
      Subject matter: Conception, development, and testing of the alleged inventions of the patents-in-suit and related patents and patent applications.

11.   Kathleen L. Coelingh
      801 Pine Street
      Apt. 25A
      Seattle, WA  98101
      Phone: (206) 695-2823
      Subject matter: Conception, development, and testing of the alleged inventions of the patents-in-suit and related patents and patent applications.

12.   Genentech, Inc.
      1 DNA Way
      South San Francisco, CA 94080-4990
      Phone: (650) 225-1000
      Subject matter:  Licensing of the patents-in-suit and related patents and patent applications.

13.   Hoffman La Roche Inc.
      U.S. Headquarters
      340 Kingsland Street
      Nutley, NJ 07110

Phone:  (973) 235-5000
Subject matter:  Licensing of the patents-in-suit and related patents and
patent applications.

14.    MedImmune, Inc.
One MedImmune Way
Gaithersburg, MD 20878
Phone: (301) 398-0000
Subject matter:  Licensing of the patents-in-suit and related patents and
patent applications.

15.    Wyeth/American Home Products
5 Giralda Farms
Madison, NJ 07940
Subject matter:  Licensing of the patents-in-suit and related patents and
patent applications.

16.    Biogen Idec/Elan
Corporate Headquarters
14 Cambridge Center
Cambridge, MA 02142
Phone: (617) 679-2000
Fax: (617) 679-2617
Subject matter:  Licensing of the patents-in-suit and related patents and
patent applications.

17.    Abbott Laboratories
U.S. Corporate Headquarters
100 Abbott Park Road
Abbott Park, IL 60064-3500
Phone: (847) 937-6100
Subject matter:  Licensing of the patents-in-suit and related patents and
patent applications.

18.    Eli Lilly and Company
Lilly Corporate Center
Indianapolis, IN 46285 USA
Phone: (317) 276-2000
Subject matter:  Licensing of the patents-in-suit and related patents and
patent applications.

19.    GlaxoSmithKline
U.S. Corporate Headquarters
One Franklin Plaza
Philadelphia, PA
Subject matter:  Licensing of the patents-in-suit and related patents and

patent applications.

B.      A copy of, or description by category and location of, all documents, electronically stored information and tangible things that are in the possession, custody, or control of the party and that the disclosing party may use to support its claims or defenses, unless solely for impeachment.

**Response:**  The documents and things listed below will be produced by counsel

for Alexion.  Alexion reserves the right to supplement and/or amend this list as its investigation

and discovery proceeds in this action.

1.      Certain data regarding the development and testing of eculizumab.

2.      Certain data regarding the characteristics of eculizumab and Soliris™.

3.      Certain clinical data regarding Soliris™ for the treatment of PNH.

4.      Certain of Alexion's other business records.

C.      A computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered.

**Response:**  At this time, Alexion does not have a claim for damages.  Alexion

reserves the right to amend its Answer and Counterclaims to include a claim for damages as

permitted by the Court's Scheduling Order (yet to be entered) or as otherwise allowed by the

Court.  At the appropriate time if requested by the Court,  Alexion will set forth its attorneys

fees, expenses and costs pursuant to its request that this be declared an exceptional case.

D.      For inspection and copying as under Rule 34 any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment.

**Response:**  Alexion states that it is not aware of any insurance agreement under

which any person carrying on an insurance business may be liable to satisfy part or all of a

judgment which may be entered in this action or to indemnify or reimburse for payments made to satisfy any such judgment.

August 6, 2007

Respectfully submitted,

_____/s/ Andrew A. Lundgren_____
Josy W. Ingersoll (I.D. #1088)
Andrew Lundgren (I.D. #4429)
YOUNG CONWAY STARGATT & TAYLOR LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware  19801
Telephone:  (302) 571-6600

*Attorneys for Defendant*

*Of Counsel:*

John M. Desmarais
Gerald J. Flattmann, Jr.
Christine Willgoos
KIRKLAND & ELLIS
153 East 53rd Street
New York, NY  1002
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

## <u>CERTIFICATE OF SERVICE</u>

I, Andrew A. Lundgren, hereby certify that on August 6, 2007, I caused a copy of the

foregoing document to be served on the following in the manner indicated:

### <u>BY E-MAIL AND HAND DELIVERY</u>

Jack B. Blumenfeld, Esquire
Karen Jacobs Louden, Esquire
Morris Nichols Arsht & Tunnell LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347

### <u>BY E-MAIL</u>

Matthew D. Powers, Esquire
Vernon M. Winters, Esquire
John D. Beynon, Esquire
Weil, Gotshal & Manges LLP
201 Redwood Shores Parkway
Redwood Shores, CA  94065

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Andrew A. Lundgren*
Josy W. Ingersoll  (No. 1088)
Andrew A. Lundgren (No. 4429)
1000 West Street, 17th Floor
Wilmington, Delaware  19801
(302) 571-6600
alundgren@ycst.com

*Attorneys for Defendant.*

# Exhibit 5

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| ) | |
| PDL BIOPHARMA, INC. | ) |
| ) | |
| Plaintiff, | ) |
| ) | |
| v. | ) Case No.: 07-CV-156-*** |
| ) | |
| ALEXION PHARMACEUTICALS, INC. | ) |
| ) | |
| Defendant. | ) |
| ) | |

## ALEXION PHARMACEUTICALS, INC.'S OBJECTIONS AND RESPONSES TO PDL BIOPHARMA, INC.'S FIRST SET OF INTERROGATORIES

Pursuant to Federal Rule of Civil Procedure 33 and Local Rule 26.1, Defendant Alexion Pharmaceuticals, Inc. ("Alexion") hereby makes the following objections and responses to Plaintiff PDL BioPharma, Inc.'s ("PDL's") First Set of Interrogatories (Nos. 1-3) to Alexion Pharmaceuticals, Inc.

Pursuant to Federal Rule of Civil Procedure 26(3), Alexion reserves the right to supplement its responses to these interrogatories if it learns of additional information.

## GENERAL OBJECTIONS

Alexion makes the following general objections to Plaintiff's First Set of Interrogatories ("General Objections"), which General Objections are hereby incorporated by reference and made part of its response to each such interrogatory.

1.      Alexion objects to each interrogatory to the extent that it seeks to impose requirements or obligations on Alexion in addition to or different from those imposed by the Federal Rules of Civil Procedure and/or Local Civil Rules for the District of Delaware.

2.     Alexion objects to each interrogatory to the extent that it calls for information that is protected from discovery by the attorney-client privilege, the attorney work-product doctrine and/or any other applicable privilege or immunity.  Inadvertent production of any such information shall not be deemed a waiver of any privilege or immunity. Nothing contained in any of these responses is intended to be, or in any way constitutes, a waiver of any such applicable privilege, immunity or doctrine.

3.     Alexion objects to PDL's "Definitions" and "Instructions" to the extent that they seek to impose requirements or obligations on Alexion in addition to or different from those imposed by the Federal Rules of Civil Procedure and/or Local Civil Rules for the District of Delaware.

4.     Alexion objects to PDL's "Definitions" and "Instructions" to the extent that they purport to alter the plain meaning and/or scope of any specific interrogatory, on the ground that such alteration renders the interrogatory vague, ambiguous, overly broad, unduly burdensome and/or uncertain.

5.     Alexion objects to PDL's definition of "Alexion" as overly broad, unduly burdensome, vague and ambiguous in its use of the terms "partners,", "divisions," "subsidiaries," "affiliates," and "related companies."

