IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PDL BIOPHARMA, INC. | |
| Plaintiff, | |
| v. | C.A. No.: 07-156-JJF |
| ALEXION PHARMACEUTICALS, INC. | |
| Defendant. | |

**ALEXION'S ANSWERING BRIEF IN OPPOSITION TO
PDL'S MOTION TO DISMISS ALEXION'S DECLARATORY JUDGMENT
<u>COUNTERCLAIMS AS TO UNASSERTED PATENT CLAIMS</u>**

Josy W. Ingersoll (I.D. #1088)
John W. Shaw (I.D. #3362)
Andrew A. Lundgren (I.D. #4429)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600

*Of Counsel:*

John M. Desmarais
Gerald J. Flattmann, Jr.
Christine Willgoos
KIRKLAND & ELLIS
153 East 53rd Street
New York, NY 10022
(212) 446-4800

DB02:6702838.

# TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDINGS ......................................................1

SUMMARY OF THE ARGUMENT .............................................................................1

STATEMENT OF FACTS ............................................................................................3

ARGUMENT ...............................................................................................................6

I.      LEGAL STANDARD........................................................................................6

II.     A JUSTICIABLE CONTROVERSY EXISTS BETWEEN ALEXION
        AND PDL WITH RESPECT TO EVERY CLAIM OF THE PATENTS-
        IN-SUIT ...........................................................................................................7

        A.      PDL's Assertion Of Infringement Established The Court's
                Jurisdiction Over The Complaint And Counterclaims Of Invalidity......................7

        B.      The Court Has Jurisdiction Over Alexion's Counterclaim Pursuant
                To *MedImmune* and *Teva*.........................................................................8

III.    PDL'S ACTIONS HAVE NOT DIVESTED THE COURT OF
        JURISDICTION OVER ALEXION'S COUNTERCLAIMS ...........................12

IV.     THE COURT SHOULD EXERCISE ITS DISCRETION TO DECLARE
        THE RIGHTS OF THE PARTIES IN THIS CASE.......................................16

CONCLUSION..........................................................................................................17

# TABLE OF AUTHORITIES

**Cases**

*Altvater v. Freeman,*
    319 U.S. 359 (1943)................................................................................................. 15

*Biogen, Inc. v Amgen, Inc.,*
    913 F. Supp. 35 (D. Mass. 1996) ......................................................................... 13

*F.B. Leopold Co. v. Roberts Filter Mfg. Co., Inc.,*
    Civil Action No. 92-2427, 1995 WL 776945 (W.D. Pa. Aug. 2, 1995) ............... 16

*Goodyear Tire & Rubber Co. v. Releasomers, Inc.,*
    824 F.2d 953 (Fed. Cir. 1987)............................................................................... 11

*Jervis B. Webb Co. v. Southern Sys., Inc.,*
    742 F.2d 1388 (Fed. Cir. 1984).............................................................................. 14

*Lear Automotive Dearborn, Inc. v. Johnson Controls, Inc.,*
    528 F. Supp. 2d 654 (E.D. Mich. 2007)....................................................... 7, 15, 17

*Maryland Cas. Co. v. Pacific Coal & Oil Co.,*
    312 U.S. 270 (1941)................................................................................................. 6

*MedImmune, Inc. v. Genentech, Inc.,*
    127 S. Ct. 764 (2007) ................................................................................... passim

*Serco Services Co., L.P. v. Kelley Co., Inc.,*
    51 F.3d 1037 (Fed. Cir. 1995)............................................................................... 18

*Shelcore, Inc. v. Durham Industries, Inc.,*
    745 F.2d 621 (Fed. Cir. 1984)......................................................................... 16, 17

*Sterling Aluminum Products, Inc. v. Bohn Aluminum & Brass Corp.,*
    298 F.2d 538 (6th Cir. 1962) ..................................................................... 7, 8, 14, 16

*Syngenta Seeds, Inc. v. Monsanto Co.,*
    No. Civ. 02-1331-SLR, 2004 WL 2790498 (D. Del. Nov. 22, 2004) .................. 16

*Teva Pharm. USA, Inc. v. Novartis Pharm. Corp.,*
    482 F.3d 1330 (Fed. Cir. 2007)..................................................................... passim

*Vanguard Research, Inc. v. PEAT, Inc.,*
    304 F.3d 1249 (Fed. Cir. 2002).............................................................................. 11

*Westvaco Corp. v. International Paper Co.,*
    991 F.2d 735 (Fed. Cir. 1993)................................................................................. 8

**Statutes**

28 U.S.C. § 2201 ................................................................................................ 8

28 U.S.C. § 2201(a) ...................................................................................... 6, 18

35 U.S.C. § 101 ................................................................................................ 3

35 U.S.C. § 102 ................................................................................................ 3

35 U.S.C. § 103 ................................................................................................ 3

35 U.S.C. § 112 .......................................................................................... 3, 9

35 U.S.C. § 282 .............................................................................................. 12

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff PDL Biopharma, Inc. ("PDL") filed its complaint against Alexion Pharmaceuticals, Inc. ("Alexion") on March 16, 2007, alleging infringement of U.S. Patents Nos. 5,693,761 ("the '761 patent"); 5,693,762 ("the '762 patent"); and 6,180,370 ("the '370 patent") (collectively "the patents-in-suit"). D.I. 1. Alexion filed its Answer and Counterclaims on June 4, 2007, and PDL filed its Answer to Alexion's Counterclaims on June 25, 2007. D.I. 11, 14. Alexion filed its Amended Answer and Counterclaims on December 7, 2007. D.I. 45. PDL filed its Reply to Alexion's Amended Counterclaims on January 4, 2008. D.I. 46.

This case is currently in fact discovery. PDL and Alexion have served their respective initial disclosures pursuant to Rule 26. D.I. 22, 30. The parties have exchanged several rounds of discovery requests and responses. D.I. 17-19, 28-30, 47, 59, 60. Document production is ongoing. The Court granted the parties' Amended Scheduling Order extending fact discovery by three months, thereby changing the close of fact discovery from July 2, 2008 (*see* D.I. 24) to October 2, 2008. D.I. 76 at 2.

The parties have exchanged claim terms for construction. The parties have agreed, with the Court's approval, to extend the briefing schedule by one month, such that the reciprocal exchange of opening *Markman* briefs are to be filed on May 14, 2008 and responses on June 11, 2008. D.I. 76 at 3. The *Markman* is scheduled on July 1, 2008. *Id.*

On March 10, 2007, PDL filed a Motion to Dismiss Alexion's Declaratory Judgment Counterclaims as to Unasserted Patent Claims. D.I. 67. This is Alexion's Answering Brief in Opposition to PDL's motion.

## SUMMARY OF THE ARGUMENT

PDL initiated this lawsuit and decided which patents to assert in this lawsuit. PDL could have chosen to allege infringement as to only certain claims of the patents, but did

not do so. Instead, PDL created this Court's jurisdiction as to ***each and every claim of each***

***patent-in-suit*** by alleging in its Complaint that "Alexion has infringed the '761 Patent, the '762

Patent, and the '370 Patent." D.I. 1 at 6. Alexion, in turn, asserted defenses and counterclaims,

including, *inter alia,* a counterclaim for a declaratory judgment that each claim of the patents-in-

suit is invalid.

        PDL now argues that the Court lacks jurisdiction over Alexion's counterclaim for

invalidity as to certain claims of the patents-in-suit simply because PDL has not "asserted" these

claims in its interrogatory responses. But a continuing controversy as to those claims remains

because they are part of PDL's Complaint against Alexion and part of Alexion's Counterclaim

against PDL. PDL cannot unilaterally divest the Court of jurisdiction over those claims through

its subsequent discovery responses. Indeed, PDL's own actions in this case belie its argument

that no controversy exists with respect to those claims. In particular, Alexion offered to

withdraw its counterclaim of invalidity with respect to any claim that PDL did not identify in its

interrogatory responses, if PDL would stipulate that Alexion did not infringe those claims. PDL

refused. Thus, not only has PDL affirmatively put those claims at issue by filing its Complaint,

PDL has also affirmatively chosen to maintain the controversy with respect to those claims.

        Yet, even if PDL does not pursue its infringement allegation with respect to

certain claims of the patents-in-suit, that does not divest this Court of jurisdiction over Alexion's

Counterclaim. This well-established principle has recently been reaffirmed by the Supreme

Court and the Federal Circuit. Last year's defining *MedImmune* and *Teva* decisions, by the

Supreme Court and the Federal Circuit respectively, affirm a court's ability to assert jurisdiction

over an action for a declaratory judgment of invalidity in the absence of a reciprocal allegation of

infringement of the same patent claims. Accordingly, these cases support this Court's

jurisdiction over Alexion's counterclaim of invalidity, even with respect to claims PDL has not identified as infringed in its interrogatory responses. Therefore, there is a present justiciable controversy as to the validity of ***all of the claims*** of the asserted patents.

The Court should exercise its discretion to declare the rights of the parties as to the full scope of Alexion's counterclaim. Doing so would promote judicial economy and encourage the thorough vetting of the patents a patentee chooses to litigate. In contrast, dismissing Alexion's counterclaim of invalidity as to the claims that PDL has not yet identified in its interrogatory responses would prejudice Alexion by precluding Alexion from obtaining discovery on patent claims that PDL may later decide to pursue in this litigation.

## STATEMENT OF FACTS

On March 16, 2007, PDL filed a complaint against Alexion in this Court, accusing Alexion of infringing the '761 patent, the '762 patent, and the '370 patent. D.I. 1. Specifically, PDL asked the Court to determine that "Alexion has infringed the '761 Patent, the '762 Patent, and the '370 Patent." *Id.* at 6. On June 4, 2007, Alexion filed its Answer and Counterclaims, alleging, *inter alia*, that "[e]ach claim of the [patents-in-suit] is invalid for failure to comply with one or more of the conditions of patentability and/or requirements specified in Part II of Title 35 of the United States Code, including 35 U.S.C. §§ 101, 102, 103 and/or 112." D.I. 11. In its Amended Answer and Counterclaims, filed on December 7, 2007, Alexion once again pled the Court to declare "that each claim of the [patents-in-suit] is invalid." D.I. 45.

From the beginning of discovery and until February of this year PDL repeatedly refused to set forth its contentions as to which specific claims of the patents-in-suit it is asserting against Alexion in this litigation. Alexion requested that PDL provide such detailed infringement contentions in its very first interrogatory, served July 23, 2007, to which PDL responded on August 22, 2007 by providing sample infringement contentions for one claim of

each patent-in-suit. Ex. 1 at 4. In a letter dated December 28, 2007, PDL provided to Alexion an infringement chart listing certain claims "for purposes of identifying claims Alexion may wish the Court to construe." Ex. 2 (without attachment). PDL supplemented its response to Alexion's Interrogatory No. 1 on February 1, 2008, alleging that Alexion infringed *"at least"* 27 specific claims of the patents-in-suit. Ex. 3 at 4. On February 21, 2008, PDL supplemented its interrogatory response to assert infringement of an additional claim, and alleged that Alexion infringed *"at least"* 28 claims. Ex. 4 at 4.

Since the inception of this suit, Alexion has alleged invalidity as to each claim of the patents in suit. *See* D.I. 11. PDL, however, has never requested Alexion's contentions regarding its Counterclaim of invalidity. Instead, PDL requested only that Alexion provide its contentions as to Alexion's *defense* of invalidity. Ex. 5 at 1. Alexion provided these contentions on August 22, 2007, and supplemented them to provide additional information on February 18, 2008. Ex. 5 at 2-5. On that date, Alexion also made clear that its assertion of invalidity extended beyond a defense to the claims that PDL has so far set forth in its infringement contentions, and included information concerning the claims Alexion alleged were invalid as part of its Counterclaim.[1]

On February 27, 2008, the parties exchanged their respective lists of claim terms to be construed by the Court. Ex. 6, 7. Consistent with the position Alexion took in its Counterclaims, Alexion included the terms that require interpretation from the entirety of the patents-in-suit, not just from the claims PDL has identified to date. Ex. 6. On February 28,

---

[1]    Although Alexion maintains that jurisdiction exists as to all claims of each of the patents-in-suit, Alexion narrowed its counterclaim of invalidity to those claims which PDL might choose to assert against Alexion in this litigation, *i.e.*, those claims directed at humanized antibodies that do not recite specific subclasses or sequence information.

2008, PDL requested that Alexion withdraw the terms related only to the claims PDL has not yet identified in its interrogatory responses. Ex. 8. The following day Alexion explained that the claims not identified by PDL at this time were nonetheless relevant as they were part of Alexion's counterclaim against PDL, and therefore would not be withdrawn. Ex. 9.

On March 10, 2008, PDL supplemented its interrogatory responses for a third time, finally setting forth its infringement contentions for the *"at least"* 28 claims it is currently asserting against Alexion. Ex. 10 at 4 (without exhibit). PDL filed this motion the same day. D.I. 67.

On March 17, 2008, Alexion proposed that, since PDL believed there was no case or controversy as to the claims it has not yet identified as part of PDL's infringement contentions, PDL stipulate that Alexion did not infringe those claims. In exchange, Alexion offered to withdraw its counterclaim of invalidity as to those claims. Ex. 11. PDL refused. Ex. 12. Thus, although PDL alleges that no case or controversy exists as to those claims, PDL refuses to take any steps to affirmatively remove those claims from this case, and instead maintains the right to pursue them at any time. PDL's refusal to stipulate to non-infringement, or otherwise take action that would delineate that its so-called "unasserted"[2] claims are not part of its Complaint against Alexion, demonstrates that there is an actual controversy with respect to the validity of those claims.

---

[2]    PDL alleges that the claims it did not yet identify in its interrogatory responses regarding infringement are "unasserted." PDL is wrong. PDL asserted those claims against Alexion in its Complaint and has taken no action to "unassert" them.

## ARGUMENT

### I.    LEGAL STANDARD

Declaratory judgment counterclaims, such as the ones filed by Alexion in this case, fall under the provisions of the Declaratory Judgment Act. 28 U.S.C. § 2201(a). The Act allows any Federal Court to declare the rights of the parties "[i]n a case of actual controversy within its jurisdiction...." *Id.* The Supreme Court, in *MedImmune, Inc. v. Genentech, Inc.*, overruled the previously incumbent "reasonable-apprehension-of-suit" test for determining whether an "actual controversy" within the meaning of the Declaratory Judgment Act exists. 127 S. Ct. 764, 774 n.11 (2007); *see also Teva Pharm. USA, Inc. v. Novartis Pharm. Corp.*, 482 F.3d 1330, 1338 (Fed. Cir. 2007). The Supreme Court reaffirmed that the "actual controversy" requirement in the Declaratory Judgment Act is the same as the "Cases" and "Controversies" requirement in Article III, and that an "actual controversy" is determined based on "all the circumstances."[3] *See MedImmune*, 127 S. Ct. at 771; *see also Teva*, 482 F.3d at 1339. Accordingly, the existence of declaratory judgment jurisdiction in this case depends on "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune*, 127 S. Ct. at 771 (citing *Maryland Cas.*, 312 U.S. at 273).

---

[3]    *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270 (1941).

II.    **A JUSTICIABLE CONTROVERSY EXISTS BETWEEN ALEXION AND PDL WITH RESPECT TO EVERY CLAIM OF THE PATENTS-IN-SUIT**

A.    **PDL's Assertion Of Infringement Established The Court's Jurisdiction Over The Complaint And Counterclaims Of Invalidity**

Where the complaint does not exclude any specific claims of the patents-in-suit from the plaintiff's allegations of infringement, and the defendant's counterclaims assert invalidity of the entirety of each patent, the pleadings create an "actual controversy" within the meaning of the Declaratory Judgment Act. *See Sterling Aluminum Products, Inc. v. Bohn Aluminum & Brass Corp.*, 298 F.2d 538, 538 (6th Cir. 1962)[4] ("The complaint charged [defendant] with infringement of the patent without excluding from such charge any of the fourteen (14) claims thereof. [Defendant's] ... counterclaim asserted invalidity of the entire patent. ... [T]hese pleadings presented an 'actual controversy' within the intendment of § 2201, Title 28 U.S.C.A."); *see also Westvaco Corp. v. International Paper Co.*, 991 F.2d 735, 741 (Fed. Cir. 1993).

Here, as in *Sterling*, PDL alleged that "Alexion has infringed the '761 Patent, the '762 Patent, and the '370 Patent" in their entirety, without excluding any claims. D.I. 1. In response, Alexion counterclaimed that "[e]ach claim of the [patents-in-suit] is invalid."[5] D.I. 11.

---

[4]    Under *MedImmune*, it is "appropriate to consider Federal Circuit case law that predates that court's application of the now-rejected 'reasonable apprehension of suit' test. [T]he Federal Circuit itself has never disavowed these earlier rulings, but has merely gone in a different analytical direction following its adoption of the 'reasonable apprehension of suit' standard." *Lear Automotive Dearborn, Inc. v. Johnson Controls, Inc.*, 528 F. Supp. 2d 654, 673 n.11 (E.D. Mich. 2007).

[5]    Contrary to PDL's allegations, Alexion never "took the position that the unasserted claims were not part of this lawsuit." D.I. 69 at 4. At no time did Alexion take a position that it would narrow the scope of its ***counterclaims*** to include only those claims that PDL asserted against Alexion. As explained above, Alexion's responses to PDL's Interrogatory No. 3 concerned only Alexion's defenses, not its counterclaims of invalidity.

7

Because the parties dispute the validity of the entirety of the patents-in-suit, the parties have pled adverse legal positions creating a substantial controversy sufficient to establish declaratory judgment jurisdiction for adjudication of the validity of each claim of the patents-in-suit.

**B.    The Court Has Jurisdiction Over Alexion's Counterclaim Pursuant To** *MedImmune* **and** *Teva*

A Court's jurisdiction over an action for a declaratory judgment of invalidity in the absence of a reciprocal allegation of infringement has been recently affirmed by both the Supreme Court and the Federal Circuit. *MedImmune*, 127 S. Ct. 764; *Teva*, 482 F.3d 1330.

