## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

_____

PDL BIOPHARMA, INC.                                   )
                                                      )
                            Plaintiff,                )
                                                      )
                     v.                               )          C.A. No. 07-156 (JJF)
                                                      )
ALEXION PHARMACEUTICALS, INC.,                        )
                                                      )
                            Defendant.                )
_____)

## OPENING CLAIM CONSTRUCTION BRIEF
## OF PLAINTIFF PDL BIOPHARMA INC.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Karen Jacobs Louden (#2881)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE   19899-1347
(302) 658-9200
klouden@mnat.com

*Attorneys for Plaintiff PDL BioPharma, Inc.*

*Of Counsel:*

Matthew D. Powers
Vernon M. Winters
WEIL, GOTSHAL & MANGES LLP
Silicon Valley Office
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000

Jennifer H. Wu
Rebecca E. Fett
WEIL, GOTSHAL & MANGES LLP
New York Office
767 Fifth Avenue
New York, NY 10153
(212) 310-8000

May 14, 2008

# TABLE OF CONTENTS

**Page**

I.      NATURE AND STAGE OF THE PROCEEDINGS ....................................................... 1

II.     SUMMARY OF ARGUMENT ................................................................................. 2

III.    STATEMENT OF FACTS ...................................................................................... 3

    A.      Background on Immunoglobulins ..................................................................... 3

        1.      Immunoglobulin Function and Structure ................................................. 3

        2.      Depicting and Comparing Immunoglobulin Amino Acid
               Sequences ........................................................................................... 5

    B.      The Three Patents-in-Suit .............................................................................. 7

        1.      The Problems the Inventors Were Trying to Solve ................................... 7

               a.      The Problems with Monoclonal Immunoglobulins and with
                      Chimeric Immunoglobulins ......................................................... 7

               b.      Limitations of Prior 'Reshaped' Antibodies – The Work of
                      Jones, Verhoeyen, Winter, and Riechmann ................................. 7

        2.      The Specifications' Description of the Three Distinct Groups of
               Inventions in the Patents ...................................................................... 8

        3.      The Asserted Claims Relate Only to One Group of Inventions:
               Replacing the CDRs in a Human Acceptor Immunoglobulin and
               Using a Human Acceptor Framework that is 65%-70%
               Homologous to the Donor ...................................................................... 10

IV.     ARGUMENT ..................................................................................................... 10

    A.      "Humanized Immunoglobulin" ..................................................................... 10

        1.      The Patents Expressly Define "Humanized Immunoglobulin," and
               that Express Definition Governs ........................................................... 11

        2.      The Claim Language is Consistent with the Express Definition ............. 12

        3.      The Specifications are Consistent with the Express Definition ............... 14

        4.      The File Histories are Consistent with the Express Definition ............... 17

    B.      "Donor Immunoglobulin" and "Human Acceptor Immunoglobulin" ................ 20

        1.      The Patents Expressly Define "Donor Immunoglobulin," "Human
               Acceptor Immunoglobulin," and "Acceptor Human
               Immunoglobulin," and Those Definitions Govern ................................. 21

        2.      The Claims are Consistent with the Express Definition ......................... 22

        3.      The Specifications are Consistent with the Express Definitions ............. 23

    C.      "Complementarity Determining Region (CDR)" and "Framework" .................. 25

        1.      The Patents Expressly Define "Complementarity Determining
               Region (CDR)" and "Framework," and Those Definitions Govern ........ 25

        2.      The Patents' Specification is Consistent with the Express
               Definitions .......................................................................................... 27

# TABLE OF CONTENTS
## (continued)

Page

3.    The File Histories are Consistent with the Express Definitions .............. 29

D.    Claim Phrases that Consist Mainly of Other Construed Terms Joined Together ................................................................................................ 30

1.    "Heavy and Light Chain Variable Region Frameworks" / "Heavy and Light Chain Frameworks" ................................................................ 30

2.    "Humanized Heavy [Light] Chain Variable Region Framework" .......... 31

3.    The "DNA Segment[s] Encoding" Claim Terms.................................... 32

4.    "Is at least 65% [70%] Identical to the [Sequence of the] Donor Immunoglobulin Heavy [Light] Chain Variable Region Framework" ...................................................................................... 36

5.    "Synthesizing a [the] DNA Segment Encoding a Humanized Heavy [Light] Chain Variable Region" .................................................. 38

V.    CONCLUSION................................................................................................ 40

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Gaus v. Conair Corp.*,
  363 F.3d 1284 (Fed. Cir. 2004)..................................................................Passim

*Hill-Rom Co., Inc. v. Kinetic Concepts, Inc.*,
  209 F.3d 1337 (Fed. Cir. 2000)..................................................................14, 24

*Intamin, Ltd. v. Magnetar Tech. Corp.*,
  483 F.3d 1328 (Fed. Cir. 2007)............................................................. 12-13, 16, 23

*Kumar v. Ovonic Battery Co., Inc.*,
  351 F.3d 1364 (Fed. Cir. 2003)..................................................................27, 33

*Lucent Techs., Inc. v. Gateway, Inc.*,
  --- F.3d ----, 2008 WL 1970225 (Fed. Cir. May 8, 2008).......................... 14-15, 24

*Microsoft Corp. v. Multi-Tech Sys., Inc.*,
  357 F.3d 1340 (Fed. Cir.), *cert. denied*, 125 S.Ct. 61 (2004)................15, 24, 37, 39

*Moleculon Research Corp. v. CBS, Inc.*,
  793 F.2d 1261, 229 USPQ 805 (Fed. Cir. 1986) ....................................14

*Multiform Desiccants, Inc. v. Medzam, Ltd.*,
  133 F.3d 1473 (Fed. Cir. 1998)..................................................................12

*Nazomi Communications, Inc. v. ARM Holdings, PLC*,
  403 F.3d 1364 (Fed.Cir.2005).....................................................................16

*NTP, Inc. v. Research In Motion, Ltd.*,
  418 F.3d 1282 (Fed. Cir. 2005).........................................................14, 19, 23, 38

*Pfizer, Inc. v. Apotex, Inc.*,
  480 F.3d 1438 (Fed. Cir. 2007)..................................................................12

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ..............................................Passim

*Rhodia Chimie v. PPG Indus., Inc.*,
  402 F.3d 1371 (Fed. Cir. 2005)..................................................................19

*Sinorgchem Co., Shandong v. Int'l Trade Comm'n*,
  511 F.3d 1132 (Fed. Cir. 2007)..................................................................Passim

iii

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*SRI Int'l v. Matsushita Elec. Corp. of Am.*,
   775 F.2d 1107 (Fed. Cir. 1985).................................................................16

*Stryker Corp. v. Intermedics Orthopedics, Inc.*,
   96 F.3d 1409, 40 USPQ2d 1065 (Fed. Cir. 1996) ..................................14

*Sunrace Roots Enter. Co. v. SRAM Corp.*,
   336 F.3d 1298 (Fed. Cir. 2003).........................................................14, 23

*United States Surgical Corp. v. Ethicon, Inc.*,
   103 F.3d 1554, 41 USPQ2d 1225 (Fed. Cir. 1997) ................................14

*Vivid Techs., Inc. v. American Science & Eng'g, Inc.*,
   200 F.3d 795 (Fed. Cir. 1999)..........................................................8, 25, 28, 34

## I.    NATURE AND STAGE OF THE PROCEEDINGS

The patentee plaintiff, PDL BioPharma, Inc., filed this lawsuit against Alexion Pharmaceuticals, Inc. ("defendant") for infringement of three groundbreaking U.S. patents that claim antibody humanization technologies, after the U.S. Food and Drug Administration approved defendant's humanized antibody, Soliris, for use against paroxysmal nocturnal hemoglobinuria ("PNH"), a potentially life-threatening disease of the blood.   D.I. 1.   PNH sufferers pay $389,000 (three hundred and eighty-nine thousand dollars) per year for it.   D.I. 1.

PDL asserts certain claims of U.S. Patent Nos. 5,693,761, 5,693,762, and 6,180,370.   D.I. 1.   PDL has accused defendant of infringing only certain claims.   D.I. 62. Almost a year after the parties' respective answers, counterclaims, and replies, D.I. 11 & 14, defendant alleged for the first time invalidity of patent claims that PDL was not asserting.   D.I. 45.   PDL accordingly moved to dismiss those claims; the Court heard and took that motion under submission on April 11, 2008. D.I. 67; D.I. 69; D.I. 77; D.I. 83.

In February 2008, the parties exchanged claim terms for construction.   PDL proposed construction of five claim terms.   Wu Decl. Ex. 1; defendant proposed twenty-four, Wu Decl. Ex. 2, including seven from the unasserted clams, *id*. at Ex. 2.   Later, defendant added another claim term from an unasserted claim (and withdrew others).   Wu Decl. Ex. 3.   PDL is prepared to file a Covenant Not to Sue on the unasserted claims, which would moot the case or controversy (had there been one) on the unasserted claims, and has provided a draft of it to Alexion.

A claim construction hearing is set for July 1, 2008 at 3:00 pm.   D.I. 76. Document discovery closes on July 10, 2008, willfulness discovery closes on August 1, 2008, fact discovery closes on October 2, 2008, expert reports for the parties with the burden of proof are due 30 days after the issuance of the Court's claim construction decision, and case-dispositive motions are due in January 2009.   D.I. 76; D.I. 89.   This is PDL's opening claim construction brief.

## II.    SUMMARY OF ARGUMENT

In *Phillips v. AWH*, the Federal Circuit, sitting *en banc*, re-confirmed the correct methodology for construing patent claims.   The Federal Circuit affirmed that when a patentee acts as his own lexicographer in the specification, that definition governs.   Absent an express definition, the Court counseled that the construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.   It also emphasized that although a specification often describes very specific embodiments of the invention, it has repeatedly warned against confining the claims to those embodiments.   It disapproved of an approach that went against its precedent counseling against importing limitations into the claims.

The parties' claim constructions must be assessed against such principles.   For example, the parties offer different constructions of "humanized immunoglobulin" – a term that appears in all of the asserted claims.   The patents expressly define that phrase in the Detailed Description of the Invention, which, "[i]n order that the invention may be more completely understood," set forth "several definitions."   One of the several definitions is of humanized immunoglobulin:   "[a]s used herein, the term 'humanized' immunoglobulin refers to an immunoglobulin comprising a human framework region and one or more CDR's from a non-human (usually a mouse or rat) immunoglobulin."   Nothing in that definition requires amino acid substitutions – or, for that matter, excludes them.   Defendant, however, seeks to re-write most of the disputed claim terms to ***require*** framework amino acid substitutions.   But the Abstract, Summary of the Invention, and Detailed Description of the Invention of the patents describe framework amino acid substitutions as "possible," "optional," and "another embodiment" of the invention – a distinction that is reflected in the claims.   There are other claims that expressly require framework amino acid substitutions.   When the claims so require, they so state.   The asserted claims are not those claims.

