IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PDL BIOPHARMA, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 07-156-JJF |
| | ) | |
| ALEXION PHARMACEUTICALS, INC. | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT ALEXION PHARMACEUTICALS INC.'S
## RESPONSIVE CLAIM CONSTRUCTION BRIEF

Josy W. Ingersoll (No. 1088)
John W. Shaw (No. 3362)
Andrew A. Lundgren (No. 4429)
YOUNG, CONAWAY, STARGATT & TAYLOR LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600
alundgren@ycst.com

*Attorneys for Defendant*

OF COUNSEL:

John M. Desmarais
Gerald J. Flattmann, Jr.
Christine Willgoos
KIRKLAND & ELLIS LLP
153 East 53rd Street
New York, New York 10022
(212) 446-4800

Dated: June 11, 2008

## TABLE OF CONTENTS

Page

NATURE AND STAGE OF THE PROCEEDINGS .................................................1

SUMMARY OF THE ARGUMENT .....................................................................1

ARGUMENT.......................................................................................................2

I.    Alexion's Constructions Of The Terms "CDR" And "Hypervariable Region" Are The Same Definitions PDL Has Used For The Past 16 Years...........................2

    A.    PDL's Proposed Construction Of "CDR" Seeks To Reclaim What Was Expressly Disclaimed During Prosecution .......................................2

    B.    "CDR" And "Hypervariable" Should Be Construed As Interchangeable Terms Meaning Kabat Plus Chothia Regions.......................................10

II.   Construction Of The "Framework" Claim Terms Is Driven By The Definition Of "CDR".........................................................................................................12

III.  The Claimed "Humanized Immunoglobulins" Require At Least One Framework Substitution .................................................................................................12

    A.    PDL's Construction Of "Humanized Immunoglobulin" Rests On An Incorrect Theory of Law..........................................................12

    B.    The Specification Of The Patents-In-Suit Supports Framework Substitutions As An Essential Element Of PDL's Claimed Humanized Immunoglobulins ...................................................................16

        1.    The Totality Of The Specification Teaches That The Claimed Humanized Immunoglobulins Must Have Framework Substitutions........16

        2.    PDL's Claim Differentiation Argument is Flawed....................20

    C.    PDL Disclaimed Humanized Immunoglobulins That Do Not Have A Framework Substitution............................................................22

    D.    Those Of Skill In The Art Would Understand That Framework Substitutions Are An Essential Part Of PDL's Humanized Immunoglobulins ...................................................................25

IV.   "Donor Immunoglobulin" and "Human Acceptor Immunoglobulin" ..............27

V.    "Humanized Immunoglobulin Heavy Chain Variable Region Framework" And "Humanized Immunoglobulin Light Chain Variable Region Framework".......27

VI.   Alexion's Constructions Of The "DNA Segment Encoding . . ." Terms Are Supported By PDL's And Dr. Strong's Own Statements.................................28

VII.  Alexion's Construction Of The "Synthesizing A DNA Segment Encoding…" Terms Is Supported By PDL's Disclosure.......................................................30

VIII. The Claim Term "Is At Least 65% Identical …" Does Not Need Construction ..............32

IX.   CONCLUSION................................................................................................33

i

# TABLE OF AUTHORITIES

Page

**Cases**

*Alloc, Inc. v. Int'l Trade Comm'n,*
    342 F.3d 1361 (Fed. Cir. 2003)..................................................................... 4, 16

*Andersen Corp. v. Fiber Composites, LLC,*
    474 F.3d 1361 (Fed. Cir. 2007)................................................................... 15, 21

*ATD Corp. v. Lydall, Inc.,*
    159 F.3d 534 (Fed. Cir. 1998)..................................................................... 13, 14

*CCS Fitness, Inc. v. Brunswick Corp.,*
    288 F.3d 1359 (Fed. Cir. 2002)......................................................................... 15

*Computer Docking Station Corp. v. Dell, Inc.,*
    519 F.3d 1366 (Fed. Cir. 2008)............................................................ 13, 19, 22, 25

*Gaus v. Conair Corp.,*
    363 F.3d 1284 (Fed. Cir. 2004)......................................................................... 17

*Graham v. John Deere Co.,*
    383 U.S. 1 (1966)............................................................................................ 5

*Hill-Rom Co., Inc. v. Kinetic Concepts, Inc.,*
    209 F.3d 1337 (Fed. Cir. 2000)......................................................................... 17

*Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.,*
    222 F.3d 951 (Fed. Cir. 2000)........................................................................... 25

*Intamin, Ltd. v. Magnetar Techs., Corp.,*
    483 F.3d 1328 (Fed. Cir. 2007)......................................................................... 31

*Liposome Co., Inc. v. Vestar, Inc.,*
    Civ. A. No. 92-332-RRM, 1994 WL 738952 (D. Del. Dec. 20, 1994) ............................. 4

*Lucent Techs., Inc. v. Gateway, Inc.,*
    ---F.3d ---, 2008 WL 1970225 (Fed. Cir. May 8, 2008) .................................................. 17

*Microsoft Corp. v. Multi-Tech Sys., Inc.,*
    357 F.3d 1340 (Fed. Cir. 2004), *cert. denied,* 125 S. Ct. 61 (2004) ................................. 17

*Multiform Desiccants, Inc. v. Medzam, Ltd.,*
    133 F.3d 1473 (Fed. Cir. 1998)......................................................................... 21

*Pharmacia & Upjohn Co. v. Mylan Pharmaceuticals, Inc.,*
    170 F.3d 1373 (Fed. Cir. 1999)......................................................................... 16

## TABLE OF AUTHORITIES
### (continued)

Page

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)..................................................................... passim

*Rheox, Inc. v. Entact, Inc.*,
    276 F.3d 1319 (Fed. Cir. 2002)..................................................................... 6, 15

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
    242 F.3d 1337 (Fed. Cir. 2001)..................................................................... 19, 22

*Sentry Protection Products, Inc. v. Eagle Mfg. Co.*,
    400 F.3d 910 (Fed. Cir. 2005)....................................................................... 15

*Sinorgchem Co., Shandong v. Int'l Trade Comm'n*,
    511 F.3d 1132 (Fed. Cir. 2007)..................................................................... 16

*Southwall Techs., Inc. v. Cardinal IG Co.*,
    54 F.3d 1570 (Fed. Cir. 1995)....................................................................... 8

*Sunrace Roots Enterprise Co., Ltd. v. SRAM Corp.*,
    336 F.3d 1298 (Fed. Cir. 2003)..................................................................... 20

*Wang Labs., Inc. v. Am. Online, Inc.*,
    197 F.3d 1377 (Fed. Cir. 1999)..................................................................... 7, 19

**Other Authorities**

Robert C. Kahrl, *Patent Claim Construction* 6-62 (Aspen Publishers 2007)............................... 15

## NATURE AND STAGE OF THE PROCEEDINGS

This suit arises out of PDL Biopharma, Inc.'s ("PDL") Complaint against Alexion Pharmaceuticals, Inc. ("Alexion"), filed March 16, 2007, alleging infringement of U.S. Patents Nos. 5,693,761 ("the '761 patent"); 5,693,762 ("the '762 patent"); and 6,180,370 ("the '370 patent"). D.I. 1. Alexion filed counterclaims of invalidity, non-infringement, and unenforceability of the patents-in-suit. D.I. 11, 14.

On March 10, 2008, PDL filed a motion to dismiss Alexion's counterclaim of invalidity with respect to certain claims of the patents-in-suit. D.I. 67. Alexion opposed PDL's motion and the Court heard oral argument on April 11, 2008. The Court has not yet decided PDL's motion. On May 6, 2008, PDL notified Alexion that it intends to provide Alexion with a unilateral covenant not to sue Alexion regarding certain claims, and that, in PDL's view, the covenant moots Alexion's counterclaim and PDL's motion to dismiss. PDL has not yet filed any covenant.

The parties mutually filed and exchanged opening claim construction briefs on May 14, 2007. This is Alexion's responsive brief in support of its proposed claim constructions.

## SUMMARY OF THE ARGUMENT

Two primary disagreements drive the dispute between Alexion and PDL regarding the scope of PDL's invention – the construction of the claim terms "CDR" and "humanized immunoglobulin." Only Alexion's proposed constructions reflect the true scope of the claims within the context of PDL's unequivocal statements regarding the *criticality* of certain claim features vis-à-vis the prior art. In contrast, PDL seeks constructions that broaden the scope of its claims beyond the patents' disclosure and contradict PDL's explicit admissions distinguishing its invention from the prior art.

