IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PDL BIOPHARMA, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C. A. No. 07-156-JJF |
| | ) | |
| ALEXION PHARMACEUTICALS, INC., | ) | **REDACTED -** |
| | ) | **PUBLIC VERSION** |
| Defendant. | ) | |

## ANSWERING CLAIM CONSTRUCTION BRIEF
## OF PLAINTIFF PDL BIOPHARMA, INC.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Karen Jacobs Louden (#2881)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE   19899-1347
(302) 658-9200
klouden@mnat.com

*Attorneys for Plaintiff, PDL BioPharma, Inc.*

*Of Counsel:*

Matthew D. Powers
Vernon M. Winters
Paula B. Whitten
WEIL, GOTSHAL & MANGES LLP
Silicon Valley Office
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000

Jennifer H. Wu
Rebecca E. Fett
WEIL, GOTSHAL & MANGES LLP
New York Office
767 Fifth Avenue
New York, NY 10153
(212)310-8000

Original Filing Date:   June 11, 2008

Redacted Filing Date:   June 13, 2008

# TABLE OF CONTENTS

Page

I.  INTRODUCTION AND SUMMARY ........................................................................... 1

II.  ARGUMENT .......................................................................................................... 2

    A.  Defendant Seeks to Import Required Framework Amino Acid
    Substitutions Into Almost Every Claim Term ............................................... 2

        1.  The "Humanized Immunoglobulins" of the Asserted Claims Do
        Not Require Framework Amino Acid Substitutions ................................. 2

            a.  Defendant Fails to Address the Legal Effect of the Patent's
            Precise Definition of "Humanized" Immunoglobulins ................. 2

            b.  The Specification Emphasizes That Framework
            Substitutions Are "Optional" and Are "Another
            Embodiment" (of Claims Not Asserted) ...................................... 3

            c.  The Prosecution Histories Lack a Clear, Unambiguous
            Statement of Claim Scope Disavowal ......................................... 6

            d.  Its Proffered Expert Testimony Conflicts with the
            Specification Definition and Other Intrinsic Evidence .............. 13

            e.  Validity is Not At Issue, and its Declarant Dr. Foote's Prior
            Sworn Statements Contradict Defendant's Argument ................ 14

        2.  The "Donor Immunoglobulin," "Human Acceptor
        Immunoglobulin/Acceptor Human Immunoglobulin,"
        "Framework," "Humanized Immunoglobulin Heavy Chain
        Variable Region Framework," And "Humanized Immunoglobulin
        Light Chain Variable Region Framework" of the Asserted Claims
        Do Not Require Framework Amino Acid Substitutions .......................... 17

        3.  The "DNA Segment[s] Encoding" Terms Do Not Require
        Framework Amino Acid Substitutions .................................................... 19

    B.  Defendant's "Synthesizing" Position Also Attempts to Import Limitations
    from the Specification ..................................................................................... 20

    C.  Looking to European Patent Office Proceedings for Support, the DOB
    Looks Past the Specification's Specific Definition of "CDR," its Usage in
    the Specification, and the File Histories ......................................................... 24

        1.  When the Specification Defines a Claim Term, that Definition
        Governs, and the Specification Defines "CDR" ..................................... 24

        2.  The "Definition" that the Defendant's Opening Brief Cites Is Not a
        Definition, Conflicts with the Specification's Actual Definition,
        and is Inconsistent with Other Portions of the Specification ................. 25

        3.  The European Proceedings Involving a European Patent Do Not
        Provide the Traction that Defendant's Opening Brief Seeks .................. 28

            a.  The Statements Made in the European Proceedings Are
            Legally Immaterial Because European Patent Law is
            Different ..................................................................................... 28

# TABLE OF CONTENTS
## (continued)

Page

   b. The Particular Statements On Which Defendant Relies Are Factually Inapposite, Because the European Specification Specifically Defined "CDR" to be Kabat Plus Chothia .............. 29

  4. The File Histories Are Consonant with the Specification's Precise Definition, and Are Not Words of Manifest Exclusion Representing a Clear Disavowal of Claim Scope .................................... 31

  5. The DOB's "Person of Ordinary Skill" Argument Answers the Wrong Question and Looks To Inapposite Documents .......................... 34

 D. "Hypervariable Regions" is Not a Claim Term in Dispute ................................. 36

 E. Defendant Has Waived Any Dispute Regarding "Is at least 65% [70%] Identical to the [Sequence of the] Donor Immunoglobulin Heavy [Light] Chain Variable Region Framework" ................................................. 36

III. CONCLUSION ............................................................................................. 36

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*3M Innovative Props. Co. v. Avery Dennison Corp.*,
   350 F.3d 1365 (Fed. Cir. 2003)................................................................31, 34

*Am. Hoist & Derrick Co. v. Sowa & Sons*,
   725 F.2d 1350 (Fed. Cir. 1984).................................................................5, 15

*Andersen Corp. v. Fiber Composites, LLC*,
   474 F.3d 1361 (Fed. Cir. 2007).................................................................12

*Astrazeneca AB v. Mutual Pharm. Co., Inc.*,
   384 F.3d 1333 (Fed. Cir. 2004).................................................................25

*Burns, Morris & Stewart Ltd. Partnership v. Masonite Int'l*,
   401 F. Supp. 2d 692 (E.D. Tex. 2005).......................................................28

*Elbex Video, Ltd. v. Sensormatic Elec. Corp.*,
   508 F.3d 1366 (Fed. Cir. 2007).................................................................7, 32

*Envtl. Designs, Ltd. v. Union Oil Co.*,
   713 F.2d 693 (Fed. Cir. 1983)...................................................................14

*Home Diagnostics, Inc. v. LifeScan, Inc.*,
   381 F.3d 1352 (Fed. Cir. 2004).................................................................5

*Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*,
   493 F.3d 1358 (Fed. Cir. 2007).................................................................7, 32

*Hormone Research Found., Inc. v. Genentech, Inc.*,
   904 F.2d 1558 (Fed. Cir. 1990).................................................................2, 27

*Int'l Rectifier Corp. v. IXYS Corp.*,
   361 F.3d 1363 (Fed. Cir. 2004).................................................................2, 27

*Intamin, Ltd. v. Magnetar Techs., Corp.*,
   483 F.3d 1328 (Fed. Cir. 2007).................................................................5

*Jack Guttman, Inc. v. Kopykake Enter., Inc.*,
   302 F.3d 1352 (Fed. Cir. 2002).................................................................3, 9, 18, 24

*Kumar v. Ovonic Battery Co., Inc.*,
   351 F.3d 1364 (Fed. Cir. 2003).................................................................26

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Merck & Co. v. Teva Pharms. USA, Inc.*,
  395 F.3d 1364 (Fed. Cir. 2005) ............................................................................. 25

*N. Telecom Ltd. v. Samsung Elecs. Co.*,
  215 F.3d 1281 (Fed. Cir. 2000) .......................................................................... 9, 33

*NTP, Inc. v. Research in Motion, Ltd.*,
  418 F.3d 1282 (Fed. Cir. 2005) ..................................................................... Passim

*Pall Corp. v. PTI Techs. Inc.*,
  259 F.3d 1383 (Fed. Cir. 2001), *vacated on other grounds*, 535 U.S. 1109 (2002) .......... 10, 33

*Pfizer, Inc. v. Apotex, Inc.*,
  480 F.3d 1348 (Fed. Cir. 2007) ........................................................................... 2, 27

*Pfizer, Inc. v. Ranbaxy Labs., Ltd.*,
  457 F.3d 1284 (Fed. Cir. 2006) .................................................................... 4, 22, 28

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ........................................................ Passim

*Sinorgchem Co., Shandong v. Int'l Trade Comm'n*,
  511 F.3d 1132 (Fed. Cir. 2007) ................................................................................ 3

*Sorensen v. Int'l Trade Comm'n*,
  427 F.3d 1375 (Fed. Cir. 2005) ........................................................................... 7, 32

*Storage Tech. Corp. v. Cisco Sys., Inc.*,
  329 F.3d 823 (Fed. Cir. 2003) ........................................................................... 31, 34

*TI Group Automotive Sys. (N. Am.), Inc. v. VDO N. Am., L.L.C.*,
  375 F.3d 1126 (Fed. Cir. 2004) ............................................................................... 28

*Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*,
  375 F.3d 1341 (Fed. Cir. 2004), *rev'd on other grounds*, 435 U.S. 394 (2006) ............. 4, 22

*Vivid Techs., Inc. v. American Science & Eng'g, Inc.*,
  200 F.3d 795 (Fed. Cir. 1999) ......................................................................... 27, 36

**STATUTES**

35 U.S.C. § 112, ¶ 1 ................................................................................................. 5

## I.    INTRODUCTION AND SUMMARY

The patents' specification defines many of the claim terms at issue.   For example, the specification defines "humanized" immunoglobulin.   In a column that begins "[i]n order that the invention may be more completely understood, several **definitions** are set forth," the specification teaches that "[a]s used herein, the term 'humanized' immunoglobulin refers to an immunoglobulin comprising a human framework region and one or more CDR's from a non-human (usually a mouse or rat) immunoglobulin."   When a specification defines a claim term, the inventor's lexicography governs.

Defendant's opening brief ignores the governing specification definitions. Instead, the brief constructs a premise – that the asserted claims are invalid because they were known in the prior art – and seeks to reach conclusions based on that premise.   Validity, however, does not dictate claim construction.   In any event, defendant's constructed premise is wrong:   as the United States Patent and Trademark Office and one of defendant's own experts concluded (in sworn statements before this litigation), the asserted claims are novel over the prior art.   The prohibitions against importing limitations from the specification into the claims apply here.

Defendant's opening brief also invokes isolated sentences from the thousands of pages that comprise the prosecution history and calls upon the doctrine of prosecution history disclaimer.   However, for prosecution history disclaimer to apply, the invoked prosecution history section must contain words or expressions of manifest exclusion or restriction representing a clear disavowal of claim scope.   The invoked sentences do not clear that bar.

Casting an even wider net, the opposition brief also looks to proceedings in the European Patent Office, and argues that statements made about European claims and a European specification, made under European law, are somehow relevant here.   The invoked European patent claims and specification are different, and the statements were made under Article 69 and the Protocol on the Interpretation of Article 69 of the European Patent Convention.   The European proceedings are not relevant here.

When viewed through the lens of the correct law, the correct claim construction is readily apparent in this case.   The specification defines most of the claim terms in dispute, and those definitions apply.   In the few instances that the specification does not specifically define a claim term, the meaning is otherwise clear.   Plaintiff, PDL BioPharma, Inc., respectfully asks that the Court confirm its claim constructions.