6.      Alexion objects to PDL's definition of "Document" to the extent that it purports to impose requirements in addition to or different from those imposed by the Federal Rules of Civil Procedure and/or Local Civil Rules for the District of Delaware.

7.     Alexion objects to PDL's definition of "Humanized Antibody Products and Methods" as overly broad, unduly burdensome, vague and ambiguous to the extent that this definition purports to include any products and/or methods other than those concerning eculizumab and/or Soliris™.

8.     Alexion objects to each interrogatory to the extent that it purports to require Alexion to provide "all facts," and "all Documents" as overly broad and unduly burdensome.  Subject to its General Objections and any specific objections, Alexion will conduct a reasonable investigation and provide responsive, non-privileged information resulting from that investigation.

9.     Alexion objects to PDL's First Set of Interrogatories to the extent that they seek information, documents or things that are not within Alexion's possession, custody or control.

10.     Alexion objects to PDL's First Set of Interrogatories to the extent that they seek information, documents or things that contain trade secret or other confidential, research, development or commercial information prior to the issuance of Protective Order in this action.

11.     Alexion objects to PDL's First Set of Interrogatories to the extent that they seek information, documents or things that are confidential information of non-parties.

12.     Alexion objects to PDL's First Set of Interrogatories as vague, ambiguous, and uncertain to the extent that they seek information, documents or things that are not described with reasonable particularity.

13.     Alexion objects to PDL's First Set of Interrogatories to the extent that they seek information, documents or things that are not relevant to the claims or defenses of any party, nor reasonably calculated to lead to the discovery of admissible evidence.

3

14.     Alexion objects to PDL's First Set of Interrogatories to the extent that they seek information generated on or after March 16, 2007.

15.     Alexion objects to PDL's First Set of Interrogatories to the extent that they contain discrete subparts, which should be counted as separate interrogatories pursuant to Federal Rule of Civil Procedure 33. Alexion reserves the right to object to further interrogatories from PDL as in excess of the number allowed by the Court's Rule 16 Scheduling Order.

16.     Alexion incorporates herein by reference the objections made in response to PDL's First Requests For Production Of Documents To Alexion Pharmaceuticals, Inc.

## OBJECTIONS AND RESPONSES

### INTERROGATORY NO. 1:

Separately for each claim in each of the Patents-In-Suit, please state all facts, and identify all witnesses to any facts, that You contend support Your first defense set forth in paragraphs 31 and 32 of Alexion's *Answer and Counterclaims* that You have not infringed the Patents-In-Suit "either directly, indirectly, literally, or under the doctrine of equivalents."

### RESPONSE TO INTERROGATORY NO. 1:

Alexion objects to this interrogatory to the extent that it seeks information, documents or things that are protected by the attorney-client privilege, attorney work product doctrine, or any other applicable privilege or immunity. Alexion further objects to this interrogatory because it purports to shift the burden of proof regarding infringement to Alexion and to require Alexion to set forth its defenses to infringement prior to PDL's identification of asserted claims or infringement contentions. PDL, as plaintiff and patentee, has the burden of proving infringement. Alexion objects to this interrogatory as premature in that it seeks Alexion's non-infringement defenses prior to the Court's ruling regarding claim construction. Alexion further objects to this interrogatory as premature in that it seeks expert opinions prior to

the time set for expert discovery by the August 21, 2007 Scheduling Order.  Alexion will

supplement its response in accordance with the Scheduling Order or as otherwise allowed by the

Court or Federal or Local Rules.  Subject to the foregoing objections and its General Objections,

Alexion responds as follows.

The accused product, Soliris™, and use thereof, do not meet, either literally or by

equivalents, each and every claim limitation of any valid claim of the patents-in-suit.

**INTERROGATORY NO. 2:**

Separately for each claim in each of the Patents-In-Suit, identify all Documents to
every invention, product, method, or technology available to customers as an alternative to the
Patents-In-Suit.

**RESPONSE TO INTERROGATORY NO. 2:**

Alexion objects to this interrogatory as vague, ambiguous and incomprehensible.

Alexion further objects to this interrogatory because it purports to shift the burden of proof

regarding infringement to Alexion and to require Alexion to set forth its defenses to infringement

prior to PDL's identification of asserted claims or infringement contentions.  PDL, as plaintiff

and patentee, has the burden of proving infringement.  To the extent that this interrogatory seeks

the identification of documents, any such relevant and responsive documents will be produced

subject to Alexion's responses and objections as set forth in Alexion's Responses to PDL's First

Set Of Requests For Production Of Documents.  Alexion objects to this interrogatory to the

extent that it seeks documents and things directed solely to the issue of damages as premature

pending the Court's decision regarding bifurcation of liability and damages issues, which,

pursuant to the Court's August 7, 2007 oral ruling, will be filed on or before September 6, 2007.

Subject to the foregoing objections and its General Objections, Alexion responds as follows.

Alexion cannot answer this interrogatory because Alexion does not understand it.

**INTERROGATORY NO. 3:**

        Separately for each claim in each of the Patents-In-Suit, please state all facts, and identify all witnesses to any facts, that You contend support Your second defense set forth in paragraph 33 of Alexion's *Answer and Counterclaims* that the Patents-In-Suit are invalid.

**RESPONSE TO INTERROGATORY NO. 3:**

        Alexion objects to this interrogatory to the extent that it seeks information, documents or things that are protected by the attorney-client privilege, attorney work product doctrine, or any other applicable privilege or immunity.  Alexion objects to this interrogatory as premature and unduly burdensome because it purports to require Alexion to set forth separate invalidity defenses for over 85 claims prior to PDL's identification of the asserted claims.  Alexion further objects to this interrogatory as premature in that it seeks expert opinions prior to the time set for expert discovery by the proposed August 21, 2007 Scheduling Order.  Alexion will supplement its response in accordance with the Scheduling Order or as otherwise allowed by the Court or Federal or Local Rules.  Subject to the foregoing objections and its General Objections, Alexion responds as follows.

        Each of the claims of the patents in suit are invalid for failure to meet the patentability requirements of one or more of 35 U.S.C. § 101, 102, 103, and 112.

        For example, several claims of the patents-in-suit are invalid because they do not meet the patentability requirements of  35 U.S.C. § 112.  The specifications of the '762, '763 and '370 patents do not provide an adequate written description to support the patentability of each claim of the respective patents.  Similarly, the specifications of the '762, '763 and '370 patents do not fully enable the scope of the purported inventions claimed.

        Several claims of the patents-in-suit are invalid under 35 U.S.C. § 101 because the claims are inoperable.

The majority, if not all, of the claims of the patents-in-suit are invalid because they are anticipated by or obvious in view of the prior art and/or the knowledge of one of ordinary skill in the art. Examples of prior art references that render the patents invalid, either alone or in combination, include but are not limited to, Chothia & Lesk, *The Relation Between the Divergence of Sequence and Structure in Proteins*, EMBO Journal 5(4):823-26 (1986); Jones et al., *Replacing the Complementarity Determining Regions in a Human Antibody With Those From a Mouse*, Nature 321:522-25 (1986); Riechmann et al., *Reshaping Human Antibodies for Therapy*, Nature 322:323-27 (1988); and Winter, EP 0239400.