The Supreme Court's decision in *MedImmune* unequivocally holds that a declaratory judgment action for invalidity is a justiciable Article III controversy even in the absence of a suit for infringement of the same patent. 127 S. Ct. at 777. In *MedImmune*, the patent challenger was not under an imminent threat of a patent infringement suit because it had licensed the patents at issue and continued to make payments under the license. *See id.* at 772. The Supreme Court, however, found that there was a continuing threat that the patentee/licensor would sue the licensee for patent infringement if the licensee stopped making payments under the license. *See id.* at 773. Accordingly, jurisdiction for a declaratory judgment of patent invalidity was proper, even in the absence of infringement allegations, because the ongoing threat of treble damages and loss of 80% of the licensee's business, if licensee stopped paying under the license was sufficient to ground an Article III controversy. *See id.*

Indeed, under *MedImmune*, it was only the patent challenger's own actions, *i.e.*, payment under the license, that eliminated the immediate threat of harm. *See id.* Here, in contrast, Alexion has no ability to mitigate or eliminate the threat of infringement allegations that exist by virtue of PDL's claim of infringement of the patents-in-suit. Only PDL has the power to choose to eliminate the threat of infringement as to those patent claims that PDL has not yet

8

identified in its interrogatory responses. PDL has chosen to maintain the ongoing threat of those

patent claims by refusing to stipulate to Alexion's non-infringement of such claims, or to

otherwise remove those claims from this case. Like the patent challenger in *MedImmune*,

Alexion is under the threat of treble damages and loss of a significant portion of its business by

virtue of PDL's imminent threat of pursuing infringement of its not yet identified patent claims.

Accordingly, PDL's imminent threat constitutes a sufficient basis for Article III jurisdiction over

Alexion's counterclaims of invalidity of the patents-in-suit in their entirety under the

*MedImmune* standard.

Similarly, the Federal Circuit has recently affirmed that jurisdiction over a

declaratory judgment of invalidity may exist, even in the absence of allegations of infringement

of the same patent, under circumstances that demonstrate an ongoing threat of the patentee later

asserting the patent. *Teva*, 482 F.3d at 1347. In *Teva*, the Court held that counterclaims of

invalidity of unasserted patents supported a finding of a justiciable controversy where the patent

holder was free to assert those patents at a later date. *Id.* The *Teva* decision provides clear

support for this Court's ability to exercise declaratory judgment jurisdiction over all claims of

PDL's patents-in suit. Like the *Teva* patentee Novartis, PDL has selectively asserted certain

patent claims while insulating other patent claims from a judicial determination of validity. And

like the *Teva* patentee, PDL has maintained its right to assert those claims against Alexion at a

later date. Accordingly, just as Novartis did in *Teva*, PDL has placed Alexion under an

imminent threat of prosecuting the remaining claims of the asserted patents at PDL's discretion.

*Id.* at 1341. Alexion, therefore, suffers an injury-in-fact from PDL's actions of selectively

pursuing some patent claims but not others.

PDL attempts to distinguish *Teva* on the grounds that it was an ANDA case, and is therefore inapplicable here. D.I. 69 at 7-8. The Federal Circuit, however, clearly stated that the logic of its *Teva* ruling was not only extensible to, but derived from, non-ANDA cases: "Our conclusion supports what we have already established in non-ANDA cases–that *related litigation involving the same technology and the same parties is relevant in determining whether a justiciable declaratory judgment controversy exists on other related patents*." *Teva*, 482 F.2d at 1344. In making this determination, the Federal Circuit relied on non-ANDA precedent holding that a justiciable declaratory judgment controversy existed in a patent non-infringement and invalidity action "where the defendant had sued the declaratory judgment plaintiff in state court for misappropriation of trade secrets involving the same technology, thereby engaging in 'a course of conduct that shows a willingness to protect that technology.'" *Id.* at 1344-45 (quoting *Goodyear Tire & Rubber Co. v. Releasomers, Inc.*, 824 F.2d 953, 956 (Fed. Cir. 1987)). *See also Vanguard Research, Inc. v. PEAT, Inc.*, 304 F.3d 1249, 1255 (Fed. Cir. 2002) (following *Goodyear* and finding a justiciable declaratory judgment controversy where the defendant had sued the declaratory judgment plaintiff for misappropriation of trade secrets thereby demonstrating "a willingness to protect [its] technology"). PDL has clearly demonstrated its willingness to protect its technology purportedly covered by the patents-in-suit. Thus, *Teva's* primary holding – that "[i]t logically follows that if such an action creates a justiciable controversy for one party, the same action should create a justiciable declaratory judgment controversy for the opposing party" – is applicable here. *Teva*, 482 F.3d at 1342.

Moreover, the facts here support jurisdiction even more so than the facts of *Teva*. While *Teva* held that the threat of piecemeal and ongoing litigation derived from an assertion of

10

*related* patents to the patent-in-suit, here, it is the ***same patents*** that PDL attempts to use as both a sword and a shield.

Notably, PDL has many licensees that license the patents-in-suit and related patents. D.I. 1 at 1. PDL has selectively chosen – so far – to pursue against Alexion only certain claims in an attempt to insulate its patent portfolio from an invalidity challenge by Alexion. PDL attempts to simultaneously use the patents-in-suit offensively against Alexion, while precluding Alexion from challenging the validity of the patents-in-suit. Importantly, although Alexion does not infringe any valid claim of the patents-in-suit, there is no reason why PDL could not choose to pursue the majority of the remaining claims of the patents-in-suit against Alexion. Indeed, although PDL alleges that it has "asserted" only certain claims of the patents-in-suit against Alexion, its Complaint asserts infringement of the ***patents***, and PDL has consistently refused to narrow the scope of this dispute to include ***only*** the claims named in PDL's interrogatory responses. PDL refuses to stipulate that Alexion has not infringed the so-called "unasserted" claims (Ex. 12), and has never conclusively stated that it ***will not*** assert those claims against Alexion. Instead, PDL's interrogatory responses allege that Alexion infringes ***"at least"*** 28 claims of the patents-in-suit. Ex. 4. PDL thus seeks to preclude Alexion from properly discovering and challenging the validity of the remaining patent claims – claims that PDL put in this suit and accused Alexion of infringing – while at the same time maintaining its right to pursue those claims at any time.[6]

Alexion's "declaratory judgment action is consistent with the 'controversy' requirement in Article III and the Declaratory Judgment Act because the suit will achieve a final

---

[6]   Pursuant to 35 U.S.C. § 282, PDL has until 30 days before trial to choose whether or not to pursue the remaining claims.

determination that resolves the entire dispute between [the parties]." *See Teva*, 482 F.3d at 1346.

Therefore, as the Federal Circuit did in *Teva*, this Court should "find that [the counterclaimant]

has an injury-in-fact and a justiciable controversy that can be fully resolved by a declaratory

judgment." *Id.* at 1346.

## III.    PDL'S ACTIONS HAVE NOT DIVESTED THE COURT OF JURISDICTION OVER ALEXION'S COUNTERCLAIMS

PDL argues that it extinguished the controversy as to certain claims of the

patents-in-suit merely by identifying only a subset of claims in its supplemental infringement

contentions.[7] D.I. 69 at 6. PDL's argument, however, is both factually and legally flawed.

First, PDL put *all of the claims* of each patent-in-suit in issue by alleging

infringement of each patent, in its entirety, in the Complaint. D.I. 1. PDL has never

affirmatively stated that any of these patent claims are not at issue – and never will be at issue –

in this litigation. In its interrogatory responses, PDL hedges its bets by stating that it is asserting

*"at least"* the 28 listed claims. Ex. 4 at 4. PDL refused to stipulate that Alexion does not

infringe the claims not identified in PDL's infringement contentions. Ex. 12. And although

---

[7]    PDL cites *Biogen, Inc. v Amgen, Inc.*, 913 F. Supp. 35 (D. Mass. 1996) in support of its argument that it has divested the Court's jurisdiction by "asserting" some, but not all of the patent claims through its interrogatory responses. D.I. 69 at 6. But *Biogen*, decided before *MedImmune*, is inapposite. Unlike PDL, the *Biogen* patentee's Complaint alleged that the defendant had infringed some, but not all, of the claims of the patent-in-suit, and subsequently further narrowed the issues in the case by asserting only two of those claims. 913 F. Supp. at 36, 39-40. The defendant filed a counterclaim seeking to invalidate the patent in its entirety. *Id.* The Court held that the counterclaim should be limited only to those claims that were alleged to be infringed, because the plaintiff "does not now allege, *and promises never to allege in the future*, that [the defendant] has infringed any of" the additional claims that the defendant sought to put at issue in its counterclaim. *Id.* at 38 (emphasis added). PDL, in contrast, alleged infringement of the entirety of the patents-in-suit and has not "promised never to allege" infringement of any of those patent claims. Indeed, PDL has expressly refused to stipulate that it would not pursue the remaining claims against Alexion in the future. Ex. 12.

PDL's Complaint alleges that Alexion infringes each of the patents-in-suit, PDL has not taken any affirmative steps to narrow the Complaint to allege infringement of only certain claims. Thus, PDL's actions indicate that it reserves the right to pursue these claims at any time. Yet, PDL seeks to dismiss Alexion's counterclaims of invalidity, deny Alexion discovery regarding these claims, and preclude Alexion from requesting that the Court construe claim terms appearing in these claims.

That PDL has so far selected only some of the claims of the patents-in-suit to pursue at this stage of the litigation does not divest the Court of the jurisdiction that PDL created by filing its Complaint. PDL's Complaint of patent infringement of the '761 patent, the '762 patent, and the '370 patent, without any limitation as to which claims were at issue, and Alexion's Counterclaim that each of the claims of those three patents is invalid, established a case or controversy as to the validity of each of those claims.[8] *See Sterling*, 298 F.2d at 538. PDL cannot unilaterally moot this Court's jurisdiction over Alexion's counterclaim merely by "asserting" in its interrogatory responses that "*at least*" 28 selected claims of the patents in suit are infringed. *See, e.g., Lear Automotive*, 528 F. Supp. 2d at 672.

---

[8]  PDL cites *Jervis B. Webb Co. v. Southern Sys., Inc.*, 742 F.2d 1388 (Fed. Cir. 1984), another pre-*MedImmune* decision, in alleged support of its proposition that the existence of case or controversy in the instant litigation should be "evaluated on a 'claim-by-claim' basis." D.I. 69 at 5. However, the facts in that case differ from this dispute between PDL and Alexion in at least one key respect: the patentee in *Webb* originally asserted only three claims against defendant, while the latter counterclaimed that the entire patent was invalid. 742 F.2d at 1388. While deciding the *Webb* case, the Federal Circuit clearly stated that its "holding does not preclude the issuance of a declaratory judgment that all claims are valid or invalid in response to … the filing of a declaratory judgment counterclaim asserting the invalidity of all of patentee's claims in response to a complaint that asserted the infringement of all of the claims." *Id.* at 1399 n.8. This is just such a case – Alexion counterclaimed asserting the invalidity of all of PDL's claims in response to PDL's complaint that asserted the infringement of three patents without excluding any of the claims within.

Indeed, that a counterclaim of invalidity cannot be mooted by the unilateral action of a patentee pursuing only certain patent claims is well-settled law established prior to the "reasonable apprehension of suit" test and affirmed by the recent *MedImmune* and *Teva* decisions. For example, in 1943, the Supreme Court held that a counterclaim of invalidity survived a decision of non-infringement. *Altvater v. Freeman*, 319 U.S. 359 (1943). The Supreme Court explicitly stated that there was a justiciable controversy over the counterclaim of invalidity even in the absence of infringement: "We have here not only bill and answer but a counterclaim. Though the decision of non-infringement disposes of the bill and answer, it does not dispose of the counterclaim which raises the question of validity." *Id.* at 363. More specifically, the Court held that the assertion of only a single claim of the patent did not divest the court of jurisdiction over the invalidity of the patent, and that the counterclaim satisfied the case or controversy standard of Article III:

> A controversy was raging, even apart from the continued existence of the license agreement. That controversy was 'definite and concrete, touching the legal relations of parties having adverse legal interests.' ... That controversy concerned the validity of the reissue patents. Those patents had many claims in addition to the single one involved in the issue of infringement.

*Id.* at 364 (internal citations omitted).

Similarly, the Sixth Circuit Court of Appeals (prior to the establishment of the Federal Circuit) held that a Complaint charging the defendant with infringement of a patent, without excluding any of the claims of the patent, coupled with a counterclaim asserting invalidity of the entire patent, created a justiciable controversy as to the entirety of the patent. *Sterling*, 298 F.2d at 538. The Court held that the patentee's eventual limitation of its infringement charge to only two of the fourteen claims of the patent did not divest the

14

controversy as to the remaining claims. *Id.* at 540. Indeed, the Court affirmed the district court's finding that the patent was invalid and void in its entirety. *Id.*

More recent Federal Circuit and district court cases have followed this principle of law. For example, in *Shelcore, Inc. v. Durham Industries*, the Federal Circuit held that the patentee could not "unilaterally remove the validity issue [as to an unasserted patent claim] because [defendant's] counterclaim put validity of all of the claims in issue." *Shelcore, Inc. v. Durham Industries, Inc.*, 745 F.2d 621, 624 (Fed. Cir. 1984). Following the *Shelcore* decision, this Court held that it retained jurisdiction over a defendant's counterclaim of invalidity as to the patent even though the patentee had continued to assert infringement only as to certain claims of the patent. *Syngenta Seeds, Inc. v. Monsanto Co.*, No. Civ. 02-1331-SLR, 2004 WL 2790498, *1 (D. Del. Nov. 22, 2004); *see also F.B. Leopold Co. v. Roberts Filter Mfg. Co., Inc.*, Civil Action No. 92-2427, 1995 WL 776945, *1-2 (W.D. Pa. Aug. 2, 1995) (The Court retained jurisdiction over invalidity counterclaims despite patentee's abandonment of some, but not all, of the infringement claims.).

As set forth above in Section II.B., the recent *MedImmune* and *Teva* decisions support the continuing controversy that arises from a counterclaim of invalidity coupled with a patentee's count for infringement of a patent. Post-*MedImmune* cases have followed this long-standing precedent. For example, in *Lear Automotive*, the Court held that despite the fact that the patentee had not "actively pursued" claim 1 of the patent during the course of the litigation, the Court maintained jurisdiction as to the validity of that claim. 528 F. Supp. 2d at 668-69. Indeed, even after the patentee provided a covenant not to sue as to the claim, the Court held that "voluntary dismissal encompassing less than all of a patent's claims does not divest the court of jurisdiction over a counterclaim of patent invalidity." *Id.* at 672. Thus, the Court held that a

patentee "could not 'unilaterally remove the validity issue' ... [because] the defendant's 'counterclaim put [the] validity of all the claims in issue.'" *Id.* at 672-73 (citing *Shelcore*, 745 F.2d at 624).

Accordingly, even if the Court finds that PDL attempted to withdraw its allegation of infringement as to certain claims of the patents-in-suit after filing its complaint, such unilateral action did not divest this Court of declaratory judgment jurisdiction over Alexion's counterclaims as to the entirety of the patents-in-suit.

## IV.    THE COURT SHOULD EXERCISE ITS DISCRETION TO DECLARE THE RIGHTS OF THE PARTIES IN THIS CASE

The considerations of judicial economy and public policy weigh strongly in favor of exercising the Court's discretion to declare the rights of the parties with respect to the validity of all claims of the patents-in-suit. Pursuant to the Declaratory Judgment Act, this Court's jurisdiction over declaratory judgment actions is discretionary. *See* 28 U.S.C. § 2201(a); *MedImmune*, 127 S. Ct. at 776-77. In deciding whether to exercise the declaratory judgment jurisdiction "[t]he court must make a reasoned judgment whether the investment of time and resources will be worthwhile." *Serco Services Co., L.P. v. Kelley Co., Inc.*, 51 F.3d 1037, 1039 (Fed. Cir. 1995).

Here, PDL explicitly refused to stipulate to non-infringement of what it calls "unasserted" claims, thus plainly saving itself an opportunity to assert these claims at a later time. These claims, however, are not "unasserted," but are part of PDL's Complaint. Thus, PDL seeks to deny Alexion the opportunity to pursue discovery relating to these claims, including the opportunity to request that the Court construe claim terms relating to those claims, while at the same time maintaining the ability to pursue the claims at a later date. Should PDL later choose to pursue these claims, the parties would have to re-open fact and/or expert discovery and seek

16

additional claim constructions from the Court, likely leading to a postponement of trial.[9]

Therefore, exercising the Court's jurisdiction to permit a declaratory action with respect to

validity of all claims of the patents-in-suit would prevent an unnecessary delay and duplication

of effort if PDL decided to litigate the remaining claims of the asserted patents at any time

between now and the pre-trial period.[10]

Finally, allowing plaintiffs to assert their patents piecemeal during the course of

litigation, while preventing the defendants from asserting invalidity as to all of the claims

originally pled against them, would cause undue prejudice against Alexion and provide an unfair

advantage for PDL.   In particular, such an action would permit PDL to unilaterally dictate the

entire scope of this action, including the scope of discovery, without risk to the patents that PDL

put at issue by filing its Complaint.

The Court should assert declaratory judgment jurisdiction over all the claims of

the patents-in-suit at this time in order to conserve judicial resources, prevent undue prejudice

against the defendants, and uphold sound public policy.

## CONCLUSION

For the reasons stated above, Alexion respectfully requests that the Court deny

PDL's Motion to Dismiss Alexion's Declaratory Judgment Counterclaims as to Unasserted

Patent Claims.

---

[9]   There are many claim terms in the claims not identified in PDL's infringement contentions
that do not appear in the other claims of the patents-in-suit.  Alexion has informed PDL that
it intends to seek construction of several such terms.

[10]   As set forth above, Alexion has alleged invalidity of only a subset of the claims of the
patents-in-suit.

Respectfully submitted,

YOUNG CONWAY STARGATT & TAYLOR, LLP

_____
Josy W. Ingersoll (I.D. #1088)
John W. Shaw (I.D. #3362)
Andrew A. Lundgren (I.D. #4429)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
(302) 571-6600
alundgren@ycst.com

*Attorneys for Defendant*

*Of Counsel:*
John M. Desmarais
Gerald J. Flattmann, Jr.
Christine Willgoos
KIRKLAND & ELLIS
153 East 53rd Street
New York, NY  10022
(212) 446-4800


Dated:  March 28, 2008

18

## CERTIFICATE OF SERVICE

I, Andrew A. Lundgren, hereby certify that on March 28, 2008, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Jack B. Blumenfeld, Esquire
> Karen Jacobs Louden, Esquire
> Morris Nichols Arsht & Tunnell LLP
> 1201 North Market Street
> P.O. Box 1347
> Wilmington, DE 19899-1347

I further certify that on March 28, 2008, I caused a copy of the foregoing document to be served by hand delivery on the above-listed counsel of record and on the following in the manner indicated:

**BY E-MAIL**

> Matthew D. Powers, Esquire
> Vernon M. Winters, Esquire
> John D. Beynon, Esquire
> Weil, Gotshal & Manges LLP
> 201 Redwood Shores Parkway
> Redwood Shores, CA  94065

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Josy W. Ingersoll  (No. 1088)
Andrew A. Lundgren (No. 4429)
1000 West Street, 17th Floor
Wilmington, Delaware  19801
(302) 571-6600
alundgren@ycst.com

*Attorneys for Defendant.*

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PDL BIOPHARMA, INC.,

         Plaintiff,

    v.