This is just one example.   For term after term, PDL proposes definitions that are, or are based on, express definitions in the patents, and, when there is no express definition, that stay true to the claims and most naturally align with the patent's description of the invention.

2

Defendant, however, consistently seeks constructions that conflict with the patents' express definitions, the claim language, and the file histories.

Patentee plaintiff PDL asks that the Court confirm all of its claim constructions.

## III.     STATEMENT OF FACTS

### A.     Background on Immunoglobulins

The patents are directed to "humanized" immunoglobulins and methods of, and biological materials used in, making them.   To assist in understanding the patents and the claim terms that defendant disputes, some brief background on immunoglobulins is provided below. More detailed information is found in the Declaration of Roland K. Strong, Ph.D., submitted with this brief ("Strong Decl.").

#### 1.     Immunoglobulin Function and Structure

Immunoglobulins are made up of proteins – that is, sequences of amino acids. Immunoglobulins are produced by the mammalian immune system, and they bind to substances, called "antigens," that are foreign to those mammals.   Strong Decl. § II, ¶¶ A(1)-(3).

The binding of an immunoglobulin to an antigen can have numerous biological effects, including, importantly, to neutralize or eliminate the target antigen.   Binding between an immunoglobulin and an antigen may result in the recruitment of other parts of the immune system that are capable of destroying the antigen.   Alternatively, when bound to an antigen that is a protein, an immunoglobulin may also block biochemical processes.   For example, the antibody may function as a physical obstruction that prevents an interaction between two proteins involved in a disease.   Strong Decl. § II, ¶¶ A(1).

The immunoglobulin must form a sufficiently strong bond with the antigen if the immunoglobulin is to have a biological effect.   The strength of the bond between an immunoglobulin and an antigen is called the "affinity"; it is a measure of the relative strength of the bond between an immunoglobulin and a particular antigen.   The degree of affinity is determined by the physical and chemical complementarity between the amino acids in the antigen binding site of the immunoglobulin and the molecules on the surface of the antigen. Immunoglobulins with a relatively strong bond are called high-affinity immunoglobulins; those

with a relatively weak bond, low-affinity immunoglobulins.   This can be represented as:



Strong Decl. § II, ¶¶ A(2).

A related concept is "specificity," which is the degree to which an immunoglobulin will bind to a particular antigen as opposed to other antigens.   The immunoglobulin's amino acid sequence determines both the degree of affinity and specificity to a particular antigen.   Given the large number of antigens that can invade a mammal, the immune system can produce extraordinarily large numbers of immunoglobulins:   in the billions.   *See, e.g.*, Strong Decl. § II, ¶¶ A(1).

Amino acids are the building blocks of all proteins, including immunoglobulins. A particular protein is defined by the length and sequence of the amino acids that comprise it. The divergent chemical properties of the different amino acids in a polypeptide drive the polypeptide to fold up into a specific compact shape, or structure.   The structure of a protein, encompassing this defined three-dimensional shape and the chemical properties of its surface, defines the function of a particular protein.   Strong Decl. § II, ¶¶ B(1)-(2).

Although an oversimplification, immunoglobulins can be represented by a two-dimensional Y-shaped molecule.



As depicted in the simplified picture above, a full immunoglobulin molecule has two identical sets of chains:  two heavy chains on the interior, and two light chains on the exterior.   The variable region of both the heavy and the light chain consists of a "constant region" and a "variable region."   The constant region contains amino acid sequences that are constant within a class of immunoglobulins (although it may vary from the sequence of immunoglobulins in other classes).   The variable region contains amino acid sequences that vary both within and across immunoglobulin classes.   Strong Decl. § II, ¶¶ C(1).

Within each variable domain, there are discrete regions (called "complementarity determining regions," or "CDRs") in which the variability of the amino acid is particularly high. The portion of the variable region that is not the CDR is called the "framework."   Binding between an immunoglobulin and an antigen occurs in the variable region, at the two distal tips of the "Y."   *See, e.g.,* Strong Decl. § II, ¶¶ B(2).

**2.      Depicting and Comparing Immunoglobulin Amino Acid Sequences**

There are twenty different amino acids, and these are usually represented by three-letter abbreviations (Leu for Leucine, Val for Valine), or single letter abbreviations (C for Cysteine or H for Histidine).   Different amino acids are linked together into a linear chain, or polymer, to form a polypeptide.   An entire amino acid sequence can be represented by a string

of letters, with each letter (or three-letter abbreviation) representing a particular amino acid. Strong Decl. § II, ¶¶ B(1)-(2).

Because amino acid sequences can be represented by a string of letters or three-letter abbreviations, the extent to which amino acid sequences are the same can be determined. The degree of sameness is called "homology." If both proteins have the same amino acid at the same sequence position, this is a match. A measure of the degree of matching is the "percent identity," defined as the total number of matches divided by the total length of the polypeptides being compared. To determine which sequence positions correspond in order to count up matches, the two or more sequences must be "aligned." The task of alignment is facilitated by systems for numbering of amino acid residues. Appropriate alignment of protein sequences can be a difficult task, particularly when comparing sequences that may have small sections deleted or added. For antibodies, the task of aligning sequences has been much simplified by the work of Kabat et al. ("Kabat"). Strong Decl. § II, ¶¶ D(2)-(4).

In 1970, Kabat first established an immunoglobulin amino acid sequence database; in it, the amino acids in each sequence were numbered according to a convention that, even by the time the patents were filed, had become known as "Kabat numbering." The Kabat sequence database has since been published in print in more than five editions and online and spans over five million light and heavy chain sequences. It is a standard reference in the fields of immunology, structural biology, and related fields. In the December 1988 – February 1989 timeframe when the patents were filed (and even today), the amino acid numbering system established by Kabat was, and is currently, the default in the field of immunology. Strong Decl. § II, ¶¶ D(3)-(4).

Kabat determined that differences between immunoglobulin sequences were not evenly distributed along the sequence, but clustered into regions. Kabat determined that variability increased greatly in three regions on each chain; these regions are called "complementarity determining regions" or "CDRs." *See, e.g.,* Strong Decl. § II, ¶¶ D(3).

At the time that the patents were filed, and today, researchers could use sequence

6

databases and search tools to identify proteins that shared a specified percentage identity with a particular amino acid sequence (i.e., protein) of interest.   Then, as now, there are a variety of publicly available databases that include millions of protein (i.e., amino acid) or DNA sequences. GenBank, maintained by the National Institutes of Health, is a frequently used database and can be accessed online.   There are also a variety of publicly available search tools that perform algorithms to analyze the sequences in the databases.   One can enter a particular amino acid sequence or DNA sequence into a search tool, and the tool will search a chosen database and identify the amino acid or DNA sequences with the greatest percentage of sequence identity to the sequence of interest.   Strong Decl. § II, ¶¶ D(5).

**B.    The Three Patents-in-Suit**

The three patents that PDL asserts share a common specification, and derive from the same parent application.   Hence their figures and text are essentially identical, although located in slightly different columns and lines.   For convenience this brief generally refers to the specification of the '761 patent when illustrating a point (for example, that the patents define a term expressly in their specifications).

**1.    The Problems the Inventors Were Trying to Solve**

**a.    The Problems with Monoclonal Immunoglobulins and with Chimeric Immunoglobulins**

As the patents note, two kinds of previous man-made antibodies (so-called 'monoclonal antibodies' and 'chimeric antibodies') suffered from the same fundamental problem:   they provoked an immune response when injected into a human.   As Dr. Strong explains, because the human body's immune system would recognize a monoclonal or chimeric antibody as "foreign," the monoclonal or chimeric antibody, instead of serving as a therapeutic, would create another immune response which may simply render it ineffective or could possibly generate harmful responses.   Strong Decl. § II, ¶¶ E(3)-(5).

**b.    Limitations of Prior 'Reshaped' Antibodies – The Work of Jones, Verhoeyen, Winter, and Riechmann**

The patents discuss the work of prior researchers in the area of "reshaped" or "humanized" antibodies, citing those publications and incorporating them by reference.   The

patents acknowledge the problems with and limits of that prior work.

One significant problem was loss of affinity, in some cases to the extent of a loss of all biological activity: "However, a major problem with present humanization procedures has been a loss of affinity for the antigen (Jones et al., Nature, 321, 522-525 (1986)), in some instances as much as 10-fold or more, especially when the antigen is a protein (Verhoeyen et al., *Science*, 239, 1534-1536 (1988)). Loss of any affinity is, of course, highly undesirable. At the least, it means that more of the humanized antibody will have to be injected into the patient, at higher cost and greater risk of adverse effects. Even more critically, an antibody with reduced affinity may have poorer biological functions, . . . (see, Riechmann et al., *Nature*, 332, 323-327 (1988); Table 1)." '761 Patent, Col. 2:12-21; *see also* Strong Decl. § III, ¶¶ A(3)(a)-(b).

Another important problem was the unpredictability of results: "Similarly, utilizing recombinant DNA technology to produce so-called 'reshaped' or 'humanized' antibodies (see, e.g., Riechmann et al., *Nature* 332, 323 (1988) and EPO Publication No. 0239400 [Winter EP]), provides uncertain results, in part due to unpredictable binding affinities." '761 Patent, Col. 21:62-67; *see also* Strong Decl. § III, ¶¶ A(3)(c).

### 2. The Specifications' Description of the Three Distinct Groups of Inventions in the Patents

As is clear from the face of the patents' specifications, and as Dr. Strong explains, one of ordinary skill at the time would have understood that in their specification the patents, broadly speaking, classify three distinct inventions, and that the claims are based on those distinctions.

The first group involves the claims at issue and therefore the subject of the claim construction proceedings in this case. This group involves replacing the CDRs in the human acceptor immunoglobulin with those from the donor immunoglobulin, using as the human acceptor an immunoglobulin whose framework region is at least 65%-70% identical to the donor framework. The Summary of the Invention states that "[t]o form the humanized variable region, amino acids in the human acceptor sequence will be replaced by the corresponding amino acids from the donor sequence if they are in the category: (1) the amino acid is in a CDR." '761

Patent, Col. 2:61-65.   These claims require that the human acceptor immunoglobulin framework amino acid sequence have a minimum level of identity with the donor acceptor immunoglobulin framework amino acid sequence:   "The human immunoglobulin framework sequence will typically have about 65 to 70% homology or more to the donor immunoglobulin framework sequences."   '761 Patent, Col. 2:51-54; *see also* Strong Decl. § III, ¶¶ B(1)(a).