The claim term "CDR" is properly defined as "Kabat plus Chothia CDRs" – a definition that PDL adopted at least *16 years ago*, but is now trying to disclaim. PDL's about face comes too late. PDL has repeatedly represented to the Patent Office, the public, the EPO, and Alexion that "CDR" as defined in the patents means a CDR as defined by Kabat together with a CDR as defined by Chothia. PDL is not now entitled to a different definition of that claim term.

Similarly, in its specification and during prosecution, PDL continuously and repeatedly described framework substitutions as *essential* and *critical* to its claimed "humanized immunoglobulins." PDL now seeks to broaden the scope of its invention by ignoring these statements. But PDL's characterization of its invention as *requiring* framework substitutions was made to overcome the prior art. PDL argues that Alexion seeks to improperly import limitations into the patent claims. To the contrary, PDL's current constructions broaden the scope of the claimed humanized immunoglobulins and read its claims directly onto the prior art it so clearly attempted to avoid during prosecution.

Indeed, *PDL's explicit admissions* – made to the Patent Office during prosecution of the patents-in-suit – *compel the claim constructions Alexion proposes*. Accordingly, Alexion requests that the Court adopt its constructions of the disputed claim terms.

## ARGUMENT

I.    **Alexion's Constructions Of The Terms "CDR" And "Hypervariable Region" Are The Same Definitions PDL Has Used For The Past 16 Years**

A.    **PDL's Proposed Construction Of "CDR" Seeks To Reclaim What Was Expressly Disclaimed During Prosecution**

Alexion's proposed construction of the claim term "CDR" – "a hypervariable region as defined by Kabat together with a hypervariable region as defined by Chothia" – is the same definition of the term that PDL provided to the Patent Office during prosecution in order to

2

get over the prior art Riechmann reference. Def. Br. at 16-18.[1] PDL now attempts to revert to a different definition, a "Kabat CDR," in an attempt to reclaim a scope of the invention that it disclaimed during prosecution. Ptf. Br. at 25.[2] PDL's reason for doing so is transparent – during prosecution and opposition of the European counterparts to the patents-in-suit, PDL also defined "CDR" as "Kabat plus Chothia" and its patents were partially revoked on that basis. Ex. 11[3] at 375-76; Clark Decl. at ¶¶ 36-40; Foote Decl. at ¶ 37.[4] Seeking to avoid the same result here, PDL reverses course. But PDL's express disclaimers to the Patent Office, its incorporation of the European proceedings as part of the U.S. prosecution, and its use of the "Kabat plus Chothia" definition to get over the prior art, all compel adoption of the "Kabat plus Chothia" definition of "CDR." Def. Br. at 14-21.

PDL argues that its patents' specification sets forth a clear definition of CDR as a "Kabat CDR." Ptf. Br. at 26. That is not so. The specification of the patents-in-suit sets forth competing definitions of the term "CDR," and ultimately adopts the definition of CDR as that of Kabat together with that of Chothia:

> The chains all exhibit the same general structure of relatively
> conserved framework regions joined by three hypervariable

---

[1] As used herein, "Def. Br." refers to Alexion Pharmaceuticals, Inc.'s Opening Brief In Support Of Its Proposed Claim Constructions. D.I. 96.

[2] As used herein, "Ptf. Br." refers to Opening Claim Construction Brief PDL Biopharma, Inc. D.I. 93.

[3] As used herein, "Ex. __" refers to Exhibits in support of Alexion's claim construction briefs. Exs. 1-23 were submitted in support of Alexion's Opening Claim Construction Brief (D.I. 96), and Exs. 24-27 are submitted herewith.

[4] As used herein, "Clark Decl." and "Foote Decl." refer to the respective declarations of Dr. Michael R. Clark and Dr. Jefferson Foote, filed in support of Alexion's brief. *See* D.I. 103, 104.

> regions, also called Complementarity Determining Regions or
> CDR's (see, 'Sequences of Proteins of Immunological Interest,'
> Kabat, E. et al., US Department of Health and Human Services,
> (1983); *and* Chothia and Lesk, *J. Mol. Biol*., 196, 901-917 (1987),
> which are incorporated herein by reference).

Ex. 5 at Col. 23:8-15 (emphasis added). *See also* Clark Decl. at ¶ 30; Foote Decl. at ¶¶ 31-34.

This *identical* paragraph was present in the European counterpart application,[5] and PDL

represented to the European Patent Office ("EPO") that it supported the "Kabat plus Chothia"

definition of CDR. PDL stated:

> [I]t is not correct to ignore how skilled persons would actually
> understand the teachings of the patent, or to construe the word
> 'and' to mean the quite different word 'or' ... *[I]t is not legally*
> *appropriate to ignore* the passage which equates hypervariable
> regions and CDRs, or *the simple fact that hypervariable regions*
> *(and hence CDRs) cannot be interpreted without including a*
> *structurally-based approach (Chothia)."*

Ex. 11 at 376 (emphasis added). Thus, beyond simply asserting that the above passage

*supported* a Kabat plus Chothia definition of CDR, PDL stated that the passage *compelled* such a

definition and that it was "not legally appropriate" for the EPO to ignore that Chothia was part of

PDL's "CDR" definition.[6]

---

5    PDL represented to that Patent Office that the '975 parent application of the patents-in-suit
     contained the same paragraph as the European specification. Ex. 11 at 13. PDL also
     incorporated the European proceedings into its U.S. file histories. Ex. 12 at 14. *See also*
     Def. Br. at 16; Foote Decl. at ¶ 38.

6    PDL cannot ignore its express admissions that the patent specification compels the
     construction of "CDR" as including Chothia hypervariable regions. *See, e.g., Liposome Co.,*
     *Inc. v. Vestar, Inc.*, Civ. A. No. 92-332-RRM, 1994 WL 738952, at *14 (D. Del. Dec. 20,
     1994) (patentee's statements before the European Patent Office are relevant evidence of how
     one of skill in the art would understand the claim terms and how patentee understood the
     claims outside the litigation); *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1371 (Fed.
     Cir. 2003) (interpreting claim consistent with the international search report of the related
     PCT application).

Moreover, although PDL purports to rely on the disclosure of the patents to support its "Kabat only" definition of CDR, its own expert, Dr. Ronald Strong, states that the patent claims set forth contradictory definitions of "CDR" and "do not resolve the Kabat/Chothia issue with respect to 'CDR'." *See* Strong Decl. at 43-45.[7] Thus, one of skill would rely on PDL's representations to the Patent Office to understand the meaning of the claim term. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) *(en banc) quoting Graham v. John Deere Co.*, 383 U.S. 1, 33 (1966) ("[A]n invention is construed not only in light of the claims, but also with reference to the file wrapper or prosecution history in the Patent Office.").

PDL also attempts to rely on the prior art in support of its proposed construction of "CDR" as Kabat only. To the extent, however, that those prior art references use a Kabat definition of CDR, it is a definition that is explicitly set forth in the references themselves. Thus, contrary to PDL's arguments, ***the patents*** do not use the Kabat definition to describe the references, rather, ***the references*** themselves define their own use of the term "CDR."[8] As PDL's and Alexion's experts agree, such a definition is necessary, as there is no one accepted definition of the term "CDR" used in the art. *See* Strong Decl. at 43-44, Clark Decl. ¶ 21. Even if, however, PDL's patents did set forth the Kabat definition it urges,[9] PDL disclaimed that

---

[7]  As used herein, "Strong Decl." refers to the declaration of Dr. Ronald Strong submitted in support of PDL's opening brief. D.I. 95.

[8]  PDL similarly argues that its use of Kabat numbering supports it definition of CDR as Kabat only. Ptf. Br. at 28. Even if true, the argument is unavailing. Kabat numbering is simply a method used to number amino acid sequences, and does not alone determine the definition of a CDR. Indeed, Chothia defined hypervariable regions that are different from Kabat CDRs, but used Kabat numbering to do so. *See* Ex. 10 at 902 ("In this paper we use the residue numbering of Kabat *et al.* (1983).").