## II.    ARGUMENT

### A.    Defendant Seeks to Import Required Framework Amino Acid Substitutions Into Almost Every Claim Term

#### 1.    The "Humanized Immunoglobulins" of the Asserted Claims Do Not Require Framework Amino Acid Substitutions

##### a.    Defendant Fails to Address the Legal Effect of the Patent's Precise Definition of "Humanized" Immunoglobulins

Defendant's Opening Brief ("DOB") concedes that the "specification may reveal a special definition given to a claim term," and that "[i]n such cases, the inventor's lexicography **governs**."   *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (*en banc*); DOB [D.I. 96] at 5, ¶ 3; *see also Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1353 n.3 (Fed. Cir. 2007) ("We recognize that hydrochloride and hydrobromide are not technically anions. However, since the patentee chose to be his own lexicographer, we will refer to these two acids as anions for purposes of this opinion."); *Int'l Rectifier Corp. v. IXYS Corp.*, 361 F.3d 1363, 1373 (Fed. Cir. 2004) (patentee defined "annular," which ordinarily meant ring-shaped, to mean polygonal); *Hormone Research Found., Inc. v. Genentech, Inc.*, 904 F.2d 1558, 1563 (Fed. Cir. 1990) (patentee is free to be his or her own lexicographer and to define terms "in a manner contrary to or inconsistent with one or more of their ordinary meanings").[1]   But the DOB fails to apply this rule.   The specification here provide such a definition:   "In order that the invention may be more completely understood, several **definitions** are set forth. . . . [¶]   **As used herein**, the term 'humanized' immunoglobulin refers to an immunoglobulin comprising a human framework

---

[1]    References to "DOB [D.I. 96] at X, ¶ Y" are to paragraph Y of page X in Defendant Alexion Pharmaceuticals, Inc.'s Opening Brief in Support of its Proposed Claim Constructions (D.I. 96).   Unless otherwise noted, all emphasis in quotations has been supplied.

region and one or more CDR's from a non-human (usually a mouse or rat) immunoglobulin." '762 Patent, Col. 11:1-2 & Col. 11:65 – 12:1 (Strong Decl. [D.I. 95] Ex. 12).[2]

The DOB overlooks this definition's dispositive legal effect, and invites the Court to do to the same. However, where the specification defines a disputed claim term, "it [is] error for the District Court to overlook it." *Jack Guttman, Inc. v. Kopykake Enter., Inc.*, 302 F.3d 1352, 1360 (Fed. Cir. 2002) (reversing in light of specification's explicit definition). "When the specification explains and defines a term used in the claims, without ambiguity or incompleteness, there is no need to search further for the meaning of the term." *Sinorgchem Co., Shandong v. Int'l Trade Comm'n*, 511 F.3d 1132, 1138 (Fed. Cir. 2007) (citation omitted). Nonetheless, the DOB searches further, invoking isolated passages from the specification, the file histories (mainly of patents other than the patents-in-suit), and European patent proceedings. This further search is in vain. The invoked sources are either consistent with the patent's specific definition or are orthogonal to the issue before the Court: how would one of ordinary skill at the time have understood "humanized immunoglobulin" in the asserted claims?

### b. The Specification Emphasizes That Framework Substitutions Are "Optional" and Are "Another Embodiment" (of Claims Not Asserted)

"[T]he specification 'is always highly relevant to the claim construction analysis,'" and "'[u]sually, it is ***dispositive***; it is the single best guide to the meaning of a disputed term.'" *Phillips*, 415 F.3d at 1315 (citation omitted). Although failing to quote this law, the attempts to find support for its construction in the specification. DOB [D.I. 96] § IV(C)(2). The attempt goes awry, because the support is not there.

The DOB observes that the examples disclosed in the specification contained framework amino acid substitutions, and from there hastens to the conclusion that all of the claims require framework amino acid substitutions. DOB [D.I. 96] at 25-26. In effect, the

---

[2]    References to "Strong Decl. [D.I. 95] Ex. X" are to Exhibit X of Dr. Roland K. Strong's Declaration in Support of PDL's Opening Claim Construction Brief. References to "Supp. Strong Decl. Ex. X" are to Exhibit X of Dr. Roland K. Strong's Supplemental Declaration in Support of PDL's Answering Claim Construction Brief. The same convention is followed for the declarations of Jennifer Wu, Esq.

DOB argues that because the disclosed examples contain amino acid substitutions, so must the claims.   That argument ignores the teaching of *Phillips* that "although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments."   *Phillips*, 415 F.3d at 1323.   Such warnings have been given because "persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments."   *Id.*   The DOB also ignores that the specification specifically states that the "examples are offered by way of illustration, not by limitation."   '762 Patent, Col. 37:66-67 (Strong Decl. [D.I. 95] Ex. 12).   The DOB's argument is thus like the argument that the Federal Circuit rejected in *Pfizer, Inc. v. Ranbaxy Labs., Ltd.*, 457 F.3d 1284 (Fed. Cir. 2006).   There, as here, all of the disclosed examples disclosed a particular embodiment (there, that a chemical reaction yielded a chemical called a "racemate").   There, as here, the infringer argued that because all of the disclosed examples disclosed a particular embodiment, the claims were limited to that embodiment.   There, as here, the specification advised those of ordinary skill that the examples were not meant to be limiting: "the specification, at col. 10, ll. 36-38, states that '[t]hese examples are illustrative and are not to be read as limiting the scope of the invention as it is defined by the appended claims.'"   *Pfizer*, 457 F.3d at 1290.

There the court concluded that such language made it legally inappropriate to limit the claims to the disclosed embodiments:

> while the examples do describe reaction sequences that produce racemates, restricting claim 1 on this basis would improperly import limitations from the specification into the claims, which should be avoided unless the patentee clearly 'intends for the claims and the embodiments in the specification to be strictly coextensive.' *Phillips*, 415 F.3d at 1323. But here, the specification, at col. 10, ll. 36-38, states that '[t]hese examples are illustrative and are not to be read as limiting the scope of the invention as it is defined by the appended claims.'

*Id.; see also, e.g.*, *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 375 F.3d 1341, 1351 (Fed. Cir. 2004), *rev'd on other grounds*, 435 U.S. 394 (2006) ("In fact, the examples are precisely what they purport to be: examples . . . .   ConAgra does little other than 'invite[] a violation of our

precedent counseling against importing limitations into the claims.'").   The DOB invites this same kind of violation.

Again invoking Winter EP 0239400, and also Verhoeyen, the DOB also asserts that humanized antibodies with 65% homology and murine CDRs were known in the art, and from this assertion reaches for the conclusion that "the second method claimed in PDL's patents" – substitutions of amino acids in the human framework region – was the "crux of PDL's purported invention" and is required of all claims.   DOB [D.I. 96] at 23-24.   But the patents-in-suit expressly disclose and incorporate each of Verhoeyen and Winter by reference.   *E.g.,* '762 Patent, Cols. 1:63-2:2, 2:10-14, & 21:60-65 (Strong Decl. [D.I. 95] Ex. 12); *see also* Strong Decl. [D.I. 95] § III, ¶¶ A(3)(a)-(c).   As a matter of law, the PTO is presumed to have properly concluded that Verhoeyen and Winter posed no obstacle to the issued asserted claims.   *E.g., Am. Hoist & Derrick Co. v. Sowa & Sons*, 725 F.2d 1350, 1359 (Fed. Cir. 1984).   One of ordinary skill in the art would have reached the same conclusion – that the PTO concluded that Verhoeyen and Winter posed no obstacle to the issued asserted claims.   Supp. Strong Decl., ¶¶ 11(a)-(c).

Finally, the DOB asserts that the Queen patents' high-homology CDR-grafted antibodies "did not always work," DOB [D.I. 96] at 24, ¶ 1, observing that in the particular case of the anti-Tac antibody example, one example that lacked framework amino acid substitutions failed.   *Id.* at 24.   From the fact that successful disclosed embodiments contained framework amino acid substitutions, the DOB vaults to the conclusion that **all** of the asserted claims require framework amino acid substitutions, whether the claims say so on their face or not.

The patent law rejects that conclusion.   "A patentee may draft different claims to cover different embodiments," *Intamin, Ltd. v. Magnetar Techs., Corp.,* 483 F.3d 1328, 1337 (Fed. Cir. 2007), which is what PDL did here; the law does not require disclosed embodiments for every claim.   Indeed, the law does not require the disclosure of any particular embodiments at all.   35 U.S.C. § 112, ¶ 1.   The disclosure of a single embodiment does not disavow other embodiments.   *Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1358 (Fed. Cir. 2004).

The statements of the DOB's declarant Dr. Foote – at least his prior sworn

statements – also contradict the DOB's position.   Dr. Foote's U.S. Patent No. 6,881,557 specifically describes Winter's approach as having the "disadvantage of frequently leading to inactive antibodies because these references do not provide information needed to rationally select among the many possible human framework sequences, those most likely to support antigen binding required by a particular CDR region from a non-human antibody."   U.S. Patent No. 6,881,557 at Col. 4:1-6 (Supp. Wu Decl. Ex. 1).   In his '557 patent, Dr. Foote specifically commended the Queen patents for solving that problem – and, tellingly, did not suggest that they also "frequently led to inactive antibodies."   *Id.* at Col. 4:17-34.   One of ordinary skill would have reached the same conclusion that Dr. Foote reached before this litigation:   that the PTO concluded that Queen's high-homology approach worked.   Supp. Strong Decl., ¶¶ 11(a)-(c).

Indeed, Alexion's infringing humanized antibody, Soliris, demonstrates another example of following the high-homology approach of the asserted claims.   Defendant asserts in this litigation that the boundaries of a "CDR" are determined by the aggregate of the Kabat and Chothia methodologies.   DOB [D.I. 96] § IV(A).   ████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████   Under defendant's litigation interpretation of CDR, Soliris provides an embodiment of the high-homology claims.

The DOB asserts that the specification "makes clear that the humanized immunoglobulins of the invention are required to have framework substitutions outside of the CDRs."   DOB [D.I. 96] at 23, ¶ 1.   The specification does the opposite – it makes clear that framework substitutions are **not** required.   The Abstract, the Summary of the Invention, and the Detailed Description of the Invention describe framework amino acid substitutions as "possible," "optional," and "another embodiment" of the invention – a distinction that is reflected in the claims.   *See generally* PDL's Opening Brief [D.I. 93] §§ IV(A)(3) & IV(B)(3).

### c.     The Prosecution Histories Lack a Clear, Unambiguous Statement of Claim Scope Disavowal

The DOB also advances the prosecution history disclaimer doctrine, DOB [D.I.

6

96] at 4, ¶ 5, casting its net beyond the patents-in-suit to include the file histories of patents not asserted.    However, when viewed against the law of prosecution history disclaimer law, the prosecution history passages that the DOB invokes provide no purchase for its argument.    In its *en banc Philllips* decision, the Federal Circuit expressly cautioned against such snippet-based "disclaimer" arguments, noting that "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes."    *Phillips,* 415 F.3d at 1317.    For prosecution history disclaimer to apply, the invoked prosecution history section must contain "'words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope.'"    *NTP, Inc. v. Research in Motion, Ltd.,* 418 F.3d 1282, 1308-09 (Fed. Cir. 2005) (citation omitted; declining to find disclaimer); *see also Elbex Video, Ltd. v. Sensormatic Elec. Corp.,* 508 F.3d 1366, 1371 (Fed. Cir. 2007); *Sorensen v. Int'l Trade Comm'n,* 427 F.3d 1375, 1380 (Fed. Cir. 2005); *Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.,* 493 F.3d 1358, 1365 (Fed. Cir. 2007).