YOUNG CONWAY STARGATT & TAYLOR, LLP

_____
Josy W. Ingersoll (I.D. #1088)
Andrew A. Lundgren (I.D. #4429)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware  19801
Telephone:  (302) 571-6600
alundgren@ycst.com

*Attorneys for Defendant*

*Of Counsel:*

John M. Desmarais
Gerald J. Flattmann, Jr.
Christine Willgoos
KIRKLAND & ELLIS
153 East 53rd Street
New York, NY  1002
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

Dated:  August 22, 2007

## CERTIFICATE OF SERVICE

I, Andrew A. Lundgren, hereby certify that on August 22, 2007, I caused a copy of the

foregoing document to be served on the following in the manner indicated:

### BY E-MAIL AND HAND DELIVERY

Jack B. Blumenfeld, Esquire
Karen Jacobs Louden, Esquire
Morris Nichols Arsht & Tunnell LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347

### BY E-MAIL

Matthew D. Powers, Esquire
Vernon M. Winters, Esquire
John D. Beynon, Esquire
Weil, Gotshal & Manges LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Josy W. Ingersoll  (No. 1088)
Andrew A. Lundgren (No. 4429)
1000 West Street, 17th Floor
Wilmington, Delaware  19801
(302) 571-6600
alundgren@ycst.com

*Attorneys for Defendant.*

# Exhibit 6

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| PDL BIOPHARMA, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C. A. No. 07-156 *** |
| | ) | |
| ALEXION PHARMACEUTICALS, INC. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT ALEXION PHARMACEUTICALS, INC.'S**
**FIRST SET OF INTERROGATORIES**

Pursuant to Federal Rule Of Civil Procedure 33, Defendant Alexion

Pharmaceuticals Inc., ("Alexion") hereby requests that Plaintiff PDL Biopharma, Inc., ("PDL")

answer the following interrogatories.  The requested answers must be provided within thirty (30)

days of the service of these interrogatories or at such other time as mutually agreed upon in

writing by counsel for the parties.

**DEFINITIONS**

1.      As used herein, "PDL" shall mean Plaintiff PDL Biopharma, Inc. and all of its

corporate parents, corporate predecessors and past or present subsidiaries, affiliates, divisions,

departments, officers, directors, agents and employees.

2.      As used herein, "patents-in-suit" shall mean United States Patent Nos. 5,693,761

("the '761 patent");  5,693,762 ("the '762 patent");  and 6,180,370 B1 ("the '370 patent");

including any corrections.

3.      As used herein, "the European Oppositions" shall mean all proceedings--including those before revocation, during appeal of revocation, and subsequent to appeal of revocation--before the European Patent Office relating to the European Patent Nos. 0682040 B1 and 0451216 B1.

4.      As used herein, "concerning" shall mean relating to, referring to, regarding, describing, evidencing, reflecting, comprising or constituting.

5.      As used herein, "person" means any natural person, corporation, partnership, business, governmental body or entity of any kind.

6.      As used herein, "and" and "or" shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive; use of a singular noun shall be construed to include the plural noun and use of a plural noun shall be construed to include the singular noun; and the use of a verb in any tense shall be construed as the use of that verb in all other tenses whenever necessary to bring within the scope of the request that which might otherwise be construed to be outside its scope.

7.      As used herein, the terms "all," "any," "each," and "every" shall each be construed as both "each" and "every" to bring within the scope of the request all responses which might otherwise be construed to be outside its scope.

## INTERROGATORIES

## INTERROGATORY NO. 1:

Please describe (by way of claim chart) the bases for PDL's infringement assertions at the time it filed the Complaint and, if different, at the present time, as follows: identify each claim of each patent in suit that PDL contends any Alexion product, including Soliris®, or the manufacture or use thereof, has infringed under any theory; state whether such alleged

infringement is literal or under the doctrine of equivalents; describe the complete factual basis and evidentiary support for the presence of each element of each asserted claim either literally or by way of a substantial equivalence and identify the three individuals most knowledgeable about the information requested in this interrogatory.

**INTERROGATORY NO. 2:**

For each claim of each patent-in-suit, please state the dates on which the claimed subject matter was conceived; reduced to practice; first described in a document; first disclosed to a person other than the inventors; first offered for sale; first sold; first described in a printed publication anywhere in the world; and first publicly used in the United States.  Please identify all supporting documents, samples, investigations, tests, measurements, analyses, opinions, and testimony supporting each date and the three individuals most knowledgeable about the information requested in this interrogatory.

**INTERROGATORY NO. 3:**

Please state the priority date that PDL asserts for each claim of the patents-in-suit.

**INTERROGATORY NO. 4:**

Please identify what PDL contents to be the relevant art for the patents-in-suit and the level of ordinary skill in that art as of December 19, 1989 and all dates identified in response to Interrogatory No. 3 and describe in detail the factual and legal bases for PDL's contentions.

## INTERROGATORY NO. 5:

Please identify all prior art, and any reference, device, material, or activity ever alleged to be prior art, known to PDL that is relevant, or has been asserted by others to be relevant, to any of the patents-in-suit, related patents, corresponding foreign patents, or related applications, including, without limitation, the date, source, and circumstances under which PDL first became aware thereof, whether the reference, device, material, or activity was known to any inventor named on or prosecuting attorneys or agents of the patents-in-suit before the issue date of each such patent, and an identification of all documents and things concerning such prior art, including, without limitation, any claim charts, declarations, or other descriptive, negotiation, prosecution, or litigation materials provided to or by PDL.

## INTERROGATORY NO. 6:

Separately, for each asserted claim of the patents-in-suit, state whether PDL contends that objective indicia (e.g., commercial success, long-felt need, failed attempts of others to solve, initial skepticism, industry recognition and praise, copying, or imitation by others) support the non-obviousness of each such claim, describe in detail all of the factual and legal bases for any such contention, and identify all documents that either support or refute and persons with knowledge of, including the subject matter known by any such person, any such contention.

## INTERROGATORY NO. 7:

Please identify each person who was substantially involved in the prosecution of any of the patent applications that matured into any of the patents-in-suit, and other patents related to the patents-in-suit, including but not limited to those patents from which the patents-in-suit in whole or in part claim priority.  For each such person, please provide their current employer, job

title and description, home address, relationship with PDL, and state the nature and extent of her

involvement in such prosecution and identify every document relating to such involvement.

**INTERROGATORY NO. 8:**

Please describe in detail the factual and legal bases for PDL's contention that Alexion has

willfully infringed any claim of the patents-in-suit, including PDL's contention that Alexion has

had actual and constructive knowledge of the patents-in-suit.  This detailed description should

include, without limitation, an identification of any document, information or tangible item that

supports, refutes, or otherwise concerns PDL's contentions.

**INTERROGATORY NO. 9:**

Please describe in detail the factual and legal bases for PDL's contention that it is entitled

to damages in the above-captioned action, including an identification of what PDL contents to be

the reasonable royalty rate for the patents-in-suit and all bases for that contention.  This detailed

description should include, without limitation, an identification of any document, information or

tangible item that supports, refutes, or otherwise concerns PDL's contentions.

**INTERROGATORY NO. 10:**

Please describe in detail the factual and legal bases for PDL's contention that the above-

captioned case is exceptional and that PDL is entitled to its attorneys' fees in the above-captioned

action.  This detailed description should include, without limitation, an identification of any

document, information or tangible item that supports, refutes, or otherwise concerns PDL's

contentions.

**INTERROGATORY NO. 11:**

Please identify and describe each direct and indirect license under any of the patents-in-suit, including when each of such licenses was granted, the terms and negotiates of each such license, and whether it is currently in force or when it terminated.