ALEXION PHARMACEUTICALS, INC.,

         Defendant.

C. A. No. 07-156 (***)

### PDL BIOPHARMA, INC.'S OBJECTIONS AND RESPONSES TO ALEXION PHARMACEUTICALS, INC.'S FIRST SET OF INTERROGATORIES

Pursuant to Federal Rules of Civil Procedure 26 and 33, Plaintiff PDL BioPharma, Inc. ("PDL") objects and responds to Defendant Alexion Pharmaceuticals, Inc.'s ("Alexion") First Set of Interrogatories (nominal Nos. 1-14) as follows:

### GENERAL OBJECTIONS

1.      PDL objects to each interrogatory to the extent its seeks information protected by the attorney-client privilege, the work-product doctrine, or any other applicable privilege or immunity. Such requests are improper, and PDL will not provide information protected from disclosure by such privileges or immunities. Nothing contained in PDL's responses is intended to be, or in any way shall be deemed, a waiver of any such applicable privilege, doctrine, or immunity.

2.      Nothing in these responses is an admission by PDL of the existence, relevance, or admissibility of any information, for any purpose, or the truth or accuracy of any statement or characterization contained in any interrogatory. PDL reserves all objections and other questions as to competency, relevance, materiality, privilege, or admissibility related to the use of its responses and any document or thing identified in its responses as evidence for any

purpose whatsoever in any subsequent proceeding in this action or any other action.

   3.  PDL incorporates by reference its objections to Alexion's Definitions and Instructions set forth in PDL's Responses To Alexion's First Set Of Requests For Production of Documents and Things (Nos. 1-68).

   4.  PDL objects to each interrogatory to the extent it seeks information in Alexion's possession or information that is or was available to Alexion from public or other sources, including, but not limited to, information from PDL's website.

   5.  PDL objects to each interrogatory to the extent that it is not limited in time.

   6.  PDL objects to each request to the extent it seeks information about PDL's technology other than information about any features and functionality relevant to the parties' claims and defenses in this action.

   7.  PDL objects to each interrogatory to the extent it seeks information that is the confidential, proprietary, and/or trade secret information of a third party that is in PDL's possession subject to an obligation to a third party. PDL will provide such information only to the extent it can do so consistent with its obligations to any third parties to whom it owes obligations.

   8.  PDL objects to each definition, instruction, and interrogatory as overly broad and unduly burdensome, and as seeking information that is not relevant to any claim or defense in this action to the extent that it seeks to impose requirements or obligations on PDL in addition to or different from those imposed by the Federal Rules of Civil Procedure and the Court's rules and orders. In responding to each interrogatory, PDL will provide information as may be required and proper under the Federal Rules of Civil Procedure and the Court's rules and orders.

   9.  PDL's discovery and investigation in connection with this litigation are continuing. As a result, PDL's responses are limited to information obtained to date, and are given without prejudice to PDL's right to amend or supplement its responses after considering

information obtained through further discovery or investigation.

10.    A number of the interrogatories seek information about each claim of the three asserted patents-in-suit.  PDL is not asserting each claim of the three asserted patents-in-suit, and thus objects to any such interrogatory on the grounds that it (a) does not seek information relevant to the claim or defense of any party, and (b) is burdensome and oppressive. Under the US patent laws, a patent is infringed if one claim of that patent is infringed. Accordingly, at the present time PDL will respond to such interrogatories by identifying the relevant information from one claim of each of the three asserted patents-in-suit.  PDL reserves the right to supplement its responses with additional asserted claims.

11.    The foregoing general objections and statements shall be applicable to, and included in, PDL's response to every interrogatory, whether or not expressly mentioned in the particular response.

Subject to and without waiving the above General Objections, PDL objects and responds to Alexion's interrogatories as follows:

## INTERROGATORIES

### INTERROGATORY NO. 1:

Please describe (by way of claim chart) [1] the bases for PDL's infringement assertions at the time it filed the Complaint and, [2] if different, at the present time, as follows: identify each claim of each patent in suit that PDL contends any Alexion product, including Soliris®, or the manufacture or use thereof, has infringed under any theory; state whether such alleged infringement is literal or under the doctrine of equivalents; describe the complete factual basis and evidentiary support for the presence of each element of each asserted claim either literally or by way of a substantial equivalence and [3] identify the three individuals most knowledgeable about the information requested in this interrogatory.

### RESPONSE TO INTERROGATORY NO. 1:

PDL incorporates its General Objections, set forth above, here.  In addition, this interrogatory improperly seeks information protected from disclosure by both the attorney-client privilege and the attorney work product doctrine:  specifically, the difference (if any) between PDL's infringement assertions at the time that it filed the lawsuit and PDL's infringement

assertions now. The Federal Rules of Civil Procedure contain provisions regarding disclosure of a party's pre-filing assessment, and Alexion does not purport to invoke those provisions. PDL further objects to this interrogatory as, in part, premature because at this juncture, Alexion has not provided PDL in discovery samples of Soliris or any information about how Soliris is manufactured, infringement is appropriately (and routinely) the subject of expert discovery, and Alexion will receive expert testimony proffered on behalf of PDL that sets forth PDL's position on these issues at the appropriate time.

Finally, Rule 33 of the Federal Rules of Civil Procedure allows only 25 interrogatories per party, "including all discrete subparts," although PDL has agreed to Alexion's request that each party be allowed 30 interrogatories. As the added brackets indicate, this interrogatory has at least three discrete subparts.

Subject to these objections, PDL responds as follows:

Under the US patent laws, patent infringement occurs when a party infringes at least one claim of a patent. Accordingly, for each of the three patents-in-suit, PDL will provide the requested information with respect to at least one claim of each patent. Appendix 1 hereto contains the requested claim chart for one claim of each asserted patent. Defining "infringement" as the process of comparing claims of the patents-in-suit to the published sequence of Soliris that is referenced in Appendix 1, there are no individuals at PDL at this juncture who can provide non-privileged testimony.

**INTERROGATORY NO. 2:**

For each claim of each patent-in-suit, please state the dates on which the claimed subject matter was [4] conceived; [5] reduced to practice; [6] first described in a document; [7] first disclosed to a person other than the inventors; [8] first offered for sale; first sold; [9] first described in a printed publication anywhere in the world; and [10] first publicly used in the United States. [11] Please identify all supporting documents, samples, investigations, tests, measurements, analyses, opinions, and testimony supporting each date and [12] the three individuals most knowledgeable about the information requested in this interrogatory.

**RESPONSE TO INTERROGATORY NO. 2:**

PDL incorporates its General Objections, set forth above, here. In addition, under

4

the Supreme Court's opinion in *Markman*, the scope of the claims is a question of law for the Court, and the Court has not yet construed the claims; hence the Court has not yet determined the scope of "the claimed subject matter." In addition, PDL is not asserting each claim of each patent; as set forth above, under the patent laws a patent is infringed if one claim is infringed, and on that basis PDL will identify (and, in the attached claim chart, has identified) one claim from each patent that Alexion infringes based on its public disclosures of the amino acid sequence of Soliris and on other information from Alexion. PDL objects to this interrogatory on the grounds that it is, in part, premature: these validity issues are appropriately (and routinely) the subject of expert discovery, and Alexion will receive expert testimony proffered on behalf of PDL that sets forth PDL's position on these issues at the appropriate time.

Finally, Rule 33 of the Federal Rules of Civil Procedure allows only 25 interrogatories per party, "including all discrete subparts," although PDL has agreed to Alexion's request that each party be allowed 30 interrogatories. As the added brackets indicate, this interrogatory has at least nine discrete subparts.

Subject to these objections, PDL responds as follows: Rule 33(d) of the Federal Rules of Civil Procedure provides that "[w]here the answer to an interrogatory may be derived or ascertained from the business records of the party upon whom the interrogatory has been served," the party upon whom the interrogatory has been served may "specify the records from which the answer may be derived or ascertained and to afford to the party serving the interrogatory reasonable opportunity to examine, audit or inspect such records and to make copies, compilations, abstracts or summaries." Pursuant to Fed. R. Civ. P. 33(d), PDL will provide such business records from which the response to this interrogatory may be ascertained.

**INTERROGATORY NO. 3:**

[13] Please state the priority date that PDL asserts for each claim of the patents-in-suit.

**RESPONSE TO INTERROGATORY NO. 3:**

PDL incorporates its General Objections, set forth above, here. In addition, the

priority date to which a patent claim is entitled turns, in part, on how that claim is construed, and under the Supreme Court's opinion in *Markman*, the scope of the claims is a question of law for the Court. The Court has not yet construed the claims. In addition, PDL is not asserting each claim of each patent; as set forth above, under the patent laws a patent is infringed if one claim is infringed, and, subject to amendment, on that basis PDL will identify (and, in the attached claim chart, has identified) one claim from each patent that Alexion infringes based on its public disclosures of the amino acid sequence of Soliris and on other information from Alexion. PDL objects to this interrogatory on the grounds that it is, in part, premature: priority date analysis subsumes legal issues that are appropriately (and routinely) the subject of expert discovery, and Alexion will receive expert testimony proffered on behalf of PDL that sets forth PDL's position on these issues at the appropriate time.

Subject to these objections, PDL responds as follows: Rule 33(d) of the Federal Rules of Civil Procedure provides that "[w]here the answer to an interrogatory may be derived or ascertained from the business records of the party upon whom the interrogatory has been served," the party upon whom the interrogatory has been served may "specify the records from which the answer may be derived or ascertained and to afford to the party serving the interrogatory reasonable opportunity to examine, audit or inspect such records and to make copies, compilations, abstracts or summaries." Pursuant to Fed. R. Civ. P. 33(d), PDL will provide such business records from which the response to this interrogatory may be ascertained.

**INTERROGATORY NO. 4:**

Please [14] identify what PDL contends to be the relevant art for the patents-in-suit and [15] the level of ordinary skill in that art as of December 19, 1989 and [16] all dates identified in response to Interrogatory No. 3 and [17] describe in detail the factual and legal bases for PDL's contentions.

**RESPONSE TO INTERROGATORY NO. 4:**

PDL incorporates its General Objections, set forth above, here. In addition, under the Supreme Court's opinion in *Markman*, the scope of the claims is a question of law for the Court, and the Court has not yet construed the claims; hence the Court has not yet determined the

scope of "the claimed subject matter." PDL objects to this interrogatory on the grounds that it is, in part, premature: these issues are appropriately (and routinely) the subject of expert discovery, and Alexion will receive expert testimony proffered on behalf of PDL that sets forth PDL's position on these issues at the appropriate time. Finally, Rule 33 of the Federal Rules of Civil Procedure allows only 25 interrogatories per party, "including all discrete subparts." As the added brackets indicate, this interrogatory has at least four subparts (although PDL has agreed to Alexion's request that each party be allowed 30 interrogatories).

Subject to these objections, PDL responds as follows: Rule 33(d) of the Federal Rules of Civil Procedure provides that "[w]here the answer to an interrogatory may be derived or ascertained from the business records of the party upon whom the interrogatory has been served," the party upon whom the interrogatory has been served may "specify the records from which the answer may be derived or ascertained and to afford to the party serving the interrogatory reasonable opportunity to examine, audit or inspect such records and to make copies, compilations, abstracts or summaries." Pursuant to Fed. R. Civ. P. 33(d), PDL will provide such business records from which the response to this interrogatory may be ascertained.

## INTERROGATORY NO. 5:

Please [18] identify all prior art, and any reference, device, material, or activity ever alleged to be prior art, known to PDL that is relevant, or has been asserted by others to be relevant, to any of the patents-in-suit, related patents, corresponding foreign patents, or related applications, including, without limitation, [19] the date, source, and circumstances under which PDL first became aware thereof, [20] whether the reference, device, material, or activity was known to any inventor named on or prosecuting attorneys or agents of the patents-in-suit before the issue date of each such patent, and [21] an identification of all documents and things concerning such prior art, including, without limitation, any claim charts, declarations, or other descriptive, negotiation, prosecution, or litigation materials provided to or by PDL.

## RESPONSE TO INTERROGATORY NO. 5:

PDL incorporates its General Objections, set forth above, here. In addition, Rule 33 of the Federal Rules of Civil Procedure allows only 25 interrogatories per party, "including all discrete subparts." As the added brackets indicate, this interrogatory has at least four subparts (although PDL has agreed to Alexion's request that each party be allowed 30 interrogatories).

PDL objects to this interrogatory on the grounds that it is, in part, premature: these issues are appropriately (and routinely) the subject of expert discovery, and Alexion will receive expert testimony proffered on behalf of PDL that sets forth PDL's position on these issues at the appropriate time.

Subject to these objections, PDL responds as follows: Rule 33(d) of the Federal Rules of Civil Procedure provides that "[w]here the answer to an interrogatory may be derived or ascertained from the business records of the party upon whom the interrogatory has been served," the party upon whom the interrogatory has been served may "specify the records from which the answer may be derived or ascertained and to afford to the party serving the interrogatory reasonable opportunity to examine, audit or inspect such records and to make copies, compilations, abstracts or summaries." Pursuant to Fed. R. Civ. P. 33(d), PDL will provide such business records from which the response to this interrogatory may be ascertained.

## INTERROGATORY NO. 6:

Separately, for each asserted claim of the patents-in-suit, [22] state whether PDL contends that objective indicia (e.g., commercial success, long-felt need, failed attempts of others to solve, initial skepticism, industry recognition and praise, copying, or imitation by others) support the non-obviousness of each such claim, [23] describe in detail all of the factual and legal bases for any such contention, and [24] identify all documents that either support or refute and persons with knowledge of, including the subject matter known by any such person, any such contention.

## RESPONSE TO INTERROGATORY NO. 6:

PDL incorporates its General Objections, set forth above, here. In addition, Rule 33 of the Federal Rules of Civil Procedure allows only 25 interrogatories per party, "including all discrete subparts," although PDL has agreed to Alexion's request that each party be allowed 30 interrogatories. As the added brackets indicate, this interrogatory has at least three subparts. PDL objects to this interrogatory on the grounds that it is, in part, premature: these issues are appropriately (and routinely) the subject of expert discovery, and Alexion will receive expert testimony proffered on behalf of PDL that sets forth PDL's position on these issues at the appropriate time.

Subject to these objections, PDL responds as follows: Rule 33(d) of the Federal Rules of Civil Procedure provides that "[w]here the answer to an interrogatory may be derived or ascertained from the business records of the party upon whom the interrogatory has been served," the party upon whom the interrogatory has been served may "specify the records from which the answer may be derived or ascertained and to afford to the party serving the interrogatory reasonable opportunity to examine, audit or inspect such records and to make copies, compilations, abstracts or summaries." Pursuant to Fed. R. Civ. P. 33(d), PDL will provide such business records from which the response to this interrogatory may be ascertained.

**INTERROGATORY NO. 7:**

[25] Please identify each person who was substantially involved in the prosecution of any of the patent applications that matured into any of the patents-in-suit, and other patents related to the patents-in-suit, including but not limited to those patents from which the patents-in-suit in whole or in part claim priority. For each such person, please provide their current employer, job title and description, home address, relationship with PDL, and [26] state the nature and extent of her involvement in such prosecution and [27] identify every document relating to such involvement.

**RESPONSE TO INTERROGATORY NO. 7:**

PDL incorporates its General Objections, set forth above, here. In addition, Rule 33 of the Federal Rules of Civil Procedure allows only 25 interrogatories per party, "including all discrete subparts," although PDL has agreed to Alexion's request that each party be allowed 30 interrogatories. As the added brackets indicate, this interrogatory has at least three subparts.

Subject to these objections, PDL responds as follows: Rule 33(d) of the Federal Rules of Civil Procedure provides that "[w]here the answer to an interrogatory may be derived or ascertained from the business records of the party upon whom the interrogatory has been served," the party upon whom the interrogatory has been served may "specify the records from which the answer may be derived or ascertained and to afford to the party serving the interrogatory reasonable opportunity to examine, audit or inspect such records and to make copies, compilations, abstracts or summaries." Pursuant to Fed. R. Civ. P. 33(d), PDL will provide such business records from which the response to this interrogatory may be ascertained.

To the extent that this Interrogatory calls for information that would be reflected in a privilege log, PDL will provide a privilege log upon such terms as the parties agree for mutual exchanges of privilege logs.

## INTERROGATORY NO. 8:

[287] Please describe in detail the factual and legal bases for PDL's contention that Alexion has willfully infringed any claim of the patents-in-suit, including PDL's contention that Alexion has had actual and constructive knowledge of the patents-in-suit. [29] This detailed description should include, without limitation, an identification of any document, information or tangible item that supports, refutes, or otherwise concerns PDL's contentions.

## RESPONSE TO INTERROGATORY NO. 8:

PDL incorporates its General Objections, set forth above, here. In addition, the "legal bases" for PDL's contention that it is entitled to willful infringement damages are beyond the permitted scope of discovery as established in Rule 26 of the Federal Rules of Civil Procedure, and PDL objects on that basis. In addition, and separately, an interrogatory that seeks the "legal bases" for PDL's contention is improper: it seeks information protected from disclosure by the attorney-client privilege and the attorney work product doctrine, and PDL objects on this additional, and separate, basis.

Subject to these objections, PDL responds as follows: Rule 33(d) of the Federal Rules of Civil Procedure provides that "[w]here the answer to an interrogatory may be derived or ascertained from the business records of the party upon whom the interrogatory has been served," the party upon whom the interrogatory has been served may "specify the records from which the answer may be derived or ascertained and to afford to the party serving the interrogatory reasonable opportunity to examine, audit or inspect such records and to make copies, compilations, abstracts or summaries." Pursuant to Fed. R. Civ. P. 33(d), PDL will provide such business records from which the response to this interrogatory may be ascertained. To the extent that this Interrogatory calls for information that would be reflected in a privilege log, PDL will provide a privilege log upon such terms as the parties agree for mutual exchanges of privilege logs.