The second group, not at issue in this case, involves replacing the CDRs in the human acceptor with the donor CDRs, and then making **optional** further amino acid substitutions in the human framework.   In the Summary of the Invention, the patents state: "[t]o form the humanized variable region, amino acids in the human acceptor sequence will be replaced by the corresponding amino acids from the donor sequence if they are in the category:   (1) the amino acid is in a CDR.   [¶]   In **another embodiment** of the present invention, either in conjunction with the above comparison step or separately, additional amino acids in the acceptor immunoglobulin chain **may** be replaced with amino acids from the CDR-donor immunoglobulin chain" in specified circumstances.   '761 Patent, Col. 2:61 – Col. 3:3; *see also* Strong Decl. § III, ¶¶ B(1)(b).[1]

The third group of inventions, also not in the asserted claims, involves replacing the CDRs in the human acceptor with the donor CDRs, and using a consensus framework as the human acceptor framework.   A consensus sequence is an "[i]dealized or 'typical' sequence (nucleic acid or protein) in which each position is the nucleotide or amino acid residue found most frequently when many actual sequences are compared."   Rosen, *Dictionary of Immunology* (1989) at 52; *see also* Strong Decl. § III, ¶¶ B(1)(c).   As the patents explain in the Detailed Description of the Invention, rather than using a human acceptor framework that is 65%-70% homologous to the donor framework, one could use a "consensus" sequence.   '761 Patent, Col. 13:5-8; *see also* Strong Decl. § III, ¶¶ B(1)(c).

---

[1] Emphasis in quotations from cases or other sources has been supplied unless otherwise noted.

### 3. The Asserted Claims Relate Only to One Group of Inventions: Replacing the CDRs in a Human Acceptor Immunoglobulin and Using a Human Acceptor Framework that is 65%-70% Homologous to the Donor

As Dr. Strong explains, "in terms of the three groupings above, one of ordinary skill at the time would have understood that all of the asserted are in the first category: Replace the CDRs in the human acceptor with those from the donor, and use a human acceptor framework that is 65%-70% homologous to the donor framework. One of ordinary skill would have also understood that none of the asserted claims are within the second category: Replace the CDRs in the human acceptor with the donor CDRs, and then make optional further amino acid substitutions in the human framework." Strong Decl. § III, ¶¶ C(1). In particular, claims in the second category require framework amino acid substitutions; but the claims in the first category do not.

## IV. ARGUMENT

As explained below, for term after term, PDL proposes definitions that are, or are based on, explicit definitions in the patents; and, when the patents contain no definition, that stay true to the claims and most naturally align with the patents' description of the invention. Defendant takes a different approach in its effort to obtain its desired result: it would have this Court import, into almost every term for construction, a limitation from the specification – framework amino acid substitutions. In the Abstract, Summary of the Invention, and Detailed Description of the Invention, the patents consistently describe framework amino acid substitutions as "possible," "optional," and "another embodiment" of the invention – a distinction that is reflected in the claims. When the claims require framework amino acid substitutions, they say so. The asserted claims are not those claims.

We begin with a fundamental claim term, present in all of the asserted claims: "humanized immunoglobulin."

### A. "Humanized Immunoglobulin"

The parties agree that a humanized immunoglobulin must be an immunoglobulin comprising a human framework region and one or more CDRs from a non-human immunoglobulin. As it does with many other claim terms, defendant, however, would import

10

from the specification a limitation not present in this claim term.   Hence:

| The Claim Term and the Parties' Dispute | | |
|---|---|---|
| Claim Term | PDL's Construction | Alexion's Position |
| "Humanized immunoglobulin" | "An immunoglobulin comprising a human framework region and one or more CDR's from a non-human (usually a mouse or rat) immunoglobulin."   Framework amino acid substitutions are optional. | An immunoglobulin comprising a framework region from a human acceptor immunoglobulin and one or more CDRs from a non-human donor immunoglobulin wherein at least one amino acid of the framework of the humanized immunoglobulin is the same as the corresponding amino acid in the donor immunoglobulin rather than that of the human acceptor immunoglobulin. |

The express definition of this term controls.   Even if it did not, the language of the claims, the

specification, and the file history all point firmly away from defendant's position.

> **1.    The Patents Expressly Define "Humanized Immunoglobulin," and that Express Definition Governs.**

   *Phillips* instructs that "the specification may reveal a special definition given to a

claim term," and that "[i]n such cases, the inventor's lexicography governs."   *Phillips v. AWH

Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) (*en banc*).    This is such a case:   the specification

defines this claim term.

   In the Detailed Description of the Invention teaches that "[i]n order that the

invention may be more completely understood, several definitions are set forth."   '761 Patent,

Col. 11:4-5.   The patents first expressly define 'immunoglobulin,' making it clear that an

"immunoglobulin" could be a full molecule, a fragment, or a single chain:   "As used herein, the

term 'immunoglobulin' refers to a protein consisting of one or more polypeptides substantially

encoded by immunoglobulin genes. . . .   One form of immunoglobulin constitutes the basic

structural unit of an antibody. . . .   In addition to antibodies, immunoglobulins may exist in a

variety of other forms including, for example, Fv, Fab, and (Fab')$_2$, as well as bifunctional hybrid

antibodies . . . and in single chains."   *Id.* at Col. 11:5-34 (citations omitted).   The patents then

define a "humanized" immunoglobulin:    "As used herein, the term 'humanized' immunoglobulin refers to an immunoglobulin comprising a human framework region and one or more CDR's from a non-human (usually a mouse or rat) immunoglobulin."   *Id.* at Col. 12:1-4.

Those definitions are unambiguous, and are complete.   Nothing in those definitions requires framework amino acid substitutions – and, correlatively, nothing excludes framework amino acid substitutions, either.   That definition is PDL's construction.   One of ordinary skill would have regarded that definition as conclusive.   Strong Decl. Opinion 3, ¶¶ C(1)(a)-(c).

The definitions are also conclusive as a matter of law.   "When the specification explains and defines a term used in the claims, without ambiguity or incompleteness, there is no need to search further for the meaning of the term."   *Sinorgchem Co., Shandong v. Int'l Trade Comm'n*, 511 F.3d 1132, 1138 (Fed. Cir. 2007) (citing *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998)).   Were one to search further, one would find that the claim language, specification, and file history do not conflict with the explicit definition, i.e., with PDL's construction – they support it.[2]

**2.    The Claim Language is Consistent with the Express Definition.**

The claim language also undercuts defendant's position – and supports PDL's. "A patentee may draft different claims to cover different embodiments," *Intamin, Ltd. v. Magnetar Tech. Corp.*, 483 F.3d 1328, 1337 (Fed. Cir. 2007), and that is what PDL did here. The asserted claims do not, on their face, require framework amino acid substitutions.   One of ordinary skill at the time would have noticed that, by contrast, a number of other claims (not asserted by PDL) do.   For example, in the '761 patent, claim 10 requires "donor amino acids substitute for corresponding amino acids in the acceptor immunoglobulin heavy chain

---

[2] The principle that the "definition given to a claim term by the patentee . . . governs" applies even when that definition "differs from the meaning it would otherwise possess," *Phillips*, 415 F.3d at 1317, and even when the explicit definition is technically incorrect, *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1438, 1454 (Fed. Cir. 2007) ("We recognize that hydrochloride and hydrobromide are not technically anions. However, since the patentee chose to be his own lexicographer, we will refer to these two acids as anions for purposes of this opinion.").   This is an easier case in which to apply the principle.

framework." '761 Patent, Col. 163:52-54.   Claim 11 requires amino acids from the donor

immunoglobulin heavy chain framework that "substitute for the corresponding amino acids in

the acceptor immunoglobulin heavy chain framework."   *Id.* at Col. 164:5-8.   Claim 28 requires

that the "donor amino acids substitute for the corresponding amino acids in the acceptor

immunoglobulin light chain framework."   *Id.* at Col. 165:59-61.   Claim 32 requires that an

amino acid from the donor immunoglobulin heavy chain framework "substitutes for the

corresponding amino acid in the acceptor immunoglobulin heavy chain framework."   *Id.* at Col.

166:27-29.   Claim 37 requires "donor amino acids substitute for corresponding amino acids in

the acceptor immunoglobulin heavy chain framework."   *Id.* at Col. 167:10 – Col. 168:2.   From

this contrast, one of ordinary skill would have concluded that when claims require framework

amino acid substitutions, they say so – and when they do not, they do not.   Strong Decl. Opinion

3, ¶¶ C(5)(a)(i) – (iii).

        Indeed, not only is defendant's position inconsistent with how one of ordinary

skill would understand the claims, defendant's position violates the doctrine of claim

differentiation.   "Differences among claims can also be a useful guide in understanding the

meaning of particular claim terms.   For example, the presence of a dependent claim that adds a

particular limitation gives rise to a presumption that the limitation in question is not present in

the independent claim."   *Phillips*, 415 F.3d at 1314-15.   Claim 32 of the '761 patent, which

depends from claim 1, provides in its entirety:

> First and second polynucleotides **according to claim 1** or 7,
> wherein said humanized immunoglobulin heavy chain **further
> comprises** an **amino acid from the donor** immunoglobulin heavy
> chain framework outside the Kabat and Chothia CDRs that
> **substitutes** for the corresponding amino acid **in the** acceptor
> immunoglobulin heavy chain **framework**, wherein said amino acid
> is typical for its position in human immunoglobulin sequences and
> said corresponding amino acid in the acceptor immunoglobulin is
> rare for its position in human immunoglobulin sequences.

'761 Patent, Col. 166:23-33.   If defendant's construction were correct, there would have been no

need for this unasserted claim to specify (as it does) the humanized immunoglobulin heavy chain

"further comprises an amino acid for the donor."   Under defendant's construction, that

13

limitation was already present.   The presumption of claim differentiation "is especially strong when," as here, "the limitation in dispute is the only meaningful difference between an independent and dependent claim."   *Sunrace Roots Enter. Co. v. SRAM Corp*., 336 F.3d 1298, 1302-03 (Fed. Cir. 2003).

Claim terms are normally interpreted "consistently throughout the patent." *Phillips*, 415 F.3d at 1314.   Moreover, where (as here) "patents all derive from the same parent application and share many common terms, we must interpret the claims consistently across all asserted patents."   *NTP, Inc. v. Research In Motion, Ltd*., 418 F.3d 1282, 1293 (Fed. Cir. 2005) (citations omitted).   Accordingly, "humanized immunoglobulin" means the same thing in all the claims:   an immunoglobulin comprising a human framework region and one or more CDRs from a non-human (usually a mouse or rat) immunoglobulin.   Framework amino acid substitutions are optional.

### 3.    The Specifications are Consistent with the Express Definition.

As the Federal Circuit explained, even before *Phillips*, "[w]e have frequently looked to the abstract to determine the scope of the invention, *see*, *e.g.*, *United States Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1560, 41 USPQ2d 1225, 1230 (Fed. Cir. 1997); *Stryker Corp. v. Intermedics Orthopedics, Inc.*, 96 F.3d 1409, 1412, 40 USPQ2d 1065, 1066 (Fed. Cir. 1996); *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1269, 229 USPQ 805, 810 (Fed. Cir. 1986)."   *Hill-Rom Co., Inc. v. Kinetic Concepts, Inc.*, 209 F.3d 1337, 1341 n.1 (Fed. Cir. 2000).   Post-*Phillips*, that remains the law.   See, e.g., *Lucent Techs., Inc. v. Gateway, Inc*., --- F.3d ----, 2008 WL 1970225, at *4-5 (Fed. Cir. May 8, 2008) (looking to the Abstract to determine scope of the invention).