[9]  PDL argues that its patents' specification clearly sets forth a definition of "CDR" as a Kabat CDR. If, however, PDL's definition of "CDR" is limited to Kabat, then many of the claims

(Continued...)

definition during prosecution in arguing over the prior art.  This disclaimer trumps any contrary

definition PDL purportedly set forth in the specification.  *See Rheox, Inc. v. Entact, Inc.*, 276

F.3d 1319, 1327 (Fed. Cir. 2002) (emphasis added) ("Reading the written description alone, [the

patentee's argument that the written description of the patent, which defines the claim term

'calcium orthophosphate' as TSP, precludes a finding that TSP was disclaimed] might be

effective, ***but in light of the prosecution history, which was generated after the written***

***description was drafted, it is apparent that Rheox relinquished any coverage of TSP***").

        Another clear illustration of PDL's disclaimer of the Kabat definition of CDR is

set forth in the November 1992 declaration of inventor and PDL founder Cary Queen, submitted

during prosecution of the '101, '761, and '762 patents.  *See* Ex. 7.  This Queen Declaration

distinguished PDL's invention of the patents-in-suit, which Queen refers to as the "third method

of humanizing antibodies," from (1) the "first method of humanizing antibodies", *i.e.*, the "CDR-

only" grafting method of Winter, Jones, and Verhoeyen; and (2) the "second method of

humanizing antibodies," *i.e.*, the method of Riechmann.  Queen described the first method of

humanization as "*precisely transfer the CDRs, as defined by Kabat, from a mouse antibody to a*

*pre-determined human framework.*"  Ex. 7 at ¶ 6 (emphasis in original).  Queen described the

second (Riechmann) method of humanization as "*transfer the Kabat CDRs plus the one Chothia*

*CDR that contains extra amino acids (H1) to a pre-determined human framework.*"  Ex. 7 at ¶ 9

(emphasis in original).  Queen represented to the Patent Office that Riechmann had no

***framework*** substitutions, because "the final humanized antibody of Riechamnn et al. contains the

---

of its patents would be invalid for introducing new matter due to PDL's subsequent use of the
term "Kabat and Chothia CDR."  *See, e.g.,* Ex. 4 at Claim 10.  This addition of "new matter"
was the reason for partial revocation of PDL's European counterparts to the patents-in-suit.
*See* Ex. 8.

Kabat CDRs and the Chothia CDR H1 from the mouse antibody, but no other mouse amino acids." Ex. 7 at ¶ 9. Thus, Queen defined Riechmann's method as transfer of Kabat plus Chothia **CDRs**, and defined his own invention (the "third method" of humanization) as containing framework substitutions *outside* of the Kabat and Chothia CDRs. Ex. 7 at ¶¶ 9, 11.

For example, Queen states that subsequent to his publication of the disclosure of PDL's invention, researchers followed PDL's "third method" and "transfer[red] framework amino acids that can contact the CDRs (*and are outside Chothia CDR H1*)." Ex. 7 at ¶ 11. Moreover, PDL distinguished its "third method" from the "second method" of Riechmann:

> In fact, as stated above, just one humanized antibody has been found to retain high binding affinity when only the Kabat CDRs (containing the Chothia CDRs) and Chothia CDR H1 were transferred to a pre-determined human framework (Riechmann et al.). In all other cases [following PDL's 'third method'], either a homologous human framework was used, or *additional mouse amino acids not contained in either the Kabat or Chothia CDRs were transferred to the humanized antibody*.

Ex. 7 at ¶ 23 (emphasis added).

By now attempting to define a scope of its claims that is contingent on the Kabat-only definition of CDR, PDL ensnares the prior art. Indeed, PDL broadly argues in its opening brief that the method of its patents-in-suit is "transfer [of the] Kabat CDRs." Ptf. Br. at 30. In contrast, the patent prosecution describes Kabat-only CDR-grafting as the first method of humanization that was already in the prior art. Ex. 7 at ¶ 6. Thus, PDL's Kabat-only definition of CDR reads its patents not only onto Riechmann, the "second method of humanizing antibodies," but also onto Winter, Jones, and Verhoeyen, "the first method of humanizing antibodies." PDL is simply not entitled to this broad construction. *See Wang Labs., Inc. v. Am. Online, Inc.*, 197 F.3d 1377 (Fed. Cir. 1999) ("[C]laims are not properly construed to have a

meaning or scope that would lead to their invalidity for failure to satisfy the requirements of patentability.")

Incredibly, PDL relies on the definition in the prior art Riechmann article to support its interpretation of "CDR" as Kabat only. In its opening brief, PDL states: "[I]f 'CDR' is defined as the aggregate of the Kabat and Chothia methods, the amino acid substitutions that Riechmann et al. made were not in the framework -- they were in the CDR." Ptf. Br. at 28; Strong Decl. at 40. But, as described above, PDL used this very same argument in the Patent Office to *distinguish its invention* from Riechmann's "second method" of humanization. Indeed, PDL and inventor Queen represented to the Patent Office that, unlike Riechmann, PDL's invention had framework substitutions *outside of the "Kabat plus Chothia" CDR*:

> The position 27 and 30 modifications of Riechmann et al. were in fact <u>within</u> the Chothia-Lesk H1 CDR, rather than outside this CDR. Moreover, Riechmann et al. provided no suggestion or guidance as to which if any non-CDR positions to substitute, or which amino acids should be put in those positions (<u>see</u> paragraph 26 of accompanying Queen declaration).

Ex. 13 at 17 (emphasis in original). Thus, PDL's contradictory arguments to the Patent Office and to this Court are clear – PDL represented to the Patent Office that the Riechmann framework substitutions were "non-CDR" substitutions because they were "in fact <u>within</u> the Chothia-Lesk H1 CDR, rather than outside this CDR" but now represents to this Court that "the amino acid substitutions that Riechmann et al. made were in the frameworks," *i.e.*, outside the CDR.

PDL disclaimed the Kabat-only definition of CDR in order to obtain allowance of the patent claims over Riechmann. Its admissions to the Patent Office and disclaimers over the prior art, therefore, compel that "CDR" be defined as "Kabat plus Chothia." *See Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995) ("Claims may not be

construed one way in order to obtain their allowance and in a different way against accused infringers.").

Moreover, PDL admitted *in this litigation* that "CDR" means Kabat plus Chothia. On December 28, 2007, PDL provided to Alexion an infringement chart "for purposes of identifying claims that Alexion may wish to construe." That infringement chart, attached hereto as Exhibit 24, states, – at least 24 times – that Alexion's antibody contains "82 amino acids in each framework region and 59 common amino acids." In determining how many amino acids were in the framework, PDL included amino acids that were *outside* of the CDR H1 as defined by both Kabat and Chothia. Ex. 24 at 4, 5, 16, 17, 19, 20, 21, 29, 30, 39, 40, 43, 46, 48, 49, 53, 57, 62, 63, 64, 65, 66, 68, and 69. Notably, the claims set forth in PDL's December 28, 2007 infringement chart were not the allegedly "unasserted" claims, but the very "homology" claims that PDL has identified in its interrogatory responses and directly accuses Alexion of infringing. After espousing a "Kabat plus Chothia" definition of CDR since at least 1992, on March 10, 2008, PDL set forth a definition of CDR that encompassed a Kabat-only definition.[10] Ex. 25.

It was not until over *16 years* after PDL's initial representation to the Patent Office, *8 years* after PDL's representations to the EPO, and *one year* after it filed this litigation that PDL reversed position and decided that "CDR" meant a Kabat-only CDR instead of a Kabat plus Chothia CDR. PDL has represented to the Patent Office, the public, the EPO, and Alexion

---

[10]  In contrast to its earlier representations to Alexion that Alexion's antibody had only 82 framework residues, PDL alleged for the first time on March 10, 2008 that Alexion's antibody contained 87 framework residues. This shift in position is a result of PDL's about face in its definition of CDR. Under a "Kabat only" definition of CDR, Alexion's antibody will contain 87 framework residues. In contrast, under a "Kabat plus Chothia" definition of "CDR," Alexion's antibody will contain only 82 framework amino acids. Thus, PDL's earlier representation that Alexion's antibody contained only 82 framework residues set forth PDL's reliance on a "Kabat plus Chothia" definition of the claim term "CDR."

that "CDR" as defined in the patent means a CDR as defined by Kabat together with a CDR as defined by Chothia. PDL is not now entitled to a different definition of that claim term.

**B.    "CDR" And "Hypervariable" Should Be Construed As Interchangeable Terms Meaning Kabat Plus Chothia Regions**

PDL does not set forth a proposed definition of the claim term "hypervariable region," and instead argues that the Court should not construe the claim term because PDL allegedly has not "asserted" any claim containing the term against Alexion. Despite PDL's argument, the claim term "hypervariable region" should be construed because it is at issue here – it is part of Alexion's counterclaim of invalidity against the patents-in-suit. Indeed, the claim term appears in at least Claims 3, 4, 9 and 10 of the '370 patent (Ex. 6), each of which Alexion has counterclaimed is invalid.