Before addressing the isolated prosecution history snippets on which the DOB bases its argument regarding "humanized immunoglobulin," there is an overarching point that refutes the DOB's file-history-based argument in its entirety.    The DOB asserts that "the law regarding prosecution history disclaimers dictates that the '[c]laims may not be construed one way in order to obtain their allowance and in a different way against accused infringers,'" DOB [D.I. 96] at 6, ¶ 1, and that "[a] claim term, however, must be used consistently, and cannot have different meanings in different claims," *id.* at 17, n.11.    Applying those two principles, the prosecution history makes perfectly clear that the DOB's attempt to re-define "humanized immunoglobulin" cannot be correct, because the PTO considered and rejected the very construction that defendant now proffers.

Specifically, during the '762 patent's prosecution, PDL presented amended claims that were generally the same as the issued claims; then-pending draft claim 86 was identical to issued (and asserted) claim 1.    '762 FH at PDL-A 0000315 & following (Strong Decl. [D.I. 95]

Ex. 15).   The PTO rejected those claims, asserting that they were "anticipated by over Huston et al.," which the PTO characterized as disclosing the "altering of two residues outside the CDR region in the humanization of the antibody."   '762 FH at PDL-A 0003046 (Strong Decl. [D.I. 95] Ex. 15).   In response, in Paper No. 18, PDL explained that although the pending '761 application contained a few claims that require framework amino acid substitutions, the '762 application did not contain **<u>any</u>** claims that required framework amino acid substitutions, and thus the disclosures of Huston et al. were not relevant to the '762 application:   "It is believed that the Examiner may be under a **<u>misapprehension</u>** that the present claims recite substitution of amino acids outside CDR regions, as is the case for some of the claims for a copending case which is being prosecuted concurrently."   '762 FH at PDL-A 0003055-63 (Strong Decl. [D.I. 95] Ex. 15).   The PTO's subsequent Interview Summary states that agreement "was reached," and that the "claims are in condition for allowance" based on PDL's explanation that the claims **<u>did not require framework amino acid substitutions</u>**.   '762 FH at PDL-A 0003388 (Strong Decl. [D.I. 95] Ex. 15).   After that Interview Summary, the claims were allowed, and **<u>none</u>** of the claims of the '762 patent (asserted or otherwise) contain, on their face, the re-write that defendant seeks to achieve:   required framework amino acid substitutions.   Thus, applying the two principles that the DOB invokes, the DOB's "humanized immunoglobulin" prosecution history argument is not correct.   "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent."   *Phillips,* 415 F.3d at 1317; *see generally* PDL's Opening Brief [D.I. 93] § IV(A)(4).

　　　　　　For completeness, however, we turn to the scattered prosecution history passages that the DOB invokes.   *See* DOB [D.I. 96] at 5, ¶ 3; at 22, ¶ 2 and § IV(C)(2).

　　　　　　The DOB first invokes several statements from the prosecution history of U.S. Patent Application No. 07/290,975, which PDL abandoned, in support of the contention that "humanized immunoglobulin" necessarily includes framework amino acid substitutions.   DOB [D.I. 96] at 26, ¶ 3 – 27, ¶ 1(citing Exs. 17-19).   The pending claims in that abandoned application **<u>lacked</u>** the disputed claim term "humanized immunoglobulin."   U.S. Patent

Application No. 07/290,975 at PDL-A 0001153-56 (Supp. Strong Decl. Ex. 12).   Because the

disputed limitation was not even present, and thus the doctrine cannot apply.

The DOB next invokes a document from the prosecution of U.S. Patent No.

5,530,101 – also not an asserted patent.   DOB [D.I. 96] at 27, ¶¶ 2-3 (citing Ex. 20).   As noted,

for prosecution history disclaimer to apply, the invoked prosecution history section must contain

"'words or expressions of **manifest exclusion** or restriction, representing a **clear disavowal of**

**claim scope**.'"   *NTP*, 418 F.3d at 1308-09 (citation omitted; declining to find disclaimer).   That

document does not contain words or expressions of manifest exclusion representing a clear

disavowal of claim scope.   To the contrary, it specifically referenced the patent's definition of

"humanized" immunoglobulin:   "Moreover, the claim terms 'humanized immunoglobulin' and

'human framework region' are defined terms (see, e.g., Specification page 27, line 28-ff and

page 27, line 7-13, respectively.)"   '101 FH at PDL-A 0001804-0001829 (Supp. Strong Decl.

Ex. 3); *see also* Supp. Strong Decl., ¶ 13.   The referenced definition of "humanized

immunoglobulin" was not a manifest exclusion or restriction representing a clear disavowal of

claim scope.   Quite the opposite – it said nothing about requiring framework amino acid

substitutions:

```
              As used herein, the term "humanized" immunoglobulin
          refers to an immunoglobulin comprising a human framework
    30    region and one or more CDR's from a non-human (usually a
          mouse or rat) immunoglobulin.  The non-human immunoglobulin
```

'101 FH at PDL-A 0001339 (Supp. Strong Decl. Ex. 3).   The DOB thus invokes a prosecution

history document that specifically refers to the definition of the disputed claim term that PDL

invokes.   Prosecution disclaimer does not apply even to an ambiguous disavowal, *Aquatex,* 419

F.3d at 1381, much less the **lack** of a disavowal that this prosecution history document

represents.   *See also Guttman*, 302 F.3d at 1360 (reversing District Court's claim construction

based on prosecution history disclaimer order in light of explicit specification definition:   "the

definition of photocopy machine provided in the specification does indeed dispose of the claim

construction dispute, and it was error for the district court to overlook it"); *N. Telecom Ltd. v.*

*Samsung Elecs. Co.*, 215 F.3d 1281, 1293-95 (Fed. Cir. 2000) (holding that prosecution disclaimer did not "support the judicial narrowing of a clear claim term" because the inventors' statements were amenable to multiple reasonable interpretations); *Pall Corp. v. PTI Techs. Inc.*, 259 F.3d 1383, 1393-94 (Fed. Cir. 2001) (remanding because the scope of disclaimer over the prior art reference was ambiguous), *vacated on other grounds*, 535 U.S. 1109 (2002).

In its wide-ranging search for a clear disavowal of claim scope, the DOB also presents snippets from the file histories of the '761, '762, and '370 patents in support of its argument that "humanized antibodies" inexorably require framework amino substitutions. The overarching effect of the '762 prosecution history, which completely rebuts this argument, was addressed above. *See also* PDL's Opening Brief [DI. 93] § IV(A)(4). In the approximately 900 pages that comprise the '761 patent's direct prosecution history (it has priority to earlier applications), the DOB invokes a single paragraph from the Detailed Description of Most Closely Related References. DOB [D.I. 96] at 28, ¶ 1 (citing Ex. 15 at 6-7). That document, however, explains that "humanized immunoglobulin" as used in the claims encompasses both humanized immunoglobulins with framework amino acid substitutions and those without.

It begins: "Claims 1-22 are presently pending in the instant application. The present claims are all directed to a single invention, namely, a polynucleotide encoding a humanized immunoglobulin, which immunoglobulin has complementarity determining regions (CDRs) from a donor immunoglobulin and heavy and light chain variable region frameworks from human acceptor immunoglobulin heavy and light chain frameworks [with a specified affinity]." DOB [D.I. 96] Ex. 2, ¶ 2. The document makes clear that there are three aspects to that invention. "In a **first aspect**, the polynucleotide encodes a humanized immunoglobulin wherein the amino acid sequence of the humanized immunoglobulin heavy chain variable region framework is 65% to 95% identical to the amino acid sequence of the donor immunoglobulin heavy chain variable region framework." *Id*. Ex. 15 at 2, ¶ 2. (The asserted claims reflect only this first aspect.) The document states that "[i]n **another aspect**," the polynucleotides encode a consensus sequence framework. *Id*. Finally, the document states that "[i]n a **further aspect**,

10

the polynucleotide encodes a **humanized immunoglobulin** where, in addition to having donor CDRs in acceptor variable region framework, amino acids from the donor immunoglobulin framework outside the Kabat and Chothia CDRs **replace** corresponding amino acids **in the** acceptor immunoglobulin heavy or light chain **frameworks**." *Id.*

In other words, the DOB asserts that a document that explains that a "humanized immunoglobulin" may – but need not – have framework amino acid substitutions contains the "words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *NTP,* 418 F.3d at 1308-09. To state that proposition is to refute it.

The DOB's last invoked passage is a document in the '370's prosecution history. DOB [D.I. 96] at 28-29 (citing Ex. 12 at 15). But that document was simply a submission from the European opposition proceedings, involving PDL's European patent. *Id.* As explained in § II(C)(3), *infra*, statements from the European opposition proceedings, which involved a different patent, with different claims and a different specification, sought under a different law that had different patentability requirements, are not apposite to the issue here: under U.S. patent law, what would those claims have meant to one of ordinary skill at the time the U.S. patent applications were filed?

Finally, the DOB argues that "humanized immunoglobulin" must inescapably require framework amino acid substitutions because (according to the DOB), PDL described framework amino acid substitutions as "essential" for "humanized antibodies." DOB [D.I. 96] at 7, n.2 & § IV(C)(1) & (2). This argument is counterfactual, and cannot be reconciled with the specification's explicit definition of "humanized" immunoglobulin, which does not state that framework amino acid substitutions are required: "As used herein, the term 'humanized' immunoglobulin refers to an immunoglobulin comprising a human framework region and one or more CDR's from a non-human (usually a mouse or rat) immunoglobulin."). '762 Patent, Col. 11:65 – Col. 12:1 (Strong Decl. [D.I. 95] Ex. 12). This argument cannot be reconciled with the specification, which describes framework amino acid substitutions as "possible," "optional," and "another embodiment" of the invention – a distinction that is reflected in the claims. *See*

11

*generally* PDL's Opening Brief [D.I. 93] § IV(A)(1) – (3) (D.I. 93).

This argument cannot be reconciled with '762 patent's prosecution history.   As explained above, the '762 patent's claims all contain the term "humanized immunoglobulin," and none of the claims require, on their face, amino acid substitutions.   When the PTO initially rejected the claims on the basis of art that contained amino acid substitutions, PDL did not state that framework amino acids were "essential" to "humanized antibodies."   Quite the contrary – PDL explained that they were irrelevant:   "It is believed that the Examiner may be under a **misapprehension** that the present claims recite substitution of amino acids outside CDR regions, as is the case for some of the claims for a copending case which is being prosecuted concurrently."   '762 FH at PDL-A 0003055-63 (Strong Decl. [D.I. 95] Ex. 15).   The PTO's subsequent Interview Summary states that agreement "was reached," and that the "claims are in condition for allowance" based on PDL's explanation that the claims **did not require framework amino acid substitutions**.   '762 FH at PDL-A 0003388 (Strong Decl. [D.I. 95] Ex. 15).