**INTERROGATORY NO. 12:**

Please identify and describe all testing of Soliris® and/or eculizumab by or on behalf of PDL, including without limitation, results and conclusions, and each and every person involved in such testing. For each such person please identify their current employer, work address, job title and description, home address, relationship with PDL, and the bases for their knowledge of such testing.

**INTERROGATORY NO. 13:**

Please describe in detail the factual and legal bases for PDL's defenses of laches and unclean hands.  This detailed description should include, without limitation, an identification of any document, information or tangible item that supports, refutes, or otherwise concerns PDL's contentions.

**INTERROGATORY NO. 14:**

Please identify each litigation or judicial or administrative proceeding, whether within or outside the United States, in which the ownership, inventorship, scope, validity or enforceability of any of the patents-in-suit, corresponding foreign patents, or any patent directly or indirectly claiming priority or benefit from, or granting or conferring priority upon any application

supporting any of the patents-in-suit, was at issue. Please state the status and disposition of each such proceeding.

YOUNG CONWAY STARGATT & TAYLOR LLP

___/s/ Andrew Lundgren_____
Josy W. Ingersoll (I.D. #1088)
Andrew Lundgren (I.D. #4429)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware  19801
Telephone:  (302) 571-6600
*alundgren@ycst.com*

*Attorneys for Defendant*

*Of Counsel:*

John M. Desmarais
Gerald J. Flattmann, Jr.
Christine Willgoos
KIRKLAND & ELLIS
153 East 53rd Street
New York, NY  1002
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

# Exhibit 7

10-K 1 form10k123105.htm PROGENICS FORM 10-K 12/31/05

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 10-K

**(Mark One)**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the fiscal year ended December 31, 2005**
**or**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the transition period from _____ to _____**

### Commission File No. 000-23143

# PROGENICS PHARMACEUTICALS, INC.
#### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **13-3379479** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification Number)** |

### 777 Old Saw Mill River Road
### Tarrytown, NY 10591
#### (Address of principal executive offices, including zip code)

### Registrant's telephone number, including area code: (914) 789-2800

### Securities Registered pursuant to Section 12(b) of the Act: None

| | |
|---|---|
| **Securities Registered pursuant to Section 12(g) of the Act:** | Common Stock, par value $0.0013 per share |
| | (Title of Class) |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.
Yes ☒     No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained

Table of Contents

Our scientists, in collaboration with researchers at the Aaron Diamond AIDS Research Center, or ADARC, described in an article in *Nature* the discovery of a co-receptor for HIV on the surface of human immune system cells. This co-receptor, CCR5, enables fusion of HIV with the cell membrane after binding of the virus to the CD4 receptor. This fusion step results in entry of the viral genetic information into the cell and subsequent viral replication. Our PRO 140 program is based on blocking binding of HIV to the CCR5 co-receptor. Further work by other scientists has established the existence of a second co-receptor, CXCR4. Based on our pioneering research, we believe we are a leader in the discovery of viral entry inhibitors, a promising new class of HIV therapeutics. We believe viral entry inhibitors could become the next generation of therapy.

*PRO 140*

PRO 140 is a humanized monoclonal antibody designed to block HIV infection by inhibiting virus-cell binding. We have designed PRO 140 to target a distinct site on CCR5 without interfering with the normal function of CCR5. PRO 140 has shown promising activity in preclinical studies. In *in vitro* studies, PRO 140 demonstrated potent, broad-spectrum antiviral activity against more than 40 genetically diverse "primary" HIV viruses isolated directly from infected individuals. Single doses of a murine-based PRO 140 reduced viral burdens to undetectable levels in an animal model of HIV infection. In mice treated with murine PRO 140, initially high HIV concentrations became undetectable for up to nine days after a single dose. Additionally, multiple doses of murine PRO 140 reduced and then maintained viral loads at undetectable levels for the duration of therapy in an animal model of HIV infection. Sustaining undetectably low levels of virus in the blood is a primary goal of HIV therapy.

In mid-2005, we completed a phase 1 study of humanized PRO 140 designed to determine the tolerability, safety, pharmacology and immunogenicity of PRO 140 in healthy volunteers. PRO 140 exhibited both a long half-life in the circulation and dose-dependent binding to CCR5-expressing cells. A single 5 mg/kg dose of PRO 140 significantly coated — and thereby potentially protected from HIV infection — CCR5 cells for as long as 60 days. PRO 140 was generally well tolerated at all dose levels in this study.

In December 2005, we initiated a phase 1b study of PRO 140. The phase 1b trial is designed to assess the tolerability, pharmacokinetics and preliminary antiviral activity of PRO 140 in approximately 40 HIV-positive patients. This multi-center, double-blind, placebo-controlled, dose-escalation study is being conducted in patients who have not taken any anti-retroviral therapy within the previous three months and who have HIV plasma concentrations greater than or equal to 5,000 copies/mL. Patients will receive a single intravenous dose of study medication — either placebo or one of three increasingly higher doses of PRO 140. PRO 140 blood levels and CCR5 coating will be determined and compared with antiviral effects measured as changes in plasma HIV viral load following treatment.

In February 2006, we received "Fast Track" designation from the FDA for PRO 140. The FDA Fast Track Development Program facilitates development and expedites regulatory review of drugs intended to address an unmet medical need for serious or life-threatening conditions.

The "humanized" version of PRO 140 was developed for us by PDL BioPharma, Inc. (formerly, Protein Design Labs, Inc.) See "Licenses—Protein Design Labs."

*ProVax*

ProVax is our vaccine product candidate under development for the prevention of HIV infection or as a therapeutic treatment for HIV-positive individuals. We are currently performing government-funded research and development of the ProVax vaccine in collaboration with the Weill Medical College of Cornell University.

Table of Contents

**UR Labs.** On December 22, 2005, we acquired certain rights for our lead investigational drug, methylnaltrexone ("MNTX"), from several of our licensors.

In 2001, we entered into an exclusive sublicense agreement with UR Labs, Inc. ("URL") to develop and commercialize MNTX (the "MNTX Sublicense") in exchange for rights to future payments resulting from the MNTX Sublicense. As of December 31, 2005 we had paid to UR Labs $550,000 under this agreement. In 1989, URL obtained an exclusive license to MNTX, as amended, from the University of Chicago ("UC") under an Option and License Agreement dated May 8, 1985, as amended (the "URL-Chicago License"). In 2001, URL also entered into an agreement with certain heirs of Dr. Leon Goldberg (the "Goldberg Distributees"), which provided them with the right to receive payments based upon revenues received by URL from the development of the MNTX Sublicense (the "URL-Goldberg Agreement").

On December 22, 2005, we entered into an Agreement and Plan of Reorganization (the "Purchase Agreement") by and among Progenics Pharmaceuticals, Inc., Progenics Pharmaceuticals Nevada, Inc., UR Labs, Inc. and the shareholders of UR Labs, Inc. (the "URL Shareholders"), under which we acquired substantially all of the assets of URL, comprised of its rights under the URL-Chicago License, the MNTX Sublicense and the URL-Goldberg Agreement, thus assuming URL's rights and responsibilities under those agreements and extinguishing our obligation to make royalty and other payments to URL.