**INTERROGATORY NO. 9:**

Please [30] describe in detail the factual and legal bases for PDL's contention that it is entitled to damages in the above-captioned action, including [31] an identification of what PDL contends to be the reasonable royalty rate for the patents-in-suit and all bases for that contention. This detailed description should include, without limitation, [32] an identification of any document, information or tangible item that supports, refutes, or otherwise concerns PDL's contentions.

**RESPONSE TO INTERROGATORY NO. 9:**

PDL incorporates its General Objections, set forth above, here. In addition, the "legal bases for PDL's contention that it is entitled to damages in the above-captioned action" are beyond the permitted scope of discovery as established in Rule 26 of the Federal Rules of Civil Procedure, and PDL objects on that basis. In addition, and separately, an interrogatory that seeks the "legal bases for PDL's contention that it is entitled to damages in the above-captioned action" is improper: it seeks information protected from disclosure by the attorney-client privilege and the attorney work product doctrine, and PDL objects on this additional, and separate, basis. Finally, PDL objects to this interrogatory on the grounds that it is, in part, premature: damages is appropriately (and routinely) the subject of expert discovery, and Alexion will receive an expert report from PDL that sets forth PDL's position on the actual damages to which it is entitled.

Subject to these objections, PDL responds as follows: Rule 33(d) of the Federal Rules of Civil Procedure provides that "[w]here the answer to an interrogatory may be derived or ascertained from the business records of the party upon whom the interrogatory has been served," the party upon whom the interrogatory has been served may "specify the records from which the answer may be derived or ascertained and to afford to the party serving the interrogatory reasonable opportunity to examine, audit or inspect such records and to make copies, compilations, abstracts or summaries." Pursuant to Fed. R. Civ. P. 33(d), PDL will provide such business records from which the response to this interrogatory may be ascertained.

PDL objects to and, other than the response above, will not further respond to

subparts [31] and [32], as each exceeds the agreed-to 30-interrogatory limit.

**INTERROGATORY NO. 10:**

[33] Please describe in detail the factual and legal bases for PDL's contention that the above-captioned case is exceptional and that [34] PDL is entitled to its attorneys' fees in the above-captioned action.  This detailed description should include, without limitation, an identification of any document, information or tangible item that supports, refutes, or otherwise concerns PDL's contentions.

**RESPONSE TO INTERROGATORY NO. 10:**

PDL objects to and will not respond to this interrogatory, as it exceeds the agreed-to 30-interrogatory limit.

Separately, PDL incorporates its General Objections, set forth above, here.  In addition, the "legal bases" for PDL's contention are beyond the permitted scope of discovery as established in Rule 26 of the Federal Rules of Civil Procedure, and PDL objects on that basis.  In addition, and separately, an interrogatory that seeks the "legal bases" for PDL's contention is improper:  it seeks information protected from disclosure by the attorney-client privilege and the attorney work product doctrine, and PDL objects on this additional, and separate, basis.

Separately, and had this interrogatory been within the agreed-to 30-interrogatory limit, PDL would have provided business records from which the response to this interrogatory could be ascertained pursuant to Fed. R. Civ. P. 33(d), which provides that "[w]here the answer to an interrogatory may be derived or ascertained from the business records of the party upon whom the interrogatory has been served," the party upon whom the interrogatory has been served may "specify the records from which the answer may be derived or ascertained and to afford to the party serving the interrogatory reasonable opportunity to examine, audit or inspect such records and to make copies, compilations, abstracts or summaries."

**INTERROGATORY NO. 11:**

[35] Please identify and describe each direct and indirect license under any of the patents-in-suit, including when each of such licenses was granted, the terms and negotiates of each such license, and whether it is currently in force or when it terminated.

**RESPONSE TO INTERROGATORY NO. 11:**

PDL objects to and will not respond to this interrogatory, as it exceeds the agreed-to 30-interrogatory limit.

Separately, PDL incorporates its General Objections, set forth above, here. Had this interrogatory been within the agreed-to 30-interrogatory limit, PDL would have provided business records from which the response to this interrogatory could be ascertained pursuant to Fed. R. Civ. P. 33(d), which provides that "[w]here the answer to an interrogatory may be derived or ascertained from the business records of the party upon whom the interrogatory has been served," the party upon whom the interrogatory has been served may "specify the records from which the answer may be derived or ascertained and to afford to the party serving the interrogatory reasonable opportunity to examine, audit or inspect such records and to make copies, compilations, abstracts or summaries."

**INTERROGATORY NO. 12:**

[36] Please identify and describe all testing of Soliris® and/or eculizumab by or on behalf of PDL, including without limitation, results and conclusions, and each and every person involved in such testing. For each such person please identify their current employer, work address, job title and description, home address, relationship with PDL, and the bases for their knowledge of such testing.

**RESPONSE TO INTERROGATORY NO. 12:**

PDL objects to and will not respond to this interrogatory, as it exceeds the agreed-to 30-interrogatory limit.

Separately, PDL incorporates its General Objections, set forth above, here. Had this interrogatory been within the agreed-to 30-interrogatory limit, PDL would have provided business records from which the response to this interrogatory could be ascertained pursuant to Fed. R. Civ. P. 33(d), which provides that "[w]here the answer to an interrogatory may be derived or ascertained from the business records of the party upon whom the interrogatory has been served," the party upon whom the interrogatory has been served may "specify the records from which the answer may be derived or ascertained and to afford to the party serving the

interrogatory reasonable opportunity to examine, audit or inspect such records and to make copies, compilations, abstracts or summaries."

## INTERROGATORY NO. 13:

Please describe in detail the factual and legal bases for PDL's defenses of [37] laches and [38] unclean hands. This detailed description should include, without limitation, [39] an identification of any document, information or tangible item that supports, refutes, or otherwise concerns PDL's contentions.

## RESPONSE TO INTERROGATORY NO. 13:

PDL objects to and will not respond to this interrogatory, as it exceeds the agreed-to 30-interrogatory limit.

Separately, PDL incorporates its General Objections, set forth above, here. In addition, the "legal bases" for PDL's contention are beyond the permitted scope of discovery as established in Rule 26 of the Federal Rules of Civil Procedure, and PDL objects on that basis. In addition, and separately, an interrogatory that seeks the "legal bases" for PDL's contention is improper: it seeks information protected from disclosure by the attorney-client privilege and the attorney work product doctrine, and PDL objects on this additional, and separate, basis.

Separately, and had this interrogatory been within the agreed-to 30-interrogatory limit, PDL would have provided business records from which the response to this interrogatory could be ascertained pursuant to Fed. R. Civ. P. 33(d), which provides that "[w]here the answer to an interrogatory may be derived or ascertained from the business records of the party upon whom the interrogatory has been served," the party upon whom the interrogatory has been served may "specify the records from which the answer may be derived or ascertained and to afford to the party serving the interrogatory reasonable opportunity to examine, audit or inspect such records and to make copies, compilations, abstracts or summaries."

## INTERROGATORY NO. 14:

[40]  Please identify each litigation or judicial or administrative proceeding, whether within or outside the United States, in which the ownership, inventorship, scope, validity or enforceability of any of the patents-in-suit, corresponding foreign patents, or any patent directly or indirectly claiming priority or benefit from, or granting or conferring priority

upon any application supporting any of the patents-in-suit, was at issue. Please state the status and disposition of each such proceeding.

**RESPONSE TO INTERROGATORY NO. 14:**

PDL objects to and will not respond to this interrogatory, as it exceeds the agreed-to 30-interrogatory limit.

Separately, PDL incorporates its General Objections, set forth above, here.

Separately, and had this interrogatory been within the agreed-to 30-interrogatory limit, PDL would have provided business records from which the response to this interrogatory could be ascertained pursuant to Fed. R. Civ. P. 33(d), which provides that "[w]here the answer to an interrogatory may be derived or ascertained from the business records of the party upon whom the interrogatory has been served," the party upon whom the interrogatory has been served may "specify the records from which the answer may be derived or ascertained and to afford to the party serving the interrogatory reasonable opportunity to examine, audit or inspect such records and to make copies, compilations, abstracts or summaries."

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

OF COUNSEL:

Matthew D. Powers
Vernon M. Winters
Eric P. Xanthopoulos
John D. Beynon
Weil, Gotshal & Manges LLP
Silicon Valley Office
201 Redwood Shores Parkway
Redwood Shores, CA 94065
650-802-3000

August 22, 2007

1218243

Jack B. Blumenfeld (#1014)
Karen Jacobs Louden (#2881)
James W. Parrett, Jr. (#4292)
1201 N. Market Street
P.O. Box 1347
Wilmington, Delaware 19899
302-658-9200
*Attorneys for Plaintiff and Counter-Defendant*
*PDL BIOPHARMA, INC.*

Appendix 1 (claim charts)

| Language from Claim of PDL's Infringed Patent | Infringement By Alexion's Soliris (based on Alexion's disclosure of the amino acid sequence in Thomas et al. (1996), *Inhibition of complement activity by humanized anti-C5 antibody and single-chain Fv*, Mol. Immunol. 33(17)1389-1401); see also Hillman, et al., The Complement Inhibitor Eculizumab in Paroxysmal Nocturnal Hemoglobinuria, 355 N. Engl. J. Med 1233-1242 at n.13 (Sept 21,2006), in which Alexion officials represented that Thomas disclosed the amino acid sequence for Soliris; and U.S. Pat. No. 6,355,245 | Infringement Literal, Doctrine of Equivalents, or Both? |
|---|---|---|
| C.L. Queen, W.P. Schneider, and H.E. Selick, Polynucleotides encoding improved humanized immunoglobulins, U.S. Pat. No. 5,639,761 (Filed Jun. 7, 1995; Issued Dec. 2, 1997) | | |
| 1. First and second polynucleotides respectively encoding heavy and light chain variable regions of a humanized immunoglobulin | Thomas et al. describes sequences encoding humanized heavy chain and light chain variable regions. See, e.g., pp. 1392-93, Figs. 1A, 1B. | To the extent this preamble is a limitation, both |
| having complementarity determining regions (CDRs) from a donor immunoglobulin and heavy and light chain variable region frameworks from human acceptor immunoglobulin heavy and light chain frameworks | Thomas et al. describes humanized heavy chain and light chain variable sequences having CDRs from a donor immunoglobulin, the mouse monoclonal antibody, 5G1.1, and framework sequences from human acceptor immunoglobulins, H20C3H (for heavy chain sequence) and I.23 (for light chain sequence). See, e.g., "For CDR grafting, the 5G1.1 heavy and light chain complementarity determining regions were introduced into the human heavy variable region H20C3H (Weng et al., 1992) to yield h5G1.1VHC (Fig. 1A) or the human light variable region I.23 (Klein et al., 1993) to yield h5G1.1VLC (Fig. 1B), respectively." pp. 1390-91. See, e.g., "Comparison of the murine 5G1.1 variable region with the human acceptor variable regions H20C3H and I.23 suggested that the murine and human framework regions differed at three positions important for CDR structure." p. 1394. | Both |
| which humanized immunoglobulin specifically binds to an antigen with an affinity constant of at least about $10^8$ M$^{-1}$ | Thomas et al. report that h5G1.1 scFv fragments have a $K_d$ of 100pM (= 1 x $10^{-10}$M). p. 1399 ("Calculations based on the competitive ELISA data (Fig. 5), as well as direct measurements of h5G1.1 scFv (CDR) binding to human C5 by surface plasmon resonance (data not shown), indicated a very high affinity of the scFv for C5 ($K_d$ = 100 pM) and a slow dissociation rate ($k_{off}$ = 1.0 x $10^{-4}$/sec)"). This translates to an affinity constant, $K_a$, of 1 x $10^{10}$M$^{-1}$. | Both |

| | | |
|---|---|---|
| which humanized immunoglobulin specifically binds to an antigen with an affinity constant . . . no greater than about four-fold that of the donor immunoglobulin | U.S. Pat. No. 6,355,245 reports the dissociation constant for the full length (donor) mouse monoclonal antibody, 5G1.1, directed against human complement protein C5:<br><br>$K_d$ of 30pM (= 3 x $10^{-11}$M). This translates to a $K_A$ of 3.33333333 x $10^{10}M^{-1}$. '245 at Fig. 8; col. 39, lines 31-61.<br><br>Thomas et al. report that h5G1.1 scFv fragments have a $K_d$ of 100pM (= 1 x $10^{-10}$M). p. 1399 ("Calculations based on the competitive ELISA data (Fig. 5), as well as direct measurements of h5G1.1 scFv (CDR) binding to human C5 by surface plasmon resonance (data not shown), indicated a very high affinity of the scFv for C5 ($K_d$ = 100 pM) and a slow dissociation rate ($k_{off}$ = 1.0 x $10^{-4}$/sec)").<br><br>This translates to an affinity constant, $K_a$, of 1 x $10^{10}M^{-1}$. | Both |
| wherein the sequence of the humanized immunoglobulin heavy chain variable region framework is at least 65% identical to the sequence of the donor immunoglobulin heavy chain variable region framework | Applying the Kabat method of determining CDRs, CDRs comprise 35 amino acids of the heavy chain variable region and framework comprises the remaining 87 amino acids of hG1.1VHC. See pp. 1392-93, Fig. 1A.<br><br>Heavy chain framework regions of h5G1.1VHC and 5G1.1 differ by 23 amino acids. Thus, they are 64/87 = 73.56% identical.<br><br>Applying the Chothia and Lesk method of determining CDRs, CDRs comprise 22 amino acids of the heavy chain variable region and framework comprises the remaining 100 amino acids of hG1.1VHC. See pp. 1392-93, Fig. 1A.<br><br>Heavy chain framework regions of h5G1.1VHC and 5G1.1 differ by 23 amino acids. Thus, they are 23/100 = 77.00% identical. | Both |
| wherein the sequence of the humanized immunoglobulin heavy chain variable region framework . . . comprises at least 70 amino acid residues identical to those in the acceptor human immunoglobulin heavy chain variable region framework. | Applying the Kabat method of determining CDRs, heavy chain framework regions of h5G1.1VHC and H20C3H have 85 identical amino acids. See pp. 1392-93, Fig. 1A.<br><br>Applying the Chothia and Lesk method of determining CDRs, heavy chain framework regions of h5G1.1VHC and H20C3H have 88 identical amino acids. See pp. 1392-93, Fig. 1A. | Both |
| **C.L. Queen, M.S. Co, W.P. Schneider, and H.E. Selick, Humanized immunoglobulins, U.S. Pat. No. 5,639,762 (Filed Jun. 7, 1995; Issued Dec. 2, 1997)** | | |
| 1. A humanized immunoglobulin | Thomas et al. describes the production of "humanized" immunoglobulins. | To the extent this preamble is a limitation, |

| | | both |
|---|---|---|
| having complementarity determining regions (CDRs) from a donor immunoglobulin and heavy and light chain variable region frameworks from human acceptor immunoglobulin heavy and light chain frameworks | Thomas et al. describes humanized heavy chain and light chain variable sequences having CDRs from a donor immunoglobulin, the mouse monoclonal antibody, 5G1.1, and framework sequences from human acceptor immunoglobulins, H20C3H (for heavy chain sequence) and I.23 (for light chain sequence).<br><br>"For CDR grafting, the 5G1.1 heavy and light chain complementarity determining regions were introduced into the human heavy variable region H20C3H (Weng et al., 1992) to yield h5G1.1VHC (Fig. 1A) or the human light variable region I.23 (Klein et al., 1993) to yield h5G1.1VLC (Fig. 1B), respectively." pp. 1390-91.<br><br>"Comparison of the murine 5G1.1 variable region with the human acceptor variable regions H20C3H and I.23 suggested that the murine and human framework regions differed at three positions important for CDR structure." p. 1394. | Both |
| which humanized immunoglobulin specifically binds to an antigen with an affinity constant of at least $10^7$ M$^{-1}$ | The affinity constant, $K_a$ is measured as [Ab-Ag]/[Ab][Ag], where Ab-Ag = antibody-antigen complex, Ab = free antibody, and Ag = free antigen.  See J. Kuby, *Immunology* at 136 (1994 2nd ed. W.H. Freeman).<br><br>The dissociation constant, $K_d$ is $1/K_a$.<br><br>Thomas et al. report that h5G1.1 scFv fragments have a $K_d$ of 100pM (= 1 x $10^{-10}$M). p. 1399 ("Calculations based on the competitive ELISA data (Fig. 5), as well as direct measurements of h5G1.1 scFv (CDR) binding to human C5 by surface plasmon resonance (data not shown), indicated a very high affinity of the scFv for C5 ($K_d$ = 100 pM) and a slow dissociation rate ($k_{off}$ = 1.0 x $10^{-4}$/sec)").<br><br>This translates to an affinity constant, $K_a$, of 1 x $10^{10}$M$^{-1}$. | Both |
| which humanized immunoglobulin specifically binds to an antigen with an affinity constant of . . . no greater than about four-fold that of the donor immunoglobulin | U.S. Pat. No. 6,355,245 reports the dissociation constant for the full length (donor) mouse monoclonal antibody, 5G1.1, directed against human complement protein C5:<br><br>$K_d$ of 30pM (= 3 x $10^{-11}$M).  This translates to a $K_A$ of  3.33333333 x $10^{10}$M$^{-1}$. '245 at Fig. 8; col. 39, lines 31-61.<br><br>Thomas et al. and the '245 patent do not report an affinity constant for full length humanized antibody.<br><br>Thomas et al. report that h5G1.1 scFv fragments have a $K_d$ of 100pM (= 1 x $10^{-10}$M). p. 1399 ("Calculations based on the competitive ELISA data (Fig. 5), as well as direct measurements of h5G1.1 scFv (CDR) binding to human C5 by surface plasmon resonance (data not shown), indicated a very high affinity of the scFv for C5 ($K_d$ = 100 pM) and a slow dissociation rate ($k_{off}$ = 1.0 x $10^{-4}$/sec)").<br><br>This translates to an affinity constant, $K_a$, of 1 x $10^{10}$M$^{-1}$. | Both |
| wherein the sequence of the humanized immunoglobulin heavy chain variable region framework is at least 65% identical to the | Applying the Kabat method of determining CDRs, CDRs comprise 35 amino acids of the heavy chain variable region and framework comprises the remaining 87 amino acids of hG1.1VHC.  See pp. 1392-93, Fig. 1A.<br><br>Heavy chain framework regions of h5G1.1VHC and 5G1.1 differ by | Both |