The Abstracts disclose that "[n]ovel methods for producing, and compositions of, **humanized immunoglobulins** having one or more complementarity determining regions (CDR's) and **possible** additional amino acids from a donor immunoglobulin and a framework region from an accepting human immunoglobulin are provided.   Each humanized immunoglobulin chain will **usually** comprise, in addition to the CDR's, amino acids from the

donor immunoglobulin framework . . . ." '761 Patent, Abstract. The Abstracts teach that framework amino acid substitutions are "possible" and even "usual" – but not required.

Likewise, the Summary of the Invention supports PDL's construction – and contradicts defendant's. It explains that "**[t]he present invention** provides novel methods for preparing humanized immunoglobulin chains having generally [1] one or more complementarity determining regions (CDR's) from a donor immunoglobulin and a [2] framework region from a human immunoglobulin." *Id.* at Col. 2:37-41 (brackets supplied). It further explains that in the human acceptor variable region, the CDRs will be replaced with CDRs from the non-human donor ("[t]o form the humanized variable region, amino acids in the human acceptor sequence will be replaced by the corresponding amino acids from the donor sequence if they are in the category: (1) the amino acid is in a CDR," *id.* at Col. 2:61-65) and that, in a first embodiment of the invention, a high-homology framework will be used ("[t]he human immunoglobulin framework sequence will typically have about 65 to 70% homology or more to the donor immunoglobulin framework sequences," *id*. at Col. 2:51-54). But, in the immediately following section, the Summary of the Invention states that framework amino acid substitutions are "another embodiment" of the invention that can be done "separately" or "in conjunction with the first embodiment":

> In **another embodiment** of **the present invention**, **either in conjunction with the above comparison step or separately**, additional amino acids in the acceptor immunoglobulin chain may be replaced with amino acids from the CDR-donor immunoglobulin chain. More specifically, further **optional substitutions** of a human framework amino acid of the acceptor immunoglobulin with the corresponding amino acid from a donor immunoglobulin will be made at positions which fall in one or more of the following categories [listing categories].

*Id.* at Col. 2:66 – Col. 3:7. Such statements are definitional. *See, e.g., Microsoft Corp. v. Multi-Tech Sys., Inc.,* 357 F.3d 1340, 1348 (Fed. Cir.), *cert. denied,* 125 S.Ct. 61 (2004) (statements in the "'Summary of the Invention' portion of the specification, are not limited to describing a preferred embodiment, but more broadly describe the overall inventions."); *Gaus v. Conair Corp*., 363 F.3d 1284, 1290 (Fed. Cir. 2004) (phrase "according to the present invention"

is definitional).   By drawing a clear distinction between one embodiment (donor CDRs in a high-homology human acceptor framework) and another (requiring framework amino acid substitutions), the specification confirms the explicit definition set forth in the patents, which does not require framework amino acid substitutions.

Defendant's argument here – that because the specification discloses a specific embodiment requiring framework amino acid substitutions, all claims must require framework amino acid substitutions – is the kind of argument that the Federal Circuit has repeatedly warned against, as it explained in *Phillips:*

> although the specification often describes very specific embodiments of the invention, **we have repeatedly warned against confining the claims to those embodiments**.   *See, e.g., Nazomi Communications, Inc. v. ARM Holdings, PLC*, 403 F.3d 1364, 1369 (Fed.Cir.2005) (claims may embrace "different subject matter than is illustrated in the specific embodiments in the specification");   *Liebel-Flarsheim*, 358 F.3d at 906-08;   *Teleflex*, 299 F.3d at 1327;   *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985).

415 F.3d at 1323.   The Federal Circuit further has "**expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment**."   *Id.*; *see also Intamin,*, 483 F.3d at 1337 ("[a] patentee may draft different claims to cover different embodiments," and "a claim need not cover all embodiments.").   PDL drafted different claims to cover different embodiments.   When the claims require framework amino acid substitutions, they say so.

Defendant's argument is also like the argument the Federal Circuit rejected in *Sinorgchem*, 511 F.3d 1132.   There, as here, the patent's specification had an explicit definition of the disputed claim term ("controlled amount") – in fact, there the definition was less explicitly identified as a definition.   The trumping definition of "controlled amount" in *Sinorgchem* did not appear (as here) in a section that states that definitions are set forth; was not accompanied (as here) by language such as "in the present invention"; and did not (as here) appear in the Abstract. Instead, in *Sinorgchem*, the specification simply provided that "a 'controlled amount' of protic material is . . . ."   The Federal Circuit concluded that that bland usage provided a "clear[],

16

deliberate[], and precise[] defin[ition]," *Sinorgchem*, 511 F.3d at 1136, that overrode other indications in the specification, *id.* at 1137.   This is an easier case:   the definition is labeled as such, and is corroborated in the Abstract and other parts of the specification.   It is also consistent with the file histories, as next explained.

4.    **The File Histories are Consistent with the Express Definition.**

Finally, although recognizing that "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it **often** lacks the clarity of the specification and thus is less useful for claim construction purposes," *Phillips*, 415 F.3d at 1317 (emphasis added), it is also true that the prosecution history can "inform the meaning of the claim language . . . ." *Id.*   Here, there is no such lack of clarity.   The prosecution history, particularly of the '762 patent, is clear and does not support requiring framework amino acid substitutions as defendant contends.

As explained above, **none** of the claims of the '762 patent contain, on their face, the limitation that defendant seeks to import:   required framework amino acid substitutions. The PTO considered and rejected during prosecution of the '762 patent precisely the construction that defendant now proffers.

Specifically, during prosecution PDL presented amended claims that were generally the same as the issued claims; then-pending draft claim 86 was identical to issued claim 1.   '762 FH at PDL-A 0000315 & following.   The PTO rejected those claims, asserting that they were "anticipated by over Huston et al.," which the PTO characterized as disclosing the "altering of two residues outside the CDR region in the humanization of the antibody":

> 6.    Claims 86-120 are rejected under 35 U.S.C. 102(a) as being anticipated by over Huston
>
> et al.  Huston et al disclose the altering of two residues outside the CDR region in the
>
> humanization of an antibody (see Figure 3, cdr 1 and the text found on column 13, lines 38-46).
>
> One skilled in the art would reasonably conclude that altering these two residues (leucine and
>
> lysine) wold result in an antibody having the affinities recited in the claims and thus Huston et al
>
> read upon the instant application.

'762 FH at PDL-A 0003046.   In response, in Paper No. 18, PDL explained that although the
pending '761 application (which contained a few such claims), the '762 application did not
contain **any** claims that required framework amino acid substitutions, and that the disclosures of
Huston et al. were not even relevant to claims that did not require framework amino acid

> It is believed that the Examiner may be under a
> misapprehension that the present claims recite substitution of
> amino acids outside CDR regions, as is the case for some of the
> claims for a copending case which is being prosecuted
> concurrently.  In fact, the present claims all recite other
> important features, which the Examiner has not alleged to be
> disclosed or suggested by Huston.

| *Interview Summary* | Application No. 08/487,200 | Applicant(s) Queen et al | |
|---|---|---|---|
| | Examiner Julie E. Reeves, Ph.D. | Group Art Unit 1806 | |

All participants (applicant, applicant's representative, PTO personnel):

(1) *Julie E. Reeves, Ph.D.*                      (3) _____

(2) *Joe Liebeschuetz*                            (4) _____

Date of Interview _____ *Apr 3, 1997* _____

Type:   X Telephonic   ☐ Personal (copy is given to   ☐ applicant   ☐ applicant's representative).

Exhibit shown or demonstration conducted:   ☐ Yes   X No.  If yes, brief description:
_____
_____

Agreement   X was reached.   ☐ was not reached.

Claim(s) discussed: *originally filed claims 86-105, now renumbered as claims 1-20*

Identification of prior art discussed:
*none*
_____

Description of the general nature of what was agreed to if an agreement was reached, or any other comments:
*Claims are now in condition for allowance in view of the arguments set forth in Paper no 18 and the changes to the claims made in Amendment D.*

substitutions:   '762 FH at PDL-A 0003055-63.   The PTO's subsequent Interview Summary
states that agreement "was reached," and that the "claims are in condition for allowance" based
on PDL's explanation that the claims **did not require framework amino acid substitutions**:
'762 FH at PDL-A 0003388.

> "[T]he prosecution history can often inform the meaning of the claim language by

demonstrating how the inventor understood the invention . . . ."  *Phillips*, 415 F.3d at 1417. This is such a case.   PDL understood the claims of the '762 patent not to require framework amino acid substitutions.   So did the PTO, and the PTO said so in its Interview Summary. Given that file history, the interpretation that defendant advances cannot be correct as a matter of law.  *Cf. Rhodia Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) ( "The purpose of consulting the prosecution history in construing a claim is to 'exclude any interpretation that was disclaimed during prosecution.'") (citation omitted).

Nor is it correct from the perspective of one of ordinary skill at the time.   Such a person, reviewing that patent prosecution record, would have concluded that "humanized immunoglobulin" as used in the patents does not require framework amino acid substitutions – that such substitutions were, to be sure, optional, but they were not required.   Strong Decl. Opinion 3, ¶¶ C(5)(c).

\* \* \* \* \*

The patents' claims, the explicit definition, the specification, and the file histories all align to point – firmly – away from defendant's argument:   that the asserted claims somehow require framework amino acid substitutions.   This is not a case where "the distinction between using the specification to interpret the meaning of a claim and importing limitations from the specification into the claim can be a difficult one to apply in practice."   *Phillips*, 415 F.3d at 1323.   Rather, this is a case where "the line between construing terms and importing limitations can be discerned with reasonable certainty and predictability if the court's focus remains on understanding how a person of ordinary skill in the art would understand the claim terms."   *Id.*

It is important to understand that almost **all of the claim terms into which defendant seeks to import the framework amino acid substitution requirement** – the requirement that the PTO specifically rejected – **appear in the asserted** '**762 patent claims**. Given the '762 patent's file history and the law that where (as here) "patents all derive from the same parent application and share many common terms, we must interpret the claims consistently across all asserted patents," *NTP, Inc.*, 418 F.3d at 1293 (citations omitted), because

19

the limitation that defendant seeks to import cannot be present in any of the limitations of the asserted '762 patent claims, they cannot be present in the corresponding '761 or '370 asserted claim terms, either.