As set forth in Alexion's opening brief, the terms "CDR" and "hypervariable region" are interchangeable – as explicitly set forth in the patent specification and the prosecution history. Def. Br. at 33-34. For example, the specification states that "[a]n immunoglobulin light or heavy chain variable region consists of a 'framework' region interrupted by three *hypervariable regions, also called CDR's*." Ex. 5 at Col. 11:35-37 (emphasis added). Similarly, the prosecution histories of the patents-in-suit define "hypervariable regions" as "an alternate term for complementarity determining regions (CDRs)." Ex. 14 at Glossary p. 2.

The prosecution history regarding the claim term "hypervariable region" further supports the construction of the claim term "CDR" as "Kabat plus Chothia." For example, the Queen declaration submitted during the prosecution of the '761 and '762 patents-in-suit stated:

> The hypervariable regions or CDRs were originally defined by Kabat et al., based on extent of sequence variability ... More recently Chothia et al. have given an alternate definition of the hypervariable regions or CDRs.

10

Ex. 7 at ¶ 5. *See also* Foote Decl. at ¶ 67.

PDL similarly defined CDRs and hypervariable regions by reference to both Kabat and Chothia hypervariable regions during the prosecution of the '370 patent. For example, PDL stated:

> Support for *replacing the phrase 'Kabat and Chothia CDRs' with 'hypervariable regions'* in [certain pending claims] is provided, for example, by the statement [in the specification]: 'The chains all exhibit the same general structure of relatively conserved framework regions joined by three *hypervariable regions, also called Complementarity Determining Regions or CDR's* (see, 'Sequence of Proteins of Immunological Interest,' Kabat E., et al., U.S. Department of Health and Human Services, (1983); and Chothia and Lesk, J. Mol. Biol., 196, 901-917 (1987), which are incorporated herein by reference).

Ex. 22 at 14 (emphasis added). Moreover, PDL specifically defined hypervariable regions: "Hence *hypervariable regions encompass both the Kabat CDRs and Chothia CDRs* so, e.g., an amino acid outside the hypervariable regions is outside both Kabat and Chothia CDRs." Ex. 22 at 14 (emphasis added). *See also* Clark Decl. at ¶ 71; Foote Decl. at ¶ 67.

PDL seeks to avoid a construction of the term "hypervariable region" because it prefers to ignore the clear definition of "hypervariable region" as a Kabat plus Chothia CDR, and the explicit and repeated definitions of "hypervariable region" and "CDR" as interchangeable. The specification and file histories, however, are clear. "Hypervariable region" encompasses both Kabat plus Chothia hypervariable regions, and is interchangeable with "CDR."

Accordingly, the Court should construe the terms "CDR" and "hypervariable region" as interchangeable terms meaning "a hypervariable region as defined by Kabat together with a hypervariable region as defined by Chothia."

## II.    Construction Of The "Framework" Claim Terms Is Driven By The Definition Of "CDR"

As set forth in Alexion's opening brief, the phrase "framework" as used in the field of antibodies, means "those portions of the variable region of an immunoglobulin that are not a CDR." Def. Br. at 21-22. PDL agrees that the term "framework" encompasses regions of the variable region that are not CDRs. Ptf. Br. at 25. Thus, the parties' dispute over the term "CDR" drives the definition of the interchangeable terms "framework," "framework region," and "variable region frameworks;" as well as the definitions of the interchangeable claim terms "heavy and light chain variable region frameworks" and "heavy and light chain frameworks."

As set forth above, the Court should construe the claim term "CDR" to mean "a hypervariable region as defined by Kabat together with a hypervariable region as defined by Chothia." Accordingly, the Court should construe "framework" to mean "those portions of the variable region of an immunoglobulin that are not a CDR" wherein CDR is defined as Kabat plus Chothia. Similarly, the Court should construe "heavy and light chain variable region framework" to mean "those portions of the heavy chain and light chain variable regions of an immunoglobulin that are not a CDR" wherein CDR is defined as Kabat plus Chothia.

## III.    The Claimed "Humanized Immunoglobulins" Require At Least One Framework Substitution

### A.    PDL's Construction Of "Humanized Immunoglobulin" Rests On An Incorrect Theory of Law

PDL argues that its definition of "humanized immunoglobulin" contained in the specification is "conclusive as a matter of law." Ptf. Br. at 12. PDL is wrong. Claim construction must be decided on the totality of the intrinsic evidence, including the disclosure of the entire specification and disclaimers made in the file history. *See Phillips,* 415 F.3d at 1314 (internal citation omitted) ("[T]he court looks to ...the words of the claims themselves, the

remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art."). *See also Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1373-74 (Fed. Cir. 2008) *citing Phillips,* 415 F.3d at 1313 (emphasis added) ("Claim terms are generally given their ordinary and customary meaning, which is 'the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention' . . . However, the person of ordinary skill is deemed to read the claims in the context of the *entire patent*, including the specification and file history.").

PDL's argument that a definition in the specification trumps all else ignores case law demonstrating that the full disclosure of the specification may narrow definitions set forth in the specification. Indeed, "[t]he specification may show that 'the patentee has disclaimed subject matter or has otherwise limited the scope of the claims' . . . For example, repeated and definitive remarks in the written description could restrict a claim limitation to a particular structure." *See Computer Docking Station*, 519 F.3d at 1374 (internal citations omitted).

For example, claims may be construed to acquire a feature that the specification *explicitly or implicitly* teaches as being essential to the invention. *See ATD Corp. v. Lydall, Inc.*, 159 F.3d 534 (Fed. Cir. 1998). In *ATD,* the invention was directed to a flexible insulating pad having "a plurality of embossments." *Id.* at 540. Consistent with the ordinary meaning of the term, a particular passage of the specification defined "embossments" as "depressions" and "depressions or bumps." *Id.* at 540. The patentee argued that because the term "embossment" had a clear and defined meaning, there was no need to look elsewhere in the specification to construe the claim term. *Id.*

13

The *ATD* Court, however, construed the claim term "embossment" consistent with the totality of the specification, not just the definition set forth. In doing so, the Court noted that other portions of the specification taught that the embossments make point contact between the adjacent layers of foil. *Id.* In particular, the specification recited that "[i]n a preferred embodiment," the layers were provided in point contact to minimize heat transfer. *Id.* Additionally, another passage in the specification stated that the "embossments" were something more than incidental impressions on the foil layers. *Id.* at 542. The Court held that the patent specification made clear that embossments that make contact with and separate adjacent foil layers were "***essential to the patented invention.***" *Id.* (emphasis added). Accordingly, the court construed "embossments" to mean "depressions or bumps" that possessed the essential feature of making point contact. *Id.*

Here, as in *ATD*, the proper construction of "humanized immunoglobulin" is one that not only embraces the generalized definition of the term set forth in the specification, but also embraces the feature that PDL continuously emphasized as ***essential*** to its invention: framework substitutions.

The prosecution history is also important in construing claims because it demonstrates how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be. *See Phillips,* 415 F.3d at 1317 (internal citation omitted) ("The purpose of consulting the prosecution history in construing a claim is to exclude any interpretation that was disclaimed during prosecution."). Indeed, just as the totality of the specification may inform an explicit definition contained therein, a "disavowal in the prosecution history of claim coverage narrows the scope of a claim ... notwithstanding an explicit definition of a claim term in the

14

specification." Robert C. Kahrl, *Patent Claim Construction* 6-62 (Aspen Publishers 2007); *see also Rheox*, 276 F.3d at 1327.

 For example, in *Rheox*, the Court relied on the prosecution history to narrow the scope of the claim term "calcium orthophosphate" set forth in the specification, because the patentee had disclaimed that scope during prosecution. *Id.* In rendering its decision, the Court explained that it was appropriate to construe the claims based on the disclaimers of the file history:

> [Patentee] also argues that the written description of the '600 patent precludes a finding that TSP was disclaimed, because it indicates that TSP, which is indisputably primarily monocalcium orthophosphate, is defined by the '600 patent as 'calcium orthophosphate.' Reading the written description alone, this argument might be effective, but *in light of the prosecution history, which was generated after the written description was drafted, it is apparent that [patentee] relinquished any coverage* of TSP.

*Id.* (emphasis added).