The specification does in fact contain "essential structural rules" for framework amino acid substitutions – but these are for the claims that require framework amino acid substitutions, which are not the asserted claims.   As the specification explains,

> In **another embodiment of the present invention**, **either in conjunction with the above comparison step or separately**, additional amino acids in the acceptor immunoglobulin chain may be replaced with amino acids from the CDR-donor immunoglobulin chain. More specifically, further **optional substitutions** of a human framework amino acid of the acceptor immunoglobulin with the corresponding amino acid from a donor immunoglobulin will be made at positions which fall in one or more of the following categories [listing categories].

'762 Patent at Col. 2:65 – Col. 3:6 (Strong Decl. [D.I. 95] Ex. 12).

Finally, the case law that the DOB invokes is not apposite.   For example, in *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1372 (Fed. Cir. 2007), *see* DOB [D.I. 96] at 6, ¶ 3, the "specification, however, uses language of requirement, not preference," when describing what the Federal Circuit concluded was a limitation.   *Anderson*, 474 F.3d at 1372.

Here, by contrast, the specification specifically states that framework amino acid substitutions are "possible," "optional," and "another embodiment" of the invention.   None of the DOB's cited cases involved such circumstances.

> **d.    Its Proffered Expert Testimony Conflicts with the Specification Definition and Other Intrinsic Evidence**

Citing two expert declarations, the DOB argues that when the patents were filed, one of ordinary skill at the time would have concluded that "'humanized immunoglobulin' in the patents-in-suit means 'an immunoglobulin comprising: a human acceptor framework in which one or more amino acids have been replaced by the corresponding amino acid(s) of the donor immunoglobulin; and one or more CDRs from the donor immunoglobulin.'"   DOB [D.I. 96] at 29-30.

In *Phillips*, however, the Federal Circuit cautioned that "a court should discount any expert testimony 'that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent.'"   *Phillips*, 415 F.3d at 1318 (citation omitted).   Here, the proffered testimony is at odds with the claims themselves (some claims require framework amino acid substitutions; some do not), the written description (the Abstract, Summary of the Invention, and Detailed Description of the Invention make clear that framework amino acid substitutions are "possible," "optional," and "another embodiment" of the invention), and the prosecution history (which, like the claims and specification, explains that framework amino acid substitutions are possible, optional, and another embodiment of the invention).   Under *Phillips*, the Court should thus discount the expert testimony.

It should discount the testimony for another reason, too.   The DOB's declarants defined the hypothetical person of ordinary skill in the art ("POSITA") differently, Supp. Strong Decl., ¶¶ 2-7, and the DOB does not try to reconcile them or decide which is correct.   And each defined the POSITA in a way that would exclude the lead named inventor, Dr. Cary Queen, *id.*, as below the level of ordinary skill as they define a POSITA.   The qualifications of the inventor are important to defining the POSITA; for example, it has long been true that the lead factor in

defining the POSITA is "the education level of the inventor."   *See, e.g., Envtl. Designs, Ltd. v. Union Oil Co.*, 713 F.2d 693, 696 (Fed. Cir. 1983).[3]   A definition of the POSITA that excludes the lead inventor as being under-qualified is odd.   Dr. Strong's definition of the POSITA, on the other hand, includes Dr. Queen, and he explains at length why the DOB's declarants' definition of the POSITA is not correct.   Supp. Strong Decl., ¶¶ 2-7.

> ### e.    Validity is Not At Issue, and its Declarant Dr. Foote's Prior Sworn Statements Contradict Defendant's Argument

The DOB's "humanized immunoglobulin" argument requires the premise that the asserted claims' 65%-homology approach was "set forth in the prior art by Winter" and according to the DOB are anticipated by Winter.   DOB [D.I. 96] at 13, ¶ 4 – 14, ¶ 1; *see also id.* at 22, ¶ 1 & at 30, ¶ 1 (adverting to enablement).   As an initial matter, the asserted '370 patent claims require 70% homology, not 65%, '370 Patent, Cols. 171-72 (Strong Decl. [D.I. 95] Ex. 13), and the DOB does not explain how its premise might apply to 70% homology claims.

More fundamentally, the premise is wrong, because validity is not at issue in claim construction absent an ambiguity issue not present here.   "While we have acknowledged the maxim that claims should be construed to preserve their validity, we have not applied that principle broadly, and **we have certainly not endorsed a regime in which validity analysis is a regular component of claim construction**.   Instead, we have limited the maxim to cases in which "the court concludes, after applying all the available tools of claim construction, that the claim is still ambiguous."   *Phillips*, 415 F.3d at 1327 (internal citations omitted).   Neither the DOB nor its two declarants argue that any of the asserted claims are ambiguous; to the contrary, they argue that the meaning is clear (although they use the wrong analysis and draw the wrong conclusion).   The doctrine that the DOB strains to apply does not apply.   *Phillips*, 415 F.3d at 1328 ("[t]he doctrine of construing claims to preserve their validity, a doctrine of limited utility in any event, therefore has no applicability here").

---

[3]    The other factors are:   (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) education level of workers in the field.   Dr. Strong applied these factors in defining the POSITA.   Supp. Strong Decl., ¶¶ 7(a)-(b).

We observe for completeness, however, that in the '762 patent's prosecution, the PTO **specifically** stated that PDL's claims were "free of the prior art" that the DOB invokes in its ironic effort to argue that the patents that defendant infringes are valid.  *See* PDL's Opening Brief [D.I. 93] § IV(A)(4) & Supp. Strong Decl., ¶¶ 11(a)-(c).   The DOB does not disclose this fact, much less address its legal effect.   In addition, at PDL's insistence the PTO specifically considered the art on which the DOB relies and issued the asserted claims over that art.  *See generally* Strong Decl. [D.I. 95] ¶¶ § XVII(C)(6) & Supp. Strong Decl., ¶¶ 11(a)-(c) (discussing prosecution history consideration of these references).   As has long been true, the burden to demonstrate validity is especially high when the PTO considered the art relied on for an invalidity attack.  *See, e.g., Am. Hoist*, 725 F.2d 1360.   Neither of the declarants explain how one of ordinary skill would have concluded that the high-homology approach of the patents-in-suit was present in the prior art, given that the PTO issued the high-homology claims over that art – and issued the '762 asserted claims with the specific conclusion that its high-homology claims were free of that prior art.

In addition, DOB declarant Dr. Jefferson Foote **told the PTO** in his own patent application **that the high-homology approach of the patents-in-suit represented an improvement over Winter, and that Queen taught the high-homology approach of the asserted claims**:

> U.S. Pat. No. **5,693,761** [which is a patent-in-suit] to Queen et al, discloses one **refinement on Winter** for humanizing antibodies, and is based on the premise that ascribes avidity loss to problems in the structural motifs in the humanized framework which, because of steric or other chemical incompatibility, interfere with the folding of the CDRs into the binding-capable conformation found in the mouse antibody. To address this problem, **Queen teaches using human framework sequences closely homologous in linear peptide sequence to framework sequences of the mouse antibody to be humanized**. Accordingly, the methods of Queen focus on comparing framework sequences between species. Typically, all available human variable domain sequences are compared to a particular mouse sequence and the percentage identity between correspondent framework residues is calculated. The human variable domain with the highest percentage is selected to provide the framework sequences for the humanizing project.

U.S. Patent No. 6,881,557 at Col. 4:17-34 (Supp. Wu Decl. Ex. 1).[4]   To obtain that patent, Dr.

Foote was legally required to declare under penalty of perjury that he had "reviewed and

underst[ood] the contents of the application" and that he believed them to be true and accurate.

37 C.F.R. §§ 1.51(b)(2), 1.63(b)(2).   In fact he signed such an oath:

> I further declare that all statements made herein of my own knowledge are true
> and that all statements made on information and belief are believed to be true; and further, that
> these statements were made with the knowledge that the making of willfully false statements and
> the like is punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the
> United States Code, and may jeopardize the validity of any patent issuing from this patent
> application.
>
> *Jefferson Foote*
> Jefferson Foote
> Date    21 Sept 02
> Residence    :    City of Seattle, County of King
>                     State of Washington

'557 FH at PDL-A 0247460 (Supp. Wu Decl. Ex. 3-A).

   Moreover, Dr. Foote repeated that statement – that Dr. Queen taught the use of

high-homology frameworks to make functional humanized immunoglobulins – during

prosecution of his '557 patent when trying to get around prior art:

> **Marasco**.  Marasco, in contrast to Applicant's teaching, follows very closely the
> line of logic set down by conventional prior art methods, such as disclosed by Queen (U.S.
> Patent No. 5,693,761), that human frameworks must match closely the sequence of the subject
> antibody frameworks in order for the subject antibody CDRs to function in a humanized
> molecule.  In this regard,  Marasco repeatedly states. "Best matched human VH and VL
> sequences were chosen *on the basis of high overall framework matching*, similar CDR length,
> and minimal mismatching of canonical and VH/VL contact residues." .

'557 FH at PDL-A 0247169 and PDL-A 0247336 (Supp. Wu Decl. Ex. 3-B).   Indeed, during his

---

[4] Dr. Foote's '557 patent referred to Dr. Winter's U.S. application, the disclosures of which
are the same as the European application.  '761 FH at PLD-A 0003865 (Supp. Wu Decl.
Ex. 2).  The disclosures of Dr. Foote's '557 patent also explained that in the '761 patent,
framework amino acid substitutions are also important and that "[c]andidate residues for
retention are typically those adjacent in linear sequence to a CDR or physically within 6
Å of any CDR residue."  U.S. Patent No. 6,881,557 at Col. 4:34-40 (Supp. Wu Decl. Ex.
1).  There are claims in the '761 patent that require such framework amino acid
substitutions – for example, claim 10, which requires substitutions when the amino acid
is, among other things, physically "within a distance of 6 Å of a CDR."   Such claims are
not asserted, and are part of the "another embodiment" that the specification discusses.

'557 patent's prosecution, Dr. Foote specifically criticized Winter because it taught that ***any frameworks*** could be used with any CDRs:

> no particular sequences or properties were ascribed to the framework regions, indeed, **Winter taught that any set of frameworks could be combined with any set of CDRs**. . . . Thus, the general humanizing methods described by Winter and Jones have the disadvantage of frequently leading to inactive antibodies because **these references do not provide information needed to rationally select** among the many possible **human framework sequences**, those most likely to support antigen binding required by a particular CDR region from a nonhuman antibody.

'557 FH at PDL-A 0247134 (Supp. Wu Decl. Ex. 3-C).   Dr. Foote told the PTO that by teaching the use of 65%- or 70%-homology frameworks, the Queen patents were a "refinement" that "address[ed] that problem" of Winter.   U.S. Patent No. 6,881,557 at Col. 4:17-34 (Supp. Wu Decl. Ex. 1).   Finally, Dr. Foote also made these same statements about the Queen patents the year before PDL filed this lawsuit, in a U.S. patent application that he filed in 2006 and which was published in 2007.   U.S. Patent App. Pub'n No. US 200710003547 A1 at Col. 2, ¶ 14 (Supp. Wu Decl. Ex. 4).   That application also had to include a declaration from Dr. Foote that he had reviewed and affirmed those statements.   37 C.F.R. §§ 1.51(b)(2) & 1.63(b)(2).   These multiple prior sworn statements are, at best, in tension with Dr. Foote's proffered opinion in this litigation, and Dr. Clark's identical opinion, that the high-homology approach of the asserted claims was already known in the prior art.   *E.g.*, Foote Decl. [D.I. 103] ¶ 43; Clark Decl. [D.I. 105] ¶ 46.