On December 22, 2005, we entered into an Assignment and Assumption Agreement with the Goldberg Distributees, under which we assumed all rights and obligations of the Goldberg Distributees under the URL-Goldberg Agreement, thereby extinguishing URL's (and consequentially, our) obligations to make payments to the Goldberg Distributees. Although we no longer have any obligation to make royalty payments to URL or the Goldbergs, we continue to have an obligation to make those payments (including royalties) to the University of Chicago that would have been made by URL.

In consideration for the assignment of the Goldberg Distributees' rights and of the acquisition of the assets of URL described above, we issued, on December 22, 2005, a total of 686,000 shares of our common stock, with a fair value of $15.8 million, based on a closing price of our common stock of $23.09, and paid a total of $2,604,900 in cash (representing the opening market value, $22.85 per share, of 114,000 shares of our common stock on the date of the acquisition) to the URL Shareholders and the Goldberg Distributees and paid $310,000 in transaction fees.

We accounted for the acquisition of the rights described above from the licensors, the only asset acquired, as an asset purchase. The acquired rights relate to the MNTX Sublicense and our research and development activities for MNTX, for which technological feasibility has not yet been established, for which there is no alternative future use and, which has not received regulatory approval for marketing. Accordingly, the entire purchase price of $18.7 million was recorded as license expense, as a separate line item in the Company's Statement of Operations, in the period incurred.

**PDL BioPharma, Inc. (formerly, Protein Design Labs).** Pursuant to an agreement, Protein Design Labs ("PDL") developed a humanized PRO 140 monoclonal antibody and granted to us related exclusive and nonexclusive worldwide licenses under patents, patent applications and know-how. In general, the license agreement terminates on the later of ten years from the first commercial sale of a product developed under the agreement or the last date on which there is an unexpired patent or a patent application that has been pending for less than ten years, unless sooner terminated. Thereafter, the license is fully paid. The last of the presently issued patents expires in 2014; however, patent applications filed in the U.S. and internationally that we have also licensed and patent term extensions may extend the period of our license rights, when and if such patent applications are allowed and issued or patent term extensions are granted. We may terminate the license agreement on 60 days prior written notice. In addition, either party may terminate the license agreement, upon ten days written notice, for breach involving failure of the counterparty to make timely payments or for breach of other material terms of the agreement, upon 30 days prior written notice, that is not cured by the other party. As of December 31, 2005, we have paid to PDL approximately $3.9 million under this agreement. If all milestones specified under the agreement are achieved, we will be obligated to pay PDL an additional approximately $3.0 million. We are also required to pay annual maintenance

Table of Contents

**PROGENICS PHARMACEUTICALS, INC**.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — *continued***
(amounts in thousands, except per share amounts or unless otherwise noted)

### iii. Aquila Biopharmaceuticals, Inc.

The Company has entered into a license and supply agreement with Aquila Biopharmaceuticals, Inc., a wholly owned subsidiary of Antigenics Inc., pursuant to which Aquila agreed to supply the Company with all of its requirements for the QS-21™ adjuvant for use in ganglioside-based cancer vaccines, including GMK. QS-21 is the lead compound in the Stimulon® family of adjuvants developed and owned by Aquila. In general, the license agreement terminates upon the expiration of the last to expire of the licensed patents, unless sooner terminated. In the U.S. the licensed patent will expire in 2008.

The Company's license agreement requires it to achieve development milestones. The agreement states that the Company is required to have filed for marketing approval of a drug by 2001 and to commence the manufacture and distribution of a drug by 2003. We have not achieved these milestones due to delays that we believe could not have been reasonably avoided. The agreement provides that Aquila shall not unreasonably withhold consent to a reasonable revision of the milestone dates under specified circumstances, and
we believe that the delays referred to above satisfy the criteria for a revision of the milestone dates. Aquila has not consented to a revision of the milestone dates as of this time.

The Company has the right to terminate the agreement without cause upon 90 days prior written notice, with the obligation to pay only those liabilities that have accrued prior to such termination. In the event of a default by one party, the agreement may also be terminated, after an opportunity to cure, by non-defaulting party upon 60 days prior written notice.

### iv. Development and License Agreement with PDL BioPharma, Inc. (formerly, Protein Design Labs, Inc.)

The Company has entered into a development and license agreement with Protein Design Labs, or PDL, for the humanization by PDL of PRO 140. Pursuant to the agreement, PDL granted the Company exclusive and nonexclusive worldwide licenses under patents, patent applications and know-how relating to the humanized PRO 140. In general, the license agreement terminates on the later of 10 years from the first commercial sale of a product developed under the agreement or the last date on which there is an
unexpired patent or a patent application that has been pending for less than ten years, unless sooner terminated. Thereafter the license is fully paid. The last of the presently issued patents expires in 2014; however, patent applications filed in the U.S. and internationally that the Company has also licensed and patent term extensions may extend the period of our license rights, when and if such patent applications are allowed and issued or patent term extensions are granted. The Company has the right to terminate the agreement without cause upon 60 days prior written notice. In the event of a default by one party, the agreement may also be terminated, after an opportunity to cure, by non-defaulting party upon 30 days prior written notice.

### v. UR Labs, Inc.

In 2001, the Company entered into an agreement with UR Labs to obtain worldwide exclusive rights to intellectual property rights related to MNTX. UR Labs had exclusively licensed MNTX from the University of Chicago. In consideration for the license, the Company paid a nonrefundable, noncreditable license fee and was obligated to make additional payments upon the occurrence of defined milestones. On December 22, 2005, the Company entered into a series of agreements with UR Labs, which extinguished Progenics' obligation to make royalty and other payments to UR Labs (see Note 8). The Company will be responsible to make certain payments to the University of Chicago, associated with the MNTX product development and commercialization program, which would have been made by UR Labs.