| | | |
|---|---|---|
| sequence of the donor immunoglobulin heavy chain variable region framework | 23 amino acids. Thus, they are 64/87 = 73.56% identical.<br><br>Applying the Chothia and Lesk method of determining CDRs, CDRs comprise 22 amino acids of the heavy chain variable region and framework comprises the remaining 100 amino acids of hG1.1VHC. See pp. 1392-93, Fig. 1A.<br><br>Heavy chain framework regions of h5G1.1VHC and 5G1.1 differ by 23 amino acids. Thus, they are 23/100 = 77.00% identical. | |
| wherein the sequence of the humanized immunoglobulin heavy chain variable region framework . . . comprises at least 70 amino acid residues identical to an acceptor human immunoglobulin heavy chain variable region amino acid sequence. | Applying the Kabat method of determining CDRs, heavy chain framework regions of h5G1.1VHC and H20C3H have 85 identical amino acids. See pp. 1392-93, Fig. 1A.<br><br>Applying the Chothia and Lesk method of determining CDRs, heavy chain framework regions of h5G1.1VHC and H20C3H have 88 identical amino acids. See pp. 1392-93, Fig. 1A. | Both |
| **'370 patent: C.L. Queen and H.E. Selick, Humanized immunoglobulins and methods of making the same, U.S. Pat. No.6,180,370 (Filed June 7, 1995; Issued Jan. 30, 2001)** | | |
| **2. A method of producing a humanized immunoglobulin, the method comprising:** | Thomas et al. discloses a method of producing a humanized antibody. | To the extent this preamble is a limitation, both |
| providing a cell containing DNA segments encoding heavy and light chain variable regions of a humanized immunoglobulin | "Similarly, a plasmid capable of expressing the CDR grafted Fab, h5G1.1 Fab (CDR), was constructed by cloning the variable regions h5G1.1VHC and h5G1.1VLC into pAPEX-3P. . . . 293-EBNA cells (Invitrogen, San Diego, CA, U.S.A.) were transfected with the pAPEX-3P expression plasmids and selected using 1 ug/ml puromycin." p. 1391.<br><br>"Two scFv proteins were constructed by the overlapping PCR technique. The h5G1.1 scFv (CDR) contained the h5G1.1VLC variable region, linked to the h5G1.1VHC variable region; . . . These scFv cDNAs were cloned into a plasmid in which expression is driven by the trc promoter. *Escherichia coli* strain ME1 was transformed with the resulting expression plasmids." p. 1391.<br><br>Thomas et al. states that an intact humanized antibody (IgG4 isotype), referred to as h5G1.1 HuG4, was constructed. p. 1396 ("Having demonstrated the effective humanization of the 5G1.1 variable regions, an intact humanized antibody (IgG4 isotype) was constructed and produced in 293-EBNA cells.") | Both |

| | | |
|---|---|---|
| having complementarity determining regions (CDRs) from a donor immunoglobulin and heavy and light chain variable region frameworks from human acceptor immunoglobulin heavy and light chain frameworks | Thomas et al. describes humanized heavy chain and light chain variable sequences having CDRs from a donor immunoglobulin, the mouse monoclonal antibody, 5G1.1, and framework sequences from human acceptor immunoglobulins, H20C3H (for heavy chain sequence) and I.23 (for light chain sequence).<br><br>"For CDR grafting, the 5G1.1 heavy and light chain complementarity determining regions were introduced into the human heavy variable region H20C3H (Weng et al., 1992) to yield h5G1.1VHC (Fig. 1A) or the human light variable region I.23 (Klein et al., 1993) to yield h5G1.1VLC (Fig. 1B), respectively." pp. 1390-91.<br><br>"Comparison of the murine 5G1.1 variable region with the human acceptor variable regions H20C3H and I.23 suggested that the murine and human framework regions differed at three positions important for CDR structure." p. 1394.. | Both |
| which humanized immunoglobulin specifically binds to an antigen with an affinity constant of at least about $10^8$ $M^{-1}$ | The affinity constant, $K_a$ is measured as [Ab-Ag]/[Ab][Ag], where Ab-Ag = antibody-antigen complex, Ab = free antibody, and Ag = free antigen. See J. Kuby, *Immunology* at 136 (1994 2nd ed. W.H. Freeman).<br><br>The dissociation constant, $K_d$ is $1/K_a$.<br><br>Thomas et al. report that h5G1.1 scFv fragments have a $K_d$ of 100pM (= 1 x $10^{-10}$M). p. 1399 ("Calculations based on the competitive ELISA data (Fig. 5), as well as direct measurements of h5G1.1 scFv (CDR) binding to human C5 by surface plasmon resonance (data not shown), indicated a very high affinity of the scFv for C5 ($K_d$ = 100 pM) and a slow dissociation rate ($k_{off}$ = 1.0 x $10^{-4}$/sec)").<br><br>This translates to an affinity constant, $K_a$, of 1 x $10^{10}$$M^{-1}$. | Both |
| which humanized immunoglobulin specifically binds to an antigen with an affinity constant . . . no greater than about four-fold that of the donor immunoglobulin | U.S. Pat. No. 6,355,245 reports the dissociation constant for the full length (donor) mouse monoclonal antibody, 5G1.1, directed against human complement protein C5: $K_d$ of 30pM (= 3 x $10^{-11}$M). This translates to a $K_A$ of 3.33333333 x $10^{10}$$M^{-1}$. '245 at Fig. 8; col. 39, lines 31-61.<br><br>Thomas et al. report that h5G1.1 scFv fragments have a $K_d$ of 100pM (= 1 x $10^{-10}$M). p. 1399 ("Calculations based on the competitive ELISA data (Fig. 5), as well as direct measurements of h5G1.1 scFv (CDR) binding to human C5 by surface plasmon resonance (data not shown), indicated a very high affinity of the scFv for C5 ($K_d$ = 100 pM) and a slow dissociation rate ($k_{off}$ = 1.0 x $10^{-4}$/sec)").<br><br>This translates to an affinity constant, $K_a$, of 1 x $10^{10}$$M^{-1}$. | Both |
| wherein the sequence of the acceptor immunoglobulin heavy chain variable region framework is at least 65% identical to the sequence of the donor | Applying the Kabat method of determining CDRs, Thomas et al. discloses the use of an acceptor heavy chain variable region framework from H20C3H that differs by 25 (out of 87 possible) amino acids from the donor framework in 5G1.1, making the framework regions 71.26% (62/87) identical. See pp. 1392-93, Fig. 1A. Thus, H20C3H framework is at least 65% identical to the donor framework.<br><br>Applying the Chothia and Lesk method of determining CDRs, | Both |

| | | |
|---|---|---|
| immunoglobulin heavy chain variable region framework | Thomas et al. discloses the use of an acceptor heavy chain variable region framework from H20C3H that differs by 35 (out of 100 possible) amino acids from the donor framework in 5G1.1, making the framework regions 65.00% (65/100) identical. See pp. 1392-93, Fig. 1A. Thus, H20C3H framework is at least 65% identical to the donor framework. | |
| the humanized immunoglobulin heavy chain variable region framework comprises at least 70 amino acid residues identical to those in the acceptor human immunoglobulin heavy chain variable region framework | Applying the Kabat method of determining CDRs, heavy chain framework regions of h5G1.1VHC and H20C3H have 85 identical amino acids. See pp. 1392-93, Fig. 1A.<br><br>Applying the Chothia and Lesk method of determining CDRs, heavy chain framework regions of h5G1.1VHC and H20C3H have 88 identical amino acids. See pp. 1392-93, Fig. 1A. | Both |
| wherein percentage sequence identity is determined by aligning amino acids in said frameworks by Kabat numbering; and | See pp. 1392-93, Fig. 1A ("Fig. 1. Sequence of the 5G1.1 heavy (A) and light (B) variable regions. The DNA sequence and the translated amino acid sequence of the cloned 5G1.1 variable regions are shown. Amino acid position is numbered according to Kabat et al. (1992), with the complementarity determining regions according to the hypervariable sequence definition (Kabat et al., 1992) or the structural variability definition (Chothia and Lesk, 1987) underlined and overlined, respectively. . . . The protein sequences of the human variable regions H20C3H and I.23 are shown below the appropriate 5G1.1 variable regions. h5G1.1VHC and h5G1.1VLC denote humanized heavy and light variable regions constructed by grafting the CDRs from 5G1.1 on to the H20C3H and I.23 human framework regions."). | Both |
| expressing the DNA segments in the cell to produce the humanized immunoglobulin. | "Similarly, a plasmid capable of expressing the CDR grafted Fab, h5G1.1 Fab (CDR), was constructed by cloning the variable regions h5G1.1VHC and h5G1.1VLC into pAPEX-3P. . . . 293-EBNA cells (Invitrogen, San Diego, CA, U.S.A.) were transfected with the pAPEX-3P expression plasmids and selected using 1 ug/ml puromycin. Secreted Fabs were purified using protein G Sepharose chromatography as described (Evans *et al.*, 1995b), dialysed into PBS, and stored at 4°C." p. 1391.<br><br>"Two scFv proteins were constructed by the overlapping PCR technique. The h5G1.1 scFv (CDR) contained the h5G1.1VLC variable region, linked to the h5G1.1VHC variable region; . . . These scFv cDNAs were cloned into a plasmid in which expression is driven by the trc promoter. *Escherichia coli* strain ME1 was transformed with the resulting expression plasmids. . . . The production of recombinant scFv was induced by the addition of 1mM isopropylthio-B-D-galactoside when the $OD_{550}$ of the culture reached 10." p. 1391.<br><br>Thomas et al. states that an intact humanized antibody (IgG4 isotype), referred to as h5G1.1 HuG4, was constructed. p. 1396 ("Having demonstrated the effective humanization of the 5G1.1 variable regions, an intact humanized antibody (IgG4 isotype) was constructed and produced in 293-EBNA cells.") | Both |

1218243

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on August 22, 2007, copies of the foregoing were caused to be served on upon the following in the manner indicated:

### BY HAND

Josy W. Ingersoll
Andrew A. Lundgren
Young, Conaway, Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Flr.
Wilmington, DE  19801

### BY EMAIL

Gerald J. Flattmann, Jr.
Christine Willgoos
Gregory A. Morris
Kirkland & Ellis
153 East 53rd Street
New York, NY  10022-4611

Jack B. Blumenfeld (#1014)

# Exhibit 2

# WEIL, GOTSHAL & MANGES LLP

SILICON VALLEY OFFICE
201 REDWOOD SHORES PARKWAY
REDWOOD SHORES, CALIFORNIA 94065

(650) 802-3000
FAX: (650) 802-3100

AUSTIN
BOSTON
BRUSSELS
BUDAPEST
DALLAS
FRANKFURT
HOUSTON
LONDON
MIAMI
NEW YORK
PARIS
PRAGUE
SINGAPORE
WARSAW
WASHINGTON. D.C.

WRITER'S DIRECT LINE

650-802-3174
eric.xanthopoulos@weil.com

December 28, 2007

**VIA EMAIL**

Christine Willgoos, Esq.
Kirkland & Ellis LLP
153 East 53rd Street
New York, NY  10022-4611
cwillgoos@kirkland.com

Re:     **PDL Biopharma, Inc. v. Alexion
          Pharmaceuticals, Inc.**

Dear Christine:

        We write regarding PDL's supplemental responses to Alexion's
interrogatories, and specifically supplementation to identify asserted claims for claim
construction purposes.  That supplementation would be based on Alexion's FDA
submission.  We asked that Alexion allow the named inventors to see Alexion's FDA
submission – subject, of course, to the named inventors being otherwise subject to the
Protective Order's confidentiality requirements.  Alexion declined PDL's request.
Alexion's refusal leaves PDL unable to supplement its interrogatory responses,
particularly for the asserted method claims, based on Alexion's FDA submission.
Accordingly, until such time as Alexion withdraws its refusal to allow the named
inventors to see Alexion's FDA submission, PDL is unable to supplement its
interrogatory responses based on Alexion's FDA submission.

WEIL, GOTSHAL & MANGES LLP

Christine Willgoos, Esq.
December 28, 2007
Page 2


However, for purposes of identifying claims that Alexion may wish the Court to construe, we enclose the attached Infringement Chart, in which sections of Alexion's FDA submission demonstrate infringement of the claims identified in the attached. Please note that the Infringement Chart has been labeled as "Highly Confidential – Outside Attorneys Only" because it quotes information that Alexion has so designated.

Each of the excerpts in the attached are contained in reports (or other separate documents). We ask that Alexion allow the named inventors to review those reports, subject to the other provisions of the Protective Order.

Please be advised that it would not be appropriate to ask the named inventors, or any other witness that PDL deposes, questions at deposition about Alexion's FDA submission, or any other documents that Alexion designated as "Highly Confidential," without first giving such witnesses a reasonable opportunity before the deposition to review such documents. If Alexion fails to give such notice and tries to ask such questions, we will be forced to move for a protective Order. If for some reason you disagree that advance reasonable notice is required, please let us know so that we can try to resolve the issue before any such depositions.

Although we agreed to provide the attached to you on December 31, we are sending the attached today, as Weil's offices are closed December 31 (and January 1).

Sincerely,

*Eric Xanthopoulos*
*eom per VW*

Eric P. Xanthopoulos

Enclosure

# Exhibit 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PDL BIOPHARMA, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C. A. No. 07-156-JJF |
| | ) | |
| ALEXION PHARMACEUTICALS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**PDL BIOPHARMA, INC.'S SUPPLEMENTAL OBJECTION AND RESPONSE TO
ALEXION PHARMACEUTICALS, INC.'S INTERROGATORY NO. 1**

Pursuant to Federal Rules of Civil Procedure 26 and 33, Plaintiff PDL

BioPharma, Inc. ("PDL") objects and responds to Defendant Alexion Pharmaceuticals, Inc.'s

("Alexion") Interrogatory No. 1 as follows:

**GENERAL OBJECTIONS**

1.     PDL incorporates by reference its objections in PDL's Responses To

Alexion's First Set Of Interrogatories.

Subject to and without waiving the above General Objections, PDL objects and

responds to Alexion's interrogatories as follows:

INTERROGATORY NO. 1:

Please describe (by way of claim chart) the bases for PDL's infringement

assertions at the time it filed the Complaint and, if different, at the present time, as follows:

identify each claim of each patent in suit that PDL contends any Alexion product, including

Soliris®, or the manufacture or use thereof, has infringed under any theory; state whether such

alleged infringement is literal or under the doctrine of equivalents; describe the complete factual

basis and evidentiary support for the presence of each element of each asserted claim either

literally or by way of a substantial equivalence and identify the three individuals most knowledgeable about the information requested in this interrogatory.

PRIOR RESPONSE TO INTERROGATORY NO. 1:

PDL incorporates its General Objections, set forth above, here. In addition, this interrogatory improperly seeks information protected from disclosure by both the attorney-client privilege and the attorney work product doctrine: specifically, the difference (if any) between PDL's infringement assertions at the time that it filed the lawsuit and PDL's infringement assertions now. The Federal Rules of Civil Procedure contain provisions regarding disclosure of a party's pre-filing assessment, and Alexion does not purport to invoke those provisions. At this juncture, Alexion has not provided PDL in discovery samples of Soliris or any information about how Soliris is manufactured. PDL also objects to this interrogatory on the grounds that it is, in part, premature: infringement is appropriately (and routinely) the subject of expert discovery, and Alexion will receive expert testimony proffered on behalf of PDL that sets forth PDL's position on these issues at the appropriate time.

Finally, Rule 33 of the Federal Rules of Civil Procedure allows only 25 interrogatories per party, "including all discrete subparts," although PDL has agreed to Alexion's request that each party be allowed 30 interrogatories. As the added brackets indicate, this interrogatory has at least three discrete subparts.

Subject to these objections, PDL responds as follows: Under the US patent laws, patent infringement occurs when a party infringes at least one claim of a patent. Accordingly, for each of the three patents-in-suit, PDL will provide the requested information with respect to at least one claim of each patent. Appendix 1 hereto contains the requested claim chart for one claim of each asserted patent. Defining "infringement" as the process of comparing claims of the

patents-in-suit to the published sequence of Soliris that is referenced in Appendix 1, there are no individuals at PDL at this juncture who can provide non-privileged testimony. This interrogatory response does not identify counsel or others with privileged knowledge about infringement. In addition, as noted above, at this juncture Alexion has not provided in discovery a sample of Soliris, and has not provided in discovery any information about how Soliris is manufactured. Accordingly, PDL reserves the right to amend this interrogatory with respect to the claims identified in it.

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:

PDL incorporates its General and Specific Objections, set forth above, here. PDL further objects to Alexion's interrogatory because it requires PDL to provide responses based on information that Alexion has chosen not to allow PDL to be able to review. In particular, information responsive to this interrogatory can be found in Alexion's submission to the United States Food and Drug Administration ("FDA"), by which Alexion persuaded the FDA that Alexion's infringing humanized antibody, Soliris, was safe, effective, and met the other standards that the FDA determines must be satisfied before FDA approval is granted. According to Alexion, it designated its entire FDA submission as Outside Attorneys Eyes Only under the Stipulated Confidentiality Protective Order in this case. That designation precludes officials at PDL from reviewing that FDA submission, and thus precludes officials at PDL from providing a verified response. PDL asked Alexion for permission to be able to review Alexion's FDA submission, but Alexion declined.

PDL also objects to Alexion's interrogatory to the extent that it calls for contentions that depend on the interpretation of claim limitations prior to the Court's issuance of a claim construction order defining disputed terms and phrases – if any – in the patents-in-suit.

Subject to these objections, PDL supplements its response as follows:  PDL asserts in this lawsuit that (a) Alexion's humanized antibody, Soliris, (b) the method by which Alexion causes Soliris to be made, and (c) materials used in making Soliris, infringe at least the following claims of PDL's '761, '762, and '370 patents:

- '761:  1, 2, 6, 8, 17, 18, 26, 33, and 35;

- '762:  1, 2, 3, 10 – 14, 18, and 19;

- '370:  1, 2, 5, 6, and 25 – 28.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Jack B. Blumenfeld (#1014)
Karen Jacobs Louden (#2881)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com

*Attorneys for Plaintiff and Counter-Defendant PDL BioPharma, Inc.*

OF COUNSEL:

Matthew D. Powers
Vernon M. Winters
Eric P. Xanthopoulos
Weil, Gotshal & Manges LLP
Silicon Valley Office
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000

Dated: February 1, 2008
1450316

## VERIFICATION

I, Herbert C. Cross, declare:

I am the Controller of PDL BioPharma, Inc., and am authorized to make this verification on its behalf.  I have read **PDL BIOPHARMA, INC.'S SUPPLEMENTAL OBJECTION AND RESPONSE TO ALEXION PHARMACEUTICALS, INC.'S INTERROGATORY NO. 1**.  The matters stated in the Supplemental Response to Interrogatory No. 1 are true to the best of my knowledge and belief.