Nonetheless, defendant makes that attempt.   It attempts to import framework amino acid substitutions into "donor immunoglobulin," "human acceptor immunoglobulin," "acceptor human immunoglobulin," "framework," "framework region," "variable region framework," "heavy and light chain variable region frameworks," "heavy and light chain frameworks," "humanized immunoglobulin heavy [light] chain variable region framework," "DNA segment encoding a [the] humanized heavy [light] chain variable region framework," "DNA segments encoding the humanized heavy and light chains," "DNA segments encoding humanized light and heavy chain variable regions," and "DNA segments encoding humanized light and heavy chain variable regions" – in short, every disputed claim term except for "complementarity determining region (CDR)."

We turn, first, to two sides of the same coin:   "donor immunoglobulin" and "human acceptor immunoglobulin."

**B.    "Donor Immunoglobulin" and "Human Acceptor Immunoglobulin"**

The parties agree that the "donor immunoglobulin" in the asserted claims is the non-human immunoglobulin providing the CDRs in the acceptor human immunoglobulin/human acceptor immunoglobulin.   The parties also agree that "human acceptor immunoglobulin" and "acceptor human immunoglobulin" are synonymous in the asserted claims, and that both are the human immunoglobulin that provides the framework for the CDRs from the donor immunoglobulin.   The disputes (defendant's positions) are whether "donor immunoglobulin" "human acceptor immunoglobulin," and "acceptor human immunoglobulin" also require that the non-human donor immunoglobulin provide additional amino acid substitutions that the human acceptor immunoglobulin must accept.   Hence:

| The Claim Term and the Parties' Dispute | | |
|---|---|---|
| Claim Term | PDL's Construction | Defendant's Position |
| "Donor immunoglobulin" | "The non-human immunoglobulin providing the CDRs." Framework amino acid substitutions are optional. | A non-human immunoglobulin that donates at least one CDR and at least one framework amino acid to a human acceptor immunoglobulin." Framework amino acid substitutions are required. |
| "Human acceptor immunoglobulin" / "acceptor human immunoglobulin" | "The human immunoglobulin providing the framework for the CDRs." Framework amino acid substitutions are optional. | A human immunoglobulin that accepts at least one CDR and at least one framework amino acid from a donor immunoglobulin." Framework amino acid substitutions are required. |

1.     **The Patents Expressly Define "Donor Immunoglobulin," "Human Acceptor Immunoglobulin," and "Acceptor Human Immunoglobulin," and Those Definitions Govern.**

As with "human immunoglobulin," the disputes about "donor immunoglobulin," "human acceptor immunoglobulin," and "acceptor human immunoglobulin" are ones in which "the inventor's lexicography governs" because "the specification . . . reveal[s] a special definition given to a claim term." *Phillips*, 415 F.3d at 1317.

In the same part of the Detailed Description of the Invention that expressly defines "humanized immunoglobulin," the specification also expressly defines "donor immunoglobulin" and the "human acceptor immunoglobulin"/"acceptor human immunoglobulin": "[a]s used herein, the term 'humanized' immunoglobulin refers to an immunoglobulin comprising a human framework region and one or more CDR's from a non-human (usually a mouse or rat) immunoglobulin. **The non-human immunoglobulin providing the CDR's is called the 'donor' and the human immunoglobulin providing the framework is called the 'acceptor.'**" '761 Patent Col. 12:1-7.

Nothing in those definitions requires framework amino acid substitutions – and, correlatively, nothing excludes them, either. Those definitions are unambiguous and complete. One of ordinary skill would have regarded them as conclusive. Strong Decl. Opinion 4, ¶¶

C(3)(a)-(c), Strong Decl. Opinion 5, ¶¶ C(3)(a)-(c).   They are, again, PDL's constructions. Defendant resists them.

In light of these express definitions, the principle that "[w]hen the specification explains and defines a term used in the claims, without ambiguity or incompleteness, there is no need to search further for the meaning of the term," *Sinorgchem*, 511 F.3d at 1138, also applies to this claim term.   But, as with "humanized immunoglobulin," such a search would confirm that the claim language, specification, and file history are consistent with those explicit definitions, i.e., they support PDL's construction, and they undercut defendant's.

### 2.    The Claims are Consistent with the Express Definition.

In the '761 patent, for example, claim 1 does not on its face require that the donor immunoglobulin must supply amino acids for framework substitutions that the human acceptor framework must accept.   Claims 10 and 37, however, do.   They requires that "the donor amino acids substitute for corresponding amino acids in the acceptor immunoglobulin heavy chain framework."   '761 Patent, Col. 163:52-54; *id*. at Col. 167:10 – 168:2.   Claim 11 requires amino acids from the donor immunoglobulin heavy chain framework that "substitute for the corresponding amino acids in the acceptor immunoglobulin heavy chain framework."   *Id.* at Col. 164:5-7.   Claim 28 requires that the "donor amino acids substitute for corresponding amino acids in the acceptor immunoglobulin light chain framework."   '761 Patent, Col. 165:59-61. Claim 32 requires that an amino acid from the donor immunoglobulin heavy chain framework "substitutes for the corresponding amino acid in the acceptor immunoglobulin heavy chain framework."   *Id.* at Col. 166:27-29.

As is discussed in this brief, *supra*, the '762 patent does not contain any claims that on their face require framework amino acid substitutions.   The '370 patent, however, contains such claims; they require that specified donor amino acids 'replace' amino acids in the acceptor human framework (all of these claims are unasserted).   *See, e.g*., '370 Patent, Col. 166:26-29 (claim 3); *id*. at Col. 166:51-53 (claim 4); *id*. at Col. 167:61-67 (claim 7); id. at Col. 168:19-23 (claim 8); and *id*. at Col. 168:37-42 (claim 9).

22

One of ordinary skill at the time, reading these claims, would understand that the absence of such requirements in the asserted claims of the patents signaled that such requirements were not present.   Strong Decl. Opinion 4, ¶¶ C(5)(a).   This is a case where the "patentee . . . draft[ed] different claims to cover different embodiments."   *Intamin,* 483 F.3d at 1337.

As with "humanized immunoglobulin," the doctrine of claim differentiation undercuts defendant's position.   Claim 32 of the '761 patent, which depends from claim 1, provides in its entirety:

> First and second polynucleotides **according to claim 1** or 7, wherein said humanized immunoglobulin heavy chain **further comprises** an **amino acid from the donor** immunoglobulin heavy chain framework outside the Kabat and Chothia CDRs that **substitutes** for the corresponding amino acid **in the acceptor immunoglobulin heavy chain framework**, wherein said amino acid is typical for its position in human immunoglobulin sequences and said corresponding amino acid in the acceptor immunoglobulin is rare for its position in human immunoglobulin sequences.

'761 Patent, Col. 166:23-32.   There would be no reason for claim 32 to specify framework amino acid substitutions if that requirement were present in claim 1.   Hence, there is a strong presumption that the disputed claim terms, as used in claim 1 of the '761 patent, do not require that the donor immunoglobulin supply amino acids for framework amino acid substitutions that the human acceptor accept, because the presumption of claim differentiation "is especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim."   *Sunrace Roots Enter. Co.*, 336 F.3d at 1302-03.   Claim terms are normally interpreted "consistently throughout the patent."   *Phillips*, 415 F.3d at 1314.   And where (as here) "patents all derive from the same parent application and share many common terms, we must interpret the claims consistently across all asserted patents."   *NTP, Inc.*, 418 F.3d at 1293 (citations omitted).   Under that precedent, these claim terms mean the same thing throughout the asserted claims.

### 3.    The Specifications are Consistent with the Express Definitions.

Other portions of the specification point firmly away from the conclusion that the patent's express definitions somehow do not apply, and that a "donor immunoglobulin" must

necessarily provide amino acids for framework substitutions in the "human acceptor immunoglobulin" or "acceptor human immunoglobulin."    The Abstract defines such substitutions as "possible" and even "usual" – but not required:

> Novel methods for producing, and compositions of, humanized immunoglobulins having one or more complementarity determining regions (CDR's) and **possible** additional amino acids from a donor immunoglobulin and a framework region from an accepting human immunoglobulin are provided. Each humanized immunoglobulin chain will **usually** comprise, in addition to the CDR's, amino acids from the donor immunoglobulin framework . . . .

'761 Patent, Abstract.    Even before *Phillips*, "[w]e have frequently looked to the abstract to determine the scope of the invention," *Hill-Rom Co.,* 209 F.3d at 1341 n.1, and the Federal Circuit continues to do so.    *Lucent Techs.,* 2008 WL 1970225, at *4-5.

The Summary of the Invention describes the circumstances in which the donor immunoglobulin provides amino acids for substitutions in the human acceptor immunoglobulin and acceptor human immunoglobulin frameworks as "another embodiment' of the invention – "optional" but not required:

> In **another embodiment** of **the present invention**, either in conjunction with the above comparison step or separately, **additional amino acids in the acceptor immunoglobulin** chain **may be replaced with amino acids from the** CDR-**donor** immunoglobulin chain. More specifically, further **optional substitutions** of a human framework amino acid of the acceptor immunoglobulin with the corresponding amino acid from a donor immunoglobulin will be made at positions which fall in one or more of the following categories [defining categories].

'761 Patent, Col. 2:66 – Col. 3:7.    Such statements are definitional, *see, e.g., Microsoft Corp., supra,* 357 F.3d at 1348 (statements in the "'Summary of the Invention' portion of the specification, are not limited to describing a preferred embodiment, but more broadly describe the overall inventions."); *Gaus, supra,* 363 F.3d at 1290 (phrase "according to the present invention" is definitional), and by drawing a clear distinction between one embodiment (donor CDRs in a high-homology human acceptor framework) and another (requiring framework amino acid substitutions), the specification confirms the patents' explicit definition, which does not require framework amino acid substitutions.

24

* * * * *

We turn to another disputed claim term that the patents define – "complementarity determining region" or "CDR" – where, again, the patents expressly define the claim term in a manner inconsistent with defendant's position.

### C.    "Complementarity Determining Region (CDR)" and "Framework"

Here, as elsewhere, the parties agree in part.   Defendant, however, seeks to disregard the patents' explicit definition and the other intrinsic evidence, and import a limitation into the claim – that "CDR" is defined by the aggregate of the Kabat and Chothia methodologies. Hence, the dispute:[3]

| The Claim Terms and the Parties' Disputes | | |
|---|---|---|
| Claim Term | PDL's Construction | Defendant's Position |
| "Complementarity determining region (CDR)" | "Amino acid sequence in the variable region, the boundaries of which are defined by the Kabat methodology" | A hypervariable region as defined by the aggregate of the Kabat methodology and the Chothia methodology |
| "Framework" / "framework region" / "variable region framework" | "The amino acid sequence in the variable region of an immunoglobulin that is not a CDR (as defined by the Kabat methodology)" | Portion of the variable region of an immunoglobulin that is not a CDR (as defined by the aggregate of the Kabat methodology and by the Chothia methodology) |

### 1.    The Patents Expressly Define "Complementarity Determining Region (CDR)" and "Framework," and Those Definitions Govern.