 Like the patentee in *Rheox*, PDL disclaimed part of the meaning of "humanized immunoglobulin" from the initial definition set forth in the specification. In addition to the contradictory and limiting teachings of the specification itself, PDL disclaimed any construction of "humanized immunoglobulin" that includes CDR-only antibodies by consistently and repeatedly representing to the Patent Office that framework substitutions were *essential* and *critical* to its invention. *See* Def. Br. at 25-28. *See also Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1372 (Fed. Cir. 2007) (emphasis added) (where the patentees use "language of *requirement*, not preference" to limit the scope of the invention, they cannot later claim that such limitation is optional and refers only to a preferred embodiment); *Sentry Protection Products, Inc. v. Eagle Mfg. Co.*, 400 F.3d 910, 915 (Fed. Cir. 2005) *quoting CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366-1367 (Fed. Cir. 2002) ("The prosecution

15

history modifies the scope of a claim term if 'the patentee distinguished that term from prior art on the basis of a particular embodiment, expressly disclaimed subject matter, or described a particular embodiment as important to the invention.'"). [11]

Thus, PDL's attempt to limit the Court's inquiry to the allegedly "conclusive" definition set forth in the patents' specification is unsupportable under applicable case law.[12] Indeed, as set forth in Alexion's opening brief and explained more fully below, the totality of the intrinsic evidence compels a definition of "humanized immunoglobulin" that requires framework substitutions.

**B.     The Specification Of The Patents-In-Suit Supports Framework Substitutions As An Essential Element Of PDL's Claimed Humanized Immunoglobulins**

**1.     The Totality Of The Specification Teaches That The Claimed Humanized Immunoglobulins Must Have Framework Substitutions**

PDL argues that the specification of the patents-in-suit supports its construction of humanized immunoglobulin that may include grafting of only CDRs, without framework substitutions. Ptf. Br. at 14-17. PDL relies on its broad definition of the term as set forth in the

---

[11]  Other cases similarly look to the prosecution history to define the scope of claim terms described in the specification. *See also Alloc*, 342 F.3d 1361(interpreting claims as requiring what the specification and prosecution history disclosed as a key feature of the claimed invention); *Pharmacia & Upjohn Co. v. Mylan Pharmaceuticals, Inc.*, 170 F.3d 1373, 1375 (Fed. Cir. 1999) (where patentee "emphasized the 'criticality'" of a limitation, it clearly and unmistakably surrendered any embodiments that did not contain said limitation.).

[12]  The *Sinorgchem* case relied upon by PDL is inapposite. *See* Ptf. Br. at 16. The Federal Circuit in *Sinorgchem* held that "a definition set forth in the specification governs the meaning of the claims," but only "[w]hen the specification explains and defines a term used in the claims, *without ambiguity or incompleteness…*" *Sinorgchem Co., Shandong v. Int'l Trade Comm'n*, 511 F.3d 1132, 1138 (Fed. Cir. 2007) (emphasis added). In the present case, however, the specification does not define the term "humanized immunoglobulin" without ambiguity or incompleteness. In contrast, the purported definition is contradicted by other portions of the specification. *See infra* Section III.B.1.

16

specification – a definition that is refined and narrowed by the rest of the disclosure of the patents and by the file histories of the patents. Apart from that definition, however, PDL points only to isolated statements in the Abstract and the Summary of the Invention – portions of the patent specification that are, by definition, broad and generalized statements relating to the invention.[13] Ptf. Br. at 14-16.

      The rest of the specification, however, (1) teaches that CDR-only grafted humanized antibodies do not work, even when those antibodies have high homology between the donor and acceptor sequences, and (2) includes framework substitutions in ***each and every*** example of the claimed humanized immunoglobulins set forth. *See* Def. Br. at 23-26. PDL ignores these key disclosures of the specification that clarify the true limits of its claimed invention.

      As set forth in Alexion's opening brief, the patent specification makes clear that framework substitutions were the crux of PDL's purported invention. Def. Br. at 23-26. PDL's specification taught that the prior art humanized antibodies used only the framework of the human acceptor immunoglobulin, without any framework substitutions, and that such CDR-grafted antibodies did not always work. Ex. 5 at Col. 2:10-25; Def. Br. at 24.

---

13   The cases that PDL cites in support of its argument that the claims should be construed based primarily on the Abstract and Summary of the Invention are inapposite. Those cases teach that the Abstract and/or Summary of the Invention must be considered, not in isolation, but in the context of the entirety of the intrinsic evidence. For example, in *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1348 (Fed. Cir. 2004), *cert. denied*, 125 S. Ct. 61 (2004), *Gaus v. Conair Corp.*, 363 F.3d 1284, 1289-90 (Fed. Cir. 2004), and *Hill-Rom Co., Inc. v. Kinetic Concepts, Inc.*, 209 F.3d 1337 (Fed. Cir. 2000), the courts looked to the Summary of the Invention or the Abstract along with the ***remainder of the specification*** to confirm that that the invention only encompassed certain embodiments. Similarly, in *Lucent Techs., Inc. v. Gateway, Inc.*, ---F.3d ---, 2008 WL 1970225, at *4-5 (Fed. Cir. May 8, 2008), the court looked to the Abstract, the Summary of the Invention and the Detailed Description and concluded that the ***entirety of the specification*** supported the Court's construction.

The specification also recognizes that framework substitutions are necessary in order to distinguish the invention from the prior art CDR-only humanized antibodies. PDL's specification taught that *framework substitutions* increased the affinity of the resulting humanized antibody:

> *The present invention includes criteria by which a limited number of amino acids in the framework* of a humanized immunoglobulin chain *are chosen to be the same as the amino acids at those positions in the donor rather than in the acceptor, in order to increase the affinity* of an antibody comprising the humanized immunoglobulin chain.

Ex. 5 at Col. 12:37-43 (emphasis added).

PDL's alleged invention is further supported by the examples of the patent specification, wherein *each functional humanized immunoglobulin produced had*, at a minimum, four *framework substitutions*. Ex. 5 at Examples 1-9. The Examples make clear that the patents only describe and claim functional humanized immunoglobulins that contain framework substitutions. Indeed, the patent explicitly taught that a humanized antibody created by CDR-grafting (without framework substitutions) did not work. *See, e.g.*, Ex. 5 at Col. 43:6-18; Def. Br. at 25. Accordingly, the specification teaches that at least one framework substitution is an *essential* part of the humanized immunoglobulins claimed:

> Because the sequences of the PDL and CDR humanized anti-Tac antibodies differ only at positions where mouse framework residues . . . were used in the PDL molecule, we conclude that *at least one of these mouse framework residues are essential for high affinity binding*.

Ex. 5 at Col. 12:13-17 (emphasis added).

PDL's argument that its invention provides two embodiments – one directed to CDR-only antibodies in a high homology human acceptor framework, and a second directed to framework substitutions – is contradicted by the disclosure of the specification. *See* Ptf. Br. at

18

15-16. The specification teaches only one functional way to produce humanized immunoglobulins – using framework substitutions to preserve high binding affinity. *See, e.g.,* Ex. 5 at Cols. 2:10-15, 12:29-43, 42:54-59, 43:6-18. To the extent that PDL asserts that its other "embodiment" is directed to CDR-only grafted antibodies with high homology, that assertion is directly contradicted by Example 2 of the specification, which demonstrates that a CDR-only grafted antibody with high homology ***did not work***. *See* Def. Br. at 25; Ex. 5 at 42:54-59. Thus, the specification not only does not enable this "embodiment," it ***teaches away*** from any embodiment containing CDR-only grafted antibodies, even those with high homology.

To even arguably enable and thereby preserve the validity of the patent claims, the specification expressly limits the humanized immunoglobulins of the invention to those containing framework substitutions. *See Wang Labs.,* 197 F.3d at 1383 ("[C]laims are not properly construed to have a meaning or scope that would lead to their invalidity for failure to satisfy the requirements of patentability.")

In sum, the totality of the specification teaches that framework substitutions are ***essential*** to overcome prior art difficulties and create functional humanized antibodies. Accordingly, the specification makes clear that the claim term "humanized immunoglobulin" requires at least one framework substitution. *See Computer Docking Station*, 519 F.3d at 1374 (internal citations omitted) ("Repeated and definitive remarks in the written description [may] restrict a claim limitation to a particular structure."); *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001) ("Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without

reference to the specification, might be considered broad enough to encompass the feature in question.").

### 2.    PDL's Claim Differentiation Argument is Flawed

In alleged support of its proposed definition of the claim term "humanized immunoglobulin," PDL attempts to employ claim differentiation to argue that the framework substitutions are required only in certain claims where such a limitation is explicitly set forth in the claim itself. Ptf. at 12-13. PDL's argument fails.