> **2.     The "Donor Immunoglobulin," "Human Acceptor Immunoglobulin/Acceptor Human Immunoglobulin," "Framework," "Humanized Immunoglobulin Heavy Chain Variable Region Framework," And "Humanized Immunoglobulin Light Chain Variable Region Framework" of the Asserted Claims Do Not Require Framework Amino Acid Substitutions**

The DOB sees required framework amino substitutions in almost every disputed claim phrase.   As just explained above, it incorrectly saw them in "humanized immunoglobulin."   It sees them in six other claim phrases, too:   "donor immunoglobulin," "human acceptor immunoglobulin/acceptor human immunoglobulin," "framework," "humanized

immunoglobulin heavy chain variable region framework," and "humanized immunoglobulin light chain variable region framework."   DOB §§ IV(B) – (E).   The DOB contends that this conclusion is compelled "because the humanized immunoglobulin of PDL's invention must include framework substitutions of the human acceptor with mouse framework amino acids." DOB [D.I. 96] at 30, ¶ 2 – 31, ¶ 3.   For all of the reasons just explained, the conclusion that "PDL's invention must include framework substitutions" is not compelled, and it is not even sustainable.   The asserted claims do not require substitutions (although some non-asserted claims do, on their face); the specification does not require substitutions; the file histories do not require substitutions; and a validity analysis (even if relevant) would not require substitutions. *See supra* §§ II(A)(1).

Moreover, the DOB does not address the legal effect of the fact that the specification defines these disputed claim terms, in a section that begins "[i]n order that the invention may be more completely understood, several definitions are set forth":

- "donor immunoglobulin":   "As used herein, . . . [t]he non-human immunoglobulin providing the CDR's is called the 'donor.'"   '762 Patent, Col. 11:1-2 & 12:1-3 (Strong Decl. [D.I. 95] Ex. 12);

- "acceptor":   "As used herein, . . . [t]he human immunoglobulin providing the framework is called the 'acceptor.'"   *Id.* at Col. 11:1-2 & 12:1-3;

- "framework":   "An immunoglobulin light or heavy chain variable region consists of a 'framework' region interrupted by three hypervariable regions, also called CDR's.   The extent of the **framework** region and **CDR's** have been **precisely defined** (see, 'Sequences of Proteins of Immunological Interest,' E. **Kabat** et al., U.S. Department of Health and Human Services, (1983); which is incorporated herein by reference)."   *Id.* at Col. 11:35-41; and

- "humanized" immunoglobulin:   "As used herein, the term 'humanized' immunoglobulin refers to an immunoglobulin comprising a human framework region and one or more CDR's from a non-human (usually a mouse or rat) immunoglobulin."   *Id.* at Col. 11:65 – 12:1.

Instead, the DOB ignores these definitions.   The DOB thus necessarily fails to address the definitions' legal effect:   they govern.   *Phillips*, 415 F.3d at 1317; *see also Guttman*, 302 F.3d

at 1360 (reversing because where the specification defines a disputed claim term, "it [is] error for the District Court to overlook it").   Finally, the cited paragraphs of the declarants are often entirely conclusory.   "[C]onclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court."   *Phillips*, 415 F.3d at 1318.

### 3.    The "DNA Segment[s] Encoding" Terms Do Not Require Framework Amino Acid Substitutions

The only basis that the DOB asserts for its argument that the "DNA segment[s] encoding" terms require framework amino acid substitutions is that "the humanized immunoglobulins of PDL's invention are required to have a framework mutation.   *See, e.g.*, Ex. 7 at ¶¶ 11, 14-15.   Accordingly, the DNA segments encoding portions of at least one of the heavy or light chains of the humanized immunoglobulins should also reflect that limitation."   DOB [D.I. 96] at 32.   The DOB cites neither of its declarants and offers no other support for its requested constructions.   DOB [D.I. 96] at 31-33.   Just as "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court," *Phillips*, 415 F.3d at 1318, so is conclusory, unsupported argument.

The DOB does not offer any separate argument or evidence for its requested constructions.[5]   However, based on the parties' communications before filing the Opening Briefs, it appeared that defendant contended that (a) the "DNA segment**s** encoding" terms somehow excluded two distinct encoding polynucleotides joined on one larger encoding polynucleotide, and (b) the "DNA segment encoding" terms somehow excluded one DNA segment being joined to another on a larger segment.   As PDL's Opening Brief explained thoroughly, the specification, file history, and the understanding of one of ordinary skill in the art at the time, corroborated by contemporaneous textbooks and technical dictionaries, exposed

---

[5]    The DNA segment[s] terms at issue are: "DNA segment encoding a humanized heavy chain variable region" / "DNA segment encoding the humanized immunoglobulin heavy chain variable region"; "DNA segment encoding a humanized light chain variable region" / "DNA segment encoding the humanized immunoglobulin light chain variable region"; "DNA segments encoding the humanized heavy and light chains"; "DNA segments encoding humanized light and heavy chain variable regions" / "DNA segments encoding heavy and light chain variable regions of a humanized immunoglobulin."

those contentions as not tenable.   PDL's Opening Brief [D.I. 93] § IV(D)(3).   As defendant has submitted no argument and referenced no evidence on this point, defendant should be deemed to have waived that argument.   Even if it has not, PDL's Opening Brief discussion lays these issues to rest.

> ### B.   Defendant's "Synthesizing" Position Also Attempts to Import Limitations from the Specification

The DOB's revised construction of "synthesizing a [the] DNA segment encoding a humanized heavy [light] chain variable region" once again attempts to import a limitation from the specification into the claims.   The DOB's new position is that "[s]nthesizing a [the] DNA segment encoding the humanized heavy [light] chain variable region" means "producing a polynucleotide encoding the entire humanized heavy chain variable region by synthesizing *de novo* and ligating oligonucleotides."[6]   Like defendant's original definition, the DOB's new construction is inconsistent with the claim language, specification, the prior art incorporated into the specification, and the common understanding of one of ordinary skill at the time.

As discussed in PDL's Opening Brief, the claim language does not support defendant's construction.   PDL's Opening Brief [D.I. 93] at 38-39.   Nothing in the claim language requires "synthesizing *de novo* and ligating oligonucleotides."   The DOB contends that the claims distinguish between two methods of producing a humanized immunoglobulin: "synthesizing the DNA segment" or "providing a cell containing DNA segments."   DOB [D.I. 96] at 36, ¶ 2.   But those two claim phrases do not describe alternative methods for producing a humanized immunoglobulin.   Rather, they describe **separate** **steps** in the process of producing a humanized immunoglobulin.   For example, asserted claim 1 of the '370 patent provides that "providing a cell containing DNA segments" and "synthesizing the DNA segment" are both required steps in producing a humanized immunoglobulin:

1. A method of producing a humanized immunoglobulin which

---

[6]   Before filing opening briefs, the parties exchanged constructions.   Defendant originally proposed that "synthesizing a [the] DNA segment encoding a humanized heavy [light chain variable region" meant "producing the entirety of a DNA segment encoding a humanized heavy [light] chain variable region by synthesizing de novo, annealing, and extending oligonucleotides."   The construction in the DOB is new.

specifically binds to an antigen, the method comprising:

**providing a cell containing DNA segments** encoding humanized light and heavy chain variable regions; and expressing the DNA segments in the cell to produce the humanized immunoglobulin;

wherein **the cell containing the DNA segments was produced by**:

(1) comparing the sequence of a donor immunoglobulin heavy chain variable region against a collection of sequences of human heavy chain variable regions;

(2) selecting a human heavy chain variable region from the collection of human heavy chain variable regions to provide an acceptor heavy chain variable region, wherein the selected variable region framework is at least 65% identical to the donor immunoglobulin heavy chain variable region framework, wherein percentage sequence identity is determined by aligning amino acids in said frameworks by Kabat numbering;

(3) **synthesizing the DNA segment** encoding the humanized heavy chain variable region, comprising complementarity determining regions (CDRs) from the donor immunoglobulin heavy chain variable region and a variable region framework from the selected acceptor heavy chain variable region;

(4) introducing the DNA segment encoding the humanized immunoglobulin heavy chain variable region and the DNA segment encoding the humanized immunoglobulin light chain variable region into the cell,

wherein the humanized immunoglobulin heavy chain variable region framework comprises at least 70 amino acid residues identical to those in the acceptor immunoglobulin heavy chain variable region framework.

Based on the claim language, one of ordinary skill would not have understood the claim language to distinguish between two methods of producing a humanized immunoglobulin, as the DOB theorizes; rather, one of ordinary skill would have understood the claim language to refer to separate steps.   Supp. Strong Decl., ¶¶ 37-38.   "[T]he use of a term within the claim provides a firm basis for construing the term."   *Phillips*, 415 F.3d at 1314.   Here the claim language

points away, and firmly so, from the DOB's supposition.[7]

The specification also fails to support the DOB's new construction.   The DOB observes that "[t]he **preferred** **method** of synthesizing and ligating oligonucleotides to produce the DNA segments of the invention is set forth in several examples of the patents-in-suit," and argues that the "preferred method" is not just preferred but is "required," inexorably.   DOB [D.I. 96] at 36. ¶¶ 1-2.   The very language the DOB cites, however, makes it clear that the preferred method is not required: "[o]nce designed, the **immunoglobulins**, including binding fragments and other immunoglobulin forms, **of the present invention may be produced readily by a variety of recombinant DNA or other techniques**.   Preferably, polynucleotides encoding the desired amino acid sequences are produced synthetically and by joining appropriate nucleic acid sequences, with ultimate expression in transfected cells."   '762 Patent, Col. 3:44-50 (Strong Decl. [D.I. 95] Ex. 12).   And as the DOB admits: "[t]he patent specification teaches that the DNA segments of the invention may be formed by **many methods**, for example, using cDNA, RNA, synthetic oligonucleotides, or genomic DNA."   DOB [D.I. 96] at 35, ¶ H(1).

The relevant legal precedent has "expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment."   *Phillips*, 415 F.3d at 1323.   "[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments."   *Id.*   And the patents specifically say that the examples are just that:   examples.   '762 Patent, Col. 37:66-67 ("examples are offered by way of illustration, not by limitation")(Strong Decl. [D.I. 95] Ex. 12.).   The DOB's invitation to convert examples into requirements is an invitation to err.   *Unitherm Food Sys.*, 375 F.3d at 1351 ("In fact, the examples are precisely what they purport to be: examples . . . .   ConAgra does little other than

---

[7]      In any event, as a technical matter, "synthesizing de novo and ligating oligonucleotides" does not accurately describe the methods set forth in the experimental section of the specification.   In Example 1, the final DNA segment encoding the heavy chain is produced in part by enzymatic synthesis (also described as extension).   This enzymatic synthesis uses other oligonucleotides as a template and could not be described as "synthesizing de novo."   Supp. Strong Decl.,, ¶¶ 43-45.