Table of Contents

# EXHIBIT INDEX

| Exhibit Number | Description |
|---|---|
| 3.1(1) | Certificate of Incorporation of the Registrant, as amended. |
| 3.2(1) | By-laws of the Registrant |
| 4.1(1) | Specimen Certificate for Common Stock, $.0013 par value per share, of the Registrant |
| 10.1(1) | Form of Registration Rights Agreement |
| 10.2(1) | 1989 Non-Qualified Stock Option Plan‡ |
| 10.3(1) | 1993 Stock Option Plan, as amended‡ |
| 10.4(1) | 1993 Executive Stock Option Plan‡ |
| 10.5(4) | Amended and Restated 1996 Stock Incentive Plan‡ |
| 10.5.1(12) | Form of Non-Qualified Stock Option Agreement‡ |
| 10.5.2(12) | Form of Restricted Stock Award‡ |
| 10.6(1) | Form of Indemnification Agreement‡ |
| 10.7(2) | Employment Agreement dated December 31, 2003 between the Registrant and Dr. Paul J. Maddon‡ |
| 10.8(1) | Letter dated August 25, 1994 between the Registrant and Dr. Robert J. Israel‡ |
| 10.9(10) | 1998 Employee Stock Purchase Plan‡ |
| 10.10(10) | 1998 Non-qualified Employee Stock Purchase Plan‡ |
| 10.11(1)† | License Agreement dated November 17, 1994 between the Registrant and Sloan-Kettering Institute for Cancer Research |
| 10.12(1)† | QS-21 License and Supply Agreement dated August 31, 1995 between the Registrant and Cambridge Biotech Corporation, a wholly owned subsidiary of bioMerieux, Inc. |
| 10.13(1)† | License Agreement dated March 1, 1989, as amended by a Letter Agreement dated March 1, 1989 and as amended by a Letter Agreement dated October 22, 1996 between the Registrant and the Trustees of Columbia University |
| 10.14(6) | Amended and Restated Sublease dated June 6, 2000 between the Registrant and Crompton Corporation |
| 10.15(3)† | Development and License Agreements, effective as of April 30, 1999, between Protein Design Labs, Inc. and the Registrant |
| 10.15.1 | Letter Agreement dated November 24, 2003 relating to the Development and License Agreement between Protein Design Labs, Inc. and the Registrant |
| 10.16(3)† | PSMA/PSMP License Agreement dated June 15, 1999, by and among the Registrant, Cytogen Corporation and PSMA Development Company LLC |
| 10.17(3)† | Limited Liability Company Agreement of PSMA Development Company LLC, dated June 15, 1999, by and among the Registrant, Cytogen Corporation and PSMA Development Company LLC |
| 10.18(8) | Amendment Number 1 to Limited Liability Company Agreement of PSMA Development Company LLC dated March 22, 2002 by and among the Registrant, Cytogen Corporation and PSMA Development Company LLC |
| 10.19(5) | Director Stock Option Plan‡ |
| 10.20(7)† | Exclusive Sublicense Agreement, dated September 21, 2001, between the Registrant and UR Labs, Inc. |
| 10.20.1(11) | Amendment to Exclusive Sublicense Agreement between the Registrant and UR Labs, Inc., dated September 21, 2001 |
| 10.21(9) | Research and Development Contract between the National Institutes of Health and the Registrant, dated September 26, 2003 |
| 10.22(9) | Agreement of Lease between Eastview Holdings LLC and the Registrant, dated September 30, 2003 |
| 10.23(9) | Letter Agreement amending Agreement of Lease between Eastview Holdings LLC and the Registrant, dated October 23, 2003 |
| 10.24(13) | Summary of Non-Employee Director Compensation‡ |
| 10.25(14) † | Supply Agreement, dated January 1, 2005, between Progenics Pharmaceuticals, Inc. and Mallinckrodt Inc. |
| 10.26 | License and Co-Development Agreement dated December 23, 2005 by and among Wyeth, acting through Wyeth Pharmaceuticals Division, Wyeth-Whitehall Pharmaceuticals, Inc. and Wyeth-Ayerst Lederle, Inc. and |

# Exhibit 8

10-K 1 a05-4774_110k.htm 10-K

# SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

# FORM 10-K

**(Mark one)**

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the Fiscal Year Ended December 31, 2004 or**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from                    to

**Commission File Number 000-30231**

# TANOX, INC.

(Exact name of registrant as specified in its charter)

| **Delaware** | **76-0196733** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**10301 Stella Link, Houston, Texas 77025**
(Address of principal executive offices)

**713-578-4000**
(Registrant's telephone number, including area code)

Securities Registered Pursuant to Section 12(b) of the Act:  **None**

Securities Registered Pursuant to Section 12(g) of the Act:  **Common Stock, $.01 par value**
**Preferred Share Purchase Rights**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒    No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Act). Yes ☒    No ☐

The aggregate market value of the registrant's common stock held by nonaffiliates as of June 30, 2004 was $582,931,932.

Number of shares of outstanding common stock as of March 2, 2005:  44,000,398.

## DOCUMENTS INCORPORATED BY REFERENCE

The information called for by Items 10, 11, 12 and 13 of Part III will be included in the registrant's definitive proxy statement to be filed pursuant to Regulation 14A and is incorporated herein by reference.

**Tanox, Inc. and Subsidiaries**

**Notes to Consolidated Financial Statements—(Continued)**

attorneys, up to a maximum of $300 million. The Company expects that the net amount it will receive from Xolair sales, taking into account both the foregoing credit and the amount payable to its former attorneys will be in the range of 8% to 12% of the net sales depending on the sales level achieved and geographic distribution of the sales. Milestone and other credits caused the net amount that Tanox received from Xolair royalties to be below 8% of net sales in 2004.

## 5. COLLABORATION AND LICENSE AGREEMENTS

*Genentech Inc. and Novartis Pharma, AG.*   In 1990, Tanox entered into a Development and Licensing Agreement with Ciba Geigy, AG (now Novartis Pharma AG) to jointly develop anti-IgE antibodies to treat allergic diseases. In connection with the settlement of a lawsuit in 1996, Genentech joined the collaboration for the purpose of developing certain anti-IgE antibodies. Under the collaboration agreements we may receive up to an additional $25.0 million in Xolair-related milestone payments of which $7.2 million would be payable to the former attorneys and $2.5 million would be creditable against future royalty payments.

In the United States, Tanox receives royalties on sales of Xolair and other collaboration products and will receive a share of Novartis' net profits on these sales. Tanox also receives royalties from Novartis on sales of Xolair in Europe and the rest of the world. Tanox shares equally with Novartis the net profits and the net losses from the development and commercialization of Xolair and other collaboration products in China, Hong Kong, Korea, Singapore and Taiwan. The royalty and profit-sharing payments to Tanox are reduced by certain milestone and other credits. In addition, 10% of all royalties received by Tanox from sales of Xolair and certain other collaboration products will be payable to Tanox's former attorneys, up to a maximum of $300.0 million, as a result of the arbitration award (see Note 4. Revenues).

Novartis and Genentech are responsible for manufacturing Xolair and other selected anti-IgE products worldwide. In consideration for relinquishing any rights to manufacture up to 50% of the worldwide requirements of those products, Tanox will receive quarterly payments from Novartis or Genentech based on the quantity of product manufactured and vialed.

*Biogen IDEC, Inc.*   In 1998, Tanox entered into an agreement to license from Biogen, Inc. (now Biogen IDEC, Inc.) its anti-CD4 monoclonal antibody and intellectual property on an exclusive worldwide basis. Biogen IDEC owns issued U.S., European, Canadian and Australian patents and has pending applications in Japan, which cover our TNX-355 product. The Company paid Biogen IDEC a license fee and agreed to make additional development milestone payments and royalty payments to Biogen IDEC based on annual net sales revenue levels. If certain milestones are met, the Company may make up to an aggregate of $1.4 million (or $10.4 million in the event Tanox merges or affiliates with a company similar in size to Biogen) in product license fees and development milestone payments under this agreement, of which the Company has paid $200,000. The license terminates on a country-by-country basis on the later of the expiration of 12 years following the first commercial product sale or the expiration or invalidity of applicable patents.

*Protein Design Labs, Inc.*   In 2000, Tanox entered into an agreement with Protein Design Labs, Inc. (PDL) to acquire the right to non-exclusive licenses to patents and patent applications owned by PDL for up to four of the Company's antibodies. Under the agreement, the Company paid initial license fees to PDL of $2.5 million, in addition to $1.5 million that was paid to PDL in 1998 under a prior licensing agreement, and must exercise the option for license not later than March 17, 2005. If the Company exercises its options to license PDL's patents for all four antibodies, the Company agreed to pay PDL up to

# Exhibit 9

# BIOTRANSPLANT INC

BUILDING 75, 3RD AVENUE
BLDG 96 13TH ST
CHARLESTOWN, MA 02129
617. 241.5200

# 10-K

**FORM 10-K**
**Filed on 03/15/2002 - Period: 12/31/2001**
File Number 000-28324



**LIVEDGAR**® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

XENOTRANSPLANTATION

Novartis has exclusive worldwide rights to market and sell xenotransplantation products, if any, arising from the research program conducted by Immerge BioTherapeutics.