Executed on January 30, 2008, at Redwood City, California.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

_____
Herbert C. Cross
Controller
PDL BioPharma, Inc.

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on February 1, 2008, copies of the

foregoing were caused to be served on upon the following in the manner indicated:

**BY HAND AND EMAIL**

Josy W. Ingersoll
Andrew A. Lundgren
Young, Conaway, Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Flr.
Wilmington, DE  19801

**BY EMAIL**

Gerald J. Flattmann, Jr.
Christine Willgoos
Gregory A. Morris
Kirkland & Ellis
153 East 53rd Street
New York, NY  10022-4611


Jack B. Blumenfeld (#1014)

# Exhibit 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PDL BIOPHARMA, INC.,

        Plaintiff,

      v.

ALEXION PHARMACEUTICALS, INC.,

        Defendant.

C. A. No. 07-156 (JJF)

## PDL BIOPHARMA, INC.'S SECOND SUPPLEMENTAL OBJECTION AND RESPONSE TO ALEXION PHARMACEUTICALS, INC.'S INTERROGATORY NO. 1

Pursuant to Federal Rules of Civil Procedure 26 and 33, Plaintiff PDL BioPharma, Inc. ("PDL") objects and responds to Defendant Alexion Pharmaceuticals, Inc.'s ("Alexion") Interrogatory No. 1 as follows:

### GENERAL OBJECTIONS

1.    PDL incorporates by reference its objections in PDL's Responses To Alexion's First Set Of Interrogatories.

Subject to and without waiving the above General Objections, PDL objects and responds to Alexion's interrogatories as follows:

### INTERROGATORY NO. 1:

Please describe (by way of claim chart) the bases for PDL's infringement assertions at the time it filed the Complaint and, if different, at the present time, as follows: identify each claim of each patent in suit that PDL contends any Alexion product, including Soliris®, or the manufacture or use thereof, has infringed under any theory; state whether such alleged infringement is literal or under the doctrine of equivalents; describe the complete factual basis and evidentiary support for the presence of each element of each asserted claim either

literally or by way of a substantial equivalence and identify the three individuals most knowledgeable about the information requested in this interrogatory.

## PRIOR RESPONSE TO INTERROGATORY NO. 1:

PDL incorporates its General Objections, set forth above, here. In addition, this interrogatory improperly seeks information protected from disclosure by both the attorney-client privilege and the attorney work product doctrine: specifically, the difference (if any) between PDL's infringement assertions at the time that it filed the lawsuit and PDL's infringement assertions now. The Federal Rules of Civil Procedure contain provisions regarding disclosure of a party's pre-filing assessment, and Alexion does not purport to invoke those provisions. At this juncture, Alexion has not provided PDL in discovery samples of Soliris or any information about how Soliris is manufactured. PDL also objects to this interrogatory on the grounds that it is, in part, premature: infringement is appropriately (and routinely) the subject of expert discovery, and Alexion will receive expert testimony proffered on behalf of PDL that sets forth PDL's position on these issues at the appropriate time.

Finally, Rule 33 of the Federal Rules of Civil Procedure allows only 25 interrogatories per party, "including all discrete subparts," although PDL has agreed to Alexion's request that each party be allowed 30 interrogatories. As the added brackets indicate, this interrogatory has at least three discrete subparts.

Subject to these objections, PDL responds as follows: Under the US patent laws, patent infringement occurs when a party infringes at least one claim of a patent. Accordingly, for each of the three patents-in-suit, PDL will provide the requested information with respect to at least one claim of each patent. Appendix 1 hereto contains the requested claim chart for one claim of each asserted patent. Defining "infringement" as the process of comparing claims of the patents-in-suit to the published sequence of Soliris that is referenced in Appendix 1, there are no

individuals at PDL at this juncture who can provide non-privileged testimony. This interrogatory response does not identify counsel or others with privileged knowledge about infringement. In addition, as noted above, at this juncture Alexion has not provided in discovery a sample of Soliris, and has not provided in discovery any information about how Soliris is manufactured. Accordingly, PDL reserves the right to amend this interrogatory with respect to the claims identified in it.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:**

PDL incorporates its General and Specific Objections, set forth above, here. PDL further objects to Alexion's interrogatory because it requires PDL to provide responses based on information that Alexion has chosen not to allow PDL to be able to review. In particular, information responsive to this interrogatory can be found in Alexion's submission to the United States Food and Drug Administration ("FDA"), by which Alexion persuaded the FDA that Alexion's infringing humanized antibody, Soliris, was safe, effective, and met the other standards that the FDA determines must be satisfied before FDA approval is granted. According to Alexion, it designated its entire FDA submission as Outside Attorneys Eyes Only under the Stipulated Confidentiality Protective Order in this case. That designation precludes officials at PDL from reviewing that FDA submission, and thus precludes officials at PDL from providing a verified response. PDL asked Alexion for permission to be able to review Alexion's FDA submission, but Alexion declined.

PDL also objects to Alexion's interrogatory to the extent that it calls for contentions that depend on the interpretation of claim limitations prior to the Court's issuance of a claim construction order defining disputed terms and phrases – if any – in the patents-in-suit.

Subject to these objections, PDL supplements its response as follows: PDL

asserts in this lawsuit that (a) Alexion's humanized antibody, Soliris, (b) the method by which Alexion causes Soliris to be made, and (c) materials used in making Soliris, infringe at least the following claims of PDL's '761, '762, and '370 patents:

- '761: 1, 2, 6, 8, 17, 18, 26, 33, and 35;
- '762: 1, 2, 3, 10 – 14, 18, and 19;
- '370: 1, 2, 5, 6, and 25 – 28.

## SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:

PDL incorporates by reference both its General and prior Specific Objections as well as its prior responses except as expressly amended below. This amendment raises no new claim construction issues.

PDL supplements its response as follows: PDL asserts in this lawsuit that (a) Alexion's humanized antibody, Soliris, (b) the method by which Alexion causes Soliris to be made, and (c) materials used in making Soliris, infringe at least the following claims of PDL's '761, '762, and '370 patents:

- '761: 1, 2, 6, 8, 17, 18, 26, 33, and 35;
- '762: 1, 2, 3, 10 – 14, 16, 18, and 19;
- '370: 1, 2, 5, 6, and 25 – 28.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*Karen Jacobs Louden*

Jack B. Blumenfeld (#1014)
Karen Jacobs Louden (#2881)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
klouden@mnat.com
*Attorneys for Plaintiff and Counter-*
*DefendantPDL BioPharma, Inc.*

4

OF COUNSEL:

Matthew D. Powers
Vernon M. Winters
Eric P. Xanthopoulos
Weil, Gotshal & Manges LLP
Silicon Valley Office
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000

February 21, 2008

# TAB 1

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on February 21, 2008, copies of the

foregoing were caused to be served on upon the following in the manner indicated:

### BY HAND AND EMAIL

Josy W. Ingersoll
Andrew A. Lundgren
Young, Conaway, Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Flr.
Wilmington, DE 19801

### BY EMAIL

Gerald J. Flattmann, Jr.
Christine Willgoos
Gregory A. Morris
Kirkland & Ellis
153 East 53rd Street
New York, NY 10022-4611

Karen Jacobs Louden (#2881)

Appendix 1 (claim charts)

| Language from Claim of PDL's Infringed Patent | Infringement By Alexion's Soliris (based on Alexion's disclosure of the amino acid sequence in Thomas et al. (1996), *Inhibition of complement activity by humanized anti-C5 antibody and single-chain Fv*, Mol. Immunol. 33(17)1389-1401); see also Hillman, et al., The Complement Inhibitor Eculizumab in Paroxysmal Nocturnal Hemoglobinuria, 355 N. Engl. J. Med 1233-1242 at n.13 (Sept 21,2006), in which Alexion officials represented that Thomas disclosed the amino acid sequence for Soliris; and U.S. Pat. No. 6,355,245 | Infringement Literal, Doctrine of Equivalents, or Both? |
|---|---|---|
| C.L. Queen, W.P. Schneider, and H.E. Selick, Polynucleotides encoding improved humanized immunoglobulins, U.S. Pat. No. 5,639,761 (Filed Jun. 7, 1995; Issued Dec. 2, 1997) | | |
| 1. First and second polynucleotides respectively encoding heavy and light chain variable regions of a humanized immunoglobulin | Thomas et al. describes sequences encoding humanized heavy chain and light chain variable regions. See, e.g., pp. 1392-93, Figs. 1A, 1B. | To the extent this preamble is a limitation, both |
| having complementarity determining regions (CDRs) from a donor immunoglobulin and heavy and light chain variable region frameworks from human acceptor immunoglobulin heavy and light chain frameworks | Thomas et al. describes humanized heavy chain and light chain variable sequences having CDRs from a donor immunoglobulin, the mouse monoclonal antibody, 5G1.1, and framework sequences from human acceptor immunoglobulins, H20C3H (for heavy chain sequence) and I.23 (for light chain sequence).<br><br>See, e.g., "For CDR grafting, the 5G1.1 heavy and light chain complementarity determining regions were introduced into the human heavy variable region H20C3H (Weng et al., 1992) to yield h5G1.1VHC (Fig. 1A) or the human light variable region I.23 (Klein et al., 1993) to yield h5G1.1VLC (Fig. 1B), respectively." pp. 1390-91.<br><br>See, e.g., "Comparison of the murine 5G1.1 variable region with the human acceptor variable regions H20C3H and I.23 suggested that the murine and human framework regions differed at three positions important for CDR structure." p. 1394. | Both |
| which humanized immunoglobulin specifically binds to an antigen with an affinity constant of at least about $10^8$ $M^{-1}$ | Thomas et al. report that h5G1.1 scFv fragments have a $K_d$ of 100pM (= 1 x $10^{-10}$M). p. 1399 ("Calculations based on the competitive ELISA data (Fig. 5), as well as direct measurements of h5G1.1 scFv (CDR) binding to human C5 by surface plasmon resonance (data not shown), indicated a very high affinity of the scFv for C5 ($K_d$ = 100 pM) and a slow dissociation rate ($k_{off}$ = 1.0 x $10^{-4}$/sec)").<br><br>This translates to an affinity constant, $K_a$, of 1 x $10^{10}$$M^{-1}$. | Both |

| | | |
|---|---|---|
| which humanized immunoglobulin specifically binds to an antigen with an affinity constant . . . no greater than about four-fold that of the donor immunoglobulin | U.S. Pat. No. 6,355,245 reports the dissociation constant for the full length (donor) mouse monoclonal antibody, 5G1.1, directed against human complement protein C5:<br><br>$K_d$ of 30pM (= 3 x $10^{-11}$M).  This translates to a $K_A$ of  3.33333333 x $10^{10}$M$^{-1}$. '245 at Fig. 8; col. 39, lines 31-61.<br><br>Thomas et al. report that h5G1.1 scFv fragments have a $K_d$ of 100pM (= 1 x $10^{-10}$M). p. 1399 ("Calculations based on  the competitive ELISA data (Fig. 5), as well as direct measurements of h5G1.1 scFv (CDR) binding to human C5 by surface plasmon resonance (data not shown), indicated a very high affinity of the scFv  for C5 ($K_d$ = 100 pM) and a slow dissociation rate ($k_{off}$ = 1.0 x $10^{-4}$/sec)").<br><br>This translates to an affinity constant, $K_a$, of 1 x $10^{10}$M$^{-1}$. | Both |
| wherein the sequence of the humanized immunoglobulin heavy chain variable region framework is at least 65% identical to the sequence of the donor immunoglobulin heavy chain variable region framework | Applying the Kabat method of determining CDRs, CDRs comprise 35 amino acids of the heavy chain variable region and framework comprises the remaining 87 amino acids of hG1.1VHC.  See pp. 1392-93, Fig. 1A.<br><br>Heavy chain framework regions of h5G1.1VHC and 5G1.1 differ by 23 amino acids.  Thus, they are 64/87 = 73.56% identical.<br><br>Applying the Chothia and Lesk method of determining CDRs, CDRs comprise 22 amino acids of the heavy chain variable region and framework comprises the remaining 100 amino acids of hG1.1VHC. See pp. 1392-93, Fig. 1A.<br><br>Heavy chain framework regions of h5G1.1VHC and 5G1.1 differ by 23 amino acids.  Thus, they are 23/100 = 77.00% identical. | Both |
| wherein the sequence of the humanized immunoglobulin heavy chain variable region framework . . . comprises at least 70 amino acid residues identical to those in the acceptor human immunoglobulin heavy chain variable region framework. | Applying the Kabat method of determining CDRs, heavy chain framework regions of h5G1.1VHC and H20C3H have 85 identical amino acids.  See pp. 1392-93, Fig. 1A.<br><br>Applying the Chothia and Lesk method of determining CDRs, heavy chain framework regions of h5G1.1VHC and H20C3H have 88 identical amino acids.  See pp. 1392-93, Fig. 1A. | Both |
| **C.L. Queen, M.S. Co, W.P. Schneider, and H.E. Selick, Humanized immunoglobulins, U.S. Pat. No. 5,639,762 (Filed Jun. 7, 1995; Issued Dec. 2, 1997)** | | |
| 1. A humanized immunoglobulin | Thomas et al. describes the production of "humanized" immunoglobulins. | To the extent this preamble is a limitation, |

| | | |
|---|---|---|
| | | both |
| having complementarity determining regions (CDRs) from a donor immunoglobulin and heavy and light chain variable region frameworks from human acceptor immunoglobulin heavy and light chain frameworks | Thomas et al. describes humanized heavy chain and light chain variable sequences having CDRs from a donor immunoglobulin, the mouse monoclonal antibody, 5G1.1, and framework sequences from human acceptor immunoglobulins, H20C3H (for heavy chain sequence) and I.23 (for light chain sequence).<br><br>"For CDR grafting, the 5G1.1 heavy and light chain complementarity determining regions were introduced into the human heavy variable region H20C3H (Weng et al., 1992) to yield h5G1.1VHC (Fig. 1A) or the human light variable region I.23 (Klein et al., 1993) to yield h5G1.1VLC (Fig. 1B), respectively." pp. 1390-91.<br><br>"Comparison of the murine 5G1.1 variable region with the human acceptor variable regions H20C3H and I.23 suggested that the murine and human framework regions differed at three positions important for CDR structure." p. 1394. | Both |
| which humanized immunoglobulin specifically binds to an antigen with an affinity constant of at least $10^7$ $M^{-1}$ | The affinity constant, $K_a$ is measured as [Ab-Ag]/[Ab][Ag], where Ab-Ag = antibody-antigen complex, Ab = free antibody, and Ag = free antigen. See J. Kuby, *Immunology* at 136 (1994 2nd ed. W.H. Freeman).<br><br>The dissociation constant, $K_d$ is $1/K_a$.<br><br>Thomas et al. report that h5G1.1 scFv fragments have a $K_d$ of 100pM (= $1 \times 10^{-10}$M). p. 1399 ("Calculations based on the competitive ELISA data (Fig. 5), as well as direct measurements of h5G1.1 scFv (CDR) binding to human C5 by surface plasmon resonance (data not shown), indicated a very high affinity of the scFv for C5 ($K_d$ = 100 pM) and a slow dissociation rate ($k_{off}$ = $1.0 \times 10^{-4}$/sec)").<br><br>This translates to an affinity constant, $K_a$, of $1 \times 10^{10}M^{-1}$. | Both |
| which humanized immunoglobulin specifically binds to an antigen with an affinity constant of . . . no greater than about four-fold that of the donor immunoglobulin | U.S. Pat. No. 6,355,245 reports the dissociation constant for the full length (donor) mouse monoclonal antibody, 5G1.1, directed against human complement protein C5:<br><br>$K_d$ of 30pM (= $3 \times 10^{-11}$M). This translates to a $K_A$ of $3.33333333 \times 10^{10}M^{-1}$. '245 at Fig. 8; col. 39, lines 31-61.<br><br>Thomas et al. and the '245 patent do not report an affinity constant for full length humanized antibody.<br><br>Thomas et al. report that h5G1.1 scFv fragments have a $K_d$ of 100pM (= $1 \times 10^{-10}$M). p. 1399 ("Calculations based on the competitive ELISA data (Fig. 5), as well as direct measurements of h5G1.1 scFv (CDR) binding to human C5 by surface plasmon resonance (data not shown), indicated a very high affinity of the scFv for C5 ($K_d$ = 100 pM) and a slow dissociation rate ($k_{off}$ = $1.0 \times 10^{-4}$/sec)").<br><br>This translates to an affinity constant, $K_a$, of $1 \times 10^{10}M^{-1}$. | Both |
| wherein the sequence of the humanized immunoglobulin heavy chain variable region framework is at least 65% identical to the | Applying the Kabat method of determining CDRs, CDRs comprise 35 amino acids of the heavy chain variable region and framework comprises the remaining 87 amino acids of hG1.1VHC. See pp. 1392-93, Fig. 1A.<br><br>Heavy chain framework regions of h5G1.1VHC and 5G1.1 differ by | Both |