As with the prior claim terms, defendant's disputes about the meaning of "complementarity determining region (CDR)" and "framework" are ones in which "the inventor's lexicography governs" because "the specification . . . reveal[s] a special definition given to a claim term."   *Phillips*, 415 F.3d at 1317.

---

[3] Defendant also attempts to import "hypervariable regions" into this dispute.   That claim term appears in unasserted claims.   There is no dispute on the unasserted claims, and hence no need to construe "hypervariable regions."   *See, e.g.*, *Vivid Techs., Inc. v. American Science & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) ("only those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy.").

In the same part of the Detailed Description of the Invention that defines the other claim terms discussed above, the specification defines "complementarity determining region (CDR)." Indeed, the specification notes that the boundaries had been "precisely defined" by a precise methodological reference (Kabat) that the specification expressly incorporates:

> **DETAILED DESCRIPTION OF THE INVENTION**
>
> An immunoglobulin light or heavy chain variable region consists of a "framework" region interrupted by three hyper-variable regions, also called CDR's. The extent of the framework region and CDR's have been precisely defined (see, "Sequences of Proteins of Immunological Interest," E. Kabat et al., U.S. Department of Health and Human Services, (1983); which is incorporated herein by reference).

'761 Patent, Col. 10:54-56 & Col. 11:38-44. One of ordinary skill at the time would have regarded this definition as conclusive. Strong Decl. Opinion 6, ¶¶ C(2)(a).

It is not until several pages later that the specification references and incorporates the Chothia paper that first set forth Chothia's methodology. '761 Patent Col. 15:21-26 ("The amino acids at several positions in the framework are known to be capable of interacting with the CDRs in many antibodies (Chothia and Lesk, *J. Mol. Biol.* 196, 901 (1987), Chothia et al., *Nature* 342, 877 (1989), and Tramontano et al., *J. Mol. Biol.* 215, 175 (1990) all of which are incorporated herein by reference)"); '761 Patent Col. 15:42-43 ("Chothia and Lesk (op. cit.) define the CDRs differently from Kabat et al. (op. cit.)"). Importantly, however, when the patent defined "CDR," it did so exclusively on the basis of the Kabat methodology – not the Chothia methodology. "Here, the drafter clearly, deliberately, and precisely defined the term," and that precise definition governs. *Sinorgchem*, 511 F.3d at 1136; *see also Phillips*, 415 F.3d at 1317 (*en banc*) (specification's express definitions "govern," even when different from accepted usage).

In light of these express definitions, the principle that "[w]hen the specification explains and defines a term used in the claims, without ambiguity or incompleteness, there is no need to search further for the meaning of the term," *Sinorgchem*, 511 F.3d at 1138, applies to

these claim terms.   If one were to look further, the claims as a whole do not support defendant;

the claim terms are neutral.   Strong Decl. Opinion 6, ¶¶ C(8).   The patents' description of the

prior art is, however, consistent with the express definitions.

### 2.    The Patents' Specification is Consistent with the Express Definitions

Prior art can be useful in construing a claim term, because it can be evidence of

what that claim term meant to those of ordinary skill in the art at the time.   *See, e.g., Kumar v.*

*Ovonic Battery Co., Inc.*, 351 F.3d 1364, 1368 (Fed. Cir. 2003).   The patents discuss a variety of

prior art to which the Kabat v. Kabat + Chothia dispute would be relevant.   The patents'

discussion of the prior art consistently employs the Kabat methodology.

The patents' specifications set forth a series of rules for amino acid substitutions.

"Category 1" is that the amino acids in the acceptor are replaced if the acceptor "amino acid

position is in a CDR is [as] defined by Kabat et al., op cit."   One of ordinary skill at the time

would have understood that this ties to the "complementarity determining regions (CDRs) from a

donor immunoglobulin" requirement of the asserted claims:   in all of the asserted claims, the

CDRs in the acceptor immunoglobulin are replaced with the CDRs from a donor

immunoglobulin.   Strong Decl. Opinion 6, ¶¶ C(3)(a).

The patents' specifications also contain a series of figures and associated text in

which the "CDR's in each chain are underlined."   In each such case, underlined CDRs correlate

to CDRs as defined by the Kabat methodology, not to the aggregate of the Kabat and Chothia

methodologies.   Strong Decl. Opinion 6, ¶¶ C(4)(a)-(e).

When the patents describe the art on which defendant principally relies in its

invalidity case (Jones, Verhoeyen, and Riechmann), the patents apply the Kabat methodology.

For example, the patents state that

> Most humanized immunoglobulins that have been previously
> described (**Jones** et al., op. cit.; **Verhoeyen** et al., op. cit.;
> **Riechmann** et al., op. cit.) have comprised a framework that is
> identical to the framework of a particular human immunoglobulin
> chain, the acceptor, and **three CDR's** from a non-human donor
> immunoglobulin chain.   In one case (Riechmann et al., op. cit.),
> two additional amino acids **in the framework** were changed to be
> the same as amino acids in other human framework regions.

'761 Patent, Col. 12:33-40.   The reference to "Riechmann et al, op. cit." is a reference to

Riechmann et al., "Reshaping human antibodies for therapy," **Nature**, 332:323-327 (1988),

which is listed on page 2 of the '761 patent (and is also listed in the other patents).   But the

additional amino acid substitutions that Riechmann made were "in the framework" only if

"CDR" is defined under the Kabat methodology; if "CDR" is defined as the aggregate of the

Kabat and Chothia methods, the amino acid substitutions that Riechmann et al. made were not in

the framework – they were in the CDR.   Strong Decl. Opinion 6, ¶¶ C(5)(b)(i).   Likewise,

Verhoeyen and Jones applied the Kabat methodology to determine the boundaries of the CDRs.

Strong Decl. Opinion 6, ¶¶ C(5)(b)(ii).

       In discussing amino acid substitutions in Category 3, citing the word of prior

researchers Amit et al., the patents discuss an interaction between amino acids in the CDR and

amino acids in the framework:

> [i]n the positions immediately adjacent to one or more of the 3
> CDR's in the primary sequence of the humanized immunoglobulin
> chain, the donor amino acid(s) rather than acceptor amino acid
> may be selected.   These amino acids are particularly likely to
> interact with the amino acids in the CDR's and, if chosen from the
> acceptor, to distort the donor CDR's and reduce affinity.
> Moreover, the adjacent amino acids may interact directly with the
> antigen (Amit et al., *Science*, 233, 747-753 (1986), which is
> incorporated herein by reference), . . .

'761 Patent, Col. 14:29-38.   Amit et al. specifically state that they defined CDRs by the Kabat

methodology, and they referenced the same Kabat publication that the patents used in defining

"CDR."   Strong Decl. Opinion 6, ¶¶ C(5)(b)(iii).

       In a further discussion of the work of prior researchers, the patents state that

"[t]he amino acids at several positions in the framework are known to be capable of interacting

with the CDRs in many antibodies," 761 Patent, Col. 15:21-23, citing Tramontano et al., *J. Mol.*

*Biol.* 215, 175 (1990), for that proposition and incorporating it by reference.   Tramontano et al.

state that they determined the CDRs by the Kabat methodology, not the 'Kabat plus Chothia'

methodology that defendant would have the Court adopt.   Strong Decl. Opinion 6, ¶¶

C(5)(b)(iv).

Indeed, the patents rely on the Kabat methodology **even when referring to the Chothia references that supposedly supply the alternative methodology defendant invokes**; even then, the patents defined CDR by the Kabat methodology.   The patents state that "[t]he amino acids at several positions **in the framework** are known to be capable of interacting with the CDRs in many antibodies (**Chothia** and Lesk, *J. Mol. Biol.* 196, 901 (1987), **Chothia** et al., *Nature* 342, 877 (1989), and Tramontano et al., *J. Mol. Biol.* 215, 175 (1990), all of which are incorporated herein by reference), notably at **positions** . . . **26-30**, . . . of the **heavy chain** (numbering according to Kabat, op. cit.), . . ."   '761 Patent Col. 15:21-28.   But positions 26-30 are in the framework **only** if CDR is defined by the Kabat methodology; if CDR is defined by the aggregate of the Kabat and Chothia methodologies (as defendant argues), then positions 26-30 are not in the framework – they are in the CDR (as defined by Chothia).   Strong Decl. Opinion 6, ¶¶ C(9).   The patent describe positions 26-30, consistent with the express definition, as being in the framework.   *See also* Strong Decl. Opinion 6, ¶¶ C(9).

This detailed explanation in the specifications underscores why the Federal Circuit emphasized in *Phillips* that "the specification 'is always highly relevant to the claim construction analysis.   Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'"   *Phillips*, 415 F.3d at 1315 (citation omitted).   Here, the specifications make clear what these claim terms mean.   Defendant's attempt to have the Court redraft the claims in the guise of "construing" them cannot prevail.

### 3.    The File Histories are Consistent with the Express Definitions

The file histories reflect that the PTO understood that the "CDRs" in the patents referred to the boundaries as defined by Kabat, not the aggregate of Kabat and Chothia as defendant argues.

In particular, during prosecution of the '761 patent, the PTO initially rejected then-pending claims on the grounds that "the state of the art at the time the invention was filed was such that one of skill in the art would have expected to lose affinity by CDR grafting (see Jones et al.) or at the very best to come close to the binding affinity of the original antibody but

not to exceed its affinity (see Reichmann et al.)."   The two references – Jones and Riechmann –
both determined the boundaries of the CDRs by the Kabat methodology, not the 'Kabat +
Chothia' methodology that defendant seeks to impose; indeed, both refer to the same Kabat
reference to which the PDL patents refer in defining "CDR" and "framework."   From this, one
of ordinary skill would have concluded that the "CDRs" in a "framework" had their boundaries
determined by the Kabat methodology only, not the aggregate of the Kabat and Chothia
methodologies.   Strong Decl. Opinion 6, ¶¶ C(5)(b)(i)-(ii).

Moreover, in the parent application to the patents-in-suit (U.S. Application No.
07/634,278), which like the patents-in-suit was directed at humanized immunoglobulins and used
claim terms such as "CDR," the PTO wrote that "the specification teaches grafting 'kabat'
CDRs."   And in a declaration dated November 4, 1992, from the file history of the parent
application, and which was also filed in the '761 patent's prosecution history without
contradiction on this point by the PTO, named inventor Cary Queen described the patents'
method of humanizing antibodies as involving the "transfer [of the] the Kabat CDRs . . . ."
From this, one of ordinary skill would have concluded that the "CDRs" in a "framework" had
their boundaries determined by the Kabat methodology only, not the aggregate of the Kabat and
Chothia methodologies as defendant urges.   Strong Decl. Opinion 6, ¶¶ C(6)(c).

### D.    Claim Phrases that Consist Mainly of Other Construed Terms Joined Together

Several claim phrases consist of disputed claim terms where defendant attempts,
again, to rewrite the unasserted claims to impose requirements not found in the claims.   The
Court should reject that attempt in these claim phrases, too.