PDL cites to *Sunrace Roots* for the proposition that the presumption of claim differentiation applies when the limitation in dispute is the "only meaningful difference between an independent and dependent claim." *See Sunrace Roots Enterprise Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1303 (Fed. Cir. 2003). That principle, however, does not apply here. There are no dependent claims of the patents-in-suit that do nothing more than add a framework substitution to the limitation. Indeed, each of the dependent claims contains additional limitations not present in the independent claims. Thus, the claims of the patent are distinguishable even when "humanized immunoglobulin" is properly construed to include at least one framework substitution.

For example, PDL cites Claim 32 of the '761 patent in alleged support of its claim differentiation argument. Ptf. Br. at 13. But as is easily seen from even a facial review of the claim, there are several areas of distinction between that claim and the claims from which it depends:

> First and second polynucleotides according to claim 1 or 7 wherein said humanized immunoglobulin heavy chain further comprises an amino acid from the donor immunoglobulin heavy chain framework outside the Kabat and Chothia CDRs that substitutes for the corresponding amino acid in the acceptor immunoglobulin heavy chain framework, ***wherein [1] said amino acid is typical for its position in human immunoglobulin sequences and [2] said***

20

> *corresponding amino acid in the acceptor immunoglobulin is*
> *rare for its position in human immunoglobulin sequences.*

Ex. 4 ('761 patent) at Claim 32. Thus, in contrast to PDL's argument that "framework

substitution" is the only differentiating factor between the dependent and independent claims, the

example to which PDL cites limits the *nature and type* of the framework substitution, not just

the existence of one. Claim 32 of the '761 patent sets forth specific rules for when a particular

framework substitution may be made, *i.e.*, (1) when the framework amino acid being substituted

is "typical" for its position in a human immunoglobulin sequence, but (2) the corresponding

human framework amino acid is "rare" in a human framework sequence.[14]

      Moreover, "[t]he doctrine of claim differentiation can not broaden claims beyond

their correct scope, determined in light of the specification and the prosecution history and any

relevant extrinsic evidence . . . [C]laims that are written in different words may ultimately cover

substantially the same subject matter." *See Andersen*, 474 F.3d at 1370 *citing Multiform*

*Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1480 (Fed. Cir. 1998). As set forth above in

Section III.B, the specification does not support a scope of the claims that includes humanized

immunoglobulins that do not have framework substitutions. Instead, it describes framework

substitutions as *critical* to a functional humanized antibody. *See also* Def. Br. at 23-26.

Similarly, as set forth below in Section III.C, the file histories specifically disclaim any such

construction by repeatedly emphasizing that framework substitutions are *essential* to PDL's

---

[14]  Similarly, each and every dependent claim, even the most narrowly defined dependent
    claims, requires additional limitations beyond the simple addition of a framework
    substitution. *See, e.g.*, Ex. 4 at Claim 28 (requiring the substituted donor amino acids to be
    "(I) [] adjacent to a CDR in the donor immunoglobulin sequence, or (II) contain[] an atom
    within a distance of 6 Å of a CDR..."), Claim 31 (same), and Claims 29 and 30 (each
    requiring the donor amino acids to be within a certain distance of a CDR).

invention. *See also* Def. Br. at 26-29. PDL may not use claim differentiation in an attempt to broaden the scope of its invention.

Thus, the principle of claim differentiation does not support PDL's proposed construction. Rather, the totality of the specification and file histories compels the construction of "humanized immunoglobulin" as having at least one framework substitution. *See Computer Docking Station*, 519 F.3d at 1374; *SciMed*, 242 F.3d at 1341.

### C. PDL Disclaimed Humanized Immunoglobulins That Do Not Have A Framework Substitution

In addition to the disclosure of the specification, PDL repeatedly and consistently argued that framework substitutions were ***critical*** and ***essential*** to its invention in order to get over the prior art references, including Winter and Riechmann. *See* Def. Br. at 26-29. PDL now seeks to regain what it explicitly disclaimed during prosecution of the patents-in-suit.

For example, PDL emphasized the criticality of framework substitutions to its invention: "Applicants here have defined ***essential structural rules*** . . . for the method of Winter to be used successfully by one of ordinary skill in the art to construct a functional human-like immunoglobulin to the human IL-2 receptor." Ex. 18 at 17 (emphasis added). *See also* Clark Decl. at ¶ 52; Foote Decl. at ¶ 50. PDL made these same statements repeatedly and consistently throughout the prosecution of all three patents-in-suit:

- PDL argued over the prior art by stating that framework substitutions ***must*** be introduced to produce a functional humanized immunoglobulin:

    > The teachings of Riechmann et al. and Chothia et al. do not provide guidance as to the changes to make in ***non-CDR regions***; neither the residue positions that ***must be changed to produce a functional humanized immunoglobulin as claimed***, nor the specific changes that must be made at those positions. Ex. 20 at 17 (underlining in original, italics added);

- PDL stated that its invention was patentable over the prior art because of framework substitutions:

22

One of ordinary skill in the art would not have had a reasonable expectation of success in constructing the claimed antibodies, as *the cited art did not teach* (1) the making of high-affinity humanized antibodies wherein acceptor *framework residues outside of a CDR loop are substituted (2) with corresponding donor sequence residues*. Ex. 14 at 29 (emphasis added);

- Inventor Cary Queen distinguished PDL's invention from the prior art by pointing to PDL's framework substitutions:

    In particular, no mention is made [in the prior art] that *the amino acids in the mouse framework that can contact the CDRs are the ones that should be transferred to the humanized antibody*, as disclosed in the subject patent application. Ex. 7 at ¶ 27 (emphasis added);

- PDL argued over the art by pointing to the existence of framework substitutions in its claimed humanized immunoglobulins:

    [E]ither way of defining the contribution [of the invention] *involves one or more other amino acid substitutions in framework amino acid positions from the non-human donor antibody, which positions are outside the CDRs as defined by Kabat and Chothia*. Ex. 12 at 15 (emphasis added).

Based on PDL's repeated representations, the Patent Office examiner understood the criticality of such framework substitutions, and issued the claims over the Winter and Riechmann references because of the *required framework substitutions*: "The declaration of the applicant establishes that *retention of the residues immediately adjacent to the CDR regions* of the murine source immunoglobulin are also *required* to ensure that the antigen binding function is transferred." Ex. 19 at 2 (emphasis added). *See also* Def. Br. at 27; Clark Decl. at ¶ 53; Foote Decl. at ¶ 51.

PDL attempts to rely on a single Response in the file history of the '762 patent to argue that its proposed claim construction is consistent with the file histories of the patents-in-

23

suit.[15] Ptf. Br. at 18. During the prosecution of that patent, the examiner rejected the pending claims as anticipated by the prior art Huston reference,[16] which disclosed framework substitutions outside of a CDR. In its opening brief, PDL argues that the patent examiner accepted PDL's representation that the then-pending claims of the '762 patent did not have framework substitutions and that the Huston reference was therefore not applicable. Ptf. Br. at 17-19. PDL's argument is misleading, and contradicted by the file histories of the patents-in-suit. In response to the examiner's rejection, PDL also referred the examiner to the co-pending application of the '761 patent that distinguished Huston from PDL's invention. Ex. 26 at 7-8 ("Huston's alleged disclosure [is] discussed in full in a response in the noted co-pending case."). In that '761 response, PDL distinguished Huston using the very same arguments it used to argue over Riechmann. That is, PDL argued that Huston **did not contain framework substitutions**, but that the substitutions made in Huston were made within the Chothia CDR H1 region. PDL stated:

> [T]he cited section of the Huston patent text . . . makes no references whatsoever to the substitution of amino acids **outside CDR regions**. Accordingly, it is submitted that most skilled readers of the Huston patent at the priority date would have seen no relevance to the present claims **directed to the substitution of amino acids outside CDR regions**.

Ex. 27 at1 3. Notably, the "present claims" that PDL distinguished from Huston on this basis are the **same claims** that PDL accuses Alexion of infringing in this litigation (*i.e.*, Claims 86, 87, 91,

---

[15]    Notably, the file histories of the patents-in-suit, as well as the file history of the direct parent application, are each well over 1000 pages. In this collection of over 4000 pages, PDL cites to only a single, vague statement by the Patent Office in an effort to support the overbroad scope of its invention it seeks here. Ptf. Br. at 18.

[16]    Huston *et al.,* U.S. Patent No. 5,476,786, issued December 19, 1996.