'invite[] a violation of our precedent counseling against importing limitations into the claims.');
*Pfizer*, 457 F.3d at 1290.   In sum, neither the specification nor the law support the DOB's effort
to convert specification examples described as a preference into requirements of the claims.

Defendant's position also (incorrectly) assumes that one of ordinary skill would
have understood "synthesizing" in the asserted claims to mean "synthetic" production.   DOB
D.I. 96] at 35, ¶ H(1).   As Dr. Strong explains, one of ordinary skill would have understood that
"synthesizing" may encompass producing polynucleotides synthetically, **in addition to**
producing polynucleotides by other methods.   Supp. Strong Decl., ¶¶ 41-42.   The specification
does not require that the two be conflated, as the DOB argues.   Indeed, the extrinsic evidence
from Drs. Clark and Foote contradicts the DOB's conflation contention.   Drs. Clark and Foote
both contend that the meaning of "synthesizing (of DNA)" to one of ordinary skill in the art
would have been "building (i.e. polymerization manufacture) of a known sequence of
nucleotides into a chain called an oligonucleotide . . . or DNA."   Clark Decl. [D.I. 105] at ¶ 73;
Foote Decl. [D.I. 103] at ¶ 72.   Their testimony confirms PDL's position that one of ordinary
skill in the art would understand that "synthesizing" is synonymous with "producing" a
polynucleotide and is not limited to "synthetic production."

Finally, Dr. Clark's conclusion that the skilled artisan would have no choice but
to synthesize oligonucleotides *de novo* is based on the counterfactual assumption that DNA
sequencing by polymerase chain reaction (PCR) was not commercially available.   Clark Decl.
[D.I. 105] at ¶ 75 (D.I. 105).   The specification's Figure 14 shows a "[s]cheme for anchored
polymerase chain reaction (PCR) cloning of the heavy and light chain variable domain cDNAs."
'762 Patent, Col. 5:38-40 (Strong Decl. [D.I. 95] Ex. 12).   And the specification reflects that
PCR sequencing was in use at the time, and that DNA sequences of antibodies could be readily
obtained:   "cDNAs for the heavy chain and light chain variable domain genes of each antibody
were cloned using anchored polymerase chain reactions (Loh et al., Science 243, 219 (1989)),
using 3' primers that hybridized to the constant regions and contained HindIII sites, and 5'
primers that hybridized to the dG tails and contained EcoRI sites (Scheme shown in FIG. 14)."

'762 Patent, Col. 36:42 (Strong Decl. [D.I. 95] Ex. 12).   In other words, not only was PCR

commercially available, the specification reflects its actual use by PDL.

>    **C.    Looking to European Patent Office Proceedings for Support, the DOB Looks Past the Specification's Specific Definition of "CDR," its Usage in the Specification, and the File Histories**

>>    **1.    When the Specification Defines a Claim Term, that Definition Governs, and the Specification Defines "CDR"**

As noted, the DOB agrees that when the specification specifically defines a term,

that definition governs.   DOB [D.I. 96] at 5, ¶ 3; *see also Phillips*, 415 F.3d at 1316 ("the

specification may reveal a special definition given to a claim term," and "[i]n such cases, the

inventor's lexicography **governs**.")   Where the specification defines a disputed claim term, "it

[is] error for the District Court to overlook it."   *Guttman*, 302 F.3d at 1360 (reversing in light of

specification's explicit definition).

Here, as elsewhere, the DOB fails to apply this rule.   The patents specifically

define "complementarity determining region" in a passage that states **twice** that it is a definition:

"[i]n order that the invention may be more completely understood, **several definitions are set**

**forth**. . . .   [¶]   An immunoglobulin light or heavy chain variable region consists of a

'framework' region interrupted by three hypervariable regions, also called CDR's.   The extent

of the framework region and CDR's **have been precisely defined** (see, "Sequences of Proteins

of Immunological Interest," E. Kabat et al., U.S. Department of Health and Human Services,

(1983); which is incorporated herein by reference)."   '762 Patent, Col. 11:1-2 & 11:34-41

(Strong Decl. [D.I. 95] Ex. 12).

The DOB never addresses this specific definition or its effect under the governing

*en banc* law.   Instead, the DOB initially takes the position that the patents adopted a special

definition of "CDR" – but not the definition that is identified as the definition, in the section of

the specification that begins "[i]n order that the invention may be more completely understood,

**several definitions are set forth**."   Instead, the DOB argues that "[t]he patent specification

adopts the definition of CDR as that of Kabat together with that of Chothia," DOB [D.I. 96] at

15, ¶ 2, in a passage that appears some 12 columns after the patent's definitions section.   *Id.*

(citing '762 Patent, Col. 23:8-15).

When assessed against the relevant legal principles, that argument is not tenable, as we next explain.

### 2. The "Definition" that the Defendant's Opening Brief Cites is Not a Definition, Conflicts with the Specification's Actual Definition, and is Inconsistent with Other Portions of the Specification

The "definition" that the DOB cites is not a definition under the claim construction law. Although "rigid formalism is not required," *Astrazeneca AB v. Mutual Pharm. Co., Inc.*, 384 F.3d 1333, 1339 (Fed. Cir. 2004), the Federal Circuit has "repeatedly emphasized that the statement in the specification must have sufficient clarity to put one reasonably skilled in the art on notice that the inventor intended to redefine the claim term." *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1370 (Fed. Cir. 2005). "The patentee's lexicography must, of course, appear 'with reasonable clarity, deliberateness, and precision' before it can affect the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1988) (citation omitted). Statements to the effect that terms "are defined below" are "a strong signal of lexicography." *Astrazeneca*, 384 F.3d at 1340. The "definition" that the DOB cites lacks such a signal – and ignores that portion of the specification that explicitly contains such a signal.

Instead, the DOB's cited passage appears only in one section of the specification, twelve columns after the definitions section begins, in a discussion of one particular embodiment (anti-IL-2 receptor antibodies) of claims that are not asserted. Supp. Strong Decl., ¶¶ 30(a)-(d). That is not the "clarity, deliberateness, and precision," *Renishaw*, 158 F.3d at 1249, that the law requires. And the fact that the cited passage does not appear in the discussion of the other disclosed embodiments suggests, both to one of ordinary skill in the art, *id.*, and as a matter of common sense, that the "definition" does not apply to all of the claims. In addition, although all of the patents' successful disclosed embodiments are directed to framework substitution claims, and not the homology claims that are asserted, it is nonetheless true that in each of the successful disclosed examples, the underlined "CDRs" are each CDRs as defined by the Kabat

methodology, not by the Kabat + Chothia methodology.   Strong Decl. [D.I. 95] ¶¶ § IV(F).   To one of ordinary skill, the fact that each of these examples employs the Kabat definition for CDRs point away from the DOB's peculiar assertion that the passage it cites could be a definition that trumps all of the other intrinsic evidence.   *See* Supp. Strong Decl., ¶¶ 30(a)-(d).

In addition, as explained in PDL's opening brief, prior art can be useful in construing a claim term, because it can be evidence of what that claim term meant to those of ordinary skill in the art at the time.   *See, e.g., Kumar v. Ovonic Battery Co., Inc.*, 351 F.3d 1364, 1368 (Fed. Cir. 2003).   The prior art that the patent discusses employs the Kabat methodology.

Indeed, even when referring to the Chothia references that supply the alternative methodology that the DOB invokes, the patents rely on the Kabat methodology.   The patents state that "[t]he amino acids at several positions **in the framework** are known to be capable of **interacting with the CDRs** in many antibodies (***Chothia*** and Lesk, *J. Mol. Biol.* 196, 901 (1987), ***Chothia*** et al., *Nature* 342, 877 (1989), and Tramontano et al., *J. Mol. Biol.* 215, 175 (1990), all of which are incorporated herein by reference), notably at **positions** . . . **26-30**, . . . of the **heavy chain** (numbering according to Kabat, op. cit.), . . ." '762 Patent Col. 15:16-23 (Strong Decl. [D.I. 95] Ex. 12).   But amino acids at those positions are outside of the CDRs (i.e., are "in the framework . . . known to be capable of interacting with the CDRs") **only** if CDR is defined by the Kabat methodology.   If "CDR" is defined by the aggregate of the Kabat and Chothia methodologies (the result the DOB seeks), then those amino acid positions are in the CDR, i.e., they are not "in the framework . . . known to be capable of interacting with the CDRs."   Strong Decl. [D.I. 95] Opinion 6, ¶¶ C(9).

The DOB invokes Riechmann as a basis to define "CDR" as 'Kabat + Chothia."   DOB [D.I. 96] at 17, ¶ 1.   However, Riechmann defined CDR by the Kabat methodology, Strong Decl. [D.I. 95] Opinion 6, ¶¶ C(5)(b)(i), not by the methodology that the DOB seeks.   Indeed, the DOB admits this.   DOB [D.I. 96] at 10 ("Riechmann, throughout his published reference reporting this humanized antibody with framework substitutions, relied upon a particular definition of CDR as set forth by the scientist Kabat").   The DOB invokes Jones *et al.*,

Replacing The Complementarity-Determining Regions In A Human Antibody With Those From A Mouse, 321 *Nature* 522 (1986). DOB [D.I. 96] at 9. Jones applied the Kabat methodology to determine the boundaries of the CDRs. Strong Decl. Opinion 6, ¶¶ C(5)(b)(ii).

The DOB invokes Verhoeyen *et al.*, Reshaping Human Antibodies: Grafting an Antilysozyme Activity, 239 *Science* 1534 (1988). DOB [D.I. 96] at 23. Like the Winter and Jones art that the DOB invokes, Verhoeyen applied the Kabat methodology to determine the boundaries of the CDRs. Strong Decl. Opinion 6, ¶¶ C(5)(b)(ii). So, too, of other art that the specification discusses. *See* Strong Decl. Opinion 6, ¶¶ C(5)(b)(iii) (patents invoke Amit, et al, 233 *Science* 747-753 (1986), which also applied the Kabat methodology to determine the boundaries of the CDRs); *id.* Opinion 6, ¶¶ C(5)(b)(iv) (patents invoke Tramontano et al., *J. Mol. Biol.* 215, 175 (1990), which also applied the Kabat methodology to define determine the boundaries of the CDRs). *See generally* Supp. Strong Decl., ¶ 30(e).

The DOB also appears to argue that there were two different definitions of CDR in common use at the time that the patent applications were filed – one defining the boundaries by the Kabat methodology, and one defining the boundaries by the Chothia methodology. *See* DOB [D.I. 96] at 15, ¶ 1; *see also* Clark Decl., ¶ 29 (D.I. 105). As a technical matter, that is not correct: as Dr. Strong explains, the accepted usage at the time defined a CDR by the Kabat methodology. Strong Decl., Opinion 6 ¶¶ 7(a) – (d). But the Court need not resolve whether both the Chothia definition and the Kabat definition were in general usage at the time. The patent's specification specifically identified the Kabat definition as "precisely" delineating the boundaries of both the "framework" and the "CDRs." '762 Patent, Col. 11:1-2 & 35-41 (Strong Decl. [D.I. 95] Ex. 12). If there were another definition in general usage, the patent's precise definition would govern it. *Phillips*, 415 F.3d at 1317; *Pfizer,* 480 F.3d at 1353 n.3 ("We recognize that hydrochloride and hydrobromide are not technically anions. However, since the patentee chose to be his own lexicographer, we will refer to these two acids as anions for purposes of this opinion."); *Int'l Rectifier Corp.,* 361 F.3d at 1373 (patentee defined "annular," which ordinary meant ring-shaped, to mean polygonal); *Hormone Research Found.,* 904 F.2d at

1563 (patentee is free to be his or her own lexicographer and to define terms "in a manner contrary to or inconsistent with one or more of their ordinary meanings").