RESEARCH AND DEVELOPMENT

Our total research and development expenses were approximately $15.7 million, $15.0 million and $10.9 million for 1999, 2000 and 2001, respectively.

PATENTS AND PROPRIETARY RIGHTS

As of February 15, 2002, we owned or had been licensed 56 issued United States patents and 31 allowed or pending United States patent applications, as well as applications for foreign patents. These patents, which expire at various times between 2005 and 2017, and patent applications are directed to, among other things, MEDI-507, our AlloMune Systems and our xenotransplantation technologies.

Our policy is to aggressively prosecute and enforce our patents and proprietary technology. We intend to continue to file United States and foreign patent applications to protect technology, inventions and improvements that are considered important to the development of our business. We also rely upon trade secrets, know how, continuing technological innovation and licensing opportunities to develop and maintain our competitive position.

A patent recently issued to a major pharmaceutical company directed towards recombinant production of monoclonal antibodies. We may require a license under this patent with respect to MEDI-507. There can be no assurance that such a license will be granted to us or that we can obtain a license on terms favorable to us. If a required license is not available, our ability to generate revenue would be adversely affected.

We have reviewed issued patents that include claims relating to humanized monoclonal antibodies. These patents are held by biotechnology companies and an academic institution. We, together with MedImmune, have obtained a license for MEDI-507 from Protein Design Laboratories Inc. under its humanized antibody patents.

We are also aware of a granted United States patent directed to the production of transgenic animals by the use of a microinjection technique that is licensed to a competitor. This patent could have an adverse impact on our, or our licensees' and collaborators' ability to produce transgenic animals by microinjection. In addition, we are aware of a United States patent that is directed to embryonic stem cells. This patent may have an adverse impact on our, or our licensees' or collaborators', programs for producing transgenic swine by the use of embryonic stem cells.

Some of our know-how and technology is not patentable. To protect our rights, we require all of our employees, consultants, advisors and collaborators to enter into confidentiality agreements with us.

COMPETITION

We face intense competition from a wide range of pharmaceutical, biopharmaceutical and medical device companies, as well as academic and research institutions and government agencies. Our competitors include organizations that are pursuing the same or similar technologies as those that constitute our technology platform and organizations that are pursuing products that are competitive with our potential products. To the extent that these technologies or products address the problems associated with autoimmune disease, cancer or transplantation on which we have focused, they may represent significant competition.

Many of the organizations competing against us have financial and other resources substantially greater than our own. In addition, many of our competitors have significantly greater experience in

14

<Page>

```
<Table>
<Caption>
                                          DESCRIPTION
EXHIBIT NO.
-----------          -----------------------------------------------------------
<C>                  <S>
    10.18(4)         Consulting Agreement between the Company and Dr. David H.
                     Sachs dated January 1, 1991.

    10.19(7)         Amendments to Consulting Agreement between the Company and
                     Dr. David H. Sachs dated December 1, 1998, January 5, 2000
                     and January 8, 2001.

    10.20(4)         Lease between the Company and BioLease, Inc. dated March 17,
                     1994.

    10.21(8)         First Amendment to Lease between the Company and BioLease,
                     Inc. dated November 17, 1998.

   +10.22(9)         Development and Supply Agreement between the Company and
                     Dendreon Corporation (formerly, Activated Cell Therapy),
                     dated August 22, 1996.

    10.23(5)         Agreement to further vary Shareholders' Agreement among the
                     Company and Castella Research, Secure Sciences and Stem Cell
                     Sciences Pty., Ltd., dated December 20, 1996.

    10.24(5)         Agreement to further vary Shareholders' Agreement among the
                     Company and Castella Research, Secure Sciences and Stem Cell
                     Sciences Pty., Ltd., dated March 16, 1997, as amended.

    10.25(11)        Letter Agreement, Security Agreement and Promissory Note
                     between the Company and Fleet National Bank, dated August
                     10, 1999.

   +10.26(10)        Miniature Swine Transfer and Maintenance Agreement dated
                     January 1, 1998 by and between Charles River Laboratories,
                     Inc., Wilmington Partners, L.P. and the Company.

   +10.27(12)        Shareholder Agreement dated September 24, 2000 by and
                     between the Company, Novartis AG and Immerge BioTherapeutics
                     AG (formerly known as Loxo AG), together with exhibits.

   +10.28(13)        Patent License Agreement (MEDI-507), dated July 17, 1997 by
                     and between Protein Design Labs and MedImmune, Inc.

    10.29(14)        Promissory Note made by Eligix, Inc. in favor of the
                     Company.

   +10.30(15)        Services Agreement dated January 1, 2001 by and between the
                     Company and Immerge BioTherapeutics, Inc., together with
                     exhibits.

    10.31(16)        Commercial Lease by and between Cummings Properties
                     Management, Inc., and Eligix, Inc. (f.k.a. Coulter Cellular
                     Therapies, Inc.).

    10.32(16)        Master Loan and Security Agreement, dated as of July 28,
                     1999, by and between Eligix, Inc. and Transamerica Business
                     Credit Corporation, including Form of Stock Subscription
                     Warrant to Purchase Common Stock and Promissory Notes in
                     favor of Transamerica Business Credit Corporation dated
                     August 9, 1999, December 29, 1999 and January 31, 2000.

    10.33(16)        First Amendment to Master Loan and Security Agreement, dated
                     as of May 15, 2001, by and among the Company, Eligix, Inc.
                     and Transamerica Business Credit Corporation.

   +10.34(16)        Agreement, dated as of June 2, 2000, by and between Eligix,
                     Inc. and Coulter Pharmaceutical, Inc

   +10.35(16)        License, Assignment and Supply Agreement, dated as of
                     February 13, 1997, by and between Coulter Corporation,
                     Coulter International Corporation and Eligix, Inc. (f.k.a.
                     Coulter Cellular Therapies, Inc.)

   *10.36(16)        Assumed Eligix, Inc. Amended and Restated Management Equity
                     Incentive Plan, as amended.

   *10.37(16)        Assumed Eligix, Inc. 1997 Equity Incentive Plan, as amended.
</Table>
```

```
<Page>
```

# Exhibit 10

Copyright 2007 Lab Business Week via IncRx.com via NewsRx.com and NewsRx.net
Lab Business Week

July 1, 2007

**SECTION:** EXPANDED REPORTING; Pg. 221

**LENGTH:** 556  words

**HEADLINE:** BIOTECH BUSINESS;
Seattle Genetics Adds Industry Veterans John P. McLaughlin and Daniel G. Welch to its Board of Directors and Promotes Eric Dobmeier to Chief Business Officer

**BODY:**

Seattle Genetics, Inc. (Nasdaq:SGEN) announced that industry veterans John P. McLaughlin and Daniel G. Welch have joined its Board of Directors, together bringing over 50 years of commercial and operational leadership to the company. The company also announced that Eric L. Dobmeier has been promoted to the newly created position of Chief Business Officer.

"John's and Dan's extensive experience and successful track records will provide us with diverse and valuable operational, business development, legal and commercialization expertise," said Clay B. Siegall, Ph.D., President and Chief Executive Officer of Seattle Genetics. Commenting on the promotion of Eric Dobmeier to Chief Business Officer, Dr. Siegall added, "Under Eric's leadership and guidance, the scope and value of our corporate collaborations have increased significantly, underscored by our most recent deal with Genentech on SGN-40. He will continue to play a key leadership role on the management team to capitalize on our rich pipeline of clinical product candidates, development capabilities and earlier-stage assets."