| | | |
|---|---|---|
| sequence of the donor immunoglobulin heavy chain variable region framework | 23 amino acids. Thus, they are 64/87 = 73.56% identical.<br><br>Applying the Chothia and Lesk method of determining CDRs, CDRs comprise 22 amino acids of the heavy chain variable region and framework comprises the remaining 100 amino acids of hG1.1VHC. See pp. 1392-93, Fig. 1A.<br><br>Heavy chain framework regions of h5G1.1VHC and 5G1.1 differ by 23 amino acids. Thus, they are 23/100 = 77.00% identical. | |
| wherein the sequence of the humanized immunoglobulin heavy chain variable region framework . . . comprises at least 70 amino acid residues identical to an acceptor human immunoglobulin heavy chain variable region amino acid sequence. | Applying the Kabat method of determining CDRs, heavy chain framework regions of h5G1.1VHC and H20C3H have 85 identical amino acids. See pp. 1392-93, Fig. 1A.<br><br>Applying the Chothia and Lesk method of determining CDRs, heavy chain framework regions of h5G1.1VHC and H20C3H have 88 identical amino acids. See pp. 1392-93, Fig. 1A. | Both |
| **'370 patent: C.L. Queen and H.E. Selick, Humanized immunoglobulins and methods of making the same, U.S. Pat. No.6,180,370 (Filed June 7, 1995; Issued Jan. 30, 2001)** | | |
| 2. A method of producing a humanized immunoglobulin, the method comprising: | Thomas et al. discloses a method of producing a humanized antibody. | To the extent this preamble is a limitation, both |
| providing a cell containing DNA segments encoding heavy and light chain variable regions of a humanized immunoglobulin | "Similarly, a plasmid capable of expressing the CDR grafted Fab, h5G1.1 Fab (CDR), was constructed by cloning the variable regions h5G1.1VHC and h5G1.1VLC into pAPEX-3P. . . . 293-EBNA cells (Invitrogen, San Diego, CA, U.S.A.) were transfected with the pAPEX-3P expression plasmids and selected using 1 ug/ml puromycin." p. 1391.<br><br>"Two scFv proteins were constructed by the overlapping PCR technique. The h5G1.1 scFv (CDR) contained the h5G1.1VLC variable region, linked to the h5G1.1VHC variable region; . . . These scFv cDNAs were cloned into a plasmid in which expression is driven by the trc promoter. *Escherichia coli* strain ME1 was transformed with the resulting expression plasmids." p. 1391.<br><br>Thomas et al. states that an intact humanized antibody (IgG4 isotype), referred to as h5G1.1 HuG4, was constructed. p. 1396 ("Having demonstrated the effective humanization of the 5G1.1 variable regions, an intact humanized antibody (IgG4 isotype) was constructed and produced in 293-EBNA cells.") | Both |

| | | |
|---|---|---|
| having complementarity determining regions (CDRs) from a donor immunoglobulin and heavy and light chain variable region frameworks from human acceptor immunoglobulin heavy and light chain frameworks | Thomas et al. describes humanized heavy chain and light chain variable sequences having CDRs from a donor immunoglobulin, the mouse monoclonal antibody, 5G1.1, and framework sequences from human acceptor immunoglobulins, H20C3H (for heavy chain sequence) and I.23 (for light chain sequence).<br><br>"For CDR grafting, the 5G1.1 heavy and light chain complementarity determining regions were introduced into the human heavy variable region H20C3H (Weng et al., 1992) to yield h5G1.1VHC (Fig. 1A) or the human light variable region I.23 (Klein et al., 1993) to yield h5G1.1VLC (Fig. 1B), respectively." pp. 1390-91.<br><br>"Comparison of the murine 5G1.1 variable region with the human acceptor variable regions H20C3H and I.23 suggested that the murine and human framework regions differed at three positions important for CDR structure." p. 1394.. | Both |
| which humanized immunoglobulin specifically binds to an antigen with an affinity constant of at least about $10^8$ M$^{-1}$ | The affinity constant, $K_a$ is measured as [Ab-Ag]/[Ab][Ag], where Ab-Ag = antibody-antigen complex, Ab = free antibody, and Ag = free antigen. See J. Kuby, *Immunology* at 136 (1994 2nd ed. W.H. Freeman).<br><br>The dissociation constant, $K_d$ is $1/K_a$.<br><br>Thomas et al. report that h5G1.1 scFv fragments have a $K_d$ of 100pM (= 1 x $10^{-10}$M). p. 1399 ("Calculations based on the competitive ELISA data (Fig. 5), as well as direct measurements of h5G1.1 scFv (CDR) binding to human C5 by surface plasmon resonance (data not shown), indicated a very high affinity of the scFv for C5 ($K_d$ = 100 pM) and a slow dissociation rate ($k_{off}$ = 1.0 x $10^{-4}$/sec)").<br><br>This translates to an affinity constant, $K_a$, of 1 x $10^{10}$M$^{-1}$. | Both |
| which humanized immunoglobulin specifically binds to an antigen with an affinity constant . . . no greater than about four-fold that of the donor immunoglobulin | U.S. Pat. No. 6,355,245 reports the dissociation constant for the full length (donor) mouse monoclonal antibody, 5G1.1, directed against human complement protein C5: $K_d$ of 30pM (= 3 x $10^{-11}$M). This translates to a $K_A$ of 3.33333333 x $10^{10}$M$^{-1}$. '245 at Fig. 8; col. 39, lines 31-61.<br><br>Thomas et al. report that h5G1.1 scFv fragments have a $K_d$ of 100pM (= 1 x $10^{-10}$M). p. 1399 ("Calculations based on the competitive ELISA data (Fig. 5), as well as direct measurements of h5G1.1 scFv (CDR) binding to human C5 by surface plasmon resonance (data not shown), indicated a very high affinity of the scFv for C5 ($K_d$ = 100 pM) and a slow dissociation rate ($k_{off}$ = 1.0 x $10^{-4}$/sec)").<br><br>This translates to an affinity constant, $K_a$, of 1 x $10^{10}$M$^{-1}$. | Both |
| wherein the sequence of the acceptor immunoglobulin heavy chain variable region framework is at least 65% identical to the sequence of the donor | Applying the Kabat method of determining CDRs, Thomas et al. discloses the use of an acceptor heavy chain variable region framework from H20C3H that differs by 25 (out of 87 possible) amino acids from the donor framework in 5G1.1, making the framework regions 71.26% (62/87) identical. See pp. 1392-93, Fig. 1A. Thus, H20C3H framework is at least 65% identical to the donor framework.<br><br>Applying the Chothia and Lesk method of determining CDRs, | Both |

| | | |
|---|---|---|
| immunoglobulin heavy chain variable region framework | Thomas et al. discloses the use of an acceptor heavy chain variable region framework from H20C3H that differs by 35 (out of 100 possible) amino acids from the donor framework in 5G1.1, making the framework regions 65.00% (65/100) identical. See pp. 1392-93, Fig. 1A. Thus, H20C3H framework is at least 65% identical to the donor framework. | |
| the humanized immunoglobulin heavy chain variable region framework comprises at least 70 amino acid residues identical to those in the acceptor human immunoglobulin heavy chain variable region framework | Applying the Kabat method of determining CDRs, heavy chain framework regions of h5G1.1VHC and H20C3H have 85 identical amino acids. See pp. 1392-93, Fig. 1A. Applying the Chothia and Lesk method of determining CDRs, heavy chain framework regions of h5G1.1VHC and H20C3H have 88 identical amino acids. See pp. 1392-93, Fig. 1A. | Both |
| wherein percentage sequence identity is determined by aligning amino acids in said frameworks by Kabat numbering; and | See pp. 1392-93, Fig. 1A ("Fig. 1. Sequence of the 5G1.1 heavy (A) and light (B) variable regions. The DNA sequence and the translated amino acid sequence of the cloned 5G1.1 variable regions are shown. Amino acid position is numbered according to Kabat et al. (1992), with the complementarity determining regions according to the hypervariable sequence definition (Kabat et al., 1992) or the structural variability definition (Chothia and Lesk, 1987) underlined and overlined, respectively. . . . The protein sequences of the human variable regions H20C3H and I.23 are shown below the appropriate 5G1.1 variable regions. h5G1.1VHC and h5G1.1VLC denote humanized heavy and light variable regions constructed by grafting the CDRs from 5G1.1 on to the H20C3H and I.23 human framework regions."). | Both |
| expressing the DNA segments in the cell to produce the humanized immunoglobulin. | "Similarly, a plasmid capable of expressing the CDR grafted Fab, h5G1.1 Fab (CDR), was constructed by cloning the variable regions h5G1.1VHC and h5G1.1VLC into pAPEX-3P. . . . 293-EBNA cells (Invitrogen, San Diego, CA, U.S.A.) were transfected with the pAPEX-3P expression plasmids and selected using 1 ug/ml puromycin. Secreted Fabs were purified using protein G Sepharose chromatography as described (Evans et al., 1995b), dialysed into PBS, and stored at 4°C." p. 1391. "Two scFv proteins were constructed by the overlapping PCR technique. The h5G1.1 scFv (CDR) contained the h5G1.1VLC variable region, linked to the h5G1.1VHC variable region; . . . These scFv cDNAs were cloned into a plasmid in which expression is driven by the trc promoter. Escherichia coli strain ME1 was transformed with the resulting expression plasmids. . . . The production of recombinant scFv was induced by the addition of 1mM isopropylthio-B-D-galactoside when the OD$_{550}$ of the culture reached 10." p. 1391. Thomas et al. states that an intact humanized antibody (IgG4 isotype), referred to as h5G1.1 HuG4, was constructed. p. 1396 ("Having demonstrated the effective humanization of the 5G1.1 variable regions, an intact humanized antibody (IgG4 isotype) was constructed and produced in 293-EBNA cells.") | Both |

1218243

# Exhibit 5

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PDL BIOPHARMA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 07-156-JJF |
| | ) | |
| ALEXION PHARMACEUTICALS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**ALEXION PHARMACEUTICALS, INC.'S FIRST SUPPLEMENTAL RESPONSE TO
PDL BIOPHARMA, INC.'S INTERROGATORY NO. 3**

Pursuant to Federal Rule of Civil Procedure 33 and Local Rule 26.1, Defendant

Alexion Pharmaceuticals, Inc. ("Alexion") hereby submits its first supplemental response to

Plaintiff PDL BioPharma, Inc.'s ("PDL's") Interrogatory No. 3 to Alexion Pharmaceuticals, Inc.

Pursuant to Federal Rule of Civil Procedure 26(e), Alexion reserves the right to

supplement its responses to these interrogatories if it learns of additional information.

**GENERAL OBJECTIONS**

Alexion hereby incorporates by reference its General Objections set forth in

Alexion Pharmaceuticals, Inc.'s Objections And Responses To PDL Biopharma, Inc.'s First Set

Of Interrogatories and makes said General Objections part of its response to each interrogatory.

**SPECIFIC OBJECTIONS AND RESPONSES**

**INTERROGATORY NO. 3:**

Separately for each claim in each of the Patents-In-Suit, please state all facts, and
identify all witnesses to any facts, that You contend support Your second defense set forth in
paragraph 33 of Alexion's *Answer and Counterclaims* that the Patents-In-Suit are invalid.

## RESPONSE TO INTERROGATORY NO. 3:

Alexion objects to this interrogatory to the extent that it seeks information, documents or things that are protected by the attorney-client privilege, attorney work product doctrine, or any other applicable privilege or immunity. Alexion objects to this interrogatory as premature and unduly burdensome because it purports to require Alexion to set forth separate invalidity defenses for over 85 claims prior to PDL's identification of the asserted claims. Alexion further objects to this interrogatory as premature in that it seeks expert opinions prior to the time set for expert discovery by the proposed August 21, 2007 Scheduling Order. Alexion will supplement its response in accordance with the Scheduling Order or as otherwise allowed by the Court or Federal or Local Rules. Subject to the foregoing objections and its General Objections, Alexion responds as follows.

Each of the claims of the patents in suit are invalid for failure to meet the patentability requirements of one or more of 35 U.S.C. § 101, 102, 103, and 112.

For example, several claims of the patents-in-suit are invalid because they do not meet the patentability requirements of 35 U.S.C. § 112. The specifications of the '762, '763 and '370 patents do not provide an adequate written description to support the patentability of each claim of the respective patents. Similarly, the specifications of the '762, '763 and '370 patents do not fully enable the scope of the purported inventions claimed.

Several claims of the patents-in-suit are invalid under 35 U.S.C. § 101 because the claims are inoperable.

The majority, if not all, of the claims of the patents-in-suit are invalid because they are anticipated by or obvious in view of the prior art and/or the knowledge of one of ordinary skill in the art. Examples of prior art references that render the patents invalid, either alone or in combination, include but are not limited to, Chothia & Lesk, *The Relation Between*

2

*the Divergence of Sequence and Structure in Proteins*, EMBO Journal 5(4):823-26 (1986); Jones

et al., *Replacing the Complementarity Determining Regions in a Human Antibody With Those*

*From a Mouse*, Nature 321:522-25 (1986); Riechmann et al., *Reshaping Human Antibodies for*

*Therapy*, Nature 322:323-27 (1988); and Winter, EP 0239400.

## SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3

Alexion objects to this interrogatory as improperly requiring Alexion to "state all

facts" and "identify all witnesses to any facts" in support of its invalidity defenses before PDL

has provided its contentions as to Alexion's infringement. Alexion further objects to this

interrogatory as premature given that it seeks expert opinion testimony prior to the disclosure

dates set forth in the Federal Rules of Civil Procedure 26(a)(2)(C) and the Court's August 21,

2007 Scheduling Order. Alexion further objects to this interrogatory as premature given that

PDL has not yet provided any claim construction contentions and the Court has not yet issued

any claim construction decision. Alexion further objects to this interrogatory to the extent that it

seeks information that is protected from disclosure under the attorney-client privilege and/or the

attorney work product doctrine. Subject to these specific objections and its General Objections,

Alexion further responds to this interrogatory as follows.

Alexion states that Claims 1-19 and 26-37 of the '761 patent, Claims 1-20 of the

'762 patent, and Claims 1-30 of the '370 patent are invalid for at least the following reasons.

Alexion reserves the right to supplement its contentions in accordance with Federal Rule of Civil

Procedure 26(e).

Alexion states that Claims 1-19 and 26-37 of the '761 patent, Claims 1-20 of the

'762 patent, and Claims 1-30 of the '370 patent are invalid for lack of utility under 35 U.S.C.

§ 101.

Alexion states that Claims 1-19 and 26-37 of the '761 patent, Claims 1-20 of the '762 patent, and Claims 1-30 of the '370 patent are invalid under 35 U.S.C. § 102(a), (b) and/or § 103 over at least the following prior art:

1.  Jones *et al.* "Replacing the Complementarity Determining Regions In A Human Antibody With Those From A Mouse." *Nature*, 321:522-25 (1986);

2.  Riechmann *et al.* "Reshaping Human Antibodies For Therapy." *Nature*, 322:323-27 (1988);

3.  EP 0328404;

4.  EP 0239400;

5.  WO 88/09344;

6.  Chothia *et al.* "Cannonical Structures For The Hypervariable Regions of Immunoglobulins." *J. Mol. Biol.*, 196:901-17 (1987);

7.  Verhoeyen *et al.* "Reshaping Human Antibodies: Grafting An Antilysozyme Activity." *Science*, 239:1534-36 (1988);

8.  De la Paz *et al.* "Modelling Of The Combining Sites Of Three Anti-Lysozyme Monoclonal Antibodies And Of The Complex Between One Of The Antibodies And Its Epitope." *EMBO Journal*, 5:2, 415-25 (1986);

9.  Alzari *et al.* "Three-Dimensional Structure Of Antibodies." *Ann. Rev. Immunol.*, 6:555-80 (1988);

10.      Amit *et al.* "Three-dimensional Structure Of An Antigen-Antibody Complex at 2.8 Å Resolution." *Science*, 233:747-53 (1986); and

11.      Poljak *et al.* "Amino Acid Sequence Of The Vh Region of a Human Myeloma Immunoglobulin (IgG New)." *Biochemistry*, 16:3412-20 (1977).

       Alexion states that Claims 1-19 and 26-37 of the '761 patent, Claims 1-20 of the '762 patent, and Claims 1-30 of the '370 patent are invalid under 35 U.S.C. § 112 as the specifications of the '762, '763 and '370 patents do not provide an adequate written description to support the patentability of each claim of the respective patents.

       Alexion states that Claims 1-19 and 26-37 of the '761 patent, Claims 1-20 of the '762 patent, and Claims 1-30 of the '370 patent are invalid under 35 U.S.C. § 112 as the specifications of the '762, '763 and '370 patents do not fully enable the scope of the purported inventions claimed.

       Alexion states that Claims 1-19 and 26-37 of the '761 patent, Claims 1-20 of the '762 patent, and Claims 1-30 of the '370 patent are invalid as indefinite under 35 U.S.C. § 112 for failing to particularly point out and distinctly claim the subject matter applicant regards as his invention.

DATED:  February 18, 2008

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

_Andr A. Cnlyn_
_____

Josy W. Ingersoll (No. 1088)
Andrew A. Lundgren (No. 4429)
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE  19899
(302) 571-6600
*alundgren@ycst.com*

*Attorneys for Defendant*

*Of Counsel:*

John M. Desmarais
Gerald J. Flattmann, Jr.
Christine Willgoos
KIRKLAND & ELLIS
153 East 53rd Street
New York, NY  1002
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

6

## CERTIFICATE OF SERVICE

I, Andrew A. Lundgren, hereby certify that on February 18, 2008, I caused a copy of the

foregoing document to be served on the following in the manner indicated:

### BY E-MAIL AND HAND DELIVERY

Jack B. Blumenfeld, Esquire
Karen Jacobs Louden, Esquire
Morris Nichols Arsht & Tunnell LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347

### BY E-MAIL

Matthew D. Powers, Esquire
Vernon M. Winters, Esquire
John D. Beynon, Esquire
Weil, Gotshal & Manges LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*Andrew A. Lundgren*

Josy W. Ingersoll (No. 1088)
Andrew A. Lundgren (No. 4429)
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600
*alundgren@ycst.com*

*Attorneys for Defendant.*

# Exhibit 6

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

Citigroup Center
153 East 53rd Street
New York, New York 10022-4611

212 446-4800

www.kirkland.com

Christine Willgoos
To Call Writer Directly:
212 446-4964
cwillgoos@kirkland.com

Facsimile:
212 446-4900

February 27, 2008

**VIA E-MAIL**

Eric Xanthopoulos
Weil, Gotshal & Manges LLP
Silicon Valley Office
201 Redwood Shores Parkway
Redwood Shores, CA 94065

Re: *PDL Biopharma, Inc. v. Alexion Pharmaceuticals, Inc.*

Dear Eric:

As per the stipulation agreed by the parties and entered by the Court, below please find Alexion's tentative proposed claim terms for construction by the Court. Alexion reserves the right to modify the claim terms proposed for construction. In addition, Alexion reserves the right to propose constructions for any claim terms for which PDL requests construction.

## Alexion's Proposed Terms For Construction

1. First and second polynucleotides respectively encoding heavy and light chain variable regions of a humanized immunoglobulin

2. humanized immunoglobulin

3. humanized immunoglobulin heavy and light chains

4. complementarity determining regions (CDRs)

5. donor immunoglobulin

6. heavy and light chain variable region frameworks / heavy and light chain frameworks

7. human acceptor immunoglobulin / acceptor human immunoglobulin

8. variable region

9. framework region / framework / variable region framework

10. sequence of the humanized immunoglobulin heavy chain variable framework region

11. humanized immunoglobulin heavy chain variable region framework

Chicago        London        Los Angeles        Munich        San Francisco        Washington, D.C.