#### 1.    "Heavy and Light Chain Variable Region Frameworks" / "Heavy and Light Chain Frameworks"

Defendant does not dispute that within the asserted claims, a "framework" is
necessarily within the variable region of an immunoglobulin, or that a variable region consists
only of a framework region interrupted by the CDRs.   Defendant's dispute here is simply
another variation of its effort to import a limitation from the specification into the claim terms –
specifically, that the "framework" is the variable region minus the "CDR" as defined by the

aggregate of the Kabat and Chothia methodologies rather than, as the patent specifies, only the

Kabat methodology.   Hence, the dispute:

| The Claim Terms and the Parties' Disputes | | |
|---|---|---|
| Claim Term | PDL's Construction | Defendant's Position |
| "Heavy and light chain variable region frameworks" / "Heavy and light chain frameworks" | "The amino acid sequence of the variable region in the heavy and light chain that is not a CDR (as defined by the Kabat methodology)" | The amino acid sequence of the variable region in the heavy and light chain that is not a CDR (as defined by the aggregate of the Kabat methodology and by the Chothia methodology |

For the same reasons that defendant's attempt to rewrite "CDR" and "framework"

fails, its attempts to rewrite "heavy and light chain variable region frameworks" and "heavy and

light chain frameworks" also fails.   *See also* Strong Decl. Opinion 8, ¶ C.

### 2.    "Humanized Heavy [Light] Chain Variable Region Framework"

Defendant does not dispute that within the asserted claims, a "framework" is

necessarily within the variable region of an immunoglobulin, or that a variable region consists

only of a framework region interrupted by the CDRs.   Defendant's dispute here is, again,

another variation of its effort to import a limitation from the specification into the claim terms –

specifically, that (1) in a "humanized immunoglobulin," framework amino acid substitutions are

required, rather than (as the patent describes them) "optional" or "another embodiment" of the

invention, and (2) the "framework" is the variable region minus the "CDR" as defined by the

aggregate of the Kabat and Chothia methodologies rather than, as the patent specifies, only the

Kabat methodology.   Hence, the dispute:

| The Claim Terms and the Parties' Disputes | | |
|---|---|---|
| Claim Term | PDL's Construction | Defendant's Position |
| "Humanized heavy [light] chain variable region framework" | "The heavy [light] chain variable region framework (as defined above) of a humanized immunoglobulin (as defined above)" | A heavy [light] chain variable region framework of a humanized immunoglobulin wherein at least one amino acid is the same as the corresponding amino acid in the donor immunoglobulin rather than that of the acceptor immunoglobulin |

For the same reasons that defendant's attempt to rewrite "humanized

31

immunoglobulin," "CDR" and "framework" fails, its attempts to rewrite "heavy and light chain variable region frameworks" and "heavy and light chain frameworks" also fail.  *See also* Strong Decl. Opinion 9, ¶ C.

### 3.    The "DNA Segment[s] Encoding" Claim Terms

The asserted claims contain a series of "DNA segment[s] encoding" limitations. In the main, those limitations are merely re-implementations of defendant's effort to import a framework amino acid substitution requirement into claims that do not have one.   The remaining disputes between the parties on those limitations are narrow.

Those limitations are:

- "DNA segment encoding a humanized heavy chain variable region" / "DNA segment encoding the humanized immunoglobulin heavy chain variable region";

- "DNA segment encoding a humanized light chain variable region" / "DNA segment encoding the humanized immunoglobulin light chain variable region";

- "DNA segments encoding the humanized heavy and light chains";

- "DNA segments encoding humanized light and heavy chain variable regions" / "DNA segments encoding heavy and light chain variable regions of a humanized immunoglobulin."

The parties agree that in the asserted claims, "encoding" means "that contains the DNA sequence that codes for."   To the extent that these limitations simply incorporate claim terms that the Court has already construed (e.g., "humanized light chain variable region"), those constructions would apply here, too.  *See also* Strong Decl. Opinion 11, ¶¶ C(2).

The parties' other disputes on these terms do not require extensive discussion to resolve.   In the "DNA segment**s**" claims, defendant would have the Court transform "DNA segments encoding" into "two or more polynucleotides encoding" – apparently defendant wishes to argue that "DNA segments encoding" could **not** be two distinct DNA segments on one larger segment.   One of ordinary skill in the art at the time would have known that a "DNA segments encoding" meant polynucleotides that encode, whether those were joined on one larger

polynucleotide or whether they were separate.

As Dr. Strong explains, one widely available textbook in the field at the time was Alberts, *The Cell* (2nd ed. 1989).   Alberts explains at page 4 that "[o]ne amino acid can join with another by forming a peptide bond, and two nucleotides can join together by a phosphodiester bond.   The repetition of these reactions leads to linear polymers known as polypeptides and polynucleotides, respectively" – or, in other words, that "DNA segments" can be on one polynucleotide or two.   Strong Decl. Opinion 13, ¶¶ C(2)(c).   This is confirmed by another reference from the time, *Dorland's Illustrated Medical Dictionary* (27th ed. 1988), which explains at page 1502 that "segment" is "a portion of a larger body or structure, set off by natural or arbitrarily established boundaries."   These references confirm that, from the claim language alone, one of ordinary skill at the time would have known that "DNA segments encoding" could be one segment that is joined or two segments that are joined as part of one larger polynucleotide.   Strong Decl. Opinion 13, ¶¶ C(2)(c)-(d).

In addition, the patents' definitions would have confirmed to one of ordinary skill at the time that "DNA segment**s**" could be either two separate oligonucleotides or a larger oligonucleotide that included the two smaller ones.   The patents define an "immunoglobulin" to include the full molecule, a fragment, a heavy chain, or a light chain, '761 Patent, Col. 11:4-31, and thus a "humanized immunoglobulin" could be a single chain (heavy or light).   But as a technical matter coding for a single chain would have to have occurred on one vector.   Strong Decl. Opinion 13, ¶¶ C(2)(d).

The prior art incorporated into the patents, which is relevant to claim construction because it shows how one of ordinary skill would have interpreted the patents, *Kumar*, 351 F.3d at 1368, would also have pointed one of ordinary skill to the conclusion that "DNA segments" could be either two separate oligonucleotides or a larger oligonucleotide that included the two smaller ones.   In defining "immunoglobulin" to include a single chain, the patents incorporate the Huston and Bird references:   "immunoglobulins may exist in a variety of other forms including, for example, . . . in single chains (e.g., Huston et al., *Proc. Natl. Acad. Sci. U.S.A.*, 85,

5879-5883 (1988), and Bird et al., *Science*, 242, 423-426 (1988), which are incorporated herein by reference." '761 Patent, Col. 11:27-33.   Both Huston and Bird disclose two-chain fragments (Fv fragments) constructed from two polynucleotides respectively encoding a heavy chain and a light chain, joined together on a larger polynucleotide.    Strong Decl. Opinion 13, ¶¶ C(2)(d). The patents' examples include constructs using two different polynucleotides, not joined.   *See, e.g.*, Patent '761, Col. 16:33-48 spec example.   Accordingly, one of ordinary skill would have understood that "DNA segments" could include both a single polynucleotide or two polynucleotides joined together on a larger polynucleotide.

The prosecution history confirms the understanding of one of ordinary skill imparted by the claim language.   During prosecution of the '761 Patent, PDL characterized the invention as involving polynucleotides encoding the heavy and light chains, either separately or on the same vector, making it clear that such nucleotides could either be physically joined on one larger polynucleotide, or separate:

> The claims have been amended to clarify that heavy and light chains of a humanized immunoglobulin are respectively encoded by first and second polynucleotides. The first and second polynucleotides may be present on separate vectors, as recited in claim 120 (support is provided at e.g., specification at p. 47, first and second paragraphs) or can both be incorporated into a single vector. Support for the recital of

'761 FH at PDL-A 0003947.   The PTO did not object to or take issue with that characterization, which in any event is consistent with the plain language of the claims.   That disclosure during prosecution would have pointed one of ordinary skill towards the conclusion that "DNA segments encoding" could be on separate vectors or incorporated into a single vector.   Strong Decl. Opinion 13, ¶¶ C(2)(e)-(f).

Defendant's dispute about the "DNA segme**t** encoding" claims is similar: defendant again invites legal error by proffering a construction that would limit the claim to "**a** polynucleotide encoding," again precluding the possibility of one DNA segment being joined to another on a larger segment.   The Court should also decline that invitation.

The disputed limitation appears in, for example, claim 14 of the '762 patent as

follows:

> (4) introducing the DNA segment encoding the humanized immunoglobulin heavy chain variable region and a DNA segment encoding a humanized immunoglobulin light chain variable region into a cell; and

> (5) expressing the DNA segments in the cell to produce the humanized immunoglobulin.

'761 Patent, Col. 163:12-17.

One of ordinary skill in the art at the time would have known that a (or the) "DNA segment encoding" meant polynucleotides that encode, whether those were joined on one larger polynucleotide or whether they were separate.   As Dr. Strong again notes, *Alberts* explains at page 4 that "[o]ne amino acid can join with another by forming a peptide bond, and two nucleotides can join together by a phosphodiester bond.   The repetition of these reactions leads to linear polymers known as polypeptides and polynucleotides, respectively" – or, in other words, that a "DNA segment encoding" can be on one polynucleotide or two.   Strong Decl. Opinion 12, ¶¶ C(3)(c).   This is confirmed, again, by *Dorland's Illustrated Medical Dictionary* (27th ed. 1988), which explains at page 1502 that "segment" is "a portion of a larger body or structure, set off by natural or arbitrarily established boundaries."   These references confirm that, from the claim language alone, one of ordinary skill at the time would have known that "DNA segments encoding" could be one segment that is joined or two segments that are joined as part of one larger polynucleotide.   Strong Decl. Opinion 12, ¶¶ C(3)(c).

The prosecution history confirms the understanding of one of ordinary skill imparted by the claim language.   As Dr. Strong explains, during prosecution of the '761 Patent, PDL characterized the invention as involving polynucleotides encoding the heavy and light chains, either separately or on the same vector, making it clear that such nucleotides could either be physically joined on one larger polynucleotide ("incorporated into a single vector"), or separate ("on separate vectors"):

```
        The claims have been amended to clarify that heavy and
   light chains of a humanized immunoglobulin are respectively
   encoded by first and second polynucleotides.  The first and
   second polynucleotides may be present on separate vectors, as
   recited in claim 120 (support is provided at e.g., specification
   at p. 47, first and second paragraphs) or can both be
   incorporated into a single vector.  Support for the recital of
```

'761 FH at PDL-A 0003947.   The PTO did not object to or take issue with that characterization,

which in any event is consistent with the plain language of the claims.   That disclosure during

prosecution would have pointed one of ordinary skill towards the conclusion that a (or the)

"DNA segment encoding" could be on separate vectors or incorporated into a single vector.