93, 101, 102, 110, 119 and 121 of that response (Ex. 27) issued as Claims 1, 2, 6, 8, 17, 18, 26,

33 and 35 of the '761 patent (Ex. 4)). *See* Ex. 25 at 4 (alleging infringement of, *inter alia*,

Claims 1, 2, 6, 8, 17, 18, 26, 33 and 35 of the '761 patent).

Thus, during prosecution, PDL (and inventor Queen) clearly disclaimed a broad

scope of its invention that would include CDR-only antibodies and limited its claimed

humanized immunoglobulins to those that contained framework substitutions. *See Hockerson-*

*Halberstadt, Inc. v. Avia Group Int'l, Inc.*, 222 F.3d 951, 957 (Fed. Cir. 2000) (patentee is not

entitled to "a mulligan that would erase from the prosecution history the inventor's disavowal of

a particular aspect of a claim term's meaning").

### D.    Those Of Skill In The Art Would Understand That Framework Substitutions Are An Essential Part Of PDL's Humanized Immunoglobulins

As set forth in Alexion's opening brief, one of skill in the art reading the patent

specification and file histories would have understood that PDL's claimed humanized

immunoglobulins require framework substitutions. Def. Br. at 29. In particular, the skilled

artisan would have understood that the only possible contribution of PDL to the field of antibody

humanization, beyond what was already known in the art, was the introduction of framework

substitutions outside of the Kabat CDR and Chothia CDR H1. *See* Def. Br. at 29; Clark Decl. at

¶ 46; Foote Decl. at ¶ 52.

PDL's expert Dr. Strong argues that the term "humanized immunoglobulin" did

not have a generally accepted meaning in the art at the time of invention, and that the skilled

artisan would have turned to the definition in the patent specification for clarification. Strong

Decl. at 17. As a matter of law, however, it is not merely that definition, but the entirety of the

specification and file histories, that one of skill would use to define the claims. *See Computer*

*Docking Station*, 519 F.3d at 1373-74 *citing Phillips*, 415 F.3d at 1313 (emphasis added) ("[T]he

person of ordinary skill is deemed to read the claims in the context of the ***entire patent***, including the specification and prosecution history."). Moreover, even if the exact claim phrase did not have an accepted meaning, those of skill at the time of invention would be familiar with the Winter, Riechmann, Jones and Huston references, as well as other references that taught humanization of antibodies. *See* Clark Decl. at ¶¶ 26, 46; Foote Decl. at ¶¶ 27-28, 52.

For example, the person of ordinary skill would have been familiar with the Winter reference, have the ability to determine the homology of Winter's humanized antibody, and recognize that the homology of donor to acceptor immunoglobulins, as well as homology of humanized to donor immunoglobulins, is over 65%. Clark Decl. at ¶ 46; Foote Decl. at ¶ 48. Indeed, one of skill in the art would have recognized that PDL's homology claims were directed to the very same invention previously disclosed by Winter.[17] *See, e.g.,* Ex. 1; Ex. 2; Ex. 16. *See also* Foote Decl. at ¶ 49. The skilled artisan would also have recognized that PDL's patents-in-suit do not teach a functional CDR-only antibody, but instead teach that at least one framework substitution is necessary for high binding affinity. Clark Decl. at ¶ 49; Foote Decl. at ¶¶ 41-45.

In short, PDL's patent taught one of skill in the art that CDR-only grafted antibodies do not work – even where those antibodies have over 65% homology. Thus, one of skill in the art, reading PDL's patent, would have understood that the "humanized immunoglobulins" claimed in PDL's patents-in-suit were required to have framework substitutions.

---

[17] *See* Ex. 21 for an illustration of how Winter EP 0 239 400 (Ex. 2) meets the "at least 65% identical" criterion that is recited, for example, in Claim 1 of the '761 patent, Claim 1 of the '762 patent, and Claim 2 of the '370 patent.

## IV.    "Donor Immunoglobulin" and "Human Acceptor Immunoglobulin"

The construction of the claim terms "donor immunoglobulin" and "human acceptor immunoglobulin" in the context of the patents-in-suit demands that the humanized immunoglobulins of the invention *require* framework substitutions.  Thus, as set forth above in Section III and in Alexion's opening brief at Sections IV.C and IV.D, the reasons for construing "humanized immunoglobulin" to require framework substitutions as an essential part of PDL's invention are equally applicable here.  PDL's proposed construction of these terms ignores the specification, as well as PDL's repeated representations to the Patent Office and its disclaimers made to secure a patent over the prior art.

Accordingly, these terms should be construed such that a donor immunoglobulin means "a non-human immunoglobulin that provides at least one CDR and at least one framework amino acid to a human acceptor immunoglobulin," and a human acceptor immunoglobulin means "a human immunoglobulin that takes at least one CDR and at least one framework amino acid from a donor immunoglobulin."

## V.    "Humanized Immunoglobulin Heavy Chain Variable Region Framework" And "Humanized Immunoglobulin Light Chain Variable Region Framework"

Construction of the claim terms "humanized immunoglobulin heavy chain variable region framework" and "humanized immunoglobulin light chain variable region framework" is similarly driven by PDL's repeated admissions, both in the specification and in the file histories, that framework substitutions are an essential and critical part of the invention.  For the same reasons set forth above in Section III and in Alexion's Opening Brief at Sections IV.C and IV.E, these claim terms require a framework substitution.

Accordingly, the terms should be construed to mean, respectively, "a heavy chain variable region framework of a humanized immunoglobulin wherein one or more amino acids of

the human acceptor framework of the humanized immunoglobulin have been replaced by the corresponding amino acid(s) of the donor immunoglobulin" and "a light chain variable region framework of a humanized immunoglobulin wherein one or more amino acids of the human acceptor framework of the humanized immunoglobulin have been replaced by the corresponding amino acid(s) of the donor immunoglobulin."

## VI.     Alexion's Constructions Of The "DNA Segment Encoding . . ." Terms Are Supported By PDL's And Dr. Strong's Own Statements

Rather than seek a clear construction of the claim terms containing the phrase "DNA segments encoding…," PDL confuses the meaning of an otherwise clear claim phrase by attempting to preempt what it presumes will be Alexion's non-infringement argument. Ptf. Br. at 32. In doing so, PDL offers no clear claim construction of its own, but rather attempts to rebut arguments that Alexion has never made.

For example, Alexion's construction of the plural claim phrase "DNA segments" to mean two or more polynucleotides is simple logic and comports with the specification and the understanding of one of skill in the art. Def. Br. at 32-33. As explained by PDL's expert Dr. Strong, a DNA sequence is the repetition of two nucleotides joined together by a phosphodiester bond resulting in linear polymers called polynucleotides. Strong Decl. at 54, 59, 63, 68; Ptf. Br. at 33. Dr. Strong also explained that multiple DNA sequences, *i.e.*, polynucleotides, may code for the same amino acid sequence, such as the amino acid sequence of a particular heavy chain of an antibody. Strong Decl. at 4. Conversely, a single DNA sequence will always code for the same amino acid sequence, *i.e.*, different amino acid sequences must be coded by different DNA sequences. Strong Decl. at 4. Thus, "DNA segments encoding" two different amino acid sequences (*e.g.*, a light chain and a heavy chain) *necessarily* must be at least two different

28

polynucleotides, one coding for each amino acid sequence. *See* Strong Decl. at 4 ("[A] given DNA sequence encodes one and only one protein sequence.").

Alexion's proposed construction of "DNA segments encoding the humanized immunoglobulin heavy and light chains" as "two or more polynucleotides coding for, respectively, the heavy chain (including the constant region) of a humanized immunoglobulin and the light chain (including the constant region) of a humanized immunoglobulin . . ." and its construction of "DNA segments encoding the humanized heavy and light chain variable regions" as "two or more polynucleotides coding for, respectively, the heavy chain variable region of a humanized immunoglobulin and the light chain variable region of a humanized immunoglobulin . . ." therefore encompass the plain meaning of the "DNA segments encoding" phrase. Nothing in the specification, file history, or the art contradicts this plain meaning. *See* Def. Br. at 32-33.