**3.    The European Proceedings Involving a European Patent Do Not Provide the Traction that Defendant's Opening Brief Seeks**

Seeking a toehold in European Patent Office records because the records of the United States Patent and Trademark Office do not advance its cause, the DOB theorizes that statements from the European Patent Office Opposition Proceedings ("European Proceedings") for EP 045 216 B1 ("the European Patent") somehow compel the conclusion that the boundaries of a "CDR," as used in the asserted claims of the U.S. patents-in-suit, are determined by the aggregate of the Kabat and Chothia methodologies.    DOB [D.I. 96] at 19-21.    This argument fails for two independent reasons:    statements in those European records are legally immaterial, and they are factually inapposite.

**a.    The Statements Made in the European Proceedings Are Legally Immaterial Because European Patent Law is Different**

Under U.S. patent law, "statements made during prosecution of foreign counterparts to [the patent-in-suit] are irrelevant to claim construction" because of differences in international requirements for patentability.    *Pfizer, Inc. v. Ranbaxy Labs, Ltd.,* 457 F.3d 1284, 1290 (Fed. Cir. 2006); *see also TI Group Automotive Sys. (N. Am.), Inc. v. VDO N. Am., L.L.C.*, 375 F.3d 1126, 1136 (Fed. Cir. 2004).    Even if relevant, it is inappropriate to invite a court "to rely upon extrinsic evidence of what happened before a foreign patent office, without a complete presentation of such evidence, nor a complete understanding of what happened before the foreign body and why that was important under foreign law."    *Burns, Morris & Stewart Ltd. Partnership v. Masonite Int'l*, 401 F. Supp. 2d 692, 698 (E.D. Tex. 2005).    The DOB nonetheless extends that invitation.

The Court should decline it.    The statements made in the European Proceedings were made pursuant to arguments under "Article 69 and the Protocol on the Interpretation of Article 69 of the [European Patent] Convention." DOB Ex. 11 at 376 ¶ 2.    The DOB does not show that statements made to support arguments under Article 69 and the Protocol on the

Interpretation of Article 69 of the European Patent Convention are relevant to the question before this Court:   what, under U.S. patent law and in particular the controlling Federal Circuit precedent including *Phillips*, do these claim terms mean in this patent?   In addition, the European Proceedings went on for years, and the records comprise thousands upon thousands of pages.   '216 FH Index at PDL-A 0016378-0016475 (Supp. Wu Decl. Ex. 5); '040 FH Index at PDL-A 0016501-0016530 (Supp. Wu Decl. Ex. 6).   The DOB did not make a complete presentation of such evidence or provide a complete understanding of what happened before the foreign body or why that was important under the foreign law.   The statements that the DOB invokes are thus legally inapposite.

> **b.    The Particular Statements On Which Defendant Relies Are Factually Inapposite, Because the European Specification Specifically Defined "CDR" to be Kabat Plus Chothia**

The statements are also factually inapposite.   One of the claims at issue in the European Patent was different – it specifically defined "CDR" as the aggregate of Kabat plus Chothia:   it required "the use of at least one amino acid substitution outside of complementarity determining regions ("CDRs") as defined by Kabat et al. (Sequences of Proteins of Immunological Interest", **Kabat**, E., et al., US Department of Health and Human Services, (1983)) **together** **with** **Chothia** et al. (Chothia and Lesk, J. Mol. Biol., 196:901-917 (1987) . . . ." European '216 Patent) at 13 (Supp. Strong Decl. Ex. 9).   The specification at issue in the European Patent was different – like that European claim, it specifically defined "CDR" (in the Summary of the Invention, at page 3, lines 29 to 32) as the aggregate of Kabat plus Chothia: "The invention provides the use of at least one amino acid substitution outside of complementarity determining regions (CDR's) **as defined** **by Kabat** et al ("Sequences of Proteins of Immunological Interest", Kabat, E., et al., US Department of Health and Human Services, (1963)) **together** **with** **Chothia** et al (Chothia and Lesk, J. Mol. Biol. 196:901-917 (1987))."   European '216 Patent at 3 (Supp. Strong Decl. Ex. 9).   These differences expose the DOB's argument that the European Patent claims and the asserted claims have "near identity" and "a substantially similar disclosure."   DOB [D.I. 96] at 19 ¶ A(2).

The European Patent Office's conclusion was based on these different, and explicit, definitions.   The European Patent Office wrote that "[t]he Board concludes therefrom that the **definition of the term CDRs** given on page 3, lines 29 to 32 of the description, and contained in claim 1 as granted, is an overriding requirement of the invention and is thus convinced that the skilled reader applies this definition to interpret the term CDRs whenever it is used in the amended patent without any further accompanying definition."   '216 European Proceeding at 23 [PDL-A 0042544] (Supp. Wu Decl. Ex. 7).   The European Patent Office concluded that under European patent law, these definitions controlled the analysis.   *Id*.

In sum, in the European Proceedings, the European Patent Office looked at a specification that defined "CDR" to be 'Kabat + Chothia' and a claim that defined "CDR" to be 'Kabat + Chothia,' and concluded that "CDR" in the context of that specification and the claims of that patent that "CDR" meant 'Kabat + Chothia' under "Article 69 and the Protocol on the Interpretation of Article 69 of the [European Patent] Convention," DOB Ex. 11 at 376 ¶ 2.   It is strange for the DOB to argue that that European analysis and European result compels the conclusion that under U.S. law a U.S. patent that specifically defines "CDR" to mean Kabat only means, instead, that "CDR" is defined as 'Kabat + Chothia.'

The DOB's invocation of the European Proceedings to support its 'CDR = Kabat + Chothia' aspiration is doubly strange in light of the fact that the accepted meaning of "CDR" was Kabat only, according to the European Patent Office.   It wrote that "the parties do not dispute that said term ["CDR"] in the application as originally filed was defined according to the definition generally used and accepted by a skilled person working in the field of humanised immunoglobulins at the filing date of the application, 28 December 1989, namely the definition of ***Kabat***."   '216 European Proceeding at 18 [PDL-A 0042539] (Supp. Wu Decl. Ex. 7) (emphasis in original).

Finally, the DOB makes a passing reference to European Opposition Proceedings involving PDL's European Patent Application No. EP 0 682 040 A1.   DOB [D.I. 96] at 20, ¶ 3 (referring to DOB Ex. 8).   That other European patent application did not contain the Kabat-

only definition of CDR that the U.S. patents asserted here contain, EP 0 682 040 at PDL-A 0016577-0016500 (Supp. Strong Decl. Ex. 8); *see generally* Supp. Strong Decl., ¶ 35, and hence is factually inapposite.   The European Patent Office concluded in that other European proceeding that that European patent contained, under European law, a specific definition of "CDR" that encompassed both Kabat and Chothia.   '040 European Proceeding at 11-13 (noting that "[o]nly one technical definition can be derived from" the specification) [PDL-A 0037252-54] (Supp. Wu Decl. Ex. 8).   For the same reasons as discussed in this section, this other European proceeding does not provide the lift that the DOB's argument requires.

### 4.    The File Histories Are Consonant with the Specification's Precise Definition, and Are Not Words of Manifest Exclusion Representing a Clear Disavowal of Claim Scope

The patents precisely define "CDR":   "In order that the invention may be more completely understood, several definitions are set forth. . . . [¶]   An immunoglobulin light or heavy chain variable region consists of a 'framework' region interrupted by three hypervariable regions, also called CDR's.   The extent of the framework region and CDR's have been **precisely defined** (see, 'Sequences of Proteins of Immunological Interest,' E. Kabat et al., U.S. Department of Health and Human Services, (1983); which is incorporated herein by reference)." '762 Patent, Col. 11:1-2 & 35-41 (Strong Decl. [D.I. 95] Ex. 12).   Seeking to avoid this precise definition, the DOB invokes the file histories.   As a point of fact, the file histories are consonant with the patent's specific definition, and one of ordinary skill would have understood that.   *See generally* Strong Decl. [D.I. 95] Opinion 6, ¶¶ C(6); Supp. Strong Decl., ¶ 31.   As a point of law, the patent's precise definition trumps broad contradictory statements in the prosecution history.   *3M Innovative Props. Co. v. Avery Dennison Corp.*, 350 F.3d 1365, 1373 (Fed. Cir. 2003); *Storage Tech. Corp. v. Cisco Sys., Inc.*, 329 F.3d 823, 833 (Fed. Cir. 2003).

In any event, the snippets that the DOB invokes, from the thousands of pages that comprise the file histories, do not overcome the specification's definition or the file histories as a whole.   Examination of the documents that the DOB specifically invokes do not help its cause.

The DOB principally invokes statements from the prosecution of U.S. Patent No.

31

5,530,101 – which is not an asserted patent.   The DOB begins with an Amendment and Remarks in response to an Office Action.   DOB [D.I. 96] at 17, ¶¶ 2 (citing DOB Ex. 13 at 17).   The DOB recognizes the fact "these statements were made only in the context of certain claims of the patents that explicitly require framework amino acid substitutions" – in other words, not in the context of the asserted claims.   DOB [D.I. 96] at 17, n. 11.   The DOB overlooks the effect of this fact.   For prosecution history disclaimer to apply, the invoked prosecution history section must "directly address" the disputed limitation.   *Aquatex*, 419 F.3d at 1381.   The DOB does not argue that "CDR" requires framework amino acid substitutions, and thus the invoked passage is legally irrelevant.

Moreover, for prosecution history disclaimer to apply, the invoked prosecution history section must contain "words or expressions of **manifest** **exclusion** or restriction representing a **clear** **disavowal** **of** **claim** **scope**."   *NTP*, 418 F.2d at 1308-09 (declining to find disclaimer); *see also Elbex*, 508 F.3d at 1371; *Sorensen*, 427 F.3d at 1380; *Honeywell,* 493 F.3d at 1365.

The DOB does not argue that the quoted passage represents a manifest exclusion representing a clear disavowal of claim scope, and an independent review of the passage from the '101 prosecution history refutes any notion that it was.   The invoked passage states:

> The position 27 and 30 modifications of Riechmann et al. were in fact within the Chothia-Lesk H1 CDR, rather than outside this CDR. Moreover, **Riechmann** et al. **provided** **no** **suggestion** **or** **guidance** **as** **to** [1] **which** **if** **any** **non**-**CDR** **positions** **to** **substitute**, **or** [2] **which** **amino** **acids** **should** **be** **put** **in** **those** **positions** (see paragraph 26 of accompanying Queen declaration).