Mr. McLaughlin is currently Chief Executive Officer of Anesiva, Inc., (formerly Corgentech), a biotechnology company developing therapies to treat pain. Before that, he was President of Tularik, which was acquired by Amgen in 2004, and was co-founder and Chairman of Eyetech Pharmaceuticals, which was acquired by OSI Pharmaceuticals in 2005. Prior to that, he spent a decade at Genentech in a number of senior management positions including Executive Vice President. Mr. McLaughlin earned a B.A. from the University of Notre Dame and a J.D. from the Catholic University of America.

Mr. Welch is currently Chief Executive Officer and President of InterMune, Inc., a biotechnology company focused on treatments for pulmonary and hepatic diseases. Before joining InterMune, he was Chairman and Chief Executive Officer of Triangle Pharmaceuticals, which was acquired by Gilead in 2003. Before that, he was President of Biopharmaceuticals at Elan Corporation. He also spent 13 years in various senior management roles at Sanofi-Synthelabo, now Sanofi-Aventis, and its successor companies. Mr. Welch holds a B.A. from the University of Miami and an M.B.A. from the University of North Carolina.

Mr. Dobmeier has been with Seattle Genetics for more than five years, serving most recently as Senior Vice President, Corporate Development. During his tenure, he has led negotiation and completion of multiple corporate alliances, including the company's worldwide license with Genentech for SGN-40, the in-license of SGN-33 from PDL Bio-Pharma and antibody-drug conjugate (ADC) collaborations with CuraGen, Progenics, Bayer, MedImmune and Agensys. In addition to business development, Mr. Dobmeier oversees Seattle Genetics' legal, corporate communications, strategic marketing and project management groups. Mr. Dobmeier holds an undergraduate degree from Princeton University and a law degree from Boalt Hall School of Law, University of California, Berkeley.

Keywords: Biotech Business, Amgen Inc., Biotechnology Business, Biotechnology Company, Genentech Inc., Genetics, OSI Pharmaceuticals, Seattle Genetics Inc.

This article was prepared by Lab Business Week editors from staff and other reports.  Copyright 2007, Lab Business Week via NewsRx.com.

BIOTECH BUSINESS; Seattle Genetics Adds Industry Veterans John P. McLaughlin and Daniel G. Welch to its Board of Directors and Promotes Eric Dobmeier to Chief Business Officer Lab Business Week July 1

**LOAD-DATE:** June 22, 2007

# Exhibit 11

HUMAN GENOME SCIENCES, INC.; Human Genome Sciences reports $62.1M Q1 net loss, provides clinical trials update Aging & Elder Health Week June 11, 2006

Copyright 2006 Aging & Elder Health Week via NewsRx.com & NewsRx.net
Aging & Elder Health Week

June 11, 2006

**SECTION:** EXPANDED REPORTING; Pg. 135

**LENGTH:** 840  words

**HEADLINE:** HUMAN GENOME SCIENCES, INC.;
Human Genome Sciences reports $62.1M Q1 net loss, provides clinical trials update

**BODY:**

Human Genome Sciences, Inc., (HGSI) (HGS) announced financial results for the quarter ended March 31, 2006. The company's net loss for the quarter, in accordance with generally accepted accounting principles, was $62.1 million, or $0.47 per share, including $6.7 million of stock-based compensation expense ($0.05 per share).

This compares with the net loss for the first quarter of 2005 of $59.6 million, or $0.46 per share. In 2005, stock-based compensation expense was not recognized in the net loss.

HGS reported revenues of $6.8 million for the quarter ended March 31, 2006, compared to revenues of $1.1 million for the first quarter of 2005. The increase in revenue relates primarily to the recognition of a $6 million milestone from GlaxoSmithKline (GSK), related to the progress of GSK716155 (formerly Albugon).

"In the first quarter, we continued to make significant progress in moving toward commercialization, and we plan to accelerate this progress in the remainder of 2006," said H. Thomas Watkins, president and CEO.

"In April 2006, HGS presented the positive interim results of two clinical trials of Albuferon in combination with ribavirin. The results to date support the company's plan to advance Albuferon to phase III development before the end of 2006. We are also working closely with our collaborator, GSK, in preparing to initiate phase III development of LymphoStat-B in systemic lupus erythematosus before the end of 2006. At the same time, our recently announced definitive agreement with BioMed Realty Trust for the sale/leaseback of the company's large-scale manufacturing facility and a new lease for our headquarters facility will generate approximately $380 million in additional cash available to support the progress of these lead compounds toward commercialization."

HGS entered into a $425 million definitive agreement with BioMed Realty Trust, Inc., in May 2006 for the sale/leaseback of the company's large-scale manufacturing facility and a new lease for its headquarters facility. The transactions are expected to add $220 million in new cash and $160 million in cash that will be freed up by elimination of the cash restriction associated with the previous lease for the headquarters facility. HGS expects to complete the transactions in the second quarter of 2006.

HGS presented interim results of two clinical trials of Albuferon at the end of April 2006. The results to date from both studies are encouraging and support the company's plan to advance Albuferon to phase III development before the end of 2006. HGS has identified 2 doses of Albuferon - 900 mcg and 1200 mcg - that may offer efficacy and safety at least comparable to Pegasys with dosing every 2 weeks, compared to weekly dosing for Pegasys, the current market leader. In addition, the studies provide a strong scientific basis for the continued study of Albuferon at higher doses administered monthly. HGS is currently considering collaboration opportunities for Albuferon.

GSK has initiated clinical development of GSK716155 for potential use in the treatment of diabetes. In the first quarter of 2006, HGS recognized a $6 million milestone related to the continuing progress of GSK716155. HGS also disclosed that GSK plans to advance relacatib (GSK462795) to phase II clinical trials for the treatment of bone metastases in 2006. Relacatib, a small-molecule drug discovered by GSK using HGS technology, is also in development for the treatment of osteoporosis and osteoarthritis.

CoGenesys, a division of HGS, and PDL BioPharma entered into a worldwide licensing agreement in January 2006, which provides PDL certain exclusive rights to intellectual property for an undisclosed target antigen discovered by HGS. Under terms of the agreement, CoGenesys is entitled to an upfront licensing fee, development milestone payments, and royalties on future sales of antibody therapeutics developed by PDL against the target. PDL also will provide

HUMAN GENOME SCIENCES, INC.; Human Genome Sciences reports $62.1M Q1 net loss, provides clinical trials update Aging & Elder Health Week June 11, 2006

CoGenesys with access to its antibody humanization technology platform, which will help enable CoGenesys' own internal discovery and development programs.

In January 2006, HGS announced a license agreement with Amgen under which Amgen acquired exclusive worldwide rights to develop and commercialize therapeutic biological products for human use based on a human gene discovered by HGS that may have potential applications in autoimmune diseases, immune deficiencies or suppression, and cancer. Amgen also acquired nonexclusive worldwide rights for the development and commercialization of diagnostic products for human use based on the same gene. HGS received an upfront payment and, according to the terms of the agreement, will receive certain annual fees, as well as development milestone payments and royalties on annual net sales for therapeutic and diagnostic products successfully developed and commercialized using such rights.

This article was prepared by Aging & Elder Health Week editors from staff and other reports. Copyright 2006, Aging & Elder Health Week via NewsRx.com.

**LOAD-DATE:** June 2, 2006