## KIRKLAND & ELLIS LLP

Eric Xanthopoulos
February 27, 2008
Page 2

12.    humanized immunoglobulin light chain variable region framework

13.    sequence of the humanized immunoglobulin light chain variable framework region

14.    outside the Kabat and Chothia CDRs

15.    DNA segment encoding a humanized heavy chain variable region / DNA segment
       encoding the humanized immunoglobulin heavy chain variable region

16.    DNA segment encoding a humanized light chain variable region / DNA segment
       encoding the humanized immunoglobulin light chain variable region

17.    DNA segments encoding the humanized heavy and light chains

18.    DNA segments encoding humanized light and heavy chain variable regions / DNA
       segments encoding heavy and light chain variable regions of a humanized
       immunoglobulin

19.    hypervariable regions

20.    outside the hypervariable regions

21.    Kabat CDRs

22.    outside the Kabat CDRs

23.    Chothia CDR H1

24.    outside the Chothia CDR H1 (amino acids 26-32)

Sincerely,

*Christine Willgoos*

Christine Willgoos

# Exhibit 7

# WEIL, GOTSHAL & MANGES LLP

SILICON VALLEY OFFICE

201 REDWOOD SHORES PARKWAY

REDWOOD SHORES, CALIFORNIA 94065

(650) 802-3000

FAX: (650) 802-3100

AUSTIN
BOSTON
BRUSSELS
BUDAPEST
DALLAS
FRANKFURT
HOUSTON
LONDON
MIAMI
MUNICH
NEW YORK
PARIS
PRAGUE
PROVIDENCE
SHANGHAI
SINGAPORE
WARSAW
WASHINGTON, D.C.

VERNON M. WINTERS
DIRECT LINE (650) 802-3005
E-MAIL: vern.winters@weil.com

February 27, 2008

**VIA EMAIL**

Gerald Flattmann, Esq.
Kirkland & Ellis LLP
153 E. 53rd Street
New York, NY 10022-4611
*GFlattmann@kirkland.com*

Re:    **PDL BioPharma, Inc. v. Alexion Pharmaceuticals, Inc.**
       **D. Del. Case No. 07-156**

Dear Gerald:

Plaintiff, PDL BioPharma, Inc., provides the following list of claim terms or phrases for, absent agreement by the parties, construction by the Court with respect to the asserted claims of PDL's U.S. Patents Nos. 5,693,761, 5,693,762, and 6,180,370.

PDL's investigation is ongoing and the defendant, Alexion Pharmaceuticals, Inc., has not yet disclosed to PDL its list of terms and claim elements for construction. In addition, and in violation of an agreement between the parties, defendant has failed to identify with any sort of reasonable specificity its invalidity contentions. Accordingly, PDL reserves its right to supplement, amend, or modify this disclosure.

1.    "acceptor immunoglobulin";

2.    "complementarity determining regions (CDRs) from a [the] donor immunoglobulin";

(#289548)

WEIL, GOTSHAL & MANGES LLP

Gerald Flattmann, Esq.
February 27, 2008
Page 2


    3.      "donor immunoglobulin";

    4.      "variable region framework"; and

    5.      "is at least 65% [70%] identical to the [sequence of the] donor immunoglobulin heavy [light] chain variable region framework."


Best regards,

Vernon M. Winters

cc:    Josy Ingersoll, Esq. (via email) (*JIngersoll@ycst.com*)
       Karen Jacobs Louden, Esq. (via email) (*KLouden@MNAT.com*)
       Wendy Adams (via email) (WAdams@kirkland.com)

# Exhibit 8

# WEIL, GOTSHAL & MANGES LLP

SILICON VALLEY OFFICE

201 REDWOOD SHORES PARKWAY

REDWOOD SHORES, CALIFORNIA 94065

(650) 802-3000

FAX: (650) 802-3100

AUSTIN
BOSTON
BRUSSELS
BUDAPEST
DALLAS
FRANKFURT
HOUSTON
LONDON
MIAMI
MUNICH
NEW YORK
PARIS
PRAGUE
PROVIDENCE
SHANGHAI
SINGAPORE
WARSAW
WASHINGTON, D.C.

WRITER'S DIRECT LINE

February 28, 2008

**VIA FACSIMILE & EMAIL**

Gerald J. Flattmann, Jr., Esq.
Kirkland & Ellis
153 East 53rd Street
New York, New York 10022-4611

> Re:  **PDL BioPharma v. Alexion, Inc.**
> **D. Del. C.A. No. 07-156**

Dear Gerald:

    We have received Alexion Pharmaceuticals, Inc.'s letter of February 28, 2008 in which it proposed 24 claim terms/phrases for construction. (The corresponding list for PDL BioPharma, Inc., contained five.) Based on Alexion's list, it appears that Alexion misapprehends the asserted claim in this litigation and in particular that Alexion may have misunderstood PDL's amended interrogatory responses. As a reminder, the asserted claims are as follows:

- '761 Patent: independent claims 1 and 35; dependent claims (independent claim(s) bracketed) 2 [1]), 6 [1], 8 [1], 17 [6], 18 [1], 26 [1], and 33 [1];

- '762 Patent: independent claims 1, 14, and 16; dependent claims (independent claim(s) bracketed) 2 [1], 3 [1], 10 [1-3], 11 [1], 12 [1], 13 [1], 18 [13], and 19 [10]; and

- '370 Patent: independent claims 1, 2, 5, 6, and 28; dependent claims (independent claim(s) bracketed) 25 [2], 26 [5], and 27 [6].

    A number of the claim terms/phrases that Alexion identified (e.g., "hypervariable regions," "outside the hypervariable regions," "outside the Kabat and Chothia CDRs") do not appear in the claims at issue. In particular, claim terms/phrases nos. 14, 19-24 on Alexion's list do not appear in the asserted claims and are thus not relevant to any issue in the litigation. Accordingly, there is no need for the Court to construe them.

WEIL, GOTSHAL & MANGES LLP

Gerald J. Flattman, Jr. Esq.
February 28, 2008
Page 2


      Could you please confirm by the end of the day on Friday, February 29, 2008 that Alexion is withdrawing nos. 14, 19-24 on its February 27 list.

      Thank you.

      Very truly yours,

      Vernon M. Winters

cc:  Jack B. Blumenfeld, Esq. (via email)

# Exhibit 9

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

Citigroup Center
153 East 53rd Street
New York, New York 10022-4611

Gerald J. Flattmann, Jr.
To Call Writer Directly:
(212) 446-4720
gflattmann@kirkland.com

(212) 446-4800

www.kirkland.com

Facsimile:
(212) 446-4900

Dir. Fax: (212) 446-4900

February 29, 2008

**BY EMAIL AND FIRST CLASS MAIL**

Vernon M. Winters
Weil, Gotshal & Manges LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065

Re:    *PDL Biopharma, Inc. v. Alexion Pharmaceuticals, Inc.*

Dear Vern:

This is in response to your letter of February 28, 2008 regarding Alexion's proposed claim terms for construction. We did not misapprehend the asserted claims in the litigation. We identified claim terms relevant to PDL's claim of infringement and to Alexion's counterclaim of invalidity. Accordingly, we are not withdrawing claim term numbers 14 or 19-24 on our February 27 list.

Sincerely,

Gerald J. Flattmann, Jr.

Chicago      Hong Kong      London      Los Angeles      Munich      San Francisco      Washington, D.C.

# Exhibit 10

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PDL BIOPHARMA, INC.,

Plaintiff,

v.

ALEXION PHARMACEUTICALS, INC.,

Defendant.

C.A. No. 07-156 (JJF)

**HIGHLY CONFIDENTIAL –
OUTSIDE ATTORNEYS' EYES
ONLY**

## PDL'S THIRD SUPPLEMENTAL OBJECTION AND RESPONSE
## TO ALEXION'S INTERROGATORY NO. 1

Pursuant to Federal Rules of Civil Procedure 26 and 33, Plaintiff PDL BioPharma, Inc. ("PDL") objects and responds to Defendant Alexion Pharmaceuticals, Inc.'s ("Alexion") Interrogatory No. 1 as follows:

### GENERAL OBJECTIONS

1.    PDL incorporates by reference its objections in PDL's Responses To Alexion's First Set Of Interrogatories.

Subject to and without waiving the above General Objections, PDL objects and responds to Alexion's interrogatories as follows:

**INTERROGATORY NO. 1:**

Please describe (by way of claim chart) the bases for PDL's infringement assertions at the time it filed the Complaint and, if different, at the present time, as follows: identify each claim of each patent in suit that PDL contends any Alexion product, including Soliris®, or the manufacture or use thereof, has infringed under any theory; state whether such alleged infringement is literal or under the doctrine of equivalents; describe the complete factual basis and evidentiary support for the presence of each element of each asserted claim either literally or by way of a substantial equivalence and identify the three individuals most knowledgeable about the information requested in this interrogatory.

**PRIOR RESPONSE TO INTERROGATORY NO. 1:**

PDL incorporates its General Objections, set forth above, here.  In addition, this interrogatory improperly seeks information protected from disclosure by both the attorney-client privilege and the attorney work product doctrine:  specifically, the difference (if any) between PDL's infringement assertions at the time that it filed the lawsuit and PDL's infringement assertions now.  The Federal Rules of Civil Procedure contain provisions regarding disclosure of a party's pre-filing assessment, and Alexion does not purport to invoke those provisions.  At this juncture, Alexion has not provided PDL in discovery samples of Soliris or any information about how Soliris is manufactured.  PDL also objects to this interrogatory on the grounds that it is, in part, premature:  infringement is appropriately (and routinely) the subject of expert discovery, and Alexion will receive expert testimony proffered on behalf of PDL that sets forth PDL's position on these issues at the appropriate time.

Finally, Rule 33 of the Federal Rules of Civil Procedure allows only 25 interrogatories per party, "including all discrete subparts," although PDL has agreed to Alexion's request that each party be allowed 30 interrogatories.  As the added brackets indicate, this interrogatory has at least three discrete subparts.

Subject to these objections, PDL responds as follows:  Under the US patent laws, patent infringement occurs when a party infringes at least one claim of a patent.  Accordingly, for each of the three patents-in-suit, PDL will provide the requested information with respect to at least one claim of each patent.  Appendix 1 hereto contains the requested claim chart for one claim of each asserted patent.  Defining "infringement" as the process of comparing claims of the patents-in-suit to the published sequence of Soliris that is referenced in Appendix 1, there are no individuals at PDL at this juncture who can provide non-privileged testimony.  This interrogatory response does not identify counsel or others with privileged knowledge about infringement.  In addition, as noted above, at this juncture Alexion has not provided in discovery a sample of Soliris, and has not provided in discovery any information about how Soliris is manufactured.

Accordingly, PDL reserves the right to amend this interrogatory with respect to the claims identified in it.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:**

PDL incorporates its General and Specific Objections, set forth above, here. PDL further objects to Alexion's interrogatory because it requires PDL to provide responses based on information that Alexion has chosen not to allow PDL to be able to review. In particular, information responsive to this interrogatory can be found in Alexion's submission to the United States Food and Drug Administration ("FDA"), by which Alexion persuaded the FDA that Alexion's infringing humanized antibody, Soliris, was safe, effective, and met the other standards that the FDA determines must be satisfied before FDA approval is granted. According to Alexion, it designated its entire FDA submission as Outside Attorneys Eyes Only under the Stipulated Confidentiality Protective Order in this case. That designation precludes officials at PDL from reviewing that FDA submission, and thus precludes officials at PDL from providing a verified response. PDL asked Alexion for permission to be able to review Alexion's FDA submission, but Alexion declined.

PDL also objects to Alexion's interrogatory to the extent that it calls for contentions that depend on the interpretation of claim limitations prior to the Court's issuance of a claim construction order defining disputed terms and phrases – if any – in the patents-in-suit.

Subject to these objections, PDL supplements its response as follows: PDL asserts in this lawsuit that (a) Alexion's humanized antibody, Soliris, (b) the method by which Alexion causes Soliris to be made, and (c) materials used in making Soliris, infringe at least the following claims of PDL's '761, '762, and '370 patents:

- '761: 1, 2, 6, 8, 17, 18, 26, 33, and 35;
- '762: 1, 2, 3, 10 – 14, 18, and 19;
- '370: 1, 2, 5, 6, and 25 – 28.

3

**SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:**

PDL incorporates by reference both its General and prior Specific Objections as well as its prior responses except as expressly amended below. This amendment raises no new claim construction issues.

PDL supplements its response as follows: PDL asserts in this lawsuit that (a) Alexion's humanized antibody, Soliris, (b) the method by which Alexion causes Soliris to be made, and (c) materials used in making Soliris, infringe at least the following claims of PDL's '761, '762, and '370 patents:

- '761: 1, 2, 6, 8, 17, 18, 26, 33, and 35;
- '762: 1, 2, 3, 10 – 14, 16, 18, and 19;
- '370: 1, 2, 5, 6, and 25 – 28.

**THIRD SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:**

PDL incorporates by reference both its General and prior Specific Objections, as well as its prior responses as set forth above, except as expressly amended below. PDL reserves its right to supplement its response at an appropriate time, after further discovery has been conducted, and/or in light of expert discovery. PDL also reserves its right to amend or supplement its response after the Court issues an order regarding the construction of any of the claim terms of PDL's '761, '762, and '370 patents or based upon other events or information as appropriate. This amendment raises no new claim construction issues.

The attached asserted claims chart shows how (a) Alexion's humanized antibody, Soliris, (b) the method by which Alexion causes Soliris to be made, and/or (c) materials used in making Soliris infringes every asserted claim of PDL's '761, '762, and '370 patents. *See* Exhibit A (Patents-In-Suit Asserted Claims Chart).

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*Karen Jacobs Louden*

Jack B. Blumenfeld (#1014)
Karen Jacobs Louden (#2881)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
klouden@mnat.com
*Attorneys for Plaintiff and Counter-*
*DefendantPDL BioPharma, Inc.*

OF COUNSEL:

Matthew D. Powers
Vernon M. Winters
WEIL, GOTSHAL & MANGES LLP
Silicon Valley Office
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000

Jennifer H. Wu
Rebecca Fett
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY  10153
(212) 310-8000

March 10, 2008
1862424

## VERIFICATION

I, Herbert C. Cross, declare:

I am the Controller of PDL BioPharma, Inc., and am authorized to make this verification on its behalf. I have read **PDL's THIRD SUPPLEMENTAL OBJECTION AND RESPONSE TO ALEXION'S INTERROGATORY NO. 1.**

Executed on March 5, 2008, at Redwood City, California.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Herbert C. Cross
Controller
PDL BioPharma, Inc.

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on March 10, 2008, copies of the foregoing

were caused to be served on upon the following in the manner indicated:

### BY HAND AND EMAIL
Josy W. Ingersoll
Andrew A. Lundgren
Young, Conaway, Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Flr.
Wilmington, DE 19801

### BY EMAIL

Gerald J. Flattmann, Jr.
Christine Willgoos
Gregory A. Morris
Kirkland & Ellis
153 East 53rd Street
New York, NY 10022-4611

_____
Karen Jacobs Louden (#2881)

# Exhibit 11


**vern.winters@weil.com**

03/17/2008 12:25 PM

To  GFlattmann@kirkland.com

cc

Subject  Re: PDL v. Alexion

Dear Gerald--I will as you ask pass on your request to PDL.  During our conversation, you agreed with my observation that were PDL to agree to the stipulation that you request, that would certainly moot the pending motion to dismiss with respect to the unasserted claims.  I also pointed out that, there being no case or controversy between the parties with respect to the unasserted claims, PDL should not have to stipulate to Alexion's non-infringement of the claims of the three patents-in-suit that have yet to be specifically asserted by PDL; Alexion has to demonstrate a case or controversy.  You disagreed.

I will get back to you, likely tomorrow, on this.

Best regards,

Vern.


*****************

Vernon M. Winters
Weil, Gotshal & Manges LLP
Silicon Valley Office
201 Redwood Shores Parkway
Redwood Shores, CA 94065
t:  650.802.3005
f:  650.802.3100
m.:  650.339.5037
w:  www.weil.com


**"Gerald J Flattmann Jr" <GFlattmann@kirkland.com>**

03/17/2008 09:19 AM

To  vern.winters@weil.com

cc

Subject  PDL v. Alexion

Dear Vern:

Thanks for talking this morning about PDL's pending motion to dismiss Alexion's counterclaim of invalidity as to "unasserted claims."  I asked you whether PDL would be willing to stipulate to Alexion's non-infringement of the claims of the three patents-in-suit that have yet to be specifically asserted by PDL. I would be grateful if PDL would consider that question and get back to us with an answer in the next day or two.

Best regards,

Gerald

```
*************************************************************
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
*************************************************************
```

< END >

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email (postmaster@weil.com), and destroy the original message. Thank you

# Exhibit 12

**From:** vern.winters
**Sent:** 03/20/2008 10:25 AM MST
**To:** Gerald Flattmann Jr
**Subject:** Re: PDL v. Alexion


Dear Gerald:

We write in response to Alexion's request that PDL BioPharma stipulate that Alexion does not infringe claims that PDL has not asserted, which you correctly refer to as the "unasserted claims." The request is not appropriate. PDL has not asserted the unasserted claims against Alexion, and there is no case or controversy between the parties with respect to those claims.

Best regards,

Vern


*****************
Vernon M. Winters
Weil, Gotshal & Manges LLP
Silicon Valley Office
201 Redwood Shores Parkway
Redwood Shores, CA 94065
t:  650.802.3005
f:  650.802.3100
m.:  650.339.5037
w:  www.weil.com


**"Gerald J Flattmann Jr" <GFlattmann@kirkland.com>**

03/17/2008 09:19 AM

To  vern.winters@weil.com
cc
Subject PDL v. Alexion

Dear Vern:

Thanks for talking this morning about PDL's pending motion to dismiss Alexion's counterclaim of invalidity as to "unasserted claims." I asked you whether PDL would be willing to stipulate to Alexion's non-infringement of the claims of the three patents-in-suit that have yet to be specifically asserted by PDL. I would be grateful if PDL would consider that question and get back to us with an answer in the next day or two.

Best regards,

Gerald

```
*************************************************************
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
*************************************************************
```

< END >

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email (postmaster@weil.com), and destroy the original message. Thank you