Strong Decl. Opinion 12, ¶¶ C(3)(e)-(f).

### 4. "Is at least 65% [70%] Identical to the [Sequence of the] Donor Immunoglobulin Heavy [Light] Chain Variable Region Framework"

Defendant's penultimate attempt to import a 'required framework amino acid

substitutions' into the claims is in this limitation.   (Its final attempt is directed to "synthesizing a

[the] DNA segment encoding a humanized heavy [light] chain variable region," addressed in the

next section.)   For the same reasons that "acceptor immunoglobulin" and "donor

immunoglobulin" do not require framework amino acid substitutions, discussed above in §

IV(B), a "donor immunoglobulin heavy [light] chain variable region framework" does not,

either.

Defendant has additionally suggested that the specified percentage identity be

made on the basis of comparisons of nucleotides that code for amino acids, rather than amino

acid sequences themselves.   That argument cannot be reconciled with the patents, the claims, the

understanding of one of ordinary skill at the time after reading the patents, or the understanding

of one ordinary skill as a matter of science.

The patents themselves state that the specified percentage identity is done by

comparing amino acid sequences.   The Summary of the Invention states that the comparison is

done on the basis of a comparison to the "**amino acid sequence** of the donor immunoglobulin."

'761 Patent, Col. 2:42-43.   The case law treats statements in the Summary of the Invention as

definitional.  *Microsoft,* 357 F.3d at 1348 (statements in the "'Summary of the Invention'

portion of the specification, are not limited to describing a preferred embodiment, but more

broadly describe the overall inventions."); *Gaus*, 363 F.3d at 1290 (phrase "according to the

present invention" is definitional).   The Detailed Description of the Invention explains that the

human acceptor framework is one that is "unusually homologous to" – that is, has a high

percentage of sequence identity with – the non-human donor, with a reference to the National

Biomedical Research Foundation Protein Identification Resource.   '761 Patent, Col. 13:6-15.

As one of ordinary skill would have known, that data bank contains proteins for which the

**amino** **acid** **sequence** has been determined.   Strong Decl. Opinion 10, ¶¶ C(2)(b).

Comparisons using that data bank were amino acid sequence comparisons, not nucleotide

comparisons.   The Detailed Description of the Invention also states that the "homology"

comparison is performed based on proteins, i.e., amino acid sequences:   "[s]ubstantially

homologous immunoglobulin sequences are those which exhibit at least about 85% homology,

usually at least about 90%, and preferably at least about 95% homology with a reference

immunoglobulin **protein**."   '761 Patent, Col. 17:32-35.   The law also treats such a statement as

definitional.  *Sinorgchem*, 511 F.3d at 1134,1136 ("a 'controlled amount' of protic material is"

was definitional).

        The claims also signal that the specified percentage identity is determined on the

basis of the amino acid sequence, and not on the basis of polynucleotide comparisons.   Various

unasserted claims in the patents (that require framework amino acid substitutions) specify that

"the sequence" is an amino acid sequence.   *See, e.g*., '761 Patent, Claims 20 & 21-25.

        In addition to the signals in the patents, one of ordinary skill at the time would

have reached that same conclusion as a matter of science, because a specific amino acid may be

coded for by any number of nucleotide sequences.   In other words, one can predict the amino

acid sequence based on a nucleotide sequence, but the reverse is not true.   *See* Strong Decl. II,

¶¶ D(1)-(3).   In short, one of ordinary skill at the time reading the patents would have

concluded that the specified amino acid sequence identity be determined on the basis of amino

acid sequence identity, not correspondence between nucleotides.    Strong Decl. Opinion 10, ¶ C(2).

      **5.**    **"Synthesizing a [the] DNA Segment Encoding a Humanized Heavy [Light] Chain Variable Region"**

      Here, again, defendant attempts to import limitations from the specification into the claims, arguing that a "humanized heavy [light] chain variable region" requires amino acid substitutions.    As explained above, it does not; framework amino acid substitutions are optional, not required.    And "a [the] DNA segment" should be construed in this claim as it was above.    *Phillips*, 415 F.3d at 1314 (Claim terms are normally interpreted "consistently throughout the patent"); *NTP, Inc.*, 418 F.3d at 1293 (where (as here) "patents all derive from the same parent application and share many common terms, we must interpret the claims consistently across all asserted patents").

      Defendant's new dispute in this claim phrase concerns "synthesizing."    Hence:

| The Claim Terms and the Parties' Disputes | | |
|---|---|---|
| Claim Term | PDL's Construction | Defendant's Position |
| "Synthesizing a [the] DNA segment encoding the humanized heavy [light] chain variable region" | "Producing a [the] polynucleotide segment that codes for the humanized heavy [light] chain variable region (as defined by the Court)" | Producing the entirety of a DNA segment encoding a humanized heavy [light] chain variable region by synthesizing de novo, annealing, and extending oligonucleotides |

Defendant's definition is circular:    it defines "synthesizing" with "synthesizing."    It is ambiguous:    it does not specify what it means by "de novo."    More trenchantly, defendant's definition cannot be reconciled with the claim language, the specification, the prior art incorporated into the specification, or the common understanding of one of ordinary skill at the time.

      The claim language does not support defendant's construction.    But it supports PDL's.    For example, claim 1 of the '370 patent requires "synthesizing the DNA segment encoding the humanized heavy chain variable region, comprising complementarity determining regions (CDRs) from the donor immunoglobulin heavy chain variable region and a variable

region framework from the selected acceptor heavy chain variable region." '370 Patent, Col.

165:32-37.   On its face, nothing in that claim language requires (or even suggests) "synthesizing

de novo, annealing, and extending oligonucleotides," as defendant would require.

      The specification does not support defendant's construction.   In the Summary of

the Invention, the patents teach that "[o]nce designed, the **immunoglobulins**, including binding

fragments and other immunoglobulin forms, **of the present invention may be produced readily

by a variety of recombinant DNA or other techniques**." '762 Patent, Col. 3:44-47.   Such

statements are definitional, *see, e.g., Microsoft Corp.,* 357 F.3d at 1348 (statements in the

"'Summary of the Invention' portion of the specification, are not limited to describing a

preferred embodiment, but more broadly describe the overall inventions."); *Gaus,* 363 F.3d at

1290 (phrase "according to the present invention" is definitional), and by disclosing that the

immunoglobulins of "the present invention" could be "readily produced by a variety of

recombinant DNA or other techniques," the patents point away from, not towards, the crabbed

construction that defendant seeks to impose.

      Consistent with the Summary of the Invention's disclosure that the synthesis

could be by a variety of techniques, the Detailed Description of the Invention also discloses

synthesizing by a variety of techniques:

> The nucleic acid sequences of the present invention capable of
> ultimately expressing the desired humanized antibodies can be
> formed from a variety of different polynucleotides (genomic or
> cDNA, RNA, synthetic oligonucleotides, etc.) and components
> (e.g., V, J, D, and C regions, **as well as by a variety of different
> techniques**. Joining appropriate synthetic and genomic sequences
> is presently the most common method of production, but cDNA
> sequences may also be utilized (see, European Pat. Publication No.
> 0239400 and L. Reichmann et al., Nature, 332, 323-327 (1988),
> both of which are incorporated herein by reference).

'762 Patent, Col. 17:50-61.   In fact, the Detailed Description of the Invention goes on to

describe synthesizing, by the inventors, using a variety of techniques:   producing DNA

segments, in this case oligonucleotides, by chemically joining individual nucleotides on a

machine, *id.* at Col. 52:5-13; producing DNA encoding the variable region by joining DNA

segments, *id.* at Col. 39:59 – Col. 40:1-2; producing one strand of DNA from another strand of

DNA, using an enzyme, Klenow polymerase, which joins individual nucleotide bases together to form a polynucleotide, *id.* at Col. 59:61-64; and producing DNA from RNA, using an enzyme, reverse transcriptase, which joins individual nucleotide bases together to form a polynucleotide, *id.* at Col. 5:44-47.

In like fashion, the prior art that the patents incorporated discloses synthesizing by a variety of techniques. In European patent application No. 0239400, which the patents incorporate by reference, Dr. Winter reported two methods of producing DNA segments. In Example 1, the nucleotides were derived from automated chemical synthesis, and none of the DNA segment was produced by extending from an oligonucleotide. Strong Decl. Opinion 15 ¶ C(3)(b). In Example 2, the final DNA segment was synthesized in part by automated chemical synthesis and in part by enzymatic extension – as was true of Riechmann, which the patents also incorporate by reference. Strong Decl. Opinion 15 ¶¶ C(3)(b)-(c).

Defendant seeks through legal alchemy to transform "synthesizing a [the] DNA segment encoding the humanized heavy [light] chain variable region" into "producing the entirety of a DNA segment encoding a humanized heavy [light] chain variable region by synthesizing de novo, annealing, and extending oligonucleotides." The patents do not support that effort.

## V.    CONCLUSION

The patents-in-suit expressly define many of the claim terms at issue in this case, including, importantly, "humanized immunoglobulin" and "CDR." Under the case law, those express definitions govern. Defendant, instead, would have this Court ignore them. Even when the patents-in-suit do not expressly define them (and even when they do), the plain language of the claims, other portions of the specification, and the file history provide clear signals for those traveling the claim construction path. Defendant would also have the Court ignore those clear signals and forge a path towards legal error, untethered to the claim construction law or the intrinsic evidence. The Court should decline that invitation.

PDL respectfully asks that the Court confirm its claim constructions.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Karen Jacobs Louden*
Jack B. Blumenfeld (# 1014)
Karen Jacobs Louden (# 2881)
1201 North Market Street
P.O. Box 1347
Wilmington, DE   19899-1347
(302) 658-9200
klouden@mnat.com

*Attorneys for Plaintiff PDL BioPharma, Inc.*

*Of Counsel:*

Matthew D. Powers
Vernon M. Winters
Weil, Gotshal & Manges LLP
Silicon Valley Office
201 Redwood Shores Parkway
Redwood Shores, CA 94065
650-802-3000

Jennifer H. Wu
Rebecca E. Fett
Weil, Gotshal & Manges LLP
New York Office
767 Fifth Avenue
New York, NY 10153
(212)310-8000

May 14, 2008

2328745.1

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, hereby certify that on May 14, 2008, I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

Josy W. Ingersoll

I also certify that copies were caused to be served on May 14, 2008, upon the following in the manner indicated:

### <u>BY HAND</u>

Josy W. Ingersoll
Andrew A. Lundgren
Young, Conaway, Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Flr.
Wilmington, DE   19801

### <u>BY EMAIL</u>

Gerald J. Flattmann, Jr.
Christine Willgoos
Gregory A. Morris
Kirkland & Ellis
153 East 53rd Street
New York, NY   10022-4611

*/s/Karen Jacobs Louden*

_____

Karen Jacobs Louden (#2881)