As set forth above and in Alexion's opening brief, the humanized immunoglobulins of PDL's invention are required to have a framework substitution. *See, e.g.,* Ex. 7 at ¶¶ 11, 14-15. Accordingly, the DNA segments encoding portions of at least one of the heavy or light chains of the humanized immunoglobulins should also reflect that limitation. *See* Def. Br. at 32. The term "DNA segment encoding a [the] humanized heavy chain variable region," therefore, should be construed as "a polynucleotide coding for a humanized immunoglobulin heavy chain variable region, where the humanized immunoglobulin comprises a human acceptor framework in which one or more amino acids have been replaced by the corresponding amino acid(s) of the donor immunoglobulin." Similarly, the claim term "DNA segment encoding a humanized immunoglobulin light chain variable region" should be construed to mean "a polynucleotide coding for a humanized immunoglobulin light chain variable region,

where the humanized immunoglobulin comprises a human acceptor framework in which one or more amino acids have been replaced by the corresponding amino acid(s) of the donor immunoglobulin."

The claim term "DNA segments encoding the humanized immunoglobulin heavy and light chains" should be construed as "two or more polynucleotides coding for, respectively, the heavy chain (including the constant region) of a humanized immunoglobulin and the light chain (including the constant region) of a humanized immunoglobulin, where the humanized immunoglobulin comprises a human acceptor framework in which one or more amino acids have been replaced by the corresponding amino acid(s) of the donor immunoglobulin." Similarly, the claim term "DNA segments encoding the humanized heavy and light chain variable regions" should be construed as "two or more polynucleotides coding for, respectively, the heavy chain variable region of a humanized immunoglobulin and the light chain variable region of a humanized immunoglobulin, where the humanized immunoglobulin comprises a human acceptor framework in which one or more amino acids have been replaced by the corresponding amino acid(s) of the donor immunoglobulin."

## VII.    Alexion's Construction Of The "Synthesizing A DNA Segment Encoding…" Terms Is Supported By PDL's Disclosure

As set forth in Alexion's opening brief, the specification of the patents-in-suit, the file histories of the patents, and the understanding of one of ordinary skill in the art support the construction of the "synthesizing a DNA segment encoding…" claim terms to mean producing a polynucleotide by synthesizing *de novo* and ligating oligonucleotides. Def. Br. at 34-38.

PDL argues only that the patents' specification discloses a variety of methods for producing the DNA segments of the invention. Ptf. Br. at 39-40. Alexion does not disagree. Rather, Alexion's construction reflects that the "synthesizing" claim term defines the preferred

30

embodiment of the invention, *i.e.*, synthesis of DNA segments through *de novo* oligonucleotide synthesis and ligation. Def. Br. at 35-36. Other claim terms, for example, the "providing a cell containing DNA segments" term, are broad enough to encompass the other methods of DNA production disclosed. *See, e.g.*, Ex. 6 ('370 patent) at Claims 1-4, 23-24. Indeed, PDL states in its opening brief that "[a] patentee may draft different claims to cover different embodiments," and admits that it did so in the patents-in-suit. Ptf. Br. at 12, 16, and 23. The "synthesizing" claims terms are examples of PDL's patenting of a distinct embodiment of its invention.

The patent specification supports Alexion's proposed construction of the claim terms because it distinguishes production of nucleic acid sequences between those that are made via synthesis and those that are made by other production methods. Def. Br. at 35-36; Clark Decl. at ¶ 74; Foote Decl. at ¶ 73. The preferred method of producing the DNA segments of the invention is oligonucleotide synthesis:

> Once designed, the immunoglobulins . . . of the present invention may be produced readily by a variety of recombinant DNA or other techniques. Preferably, *polynucleotides encoding the desired amino acid sequences are produced synthetically and by joining appropriate nucleic acid sequences*, with ultimate expression in transfected cells.

Ex. 5 at Col. 3:45-51 (emphasis added). *See also* Clark Decl. at ¶ 74; Foote Decl. at ¶ 71.

Other methods of producing the DNA segments of the invention are described and claimed in the patent, but only synthesizing *de novo* and ligating oligonucleotides is referred to as "synthesizing" DNA. Ex. 5 at Cols. 3:44-50, 17:50-58, 22:25-30, 30:66-31:4, 33:56-61, and 36:59-64. *See also* Clark Decl. at ¶ 74; Foote Decl. at ¶ 71. Thus, the claim term at issue covers specific embodiments of the invention directed to "synthesizing" DNA segments. *See Intamin, Ltd. v. Magnetar Techs., Corp.*, 483 F.3d 1328, 1336-37 (internal citations omitted) (Fed. Cir. 2007) ("A patentee may draft different claims to cover different embodiments.").

31

Moreover, as set forth in Alexion's opening brief, one of ordinary skill in the art would understand that the term "synthesis" means *de novo* synthesis and ligation of oligonucleotides because (1) the patents teach comparing amino acid sequences, and (2) the nucleic acids necessary to produce DNA segments from DNA or RNA that code for these amino acids sequences were not commercially or readily available. Def. Br. at 38; Clark Decl. at ¶ 76. Thus, one of skill in the art would understand that, after comparing amino acid sequences to select the appropriate acceptor sequence according to the teachings of the patents, he or she would have to synthesize the DNA segments encoding those amino acid sequences without the benefit of pre-existing oligonucleotides, *i.e.*, by *de novo* synthesis and ligation of oligonucleotides. Clark Decl. at ¶ 76. The examples of the patents demonstrate this very method, and therefore support this understanding of the skilled artisan. *See* Def. Br. at 38; Ex. 5 at Cols. 39:16-23 (Example 1), 46:50-59 (Example 4).

Accordingly, the Court should construe the claim term "synthesizing a [the] DNA segment encoding a humanized heavy chain variable region" to mean "producing a polynucleotide encoding the entire humanized heavy chain variable region by synthesizing *de novo* and ligating oligonucleotides." Similarly, the Court should construe "synthesizing a DNA segment encoding a humanized light chain variable region" to mean "producing a polynucleotide encoding the entire humanized light chain variable region by synthesizing *de novo* and ligating oligonucleotides."

## VIII.  The Claim Term "Is At Least 65% Identical …" Does Not Need Construction

PDL purportedly requests that the Court construe the claim term "is at least 65% [70%] identical to the [sequence of the] donor immunoglobulin heavy [light] chain variable region framework." Ptf. Br. at 36. Yet, PDL's argument regarding this claim term is illogical because PDL does not actually propose a construction for the term. Instead, PDL merely argues

32

that the identity is directed to amino acid, not nucleotide, sequences. Ptf. Br. at 37-38. PDL also argues, without explanation, that this claim limitation is Alexion's "penultimate" attempt to import limitations into the claims. Ptf. Br. at 36. PDL's arguments are nonsensical because neither PDL nor Alexion has proposed any construction of this claim term.

Alexion does not believe that this claim term requires construction. Instead, the plain meaning of the term would be clear to one of skill in the art.

## IX.    CONCLUSION

For all of the reasons set forth above and in Alexion's Opening Brief, Alexion requests that the Court adopt Alexion's proposed claim constructions.

YOUNG, CONAWAY, STARGATT & TAYLOR LLP

_____
Josy W. Ingersoll (No. 1088)
John W. Shaw (No. 3362)
Andrew A. Lundgren (No. 4429)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600
alundgren@ycst.com

*Attorneys for Defendant Alexion Pharmaceuticals, Inc.*

OF COUNSEL:

John M. Desmarais
Gerald J. Flattmann, Jr.
Christine Willgoos
KIRKLAND & ELLIS LLP
153 East 53rd Street
New York, New York 10022
(212) 446-4800

Dated: June 11, 2008

33

## CERTIFICATE OF SERVICE

I, Andrew A. Lundgren, hereby certify that on June 11, 2008, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Jack B. Blumenfeld, Esquire
> Karen Jacobs Louden, Esquire
> Morris Nichols Arsht & Tunnell LLP
> 1201 North Market Street
> Wilmington, DE  19801
>
> Kevin S. Mann, Esquire
> Michael J. Joyce, Esquire
> Cross & Simon, LLC
> 913 N. Market Street, 11th Floor
> Wilmington, DE  19801

I further certify that on June 11, 2008, I caused a copy of the foregoing document to be served by hand delivery on the above-listed counsel of record and on the following in the manner indicated:

> **BY E-MAIL**
>
> Matthew D. Powers, Esquire
> Vernon M. Winters, Esquire
> John D. Beynon, Esquire
> Weil, Gotshal & Manges LLP
> 201 Redwood Shores Parkway
> Redwood Shores, CA  94065

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Andrew A. Lundgren*
Josy W. Ingersoll  (No. 1088)
Andrew A. Lundgren (No. 4429)
Karen E. Keller (No. 4489)
1000 West Street, 17th Floor
Wilmington, Delaware  19801
(302) 571-6600
kkeller@ycst.com

*Attorneys for Defendant*