DOB [D.I. 96] at 17, ¶ 2 (citing DOB ex. 13 at 17; brackets supplied).   The specification states that Riechmann made amino acid substitutions in the framework, **not** the CDRs:

> Most humanized immunoglobulins that have been previously described (Jones et al., op. cit.; Verhoeyen et al., op. cit.; Riechmann et al., op. cit.) have comprised a framework that is identical to the framework of a particular human immunoglobulin chain, the acceptor, and three CDR's from a non-human donor immunoglobulin chain. **In** **one** **case** (**Riechmann** et al., op. cit.), two additional amino acids **in** **the** **framework** were changed to be the same as amino acids in other human framework regions.

'762 Patent, Col. 12:29-37 (Strong Decl. [D.I. 95] Ex. 12).   Indeed, the DOB itself argues that "within the variable region of an immunoglobulin, a particular amino acid is part of the framework or it is part of a CDR; it cannot be both."   DOB [D.I. 96] at 21, ¶ 3.   Hence, read fairly and in light of the specification, the gist of the invoked '101 prosecution history passage is to distinguish Riechmann on the grounds that it provided no suggestion or guidance as to [1] which if any non-CDR positions to substitute, or [2] which amino acids should be put in those positions provided.   *See also* Supp. Strong Decl., ¶ 31(b).

        The passage's observation that the two amino acid substitutions that Riechmann made were in the Chothia H1 CDR was technically accurate, Supp. Strong Decl., ¶ 31(b), and particularly in light of the specification's statement that that Riechmann made amino acid substitutions in the framework, this passage does not demonstrate a manifest exclusion representing a clear disavowal of claim scope.   Certainly one of ordinary skill would not understand it as such.   *Id*.   At worst the passage is ambiguous, and prosecution disclaimer does not apply to an ambiguous disavowal.   *E.g.*, *N. Telecom*, 215 F.3d at 1293-95 (holding that prosecution disclaimer did not "support the judicial narrowing of a clear claim term" because the inventors' statements were amenable to multiple reasonable interpretations); *Pall*, 259 F.3d at 1393-94 (remanding because the scope of disclaimer over the prior art reference was ambiguous).

        The DOB next invokes ¶ 9 of a 19-page declaration that Dr. Cary L. Queen, the lead named inventor, initially filed in the '101 prosecution history to support the irrelevant '101 prosecution history passage just discussed.   DOB [D.I. 96] at 17, ¶ 3.   This paragraph, which discusses Riechmann, is likewise not probative.   As the DOB recognizes, this declaration was "made only in the context of certain claims of the patents that **explicitly** require framework amino acid substitutions," DOB [D.I. 96] at 17, n.11, a requirement absent from the asserted claims.   This declaration thus does not "directly address" the disputed limitation, *Aquatex,* 419 F.3d at 1381, because the DOB does not argue that "CDR" requires framework amino acid substitutions.   In addition, the specification specifically states that Rieichmann made amino acid

substitutions in the framework, not the CDR, '762 Patent, Col. 12:29-37 (Strong Decl. [D.I. 95] Ex. 12), and Dr. Queen explained in his declaration that (a) the method of Riechmann had worked for only one antibody, and (b) Riechmann did not set forth any rules or principles for making framework amino acid substitutions outside of the CDR.   DOB Ex. 7 ¶¶ 10 & 25-27. On that record, the isolated passage from ¶ 9 that the DOB invokes is not the manifest statement of clear disavowal that the law requires.   *E.g., NTP*, 418 F.2d at 1308-09.

The fact that PDL re-filed the entire declaration in the '761 and '762 prosecution histories, DOB [D.I. 96] at 18 ¶3, does not bootstrap the statements into a manifest statement of clear disavowal, and neither do the other two isolated passages, *id*. (citing DOB Ex. 12 & 15), that the DOB cites.   To the contrary, the prosecution history snippets that the DOB invokes are a good example of how a prosecution history can "often lack[] the clarity of the specification and thus is less useful for claim construction purposes."   *Phillips*, 415 F.3d at 1317.   As noted above, the precise definition in a specification trumps broad contradictory statements in the prosecution history.   *3M Innovative Properties,* 350 F.3d at 1373; *Storage Tech.,* 329 F.3d at 833.   The DOB's argument runs afoul of this principle.

### 5.    The DOB's "Person of Ordinary Skill" Argument Answers the Wrong Question and Looks To Inapposite Documents

The DOB's 'person of ordinary skill' argument – that, reading the patents, their file histories, and the European Proceedings, one of ordinary skill would conclude that in these patents "CDR" means 'Kabat + Chothia' – is untenable.   It relies principally on the European Proceedings, DOB [D.I. 96] at 19 ¶ 2 – 21 ¶ 2, which are legally and factually inapposite as just discussed.

It also relies on the declaration of Dr. Jefferson Foote.   DOB [D.I. 96] at 19 ¶ 1. But Dr. Foote's declaration does not assess the effect of – or even cite – the patent's specific definition of "CDR":   "In order that the invention may be more completely understood, several definitions are set forth. . . . [¶]   An immunoglobulin light or heavy chain variable region consists of a "framework" region interrupted by three hypervariable regions, also called CDR's. The extent of the framework region and CDR's **have been precisely defined** (see, 'Sequences of

Proteins of Immunological Interest,' E. **Kabat** et al., U.S. Department of Health and Human Services, (1983); which is incorporated herein by reference)."   '762 Patent, Col. 11:1-2 & 35-41 (Strong Decl. [D.I. 95] Ex. 12); *cf.* Foote Decl. [D.I. 103] ¶¶ 31-39 (failing to cite the patent's definition).

In addition, Dr. Foote's declaration answers the wrong question.   The correct question is, how would one of ordinary skill **at the time of the invention** have understood the disputed claim term?   *E.g.*, *Phillips*, 415 F.3d at 1303.   But Dr. Foote opines about how "the person of ordinary skill would understand the term" – not at the time of the invention, but now. Foote Decl. [D.I. 103] ¶ 31; *see also id.* ¶ 34 & 39 ("person of ordinary skill would understand"). His opinion is thus not entitled to weight.   The distinction is not merely academic, because according to defendant, the meaning of "CDR" may have changed over time.   Although in a World Intellectual Property Organization patent application filed in 2004, defendant stated that "CDRs are according to Kabat, et al.," Alexion's WIPO Patent WO/2004/108889 (Wu Suppl. Decl. Ex. 9), and it repeated this position in 2006 in a technical publication, Frederickson, et al., at n.18 [PDL-A 0246734] (defining "CDR" according to Kabat) (Supp. Wu Decl. Ex. 10), in 1994, defendant told the PTO that "[t]wo definitions of CDR location are **currently** in general use in the art.   These are the 'sequence variability' definition of Kabat et al. . . . and the 'structural variability' definition of Chothia . . . ."   Alexion's US Patent No. 6,355,245 (Supp. Wu Decl. Ex. 11) .   If the meaning of "CDR" has changed over time, it is all the more important that a declarant address the right question, which defendant's Dr. Foote failed to do.

Finally, the DOB relies on the declaration of Dr. Michael Clark.   But Dr. Clark invokes as the definition of "CDR" the passage that appears some twelve columns after the actual definition, in a passage that does not label his invoked passage as a definition.   Clark Decl. [D.I. 105] ¶ 30.   "[A] court should discount any expert testimony 'that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent.'"   *Phillips*, 415 F.3d at 1318 (citation omitted).

35

### D.    "Hypervariable Regions" is Not a Claim Term in Dispute

As noted above, the DOB asserts that the Court should construe the phrase "framework substitutions."   DOB [D.I. 96] at 4, ¶ 3 ("Two key limitations of the patents-in-suit, "CDR" and "framework substitutions" drive the primary dispute between PDL and Alexion . . . .").   The phrase "framework substitutions" does not appear in any asserted claim.   The DOB also asks that the Court construe the phrase "hypervariable regions."   That term is also absent from the asserted claims.   There is no need to construe it.   *See, e.g., Vivid Techs., Inc. v. American Science & Eng'g, Inc.,* 200 F.3d 795, 803 (Fed. Cir. 1999) ("only those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy.").

### E.    Defendant Has Waived Any Dispute Regarding "Is at least 65% [70%] Identical to the [Sequence of the] Donor Immunoglobulin Heavy [Light] Chain Variable Region Framework"

This disputed claim phrase appears in the asserted claims, but defendant did not brief it, and thus has waived argument on it.   One area of dispute before filing the opening briefs was whether the specified identity was on the basis of nucleotide comparisons or, as PDL argued, amino acid comparisons.   PDL's Opening Brief explained why the claims and specification, and the understanding of one of ordinary skill, made it clear that the amino acids were compared.   *See* PDL's Opening Brief [D.I. 93] § IV(D)(4).   To that evidence one can now add the prior sworn statements of defendant's declarant Dr. Jefferson Foote.   In his '557 patent, Dr. Foote explained (in a passage that refers to the '761 patent-in-suit) that "Queen teaches using human framework sequences closely homologous in linear peptide [i.e, amino acid] sequence to framework sequences of the mouse antibody to be humanized."   U.S. Patent No. 6,881,557 at Col. 4:17-20 (Supp. Wu Decl. Ex. 1).

### III.    CONCLUSION

The path to the correct claim construction is clear in this case.   The specification defines most of the claims in dispute.   Where it does not, the claims, specification, and file history make the meaning readily apparent.   The asserted claims do not require framework substitutions.   The boundaries of a CDR are determined by the Kabat methodology. "Synthesizing" does not mean producing "*de novo*."   The re-write of the claims that the DOB

36

seeks to achieve simply is not sustainable.

PDL respectfully asks that the Court confirm its claim constructions.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Karen Jacobs Louden*
_____
Jack B. Blumenfeld (ID # 1014)
Karen Jacobs Louden (ID # 2881)
1201 North Market Street
P.O. Box 1347
Wilmington, DE   19899-1347
(302) 658-9200
klouden@mnat.com

*Attorneys for Plaintiff PDL BioPharma, Inc.*

*Of Counsel:*

Matthew D. Powers
Vernon M. Winters
Paula B. Whitten
Weil, Gotshal & Manges LLP
Silicon Valley Office
201 Redwood Shores Parkway
Redwood Shores, CA 94065
650-802-3000

Jennifer H. Wu
Rebecca E. Fett
Weil, Gotshal & Manges LLP
New York Office
767 Fifth Avenue
New York, NY 10153
(212)310-8000

June 11, 2008
2362319

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on June 13, 2008, I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

Josy W. Ingersoll

I also certify that copies were caused to be served on June 13, 2008, upon the following in the manner indicated:

### BY HAND

Josy W. Ingersoll
Andrew A. Lundgren
Young, Conaway, Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Flr.
Wilmington, DE   19801

### BY EMAIL

Gerald J. Flattmann, Jr.
Christine Willgoos
Gregory A. Morris
Kirkland & Ellis
153 East 53rd Street
New York, NY   10022-4611


/s/  Karen Jacobs Louden
_____
Karen Jacobs Louden